## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| KIOR, INC.,[1] | § | |
| | § | Case No. 14-_____ (___) |
| | § | |
| | § | |
| Debtor. | § | |

------------------------------------------------------------

## DECLARATION OF CHRISTOPHER A. ARTZER IN SUPPORT
## OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Christopher A. Artzer, under 28 U.S.C. § 1764, declares as follows under the penalty of perjury:

I am the President and Interim Chief Financial Officer of the debtor, KiOR, Inc., a corporation organized under the laws of the state of Delaware ("KiOR" or the "Debtor"). In this capacity, I am responsible for overseeing the day-to-day operations and financial activities of KiOR, and also responsible for overseeing the day-to-day operations and financial activities of the Debtor's wholly-owned, non-debtor subsidiary, KiOR Columbus, LLC, a limited liability company organized under the laws of the state of Delaware ("KiOR Columbus," and together with the Debtor, when applicable, the "KiOR Entities"). In these capacities, my responsibilities include, but are not limited to, monitoring cash flow, business relationships, workforce issues, tax and financial and strategic planning. As a result of my tenure with KiOR, my review of public and non-public documents, and my discussions with other members of KiOR's management team, I am generally familiar with KiOR's business, financial condition, policies and procedures, day-to-day operations, and books and records.

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is KiOR, Inc. (2233). The above-captioned Debtor's mailing address is 13011 Bay Park Road, Pasadena, Texas 77507.

I am authorized to submit this declaration (the "Declaration") in support of the Debtor's chapter 11 petition and the First Day Motions (defined herein). Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge or knowledge of such matters I have gained from the Debtor's employees or retained advisers that report to me in the ordinary course of my responsibilities, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs including the business records of the Debtor. References to the Bankruptcy Code (as hereafter defined), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If I were called upon to testify, I would testify competently to the facts set forth herein.

Part I of this Declaration provides an overview of the Debtor's business, organizational structure, capital structure, and significant prepetition indebtedness, as well as a discussion of the Debtor's financial performance and the events leading to the Debtor's chapter 11 filing. Part II sets forth the relevant facts in support of the First Day Motions.

## PART I: BACKGROUND

On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

The Debtor has continued in possession of its properties and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in this case.

## A.    General Background and Events Leading Up to the Chapter 11 Case

The Debtor and KiOR Columbus are development stage, renewable fuels companies based in Pasadena, Texas and Columbus, Mississippi, respectively.  The Debtor was founded in 2007 as a joint venture between Khosla Ventures, LLC and BIOeCon B.V.  KiOR Columbus was formed as a wholly-owned subsidiary of the Debtor on October 6, 2010, in connection with the acquisition of property and the construction of a manufacturing facility in Columbus, Mississippi.  The Debtor's primary business is the development and commercialization of a ground-breaking proprietary technology designed to generate a renewable crude oil from non-food cellulosic biomass (*e.g.*, trees, grasses, etc.), which can be refined into gasoline, diesel, and aviation fuels.  The fuels produced by the Debtor's highly specialized process are true hydrocarbon fuels that are molecularly consistent with their traditional petroleum-based counterparts.  However, the Debtor estimates that its cellulosic hydrocarbon fuels reduce lifecycle greenhouse gases by over 60% when compared to traditional fossil fuels.

The Debtor maintains corporate offices, research and development facilities and a test-scale demonstration facility in Pasadena, Texas.  Currently, the Debtor employs approximately 71 people.  In mid-2012, the KiOR Entities completed construction of an initial-scale production facility with a design capacity for approximately 500 bone dry tons of biomass feedstock per day in Columbus, Mississippi (the "Columbus Facility").  When the Columbus Facility opened in 2012, it was the first large-scale plant in the U.S. to convert cellulosic non-food biomass into hydrocarbon gasoline and diesel. KiOR Columbus operated the Columbus Facility during 2013, producing and selling cellulosic fuels that met certain contractual specifications.  However, KiOR Columbus encountered certain challenges at the Columbus Facility, including operational, production, and capacity issues as well as difficulties related to optimizing catalyst performance. In January 2014, KiOR Columbus suspended operations at the Columbus Facility, and has since

3

idled and decommissioned the Columbus Facility, to minimize ongoing costs. The Debtor continues, however, to maintain its research and development facilities, as well as a test scale demonstration facility, in Pasadena, Texas, and also continues to provide certain shared services such as accounting, legal and human resources and other management to KiOR Columbus.

As of June 30, 2014, on a consolidated basis the KiOR Entities reported assets of $58,274,000 and liabilities of $261,313,000. A substantial portion of the book value of the KiOR Entities' assets relate to the Columbus Facility, and approximately $70 million of the total indebtedness is the primary obligation of KiOR Columbus. The Debtor's primary assets consist of machinery, equipment and intellectual property, as well as its equity interest in KiOR Columbus.

The Debtor's liabilities consist primarily of several tranches of long-term secured debt held by affiliates of Alberta Investment Management Corp. ("AIMCO"), the KFT Trust, Vinod Khosla, Trustee (the "Trust"), VNK Management LLC ("VNK"), and Khosla Ventures III, LP ("KV III" and together with the Trust, VNK, the "Senior Lender Parties").[2]  In addition, the Debtor is obligated under an unsecured guaranty of debt of KiOR Columbus incurred to the Mississippi Development Authority ("MDA") in connection with the construction of the Columbus Facility.[3]

As of the Petition Date, the Debtor owes approximately $77,000,000 in principal and interest to AIMCO and approximately $159,000,000 in principal and interest to the Senior

---

[2]    The Senior Lender Parties are owned or controlled by Vinod Khosla.

[3]    As of June 30, 2014, KiOR Columbus owed MDA approximately $69,375,000, pursuant to a Loan Agreement and certain security agreements, which provided a portion of the financing for development and construction of the Columbus Facility. The MDA asserts senior liens and security interests on the land and certain equipment at the Columbus Facility. The Prepetition Secured Agents (as defined below) assert that they hold first and second liens and security interests on certain personal property of KiOR Columbus, i.e., all property not subject to the liens of MDA which holds a first lien on most of the land and certain personal property of KiOR Columbus.

4

Lender Parties. The Senior Lender Parties have liens and security interests on all of the Debtor's assets. The Debtor also has aggregate unsecured trade debt of approximately $3,300,000.

Prepetition, the Debtor faced challenges in commercializing its technology and scaling its production to the volumes necessary to meet its targets. At present, due to the idling of the Columbus Facility, the KiOR Entities generate no revenues, but continue to incur the ongoing costs related to their operations, including continued work on optimization of their technology, the cost of ongoing research and development, payment of obligations owed to employees, vendors, and governmental authorities, and substantial debt.

Most recently, the operations of the Debtor and KiOR Columbus have been funded by the Senior Lender Parties. Since 2013 the Senior Lender Parties, and since April 2014 the Trust, have financed the KiOR Entities' continued operations, the idling of the Columbus Facility (including comprehensive decommissioning and clean-out of equipment and tankage at that site), and a robust sale, marketing, and potential reorganization process for the KiOR Entities conducted by Guggenheim Securities, LLC ("Guggenheim").

The Debtor and KiOR Columbus have, beginning in 2013 and continuing into 2014, evaluated a number of options to respond to their operational and liquidity issues. To this end, the Debtor engaged multiple professionals to assist in developing a business strategy and potential sale of some or all assets of either entity and/or investment process. In late May 2014, the Debtor retained Guggenheim to evaluate and assist the Debtor in identifying and implementing various strategic options, including but not limited to, the raising of additional capital, a sale of some or all assets and/or a restructuring transaction. Guggenheim has spent considerable time and resources evaluating and analyzing the Debtor's operations and capital

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

structure, as well as those of KiOR Columbus, and has made such information available to third parties on a confidential basis.

