IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| KIOR, INC.,[1] | § | |
| | § | Case No. 14-_____ (____) |
| | § | |
| | § | |
| Debtor. | § | |

---

**DECLARATION OF ALEXANDER C. FISCH IN SUPPORT OF:**

**(1) DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 AND 552 FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTOR TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; (IV) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (V) MODIFYING AUTOMATIC STAY; AND (VI) SCHEDULING A FINAL HEARING; AND**

**(2) DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING BID PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING THE DEBTOR TO ASSUME THE PLAN SUPPORT AGREEMENT; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) APPROVING THE MANNER AND FORM OF NOTICE OF THE AUCTION AND SALE HEARING; AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

Alexander C. Fisch, under 28 U.S.C. § 1764, declares as follows under the penalty of perjury:

1. I am a Managing Director at Guggenheim Securities, LLC ("Guggenheim"), which is an investment banking firm that maintains offices at 330 Madison Avenue, New York, New York 10017, and I make this Declaration in support of the Debtor's first day motions.

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is KiOR, Inc. (2233). The above-captioned Debtor's mailing address is 13011 Bay Park Road, Pasadena, Texas 77507.

2. KiOR, Inc. (the "Debtor") retained Guggenheim in late May 2014 to assist in evaluating various strategic options, including but not limited to, the raising of additional capital, a sale of some or all assets and/or a restructuring transaction. Since that time, Guggenheim has developed and executed a marketing process for the Debtor and its wholly-owned, non-debtor subsidiary KiOR Columbus, LLC ("KiOR Columbus," and collectively with the Debtor, where applicable, the "KiOR Entities"). Guggenheim has spent considerable time and resources evaluating and analyzing the KiOR Entities' operations and capital structure and have made such information available to third parties on a confidential basis.

3. Guggenheim's marketing efforts were designed to elicit from third parties expressions of interest in all, or portions, of the KiOR Entities' business and assets. Since July 2014, Guggenheim has executed this process by contacting over 165 potentially interested parties, holding introductory conversations, and distributing initial marketing materials. Over twenty parties expressed interest and executed non-disclosure agreements. These parties were granted access to an electronic data room and provided a detailed confidential information memorandum describing the company, its operations and opportunities. Guggenheim continued to facilitate the due diligence process throughout October 2014, hosting numerous telephonic discussions between interested parties and management as well as over ten in person site visits and management presentations. Multiple parties submitted non-binding indications of interest in a potential transaction with the KiOR Entities at the end of August 2014. Guggenheim and the KiOR Entities continue to work with these parties to facilitate continued due diligence, including additional on-site meetings. At this time, several of these entities have expressed continuing interest in pursuing a transaction involving all, or a portion, of one or both of the KiOR Entities.

4. The Debtor has determined, upon consultation with Guggenheim and its other professional advisors, that the best offer received by the Debtor to date for the purchase of its assets is the offer received from KFT Trust, Vinod Khosla, Trustee, Khosla Ventures III LP, VNK Management LLC, and Pasadena Investments, LLC ("PI LLC" and collectively, the "Stalking Horse Bidder") that is described in the Debtor's Motion for an Order (A) Authorizing and Approving Bid Procedures to be Employed in Connection with the Potential Sale of Substantially all of the Assets of the Debtor; (B) Authorizing the Debtor to Assume the Plan Support Agreement; (C) Scheduling an Auction and Sale Hearing; (D) Approving the Manner and Form of Notice of the Auction and Sale Hearing; and (E) Granting Related Relief (the "Sale Motion"). Other than the transaction proposal made by the Stalking Horse Bidder, there were no other viable offers for the Debtor's assets. The Debtor accordingly negotiated the Plan Support Agreement (the "PSA") intended to effectuate a reorganization transaction with the Stalking Horse Bidder, and the bidding procedures described in the Sale Motion (the "Bid Procedures"), in good faith and at arm's length among the parties and their respective professional advisors.

5. The Bid Procedures constitute a reasonable, sufficient, adequate, and proper means to provide any potential competing bidders with an opportunity to submit and pursue higher and better offers for all or substantially all of the Debtor's assets. Notably, the Bid Procedures do not contemplate the payment of any breakup fee or expense reimbursement to the Stalking Horse Bidder in the event of an overbidder.

6. In early September 2014, when it became apparent that consummation of a transaction may necessitate a Chapter 11 filing, Guggenheim began to solicit interest from lenders in providing debtor-in-possession ("DIP") financing. Guggenheim approached more than 10 potential providers of liquidity. These parties declined to submit a DIP financing

DMSLIBRARY01\22196\231001\24025113.v6-11/9/14
RLF1 11041039v.1

proposal for the Debtor based on a number of factors, including the company's inability to generate current revenue, the unique nature of the potential collateral (including the intellectual property of the Debtor and the specialized nature of the fixed assets at KiOR Columbus), concerns about the alternative fuel industry, the size of the transaction and the need to prime multiple existing lenders to the Debtor.

7. Accordingly, in order to fund a Chapter 11 filing and the sale process described above, Guggenheim assisted the Debtor in what I believe were vigorous, arm's-length negotiations with PI LLC, on the terms of the financing set forth in the *Senior Secured and Superpriority Financing Agreement*, dated on or about November 9, 2014 (the "DIP Credit Agreement"), by and among the Debtor and PI LLC, as administrative agent for the lenders from time to time party thereto (the "DIP Lenders"), which I believe is appropriately sized to meet the Debtor's financing needs during this process (the "DIP Facility").

8. I believe that the terms of the DIP Facility are fair and reasonable under the circumstances for several reasons. In particular, the DIP Facility was negotiated at arms-length, and contains economic terms, including an interest rate that is lower than the rate applicable to the Debtor's pre-petition secured debt and that is lower than the rate I believe the Debtor could obtain in comparable financing (if any were available) outside the context of this Chapter 11 case. Also, the interest under the DIP Facility is exclusively payment-in-kind (PIK) interest, as opposed to the cash interest payments that would have been required by the potential lenders that we contacted. The DIP Facility also does not contain fees, such as commitment fees, up-front fees, or closing fees, that are common in DIP financing and would have been required by the potential lenders that we contacted. Based on the foregoing and my experience in numerous

4

other bankruptcy matters, it is my opinion that the terms of the DIP Credit Agreement are fair and reasonable under the circumstances.

9. In my opinion, no acceptable financing is available on more favorable terms than those contained in the DIP Credit Agreement. Specifically, the Debtor has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor has also been unable to obtain credit on terms acceptable to the Debtor that is (a) unsecured but senior to other administrative expenses, (b) secured only by liens on property of the estate that is not otherwise subject to a lien and/or (c) secured only by a junior lien on property of the estate that is subject to a lien. The Debtor, moreover, has been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lenders pursuant to the DIP Credit Agreement. Accordingly, the Debtor is unable to obtain secured credit without (a) granting to the DIP Lenders the rights, remedies, privileges, benefits, and protections provided in the DIP Credit Agreement and related documents (collectively, the "DIP Loan Documents"), including, without limitation, the liens and superpriority claims provided for in the DIP Loan Documents, (b) allowing the DIP Lenders to provide the loans and other financial accommodations under the DIP Loan Documents and (c) providing the Debtor's prepetition secured lenders the adequate protection more fully set forth in the Interim DIP Order.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 9, 2014, at New York, New York.

By: _____
Alexander C. Fisch
Managing Director
Guggenheim Securities, LLC