The KiOR Entities, with support from Guggenheim, embarked on a fulsome marketing process designed to elicit from third parties expressions of interest in all, or portions, of the KiOR Entities' business and assets. Specifically, since July 2014 Guggenheim has executed this process by contacting over 165 potentially interested parties, holding introductory conversations, and distributing marketing materials. Over twenty parties expressed interest and executed non-disclosure agreements. These parties were granted access to an electronic data room and provided a detailed confidential information memorandum describing the Debtor and KiOR Columbus, their operations, and opportunities. Guggenheim has continued to facilitate the due diligence process throughout October, hosting numerous telephonic discussions between interested parties and management as well as over ten in person site visits and management presentations. As of the Petition Date, although several of these entities have expressed continuing interest in pursuing a transaction involving all, or a portion of, the assets of one or both of the Debtor or KiOR Columbus, no entities other than the Senior Lender Parties and Pasadena Investments, LLC (collectively, the "Stalking Horse Bidder") have provided a firm bid for any of the Debtor's assets or been willing to fund the continuing costs of operating the Debtor's business and restructuring process. The Debtor intends to continue the marketing process through this case related to its proposed auction process.

While the Guggenheim marketing process was taking place, and in the absence of any other firm offers for the Debtor's assets, the Debtor and the Stalking Horse Bidder have engaged in arm's length, good faith negotiations regarding the formulation of a consensual chapter 11 plan and a comprehensive resolution of all claims and disputes between them on the terms and

6

conditions set forth in a plan term sheet (the "Plan Term Sheet"), which is part of Exhibit 1 to the proposed *Order (A) Authorizing and Approving Bid Procedures to be Employed in Connection with the Potential Sale of Substantially All of the Assets of KiOR, Inc.; (B) Authorizing KiOR, Inc. to Assume the Plan Support Agreement; (C) Scheduling an Auction and Sale Hearing; (D) Approving the Manner and Form of Notice of the Auction and the Sale Hearing; and (E) Granting Related Relief* (the "Bid Procedures Order").

If the Debtor's concurrent efforts to market a disposition of its assets through a section 363 sale are not successful, then the Stalking Horse Bidder has agreed to convert $16,000,000 of the senior secured debt to new equity interests in the reorganized Debtor, subject to the confirmation requirements under section 1129 of the Bankruptcy Code (all old equity interests in the Debtor will be cancelled without any distribution or retention of property on account thereof).

The Debtor seeks relief in this Court to protect, preserve, and maximize the value of its assets and to obtain, through a DIP loan facility, the funds needed for working capital requirements and to further develop its proprietary renewable fuels production process, as well as provide for a sale or reorganization that will optimize the value of the assets for all creditors. The Plan Term Sheet describes a reorganization of the Debtor, subject to higher and better offers under the concurrent section 363 sale process, both of which are being "backstopped" by the Stalking Horse Bidder. The sale and plan processes will enable Guggenheim to continue its marketing process while at the same time assuring that the Debtor's promising technology, jobs, operations, and creditor distribution are preserved through the plan process if there are no higher acceptable bids. Put simply, through this chapter 11 case, the Debtor intends to reorganize its

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

business or sell substantially all of its assets so that it can continue its core research and development activities.

**B.       Corporate Structure and Capital Structure**

The Debtor's corporate offices, research and development facilities, as well as its test-scale demonstration facility, are maintained in Pasadena, Texas. The Debtor is a publicly-owned company with two classes of common stock, the majority of which is owned by the Senior Lender Parties. The Debtor is currently party to the following credit facilities:

First Lien Prepetition Secured Debt. Pursuant to that certain Protective Advance Loan and Security Agreement, dated as of July 17, 2014 (as amended, restated, or otherwise modified from time to time prior to the Petition Date, the "Prepetition First Lien Loan Agreement" and collectively with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Loan Documents"), by and among the Debtor, the lenders party thereto (collectively, the "Prepetition First Lien Lenders"), and the Trust, as administrative agent for the Prepetition First Lien Lenders (in such capacity, the "Prepetition First Lien Secured Agent" and, together with the Prepetition First Lien Lenders and any other party to which Prepetition First Lien Obligations (as defined below) are owed, the "Prepetition First Lien Secured Parties"), the Prepetition First Lien Secured Parties agreed to extend loans and other financial accommodations to the Debtor pursuant to the Prepetition First Lien Loan Agreement. All obligations of the Debtor arising under the Prepetition First Lien Loan Agreement (including, without limitation, the "Secured Obligations" as defined therein) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "Prepetition First Lien Obligations." As of the

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

Petition Date, approximately $16,273,500 in principal is due and owing under the Prepetition First Lien Obligations.

2013 Second Lien Prepetition Secured Debt.    Pursuant to that certain Senior Secured Convertible Note Purchase Agreement, dated as of October 18, 2013 (as amended, restated, or otherwise modified from time to time prior to the Petition Date, the "2013 Second Lien Purchase Agreement" and collectively with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Transaction Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "2013 Second Lien Note Documents"), by and among the Debtor, the note purchasers party thereto (collectively, the "2013 Second Lien Lenders"), and KV III, as administrative agent for the 2013 Second Lien Lenders (in such capacity, the "2013 Second Lien Agent" and, together with the 2013 Second Lien Lenders and any other party to which 2013 Second Lien Obligations (as defined below) are owed, the "2013 Second Lien Secured Parties"), the 2013 Second Lien Secured Parties agreed to purchase notes and extend other financial accommodations pursuant to the 2013 Second Lien Purchase Agreement.    All obligations of the Debtor arising under the 2013 Second Lien Purchase Agreement (including, without limitation, the "Secured Obligations" as defined therein) or the other 2013 Second Lien Note Documents shall collectively be referred to herein as the "2013 Second Lien Obligations."    As of the Petition Date, approximately $95,700,000 in principal is due and owing under the 2013 Second Lien Obligations.

2014 Second Lien Prepetition Secured Debt.    Pursuant to that certain Senior Secured Promissory Note and Warrant Purchase Agreement, dated as of March 31, 2014 (as amended, restated, or otherwise modified from time to time prior to the Petition Date, the "2014 Second Lien Purchase Agreement" and collectively with any other agreements and documents executed

9

or delivered in connection therewith, including, without limitation, the "Transaction Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "2014 Second Lien Note Documents") (collectively, the Prepetition First Lien Loan Documents, the 2013 Second Lien Note Documents, and the 2014 Second Lien Note Documents are referred to as the "Prepetition Loan Documents"), by and among the Debtor, the note purchasers party thereto (collectively, the "2014 Second Lien Lenders" and together with the Prepetition First Lien Lenders and 2013 Second Lien Lenders, the "Prepetition Secured Lenders"), and the Trust, as administrative agent for the 2014 Second Lien Lenders (in such capacity, the "2014 Second Lien Agent" and, together with the 2014 Second Lien Lenders and any other party to which 2014 Second Lien Obligations (as defined below) are owed, the "2014 Second Lien Secured Parties") (collectively, the Prepetition First Lien Secured Parties, the 2013 Second Lien Secured Parties, and the 2014 Second Lien Secured Parties are referred to as the "Prepetition Secured Parties"), the 2014 Second Lien Secured Parties agreed to purchase notes and extend other financial accommodations pursuant to the 2014 Second Lien Purchase Agreement. As of the Petition Date, approximately $10,400,000 in principal is due and owing under the 2014 Second Lien Note Documents. All obligations of the Debtor arising under the 2014 Second Lien Purchase Agreement (including, without limitation, the "Secured Obligations" as defined therein) or the other 2014 Second Lien Note Documents shall collectively be referred to herein as the "2014 Second Lien Obligations" (together with the 2013 Second Lien Obligations, the "Prepetition Second Lien Obligations" and collectively with the Prepetition First Lien Obligations and the 2013 Second Lien Obligations, the "Prepetition Secured Obligations").

Third Lien Prepetition Debt. Pursuant to that certain Loan and Security Agreement, dated as of January 26, 2012 (as amended, restated, or otherwise modified from time to time

10

prior to the Petition Date, the "Prepetition Third Lien Loan Agreement" and collectively with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Third Lien Loan Documents"), by and among the Debtor, the lenders party thereto (collectively, the "Prepetition Third Lien Lenders"), and 1538731 Alberta Ltd, as administrative agent for the Prepetition Third Lien Lenders (in such capacity, the "Prepetition Third Lien Agent" and, together with the Prepetition Third Lien Lenders and any other party to which Prepetition Third Lien Obligations (as defined below) are owed, the "Prepetition Third Lien Parties"), the Prepetition Third Lien Parties agreed to extend loans and other financial accommodations pursuant to the Prepetition Third Lien Loan Agreement.  All obligations of the Debtor arising under the Prepetition Third Lien Loan Agreement (including, without limitation, the "Secured Obligations" as defined therein) or the other Prepetition Third Lien Loan Documents shall collectively be referred to herein as the "Prepetition Third Lien Obligations."  As of the Petition Date, there is approximately $115,000,000 in principal and interest due and owing under the Prepetition Third Lien Obligations.

Prepetition Liens and Prepetition Collateral.  Pursuant to certain Prepetition Loan Documents (as such documents were amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date, the "Prepetition Collateral Documents"), by and among the Debtor and one or more of the Prepetition First Lien Secured Agent, the 2013 Second Lien Agent, and the 2014 Second Lien Agent (collectively, the "Prepetition Secured Agents"), the Debtor granted to the applicable Prepetition Secured Agent, for the benefit of itself and the applicable Prepetition Secured Lenders, to secure the applicable Prepetition Secured Obligations,

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

a first priority security interest (with respect to the Prepetition First Lien Obligations) or second priority security interest (with respect to the Prepetition Second Lien Obligations) in and continuing lien (the "Prepetition Liens") on substantially all of the Debtor's assets and properties (which, for the avoidance of doubt, includes Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising.  All "Collateral" as defined in the Prepetition First Lien Loan Agreement granted or pledged pursuant to any Prepetition Collateral Document or any other Prepetition Loan Document shall collectively be referred to herein as the "Prepetition Collateral."[4]  As of the Petition Date, (I) the Prepetition Liens (a) are legal, valid, binding, enforceable, and perfected liens, (b) were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code or any applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below), (C) the Adequate Protection Replacement Liens (as defined below), and (D) the Prepetition Prior Liens; and (II) (x) the Prepetition Secured Obligations constitute legal, valid, and binding obligations of the Debtor, enforceable in accordance with the terms of the applicable Prepetition Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (y) no setoffs, recoupments, offsets, objections, defenses, or counterclaims to any of the Prepetition Secured Obligations exist, and (z) no portion of the Prepetition Secured Obligations or any payments made to any or all of the Prepetition Secured

---

[4]    In addition to their perfected liens on the Prepetition Collateral that belongs to the Debtor, the Prepetition Secured Agents, for the benefit of themselves and the applicable Prepetition Secured Lenders, assert that they hold first and second liens and security interests on certain personal property of KiOR Columbus, *i.e.,* all property not subject to the liens of MDA which holds a first lien on most of the land and certain personal property of KiOR Columbus

Parties are subject to avoidance, disallowance, impairment, recharacterization, recovery, disgorgement, subordination, attack, setoff, offset, recoupment, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or any applicable non-bankruptcy law.

Amounts Owed under Prepetition Loan Documents. As of the Petition Date, the Debtor owed the Prepetition Secured Parties, pursuant to the Prepetition Loan Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of loans made by the Prepetition Secured Parties, (a) protective advances in the amount of not less than $16,273,500 pursuant to the Prepetition First Lien Loan Documents, (b) notes in the principal amount of not less than $95,700,000 pursuant to the 2013 Second Lien Loan Documents, and (c) notes in the principal amount of not less than $10,400,000 pursuant to the 2014 Second Lien Loan Documents, in each case *plus* all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including, without limitation, any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents), and other amounts now or hereafter due under the Prepetition Loan Documents.

C.    **The DIP Financing, Negotiation of Asset Purchase Agreement and Plan Support Agreement, and the Proposed Restructuring Timeline**

This chapter 11 case is predicated on the sale of substantially all the Debtor's assets through either a section 363 sale to a third party bidder, or through a plan of reorganization with the Stalking Horse Bidder subject to higher and better offers. To assist in funding this process, the Debtor engaged in vigorous, arm's-length negotiations with Pasadena Investments, LLC ("PI LLC"), on the terms of the *Senior Secured and Superpriority Financing Agreement*, dated as of November 9, 2014 (the "DIP Credit Agreement"), by and among the Debtor and PI LLC, as

administrative agent for the lenders from time to time party thereto (the "DIP Lenders"), which I

believe is appropriately sized to meet the Debtor's financing needs during this case.

As described above and in greater detail in the *Motion for an Order (A) Authorizing and Approving Bid Procedures to be Employed in Connection with the Potential Sale of Substantially all of the Assets of the Debtor; (b) Authorizing the Debtor to Assume the Plan Support Agreement; (c) Scheduling an Auction and Sale Hearing; (d) Approving the Manner and Form of Notice of the Auction and Sale Hearing; and (e) Granting Related Relief* (the "Sale Motion"), the

Debtor determined, upon consultation with Guggenheim and its other professional advisors, that

the best offer received by the Debtor to date for a transaction relating to assets is the offer

received from the Stalking Horse Bidder.  The Sale Motion proposes the following timeline:

| Event | Deadline |
|---|---|
| Bid Procedures Hearing | December 1, 2014[5] |
| Bid Deadline | December 15, 2014 |
| Auction | December 17, 2014 |
| Sale Hearing (Cash Buyer) | December 22, 2014[6] |
| Closing of Cash Sale | January 15, 2015 |
| Confirmation of Plan (Stalking Horse Buyer) | February 12, 2015 |
| Effective Date of Plan | February 27, 2015 |

The proposed bid procedures, including the proposed timeline, are designed to maximize

the value received for the Debtor's assets and to facilitate a fair and open process in which all

interested bidders may participate.  Given the Debtor's prepetition marketing efforts, the Debtor

believes that the proposed timeline is more than sufficient to complete a fair and open sale

process that will maximize the value received for the assets.  The proposed timeline will provide

the Debtor and Guggenheim sufficient time to solicit (and/or re-solicit) prospective purchasers in

advance of the proposed bid deadline, while respecting the necessity to consummate a sale as

---

[5] The failure to meet the December 1, 2014 deadline shall constitute a Default and shall mature into an Event of Default if such Milestone is not met by December 5, 2014.

[6] The failure to meet the December 22, 2014 deadline shall constitute a Default and shall mature into an Event of Default if such Milestone is not met by December 30, 2014.

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

quickly as possible to maximize the value received for the Debtor's Assets.

In the event there are no competing higher and better offers to purchase the Debtor's assets, a comprehensive restructuring will be effectuated through a plan of reorganization subject to the terms and conditions of the Plan Term Sheet, the Plan Support Agreement (the "PSA"), and the applicable confirmation requirements under section 1129 of the Bankruptcy Code.

## PART II: THE FIRST DAY MOTIONS

Contemporaneously with the filing of the bankruptcy petition, the Debtor filed the motions and applications listed on Exhibit A (collectively, the "First Day Motions"). I submit this declaration in support of the First Day Motions (recognizing that only a portion of such motions may be heard immediately). I have reviewed each of the First Day Motions, Proposed Orders and exhibits thereto (or have otherwise had their contents explained to me) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

As a result of my first-hand experience, and through my review of various materials and other information, discussions with other of the Debtor's executives, and discussions with outside advisors, I have formed opinions as to: (a) the necessity of obtaining the relief sought in the First Day Motions; (b) the importance of the relief sought in the First Day Motions for the Debtor to continue to operate effectively; and (c) the negative impacts upon the Debtor of not obtaining the relief sought in the First Day Motions.

As described more fully below, the relief sought in the First Day Motions will minimize the adverse effects of the Chapter 11 Case on the Debtor and ensure that the Debtor's reorganization efforts proceed as efficiently as possible and result in maximum recovery for creditors, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate as debtor-in-possession.

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

A.    **Retention Applications**

The Debtor filed an application (the "Section 156(c) Application") contemporaneously herewith to retain Epiq Bankruptcy Solutions ("Epiq"), as claims, noticing, soliciting, and balloting agent pursuant to Sections 105(a), 156(c), and rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"). Epiq is one of the country's leading chapter 11 administrators, with significant experience in noticing, claims administration, solicitation, balloting, and other administrative aspects of chapter 11 cases. Appointing Epiq as the claims and noticing agent in the Chapter 11 Case will relieve the administrative burden on the Clerk of the Bankruptcy Court for the District of Delaware (the "Clerk").

The Debtor's selection of Epiq to act as the claims and noticing agent has complied with the Court's Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtor has obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process. Moreover, the Debtor submits, based on all engagement proposals obtained and reviewed, that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise. The Section 156(c) Application pertains only to the work to be performed by Epiq under the Clerk's delegation of duties permitted by Judicial Code Section 156(c) and Local Rule 2002-1(f), and any work to be performed by Epiq outside of this scope is not covered by the Section 156(c) Application or by any order granting approval thereof. A separate retention application addressing Epiq's services beyond Section 156(c) of the Bankruptcy Code will be filed shortly.

The Debtor also anticipates that it will request permission to retain the following professionals: (a) King & Spalding, as restructuring counsel; (b) Richards Layton & Finger, as

16

Delaware restructuring counsel; (c) Guggenheim Securities, LLC as investment banker; and (d) Alvarez & Marsal as financial advisor.  I believe that the above professionals are well qualified to perform the services contemplated by their various retention applications, the services are necessary for the success of the Chapter 11 Case, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtor may find it necessary to seek retention of additional professionals as the Chapter 11 Case progresses.

## B.    Cash Management Motion

The Debtor has also filed a motion (the "Cash Management Motion") seeking approval to continue its present cash management system and a waiver of certain requirements related to investment procedures.  In particular, the Debtor uses a cash management system (the "Cash Management System") in the ordinary course of business which permits the efficient collection, investment and application of funds.  The Debtor maintains four (4) bank accounts with SVB Financial Group ("SVB").  A list of the Debtor's current bank and investment accounts is attached as Exhibit A to the Cash Management Motion.  The Debtor's existing accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtor and all parties in interest.

The Debtor's Cash Management System is managed by the financial personnel at the Debtor's headquarters in Pasadena, Texas, and can be summarized as follows:

   a.  The Debtor has one (1) operating account (******9708) with SVB (the "Operating Account") which the Debtor uses to process the majority of its day-to-day cash needs. Disbursements can be sent via check[7], ACH[8] or wire[9] depending on the preference of the intended recipient.

---

[7]    Check payments are processed by the Debtor's Accounts Payable group via SAP (the Debtor's accounting software).

[8]    ACH payments are processed via CORE FTP, a third party software solution.

[9]    Wire payments are processed via the SVB web portal.

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

b.  The Debtor also maintains a segregated bank account (******6904) with SVB (the "FSA Account") which holds funds that employees have requested be deducted from their pay checks (pre-tax) to be deposited into their Flexible Spending Account ("FSA"). All funds in the FSA Account are maintained by the Debtor for the benefit of the Debtor's employees. On a monthly basis, Beneflex[10] sweeps the balance of the account from the FSA account and deposits the funds in each respective Employee's FSA.

c.  Furthermore, the Debtor maintains a segregated bank account (******0787) with SVB (the "ESPP Account") which holds funds employees have requested be deducted from their pay checks to be used to purchase equity in the Debtor.

d.  Additionally, the Debtor maintains one (1) collateral account (******6685) with SVB (the "Collateral Account"). The Collateral Account serves as collateral on account of credit cards used by the Debtor's employees for travel and other business expenses.

The Debtor's cash management system allows the Debtor to efficiently (a) identify the Debtor's cash requirements, (b) transfer cash as needed to respond to these requirements, (c) track all intercompany transfers; (d) forecast cash needs; (e) and maintain accounting records. In the ordinary course of business, the Debtor accurately records such collections, transfers, and disbursements as they are made.

In my opinion, compliance with the guidelines established by the Office of the U.S. Trustee for the District of Delaware has established guidelines (the "Guidelines") to supervise the administration of Chapter 11 cases and prevent post-petition payments for pre-petition claims would create substantial and unnecessary administrative burdens. Requiring the Debtor to open new bank accounts and alter its cash management system would impose unnecessary expense, confusion, and diversion of scarce time and personnel, and would hinder the efficient use of the Debtor's resources at the critical first days of this case. On the other hand, permitting the Debtor to maintain its existing bank accounts and existing cash management system (or to make only

---

[10]  Beneflex is a third party benefits administrator contracted by the Debtor to administer the FSA program.

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtor's operations and will not prejudice any party in interest.

The Debtor's existing procedures, along with additional safeguards proposed in the Cash Management Motion, adequately address the concerns that underlie the Guidelines. The Debtor has in place sophisticated, computerized record keeping systems and will be able to ensure that all pre-petition and post-petition transactions are properly accounted for and can easily be distinguished. The Debtor will continue to maintain complete and accurate records of all transfers of funds in and out of the Debtor's bank accounts.

In addition to the protections inherent in the Debtor's existing procedures, the Debtor proposes to provide additional safeguards. First, to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and to prevent the inadvertent post-petition payment of pre-petition claims, the Debtor will establish a 100 number break in the sequence of its checks to clearly designate pre-petition from post-petition transactions. Second, the Debtor has retained professional financial and legal advisors who will work with the Debtor to ensure that pre- and post-petition obligations are properly demarcated. Third, the Debtor will freeze any intercompany accounts between the Debtor and any non-debtor affiliates.[11]

Based on the foregoing, I believe that the following specific relief is appropriate with respect to their books and records, cash management system, and business forms:

    a. a waiver of the requirement that the Debtor's pre-petition bank accounts be closed and new post-petition bank accounts be opened;

    b. approval to maintain and continue to use without change in account style its existing bank accounts;

---

[11] The Debtor has submitted motions with respect to the payment of certain pre-petition obligations, including payment of pre-petition employee salaries and wages. The Debtor submits that no such pre-petition obligations will be paid or honored by its existing banks by virtue of the Cash Management Motion except as specifically authorized by this Court.

19

c.  approval to maintain and continue to use its existing cash management system;

d.  approval to use, in their present form, existing checks and other business forms related to the Debtor's bank accounts; *provided, however*, that upon depletion of the Debtor's current supply of such checks and forms, the Debtor will have the debtor in possession nomenclature added to such checks and forms;

e.  approval to use the Debtor's existing books and records with appropriate notations to reflect the filing of the Chapter 11 petition; and

f.  entry of an order authorizing the banks at which the Debtor has bank accounts to maintain and administer the Debtor's bank accounts in accordance with the contracts entered into between the Debtor and such banks before the filing of the Debtor's Chapter 11 petition and otherwise in accordance with past practice, and enjoining such banks from freezing or otherwise impeding the Debtor's bank accounts; *provided, however*, that such banks shall not honor any checks issued on such bank accounts on a date prior to the commencement of this Chapter 11 case and presented for payment to the banks post-petition unless otherwise authorized to do so by order of this Court (such as the authority to pay all pre-petition employee obligations).

The Debtor's existing investment procedures are designed to protect the principal invested while maximizing liquidity and, therefore, I believe that sufficient cause exists to waive the investment requirements of Bankruptcy Code section 345(b) to allow the Debtor to continue its existing cash procedures.  I believe that the deposits at issue are safe because of the relative strength of the bank(s) where the Debtor's pre-petition accounts are maintained.  Requiring the Debtor to open multiple accounts at different banks so that the deposits in each bank would be insured by the FDIC would be unnecessarily burdensome and would lead to the same delays and disruption to the Debtor's business that the Cash Management Motion seeks to avoid.

The Debtor's Bank Accounts are with banking institutions that have standing collateral agreements with the Office of the United States Trustee and/or are covered by FDIC insurance and contain amounts which are within the limits of such insurance.  Accordingly, the Debtor's Bank Accounts are in compliance with the requirements under section 345(b) of the Bankruptcy

Code. Accordingly, the Debtor believes that a waiver of section 345(b) of the Bankruptcy Code is appropriate. Consistent with local practice, the Debtor is seeking a waiver, on an interim basis, of thirty (30) days from the Petition Date (the "Extension Period") within which to make appropriate arrangements with the United States Trustee. Such waiver shall be without prejudice to the Debtor's rights to seek a further extension of the Extension Period.

In sum, I believe that the continued operation of the Debtor's Cash Management System is in the best interests of the Debtor's estate and creditors, will avoid immediate and irreparable harm to the Debtor, and is both necessary and appropriate to further the reorganization policy of Chapter 11.

## C.    Employee Obligations Motion

The Debtor has also filed a motion (the "Employee Obligations Motion") seeking to pay employee obligations and continue certain employee programs. As of the Petition Date, the Debtor has approximately 71 employees, of which approximately 46 are exempt employees. None of the Debtor's employees are members in a labor union. Currently, 55 of the Debtor's Pasadena employees support the Debtor's research, development and technology programs. This includes exempt personnel holding science or engineering degrees (9 PhDs, 3 Master's degrees, and 16 Bachelor's degrees), as well as 22 hourly operators, lab analysts, and analyzer technicians possessing skills and expertise specific to operating test apparatuses utilized by the Debtor for research and development purposes. Eleven of the 22 hourly employees hold a Bachelor's degree. Most of these employees have been with the company for over one year, and therefore have significant experience with and understanding of KiOR technologies and research objectives.

As described more fully in the Employee Obligations Motion, in the ordinary course of business the Debtor has incurred certain pre-petition employee obligations that remain unpaid as

21

of the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "Employee Obligations") will become due and payable in the ordinary course of the Debtor's business on and after the Petition Date. These obligations can generally be categorized as follows: (a) wages, salaries, and other compensation; (b) payroll taxes; (c) vacation, sick, and holiday programs; (d) qualified 401(k) plan obligations; (e) health and welfare benefits and (f) miscellaneous other benefits provided to the employees in the ordinary course of business. The Debtor's obligations, exclusive of KiOR Columbus, are described as follows:

a.  *Wages, salaries, and other compensation*

Wages, salaries, and other compensation consist of pre-petition wages, salaries and equity incentives owed to the Debtor's employees[12] (the "Payroll Obligations"). All exempt employees are paid semi-monthly, while all non-exempt employees are paid bi-weekly. The Debtor's average monthly gross Payroll Obligation over the past six months is approximately $1,000,000.[13] This gross amount includes certain deductions described separately below, such as payroll taxes, FICA and 401(k) contributions. As of the Petition Date, some Payroll Obligations were unpaid because (a) they constitute wages and salaries earned but unpaid as of the Petition Date, or (b) certain paychecks issued pre-petition remained uncashed on the Petition Date. The Debtor estimates that the gross amount of the Payroll Obligations owed as of the Petition Date is approximately $80,000.

The Debtor has contracted Paylocity to process the payment of all wages, salaries, employment taxes and garnishments. Paylocity sweeps the gross payroll amount from the Debtor's operating bank account one to two days after the close of a given payroll period[14] and distributes the funds to employees one to two days after the sweep occurs.

The Debtor also has approximately 32 contracted service professionals each of which is paid per the terms of their respective negotiated contracts with the Debtor (the "Contractor Obligations"). The Debtor's average monthly Contractor Obligation over the last six months is approximately $305,000. As of the Petition Date, some

---

[12]  As described more fully below, the Debtor also owes contract/temporary employees for services earned and not yet paid as of the Petition Date.

[13]  The Debtor's monthly payroll has decreased over the past few payroll periods due to terminations executed by the Debtor as well as resignations of Employees.

[14]  Paylocity automatically sweeps funds from the Debtor's operating account.

Contractor Obligations were unpaid because they represent services earned but unpaid as of the Petition Date. The Debtor estimates that the total amount of the Contractor Obligations owed as of the Petition Date for the month of November is approximately $40,000.

Additionally, the Debtor offered certain current and former employees grants in the form of stock options and/or restricted stock ("Stock") which are distributed to relevant employees based on the terms of their incentive agreement (the "Equity Obligations").[15] As of the Petition Date, the Debtor had approximately 11,300,000 shares of Stock which are either unvested or have not been exercised by the current or former employees.

b. *Payroll taxes*

The Debtor's payroll taxes consist of federal, state, and local income taxes, Social Security, and Medicare taxes (the "Payroll Taxes"). The Payroll Taxes include the amounts owed by employees that the Debtor withhold from the gross amount of employees' wages or salary as well as the amounts separately owed by the Debtor. The Debtor's average monthly Payroll Taxes over the last six months is approximately $300,000. As of the Petition Date, the Debtor estimates that it owes approximately $30,000 in pre-petition Payroll Taxes.

c. *Vacation, sick, and holiday programs.* These programs consist of time off for vacation, illness and holidays ("PTO"). The Debtor recognizes nine company holidays per year, including New Year's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving, the day after Thanksgiving, Christmas Eve and Christmas Day. Additionally, the Debtor allows each employee five days of paid time off ("PTO") due to personal illness each calendar year. PTO related to illness expires on December 31st of each year and cannot be carried forward into the next calendar year. The Debtor also allows full time employees PTO for vacation. Initial vacation eligibility is defined in each employee's offer letter. An additional five days of vacation is earned by an employee for each five years of service with the Debtor up to a maximum of six total weeks. Up to 40 hours of vacation can be carried forward into the next calendar year.[16] In the event of unusual business or operating conditions, senior leadership may approve additional vacation carry-over. Eligible Employees[17] have historically been paid for accrued but unused vacation and a floating holiday upon termination. As of the Petition Date, the Debtor estimates that it

---

[15]     The Equity Obligations vest over a certain period of time depending on the terms of the incentive agreement.

[16]     Vacation carry forward is limited to 40 hours (48 for 12 hour shift workers) unless carry forward is approved by Senior Management. The Debtor implemented this policy in January 2013. Employees who had previously carried over more than the allowed amount (prior to the policy change) were grandfathered and are allowed to continue carrying over that amount, but may not carry forward any additional hours until their PTO bank falls below 40 (or 48 for 12 hour shift workers).

[17]     Eligible Employees are defined as employees that left the Debtor on good terms.

23

owes approximately $290,000 in pre-petition vacation and floating holiday PTO limited by the $12,475 priority cap per employee established in 11 U.S.C. § 507(a)(4).

d. *Qualified 401(k) plan obligations.* The Debtor maintains the KiOR Inc. 401(k) Profit Sharing Plan and Trust[18] (the "401(k) Plan"), under which all Eligible Employees[19] may defer a portion of their pre-tax salary to the 401(k) Plan. Employees that elect to participate in the 401(k) Plan are 100% vested in employer profit sharing contributions upon entering the 401(k) Plan. Each participant may elect to have between 0% to 96% of their salary deferred and up to 100% of any bonus deferred[20]. The Debtor matches 100% of an employee's elective deferrals that do not exceed 3% of the employee's compensation plus 50% of an employee's elective deferrals that exceed 3% of compensation but do not exceed 5% of compensation. The average aggregate monthly amount of employee contributions and matching contributions over the last six months are approximately $95,000. As of the Petition Date, the Debtor estimates that it owes approximately $10,000 in pre-petition 401(k) contributions.

e. *Health and welfare benefits.* Prior to the Petition Date, the Debtor offered employees and their eligible spouses and dependents various standard employee benefits, including, without limitation: (i) medical and dental coverage; (ii) coverage continuation under COBRA; (iii) vision coverage, basic term life insurance, supplemental life insurance, accidental death and dismemberment insurance ("AD&D"), short-term and long-term disability insurance, critical illness insurance, accident insurance and (iv) flexible health care spending and flexible dependent care spending accounts (collectively, the "Employee Benefits"). As of the Petition Date, the Debtor was obligated to pay certain contributions to or provide benefits under such plans, programs and policies[21].

   i. Medical / Dental
   All employees are given the opportunity to participate in a medical/dental plan administered by Aetna Inc. (the "Aetna Medical Plan"), under which employees and their family members have the choice to use providers within the network or to use providers outside of the network (the latter option being subject to higher costs). Approximately 95% of active employees have chosen to participate in the Aetna Medical Plan as of the Petition Date.

---

[18]    The 401(k) Plan is administered by Transamerica.

[19]    Eligible Employees are defined as all employees except those employees which are either a) Union Employees, or b) Non-Resident aliens. Additionally, all eligible employees must be 18 years of age to participate in the 401(k) Plan.

[20]    Total annual contribution to the 401(k) Plan is subject to applicable statutory limits. Additionally, only cash bonuses can be deferred.

[21]    All amounts referenced in section 11 (e) are presented on a KiOR entity level.

The Aetna Medical Plan has different premiums, deductibles and benefits depending on the employee's elected coverage. Regardless of the coverage selected, employees pay approximately 15% to 25% of the premium for their medical benefits coverage through pre-tax contributions from their paychecks, and the Debtor incurs the remaining 75% to 85% of the premium cost.

The Debtor's average monthly cost on account of the Aetna Medical Plan over the last six months is approximately $75,000. As of the Petition Date, the Debtor owed approximately $78,000 to Aetna Inc. for premiums due under the terms of the Aetna Medical Plan.[22]

Additionally, the Debtor's policy was to provide certain employees with a reimbursement of their legacy retiree medical plan premiums which continued coverage for those employees under those legacy retiree plans with prior employers. The obligations that the Debtor has incurred on behalf of the employees on account of the legacy retiree medical plan premium reimbursements have approximated $8,000 per month over the last six months.

ii. Coverage Continuation under COBRA
The Debtor has paid an average of approximately $1,500 per month over the past six months for coverage relating to its continuation under COBRA (the "COBRA Program")[23]. The COBRA Program is administered by Beneflex. As of the Petition Date, the Debtor owed approximately $25 to Beneflex for administration fees on account of the COBRA Program. By this motion, the Debtor seeks authority to (a) continue to pay benefits on account of the COBRA program, and (b) modify its pre-petition policies relating to the COBRA Program as it deems appropriate. As of the Petition Date, the Debtor owed approximately $200 to relevant Plan Providers[24] on account of the COBRA Program.

iii. Vision, Life, AD&D, Short Term Disability, Long Term Disability, Supplemental Life Insurance, Critical Illness and Accident Insurance Coverage
The Debtor offers employees coverage for vision, life, AD&D, short term disability ("STD"), long term disability ("LTD"), critical illness and accident insurance through a number of difference insurance providers.

The Debtor offers employees the ability to participate in a vision plan that is administered by EyeMed Vision Care (the "EyeMed Plan"). The EyeMed Plan is 100% employee funded. The Debtor deducts the premiums associated

---

[22] This includes the estimated the pro rata amount due for November through the Petition Date.
[23] The Debtor has significantly reduced its head count over the past six months which will likely increase the amounts due under the COBRA Program.

[24] Plan Providers include Aetna Inc., Beneflex and EyeMed Vision Care.

25

with the EyeMed Plan from the paychecks (on a pre-tax basis) of those employees that chose to participate. EyeMed Vision Care invoices the Debtor on a monthly basis and those deductions are then sent from the Debtor to EyeMed Vision Care. The Debtor's average monthly cost on account of the EyeMed Plan over the last six months is approximately $800[25]. As of the Petition Date, the Debtor owed approximately $100 to EyeMed Vision Care for premiums due under the terms of the EyeMed Plan.

The Debtor also offers employees basic life and AD&D insurance coverage which is provided by Aetna Inc. (the "Aetna Life Policies")[26] and is fully funded by the Debtor. The basic life insurance provides benefits in an amount equal to 200% of the employee's basic annual earnings, up to a maximum of $400,000 in case of death. The AD&D insurance provides benefits to employees in cases involving the accidental death or dismemberment of an employee (such as the loss of a hand, or foot or the total loss of sight in an eye). Benefits provided to participants in the AD&D Plan vary depending on the severity of the injury or dismemberment. The Debtor pays 100% of the premiums associated with the Aetna Life Policies. The obligations that the Debtor has incurred on behalf of the employees on account of the Aetna Life Policies have approximated $3,300 per month over the last six months. As of the Petition Date, the Debtor owed approximately $400 to Aetna Inc. relating to the Aetna Life Policies.

The Debtor also offers employees a STD plan (the "STD Plan") which is self-funded by the Debtor[27]. Employees may be eligible for STD benefits immediately following a 14 day unpaid waiting period. If an employee's absence does qualify for STD benefits, the employee will receive 60% of their base pay until released to full duty or the employee qualifies or disqualifies for LTD benefits. The obligations that the Debtor has incurred on behalf of the employees on account of the STD Plan have approximated $6,200 per month over the last six months. As of the Petition Date, the Debtor owed approximately $0 to employees relating to the STD Plan.

Additionally, the Debtor offers employees a LTD plan which is administered by Aetna Inc. (the "Aetna LTD Plan") and provides benefits to employees who have been disabled for at least 180 days. Employees that qualify for the Aetna LTD Plan are eligible to receive 60% of their monthly, pre-disability, earnings up to a maximum of $10,000 per month. The Debtor pays 100% of

---

[25]    This monthly cost is 100% funded by the employee's via paycheck deduction on a pre-tax basis.

[26]    Employees have the option to purchase supplemental life and supplemental AD&D insurance ("the Supplemental Plans") for themselves and /or their immediate family members at their own cost. The Debtor's average monthly cost on account of the Supplemental Plans over the last six months is approximately $2,300. As of the Petition Date, the Debtor owed approximately $600 under the terms of the Supplemental Plans.

[27]    The STD Plan is also self-administered by the Debtor.

premiums for the Aetna LTD Plan. The obligations that the Debtor has incurred on behalf of the employees on account of the Aetna LTD Plan have approximated $2,600 per month over the last six months. As of the Petition Date, the Debtor owed approximately $300 to Aetna Inc. relating to the Aetna LTD Plan.

Finally, the Debtor offers employees the opportunity to participate in a critical illness plan and an accident plan, both of which are administered by Allstate Insurance (the "Allstate Plans"). The Allstate Plans are 100% employee funded. The Allstate Plans provide benefits to employees in cases involving the critical illness (such as a heart attack, stroke or major organ transplant) or injury from accident of an employee (such as a car accident or a slip and fall). Benefits provided to participants in the Allstate Plans vary depending on the severity of the critical illness or accident. The Debtor deducts the premiums associated with the Allstate Plans from the paychecks (on an after-tax basis) of those employees that chose to participate in the Allstate Plan(s). Allstate Insurance invoices the Debtor on a monthly basis. Those deductions are then sent from the Debtor to Allstate Insurance. The Debtor's average monthly cost on account of the Allstate Plans over the last six months is approximately $1,400[28]. As of the Petition Date, the Debtor owed approximately $200 to Allstate Insurance for premiums due under the terms of the Allstate Plans.

iv.  Health Care Flexible Spending Account ("FSA") and Dependent Care Flexible Spending Account ("DCFSA")

The Debtor also offers employees the option to participate in a FSA and/or DCFSA program(s). The FSA program gives employees the ability to contribute pre-tax dollars to a FSA which can be used by the employee to pay for qualifying medical expenses. The DCFSA program gives employees the ability to contribute pre-tax dollars to a DCFSA which can be used by the employee to pay for qualifying dependent care expenses. The Debtor has contracted Beneflex to administer both the FSA and DCFSA programs[29]. Each pay-period the Debtor deducts (on a pre-tax basis) the amount each employee has elected to have transferred to their FSA and/or DCFSA[30] and place the funds in a segregated bank account with Silicon Valley Bank ("SVB")[31]. At the end of each month, Beneflex sweeps the balance of the segregated SVB bank account and funds each respective employee's FSA and/or DCSA. As of the Petition Date, the Debtor owed approximately $400 to Beneflex on account of FSA and DCFSA programs.

---

[28]  This monthly cost is 100% funded by the employee's via paycheck deduction on a pre-tax basis.

[29]  As of the Petition Date, the Debtor owes Beneflex approximately $35 for these services.

[30]  The total amount employees can elect to have contributed to the FSA and/or DCFSA is subject to applicable statutory limits.

[31]  The Debtor transfers funds to a segregated FSA account (******6904) held for the Benefit of KiOR Inc. by SVB.

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

f. *Miscellaneous other benefits.* Prior to the Petition Date, the Debtor offered certain employees miscellaneous benefits, including, without limitation: (i) an expense reimbursement program and (ii) a safety shoe program.

    i. <u>Expense Reimbursement Program</u>

The Debtor maintained an Expense Reimbursement Program (the "Reimbursement Program") prior to the Petition Date. In the ordinary course of business, certain employees incurred business expenses including, but not limited to travel, car allowances, lodging, and meals. All such expenses were incurred on behalf of the Debtor in the ordinary course of business with the expectation that such expenses would be reimbursed in accordance with past practice. It is essential to the uninterrupted operation of the Debtor's business that the Debtor continues to reimburse employees for such business-related expenses in the ordinary course.

Under the policies of the Reimbursement Program, once reimbursement requests are submitted, reviewed and approved, payment is typically processed within approximately one week. Because employees do not always submit claims for reimbursement promptly, it is difficult to determine the exact amount outstanding at any particular time. The Debtor estimates that pre-petition expense reimbursements will include reimbursable business expenses of approximately $12,000 as of the Petition Date.

    ii. <u>Safety Shoe Program</u>

Additionally, the Debtor has a Safety Shoe Program (the "Shoe Program") which allows eligible employees to purchase safety shoes (i.e., steel toe work boots) for use during field work. Each employee is allowed a $100 reimbursement on safety shoe purchases.[32] Once safety shoe reimbursement requests are submitted, reviewed and approved, payment is typically processed within approximately one week. Because employees do not always submit claims for the Shoe Program promptly, it is difficult to determine the exact amount outstanding at any particular time. The Debtor estimates that pre-petition Shoe Program expense reimbursements will include reimbursable business expenses of approximately $0 as of the Petition Date.

The Debtor seeks authority, but not direction, to pay the Employee Obligations that become due and owing during this Chapter 11 case and to continue its practices, programs, and policies that were in effect as of the Petition Date.[33] Furthermore, because it is difficult for the

---

[32]    The $100 allowance can be used to purchase qualified shoes at the beginning of employment and to replace shoes with excessive wear and tear.

[33]    The Debtor may separately seek authorization to implement new programs designed to incentivize current Employees and to encourage continued employment.

Debtor to determine with precision the accrued amount for many of the Employee Obligations, to the extent that the Debtor subsequently determines that there are any additional outstanding Employee Obligations related to the programs and policies described herein, the Debtor requests authority to pay such pre-petition amounts.[34]

I believe that the Debtor's ability to successfully maximize the value of the estate is dependent on the expertise and continued enthusiasm and service of its workforce. Due to the disruption and uncertainty that typically accompanies a Chapter 11 filing, I believe that the morale and, thus, the performance of the Workforce may be adversely affected. If the Debtor fails to pay the Employee Obligations in the ordinary course, the employees will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses. Such a result would have a highly negative impact on morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtor and its estate. In addition, the Debtor has determined that continuation of the programs described above is vital to preserving and rebuilding workforce morale during the pendency of this Chapter 11 Case and to reducing the level of attrition that might otherwise occur.

The Debtor further requests that all banks and other financial institutions be authorized and directed, when requested by Debtor and in the Debtor's sole discretion, to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts to pay the Employee Obligations, provided that sufficient funds are available in the applicable accounts to make the payments and transfers. The Debtor believes that payment of an Employee Obligation can be readily identified as such. Accordingly, the Debtor believes that unrelated checks and transfers will not be honored inadvertently. The Debtor similarly requests that it be authorized to pay any

---

[34] Nothing herein is intended to be an admission of the validity of any claim against the Debtor or an assumption or rejection of any contract or lease under Bankruptcy Code section 365.

29

cost or penalty incurred by its Employees in the event that a check issued by Debtor for payment of the Employee Obligations is inadvertently not honored because of the filing of the Debtor's bankruptcy case. Though the Debtor estimates any such costs or penalties to be *de minimis* in amount, if the Debtor is not authorized to pay such costs or penalties, then its employees will suffer the exact type of harm that the Employee Obligations Motion seeks to prevent and the Debtor will suffer from loss of employee goodwill.

### D.    Utilities Motion

The Debtor has also filed a motion (the "Utilities Motion") seeking to maintain its utility service and provide adequate protection to utilities. Utility services are essential to the Debtor's ability to sustain its operations and maintain the value of its assets while reorganizing under Chapter 11. In the current status of the Debtor's business, the Debtor has relationships with five companies who may claim to be utility companies for the provision of wireless services, telecommunications services, internet services and waste removal services (both hazardous and non-hazardous) (collectively the "Utility Companies"). A list of the Utility Companies is attached hereto as **Exhibit A**.[35] The aggregate monthly average utility usage for the most recent three months is approximately $28,500. At the Debtor's Pasadena facility, electricity and natural gas are included on a pass-through basis under the Debtor's lease. Accordingly, the Debtor does not contract directly with utility providers for this service and this Motion is not intended to affect any contract for the provision electricity and gas to the Debtor's Pasadena facility.

---

[35] This Motion does not seek assumption or rejection of any executory contract under Bankruptcy Code Section 365, and the Debtor reserves the right to claim that any contract with a Utility Companies is or is not an executory contract, as the facts may dictate. Similarly, the Debtor reserves the right to take the position that, notwithstanding their inclusion in this Motion, those providers listed in Exhibit A are not utilities within the meaning of Bankruptcy Code Section 366.

Any interruption in utility service to the Debtor would be severely disruptive and diminish the Debtor's chance for a successful reorganization. Accordingly, the Debtor seeks entry of interim and final orders pursuant to Bankruptcy Code Section 366(a):

> (a) prohibiting the Utility Companies from altering, refusing, or discontinuing services to, and/or discriminating against, the Debtor on the basis of the commencement of this case or on account of any unpaid invoice for services provided by any of the Utility Companies to the Debtor prior to the Petition Date; and

> (b) approving the Debtor's deposit of $14,250 (which is one half of the estimated monthly cost of the utility services, calculated using the average of the past three months) into a newly-created segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies; and

> (c) establishing procedures for:

>> (i) determining requests for additional assurance of payment, and

>> (ii) to the extent necessary, subject to the procedures set forth below, modifying the adequate assurance of payment demanded by Utility Companies.

The Debtor intends to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide for additional assurance of payment for future services to the Utility Companies, the Debtor will deposit $14,250 (the "Adequate Assurance Deposit"), into a newly created, segregated, interest-bearing account, within twenty (20) days of the Petition Date. The Adequate Assurance Deposit will be maintained during the Chapter 11 case with a minimum balance equal to one-half of one month's usage, calculated using the average of the past three months. The Adequate Assurance Deposit may be adjusted by the Debtor to account for the termination of utility services by the Debtor or other arrangements with respect to adequate assurance of payment reached with an individual Utility Company.

The Debtor further proposes that, subject to entry of a final order, to the extent the Debtor becomes delinquent with respect to a Utility Company's account, such Utility Company will file

31

a written notice of such delinquency (the "Delinquency Notice") with the Court and serve such Delinquency Notice on the parties listed in the Utilities Motion.  The Debtor proposes that if such delinquency is not cured and no Party in Interest has objected to the Delinquency Notice within ten (10) days of receipt of the Delinquency Notice, then the Debtor will be required to (a) remit to such Utility Company from the Adequate Assurance Deposit the amount of postpetition charges claimed as delinquent in the Delinquency Notice and (b) replenish the Adequate Assurance Deposit for the amount remitted to such Utility Provider.  If a Party in Interest objects to the Delinquency Notice, then the Debtor would propose that the Court hold a hearing to resolve the dispute and determine whether a payment should be remitted from the Adequate Assurance Deposit and, if such payment is warranted, how much should be remitted.

In my opinion, the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for the utility services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.  If any Utility Company believes that additional assurance is required, they may request such assurance pursuant to the Determination Procedures described in detail in the Utilities Motion.

I believe that the Debtor could not operate its Pasadena facility without the Utility Services.  If the Utility Companies refuse or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted, and the Debtor could be forced to cease operations.

**E.**    **Debtor-in-Possession Financing Motion**

In order to fund a Chapter 11 filing and the sale process discussed below, the Debtor engaged in vigorous, arm's-length negotiations with PI, LLC on the terms of the DIP Credit Agreement which I believe is appropriately sized to meet the Debtor's financing needs during this process.

I believe that the terms of the DIP Credit Agreement are fair and reasonable under the circumstances for several reasons. In particular, the DIP Credit Agreement is the result of arm's-length negotiations, and contains economic terms, including an interest rate discounted from the rate applicable to the Debtor's pre-petition secured debt, and the absence of certain fees, that are below what I believe the Debtor could obtain in comparable financing (if any were available) outside the context of this Chapter 11 Case. Based on the foregoing, it is my opinion that the terms of the DIP Credit Agreement are fair and reasonable under the circumstances.

In my opinion, no acceptable financing is available on more favorable terms than those contained in the DIP Credit Agreement. The Debtor is unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit on terms acceptable to the Debtor allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. The Debtor has been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lenders pursuant to the DIP Credit Agreement. Accordingly, the Debtor is unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Lenders the rights, remedies, privileges, benefits, and protections provided in the DIP Credit Agreement and related documents (collectively, the "DIP Loan Documents"), including, without limitation, the liens and superpriority claims provided for in the DIP Loan Documents, (b) allowing the DIP Lenders to provide the loans and other financial accommodations under the DIP Loan Documents and (c) providing the Debtor's prepetition secured lenders the adequate protection more fully described in the Interim DIP Order.

The Debtor has an immediate and critical need to obtain postpetition financing under the DIP Credit Agreement in order to, among other things, finance the ordinary costs of its

operations, maintain business relationships with vendors, suppliers and customers, make payroll and satisfy other working capital and operational needs.

I also believe that the Debtor has an immediate need for the use of the interim funds provided by the DIP Credit Agreement on an interim basis, and for the use of the total aggregate amount of the DIP Credit Agreement following entry of a final order.  I do not believe that alternative sources of financing are readily available, if available at all.  In addition, I do not believe it would be possible for the Debtor to administer this Chapter 11 estate on a "cash collateral" basis.

Because there is simply no viable alternative for the Debtor to maintain the value of its assets while facilitating the possible sale of substantially all of its assets without the DIP Credit Agreement, I believe that the advances thereunder are vital to the preservation and maintenance of the going concern value of the Debtor's estate and to maximize the value of the Debtor's estate for the benefit of all parties in interest.  I further believe that without access to the DIP Facility, to the extent authorized by the Court, the Debtor and its estate would suffer immediate and irreparable harm.

**F.**     **Bid Procedures and Sale Motion**

As set forth above, the best offer received by the Debtor to date for a transaction involving its assets is the transaction that the Debtor negotiated with the Stalking Horse Bidder. The terms and conditions of the transaction and PSA are fair, reasonable, and the best available to the Debtor under the circumstances, reflect an exercise of prudent business judgment consistent with KiOR's fiduciary duties, are based on good, sufficient, and sound business purposes and justifications, and are supported by reasonably equivalent value and consideration. In addition, the Bid Procedures set forth in the Sale Motion constitute a reasonable, sufficient, adequate, and proper means to provide any potential competing bidders with an opportunity to

34

submit and pursue higher and better offers for all or substantially all of the Debtor's assets. Notably, the Bid Procedures do not contemplate that any breakup fee, expense reimbursement, or similar charge will be payable to the Stalking Horse Bidder in the event of an overbid.

## **CONCLUSION**

I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

DMSLIBRARY01\22196\231001\24015750.v8-11/8/14
RLF1 11041037v.1

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2014, at Houston, Texas.

By: /s/ _____
Christopher A. Artzer
President and Interim Chief Financial
Officer of KiOR, Inc.

**EXHIBIT A**

**INDEX OF FIRST DAY MOTIONS**

| | |
|---|---|
| 1. | Motion for Order Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits, and Related Expenses |
| 2. | Debtor's Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 for Interim and Final Orders: (I) Approving Postpetition Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Adequate Protection; (IV) Granting Liens and Providing Superpriority Administrative Expense Status; (V) Modifying Automatic Stay; and (VI) Scheduling a Final Hearing |
| 3. | Motion for Order (A) Authorizing Maintenance of Pre-Petition Bank Accounts and Cash Management System and Continued Use of Existing Business Forms, Books, and Records, and (B) Approving Investment Accounts and Procedures |
| 4. | Motion for an Order Establishing Procedures for (A) Utilities to Request Additional Assurance of Payment, and (B) Resolving Disputes with Utilities Relating to Adequate Assurance Requests |
| 5. | Debtor's Application for Entry of an Order Appointing EPIQ Bankruptcy Solutions, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a), Bankruptcy Rule 2002(f) and Local Rule 2002-1(f) |