# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| KIOR, INC.,[1] | § | |
| | § | Case No. 14-_____ (____) |
| | § | |
| | § | |
| Debtor. | § | |

-----------------------------------------------------------------

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365 FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING AND APPROVING BID PROCEDURES IN CONNECTION WITH THE POTENTIAL SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING THE DEBTOR TO ASSUME THE PLAN SUPPORT AGREEMENT; (C) SCHEDULING AN AUCTION AND SALE HEARING; (D) APPROVING THE MANNER AND FORM OF NOTICE OF THE AUCTION AND SALE HEARING; AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL INTERESTS; (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (C) GRANTING RELATED RELIEF**

KiOR, Inc. (the "<u>Debtor</u>" or "<u>Seller</u>") hereby moves this Court (the "<u>Motion</u>"), pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006 and 9008 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 2002-1, 6004-1, and 9006-1(c) of the Local Bankruptcy Rules for the District of Delaware (the "<u>Local Rules</u>"), for entry of (I) an Order (A) authorizing and approving bid procedures for the potential sale of substantially all of the Debtor's assets; (B) authorizing the Debtor to assume the Plan Support Agreement (as defined below); (C) scheduling an Auction and Sale Hearing (as defined below); (D) approving the manner and form of notice of the Auction and Sale Hearing; and (E) granting related relief; and (II) an Order (A)

---

[1]    The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is KiOR, Inc. (2233).  The above-captioned Debtor's mailing address is 13011 Bay Park Road, Pasadena, Texas 77507.

approving the sale of substantially all of the Debtor's assets free and clear of all interests; (B) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (C) granting related relief.  In support of this Motion, the Debtor relies upon and incorporates by reference the *Declaration of Christopher A. Artzer, President and Interim Chief Financial Officer of KiOR, Inc., in Support of First Day Motions*, filed with the Court concurrently herewith (the "Artzer Declaration") and the Declaration of Alexander C. Fisch in Support of this Motion and the DIP Motion (defined therein) (the "Fisch Declaration").

## SUMMARY OF RELIEF REQUESTED

Following a five-month process involving a robust marketing campaign, the Debtor has negotiated a proposed transaction with the Stalking Horse Bidder (defined below).  Pursuant to the Plan Support Agreement (the "PSA") by and among the Debtor, KFT Trust, Vinod Khosla, Trustee ("KFT Trust"), Khosla Ventures III LP ("Khosla Ventures III"), VNK Management LLC ("VNK Management"), and Pasadena Investments, LLC (collectively with the KFT Trust, Khosla Ventures III, and VNK Management, the "Stalking Horse Bidder") and, collectively with the Debtor, the "Parties"), subject to Court approval, the Stalking Horse Bidder has agreed to consummate a comprehensive restructuring transaction involving substantially all of the Debtor's assets (the "Assets") though a plan of reorganization to be filed by the Debtor.  The terms of such a plan of reorganization are set forth in the Plan Term Sheet, attached to the PSA as Exhibit C thereto (the "Plan Term Sheet").  The PSA transaction is subject to higher and/or better offers, and in furtherance of the Debtor's efforts to maximize the value of its estate, it intends to conduct the Auction for Qualified Bidders (as defined below) to bid to purchase the Assets.  To further this process, the Debtor seeks the entry of two orders:

*First*, the "Bid Procedures Order" attached hereto as **Exhibit A**:

(i) authorizing and approving bid procedures (the "Bid Procedures") for a potential sale of the Assets;

(ii) approving the PSA and authorizing the Debtor to assume and perform under the PSA;

(iii) scheduling an auction (the "Auction") and, unless the Stalking Horse Bidder is the sole Qualified Bidder (as defined below) at the Auction, scheduling a hearing (the "Sale Hearing");

(iv) approving the manner and form of Notice of the Auction and Sale Hearing, substantially in the forms attached to the Bid Procedures Order as **Exhibit 2** (the "Sale Notice") and **Exhibit 3** (the "Publication Notice"); and

(v) granting related relief.

*Second*, if the Successful Bidder is a party other than the Stalking Horse Bidder, the "Sale Order" in a form to be filed with the Court after the Auction:

(i) approving and authorizing the sale of the Assets free and clear of all interests, except to the extent set forth in the Successful Bidder's (as defined below) asset purchase agreement;

(ii) authorizing the assumption and assignment of certain executory contracts and/or unexpired leases, and

(iii) granting related relief.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this case and this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), and (N) and the Debtor confirms its consent pursuant to Rule 9013-1(f) of the Local Rules to the

entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

3.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 363, and 365, and Bankruptcy Rules 2002, 6004, 6006, and 9008.

## BACKGROUND

**A.      General Background**

4.      On November 9, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      The Debtor has continued in possession of its properties and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in this case.

6.      The Debtor and its wholly-owned, non-debtor subsidiary KiOR Columbus, LLC ("KiOR Columbus," and collectively with the Debtor, when applicable, the "KiOR Entities"), are development stage, renewable fuels companies based in Pasadena, Texas and Columbus, Mississippi, respectively.   The Debtor's primary business is the development and commercialization of a ground-breaking proprietary technology designed to generate a renewable crude oil from non-food cellulosic biomass (e.g., trees, grasses, etc.), which can be refined into gasoline, diesel, and aviation fuels.  The fuels produced by the Debtor's highly

specialized process are true hydrocarbon fuels that are molecularly consistent with their traditional petroleum-based counterparts. However, the Debtor estimates that its cellulosic hydrocarbon fuels reduce lifecycle greenhouse gases by over 60% when compared to traditional fossil fuels.

7.     The Debtor maintains corporate offices, research and development facilities and a test-scale demonstration facility in Pasadena, Texas. Currently, the Debtor employs approximately 71 people. In mid-2012, the KiOR Entities completed construction of an initial-scale production facility with a design capacity for approximately 500 bone dry tons of biomass feedstock per day in Columbus, Mississippi (the "Columbus Facility"). When the Columbus Facility opened in 2012, it was the first large-scale plant in the U.S. to convert cellulosic non-food biomass into hydrocarbon gasoline and diesel. KiOR Columbus operated the Columbus Facility during 2013, producing and selling cellulosic fuels that met certain contractual specifications. However, KiOR Columbus encountered certain challenges at the Columbus Facility, including operational, production, and capacity issues as well as difficulties related to optimizing catalyst performance. In January 2014, KiOR Columbus suspended operations at the Columbus Facility, and has since idled and decommissioned the Columbus Facility, to minimize ongoing costs. The Debtor continues, however, to maintain its research and development facilities, as well as a test scale demonstration facility, in Pasadena, Texas, and also continues to provide certain shared services such as accounting, legal and human resources and other management to KiOR Columbus.

8.     Prepetition, the Debtor faced challenges in commercializing its technology and scaling its production to the volumes necessary to meet its targets. At present, due to the idling

of the Columbus Facility, the KiOR Entities generate no revenues, but continue to incur the ongoing costs related to their operations, including continued work on optimization of their technology, the cost of ongoing research and development, payment of obligations owed to employees, vendors, and governmental authorities, and substantial debt.

9.      The Debtor seeks relief in this Court to protect, preserve, and maximize the value of its assets and to obtain, through a DIP loan facility, the funds needed for working capital requirements and to further develop its proprietary renewable fuels production process, as well as provide for a sale or reorganization that will optimize the value of the assets for all creditors.  Put simply, through this chapter 11 case, the Debtor intends to reorganize its business or sell substantially all of its assets so that it can continue its core research and development activities.

10.     Additional factual background regarding the Debtor, including its current and historical business operations and the events precipitating this chapter 11 filing, is set forth in detail in the Artzer Declaration filed contemporaneously with this Motion and incorporated herein by reference.

**B.      The Debtor's Marketing Process**

11.     Most recently, the operations of the Debtor and KiOR Columbus have been funded by KFT Trust, Khosla Ventures III, and VNK Management.  Since 2013 these entities, and since April 2014 the KFT Trust, have financed the KiOR Entities' continued operations, the idling of the Columbus Facility (including comprehensive decommissioning and clean-out of equipment and tankage at that site), and a robust sale, marketing, and potential reorganization process for the KiOR Entities conducted by Guggenheim Securities, LLC ("Guggenheim").

12.     The Debtor and KiOR Columbus have, beginning in 2013 and continuing into 2014, evaluated a number of options to respond to their operational and liquidity issues.  To this end, the Debtor engaged multiple professionals to assist in developing a business strategy and potential sale of some or all assets of either entity and/or investment process.  In late May 2014, the Debtor retained Guggenheim to evaluate and assist the Debtor in identifying and implementing various strategic options, including but not limited to, the raising of additional capital, a sale of some or all assets and/or a restructuring transaction.  Guggenheim has spent considerable time and resources evaluating and analyzing the Debtor's operations and capital structure, as well as those of KiOR Columbus, and has made such information available to third parties on a confidential basis.

13.     The KiOR Entities, with support from Guggenheim, embarked on a fulsome marketing process designed to elicit from third parties expressions of interest in all, or portions, of the KiOR Entities' business and assets.  Specifically, since July 2014 Guggenheim has executed this process by contacting over 165 potentially interested parties, holding introductory conversations, and distributing marketing materials.  Over twenty parties expressed interest and executed non-disclosure agreements.  These parties were granted access to an electronic data room and provided a detailed confidential information memorandum describing the Debtor and KiOR Columbus, their operations, and opportunities.  Guggenheim has continued to facilitate the due diligence process throughout October, hosting numerous telephonic discussions between interested parties and management as well as over ten in person site visits and management presentations.  As of the Petition Date, although several of these entities have expressed continuing interest in pursuing a transaction involving all, or a portion of, the assets of one or

both of the Debtor or KiOR Columbus, no entities other than the Stalking Horse Bidder have provided a firm bid for any of the Debtor's assets or been willing to fund the continuing costs of operating the Debtor's business and restructuring process.  The Debtor intends to continue the marketing process through this case related to its proposed auction process.

14.    While the Guggenheim marketing process was taking place, and in the absence of any other firm offers for the Debtor's assets, the Debtor and the Stalking Horse Bidder have engaged in arm's length, good faith negotiations regarding the formulation of a consensual chapter 11 plan and a comprehensive resolution of all claims and disputes between them on the terms and conditions set forth in a plan term sheet (the "Plan Term Sheet"), which is part of Exhibit 1 to the proposed Bid Procedures Order.

**C.    The Stalking Horse Bidder's PSA and the Form of APA**

15.    The Debtor has determined, upon consultation with Guggenheim and its other professional advisors, that the best offer received by the Debtor to date regarding the Assets is set forth in the PSA and the Plan Term Sheet (the "Stalking Horse Bid").  Subject to this Court's approval and to the Bid Procedures set forth herein, the independent members of the Debtor's board have voted to approve the PSA.  The Debtor's board has also approved an asset purchase agreement form, attached hereto as **Exhibit B** (the "APA"), for use in connection with the Auction, although that APA is not part of the Stalking Horse Bid insofar as a transaction with the Stalking Horse Bidder would be consummated through a chapter 11 plan.

16.    The PSA provides for the Stalking Horse Bidder to engage in a reorganization transaction involving all of the Assets, which include substantially all of the Debtor's assets.  If the Stalking Horse Bidder is the Successful Bidder (defined below), then the PSA requires the

Debtor to consummate through a plan the comprehensive reorganization outlined in the Plan

Term Sheet.  The Plan Term Sheet provides that the plan would preserve the Debtor's business

as a going concern through the cancellation of existing equity interests, the issuance of new

equity interests to the Stalking Horse Bidder or its affiliates in exchange for cancellation of

substantial secured debt held by the Stalking Horse Bidder and/or its affiliates, and the provision

of exit financing for the reorganized Debtor.  The plan would further provide for the assumption

of contracts pursuant to the plan.  In sum, subject to Court approval and higher and better offers,

the PSA and the Plan Term Sheet provide for the Stalking Horse Bidder to reorganize the Debtor

by indirectly acquiring the Assets and owning 100% of the equity of the reorganized Debtor.

17.    A summary of the pertinent terms of the PSA and the form of APA that the

Debtor will make available to third-party bidders, including the terms to be highlighted pursuant

to Local Rule 6004-1, is as follows:[2]

- **The Stalking Horse Bidder is an Insider:** The Stalking Horse Bidder is an insider of the Debtor, as defined in Bankruptcy Code section 101(31). The Stalking Horse Bidder is, or is an affiliate of, (i) one of the largest equity holders of the Debtor and (ii) the largest secured creditor of the Debtor.  The Debtor has conducted an extensive marketing process for the sale of the Debtor's assets and the Stalking Horse Bid is expressly subject to higher and better offers from third parties.  Notably, in the event of any overbid, the Stalking Horse Bidder will not be entitled to any breakup fee, expense reimbursement, or similar payment.

- **Assets:** The PSA would involve a reorganization of the Debtor and all of its assets.  In contrast, Section 1.1 of the APA lists the Purchased Assets, which are comprised of substantially all of the Debtor's assets, including certain leases and contracts, improvements, personal property, intangible property, receivables, and inventory.  The Excluded Assets include all

---

[2]    The following summary is qualified in its entirety by reference to the provisions of the APA and PSA. In the event of any inconsistencies between the provisions of the APA and PSA and the terms herein, the terms of the APA or PSA, as applicable, shall control. Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the APA or PSA, as applicable.

assets not included in the Purchased Assets, cash, avoidance actions under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code, the Debtor's rights under the APA, insurance proceeds, claims, causes of action, security deposits and corporate books and records relating the Debtor's organization and existence.  APA § 1.2.

- **Assumed Liabilities:**  Section 2.2 of the APA lists assumed liabilities, including (i) post-closing obligations under assumed contracts, (ii) post-petition accounts payable and accrued expenses of the Debtor for work done in the ordinary course and conduct of the Debtor's business (excluding any expenses incurred with respect to the administration of the Case) which would qualify as administrative priority expenses under Section 503(b) of the Bankruptcy Code; and (iii) any required COBRA continuation coverage, as further described in the APA.

- **Purchase Price:**  One of the requirements to be Qualified Bidder (defined below), is a minimum cash purchase price of $17,135,000.

- **Termination and Other Deadlines:**

  The APA terminates upon:

  (i) written mutual consent at any time prior to the Closing.

  (ii) failure by a party to tender performance of its closing obligations when required.

  (iii) January 15, 2015 upon service of written notice by Seller or Buyer

  (iv) the closing of a transaction with a third-party overbidder at the Auction without further notice by either party.

  (v) Seller's election in the event of any uncured breach by Buyer resulting in the failure of a condition to Seller's obligations.
  APA § 4.3.

- **Agreements with Management:** None, except that Buyer intends to make offers of employment to substantially all of Seller's employees. APA § 9.2.1.

- **Expense Reimbursement**: Each party to the APA shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the

Agreement and the transaction described herein.  APA § 10.12.  The Plan Term Sheet provides that "the reasonable fees and expenses of the Purchaser (including reasonable fees and expenses of the Purchaser's professionals) shall be paid by Reorganized KiOR in full in cash on the Effective Date" of the plan described in the PSA (the "<u>Plan</u>").  Term Sheet at 3(g).

- **Closing Conditions/Deadlines.**  Under the proposed APA, the respective obligations of the Buyer and the Seller to consummate the closing are subject to the satisfaction or waiver of the closing conditions set forth in sections 4.1 and 4.2 of the APA.  The plan contemplated by the Plan Term Sheet will have customary conditions to its effective date, as well as certain other conditions referenced in the Plan Term Sheet.

- **Good Faith Deposit.**  10% of the Purchase Price. APA § 2.1.2.

- **Exclusivity Period.**  None.

- **Record Retention.**  Under the proposed APA, the Debtor or its successor has full and complete access to historical records.  APA § 9.1

- **No Successor Liability.**  Under the proposed APA, Buyer will acquire all of Seller's right, title and interest in and to all the Purchased Property, free and clear of any liens, claims or encumbrances as set forth in the Approval Order, subject to Sections 2.2 (assumed liabilities) and 3.5 (prorations) of the APA.  APA § 5.4

- **Releases**. The plan contemplated by the Plan Term Sheet will include certain proposed estate and third-party releases as described more fully in the Plan Term Sheet.  The APA contemplates that the Buyer will release all claims against Seller and each of its affiliates, lenders and their respective successors and assigns and all officers, directors, partners, members, managers, shareholders, and employees relating in any way to the Purchased Property or the Assumed Liabilities.  APA § 10.28.

- **Tax Exemption**. None. The APA provides that "In the event that any: (a) real estate transfer taxes or similar taxes or charges are required to be paid in order to record the Deeds to be delivered to Buyer in accordance herewith, or in the event any such taxes are assessed at any time thereafter; or (b) sales, use, transfer or other similar taxes or charges are assessed at Closing or at any time thereafter on the transfer of any other Purchased Property, then in each instance such taxes or charges incurred as a result of the transactions contemplated hereby shall be paid by Buyer." APA § 3.6.

- **Sale of Avoidance Actions**. Avoidance actions are Excluded Assets.  APA § 1.2. The plan contemplated by the Plan Term Sheet would provide for certain avoidance actions to be transferred to a trust for the benefit of general unsecured creditors.

- **Sale Free and Clear of Unexpired Leases**. None.

- **Buyer's Right to Credit Bid**. The Plan Term Sheet provides that the Stalking Horse Bidder will convert certain debt to equity, and the Bid Procedures Order contemplates that this amount may be increased by the Stalking Horse Bidder, which is a construct similar to a right to credit bid.[3]

- **Relief From Bankruptcy Rule 6004(h).**  The Sale Order will likely provide that it will be effective and enforceable immediately upon entry.

- **Structure of Transaction Set Forth in the PSA and Plan Term Sheet.** If the Stalking Horse Bidder is the Successful Bidder, the Stalking Horse Bidder, pursuant to a plan of reorganization, will obtain the equity interests in the reorganized Debtor in exchange for the cancellation of debt held by the Stalking Horse Bidder and/or its affiliates and the provision of exit financing for the reorganized Debtor.

## RELIEF REQUESTED

**A.    Bid Procedures Order**

18.    By this Motion, the Debtor seeks entry of the Bid Procedures Order: (i) approving the Bid Procedures (as set forth below) and establishing procedures for providing notice to parties to contracts proposed to be assumed and assigned, and an opportunity for such counterparties to object, as set forth in the Bid Procedures; and (ii) scheduling the Auction (if necessary) and a Sale Hearing, and approving the form and manner of notice thereof.

**(i)    The Bid Procedures and Cure Procedures**

19.    To maximize value for the benefit of the Debtor's estate and its stakeholders, the

---

[3]    The Interim DIP Order proposed to be entered in this case provides for certain credit bidding rights, subject to entry of a Final DIP Order.

Debtor seeks to implement a competitive bidding process that is designed to generate maximum value for the Assets.  As described more fully in the "Bid Procedures" set forth in the Bid Procedures Order and summarized herein, the Debtor seeks approval to sell the Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets.  As described more fully in the Bid Procedures, the Debtor requests that competing bids for the Assets be governed by the following procedures, which are disclosed herein pursuant to Local Rule 6004-1(c).[4]  The Debtor further requests the procedures (the "Cure Procedures") for notifying counterparties to executory contracts and leases of potential Cure Amounts (as defined below) with respect to those executory contracts and leases that the Debtor may seek to assume and assign under the Successful Bidders asset purchase agreement.

      a.    Qualified Bids.  Each competing bidder other than the Stalking Horse Bidder shall, on or before **4:00 p.m. (prevailing Eastern time) on December 15, 2014** (the "Bid Deadline"), deliver to KiOR:

      (i) a cash deposit (via certified or bank check or wire transfer) of 10% of the cash purchase price of such bid (the "Deposit");

      (ii) reasonable proof acceptable to KiOR, in consultation with any statutory appointed committee of unsecured creditors (the "Committee"), of the interested party's ability to consummate a purchase of the Purchased Assets and assumption of any liabilities with respect to which such bidder seeks assignment from KiOR and provide adequate assurance of future performance under all leases or contracts with respect to which such bidder seeks assignment from KiOR, including copies of such party's annual and quarterly financial statements for the most recently ended fiscal periods, certified to be true, correct, and complete in all material respects and evidence of sufficient financing along with any other financial information which a bidder believes substantiates its ability to perform its obligations with regard to its bid (collectively, "Financials");

---

[4]    The following description of the Bid Procedures is only a summary of the terms of the Bid Procedures set forth in the Bid Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bid Procedures. In the event of any inconsistencies between the provisions of the Bid Procedures and the terms herein, the terms of the Bid Procedures shall control.

and

(iii) an executed asset purchase agreement, which asset purchase agreement shall (1) specify the amount of cash or other consideration offered by the competing bidder for the Purchased Assets (provided that the cash component of such bid may not be less than $17,135,000); (2) not be subject to unperformed due diligence, financing conditions, corporate approval conditions, or regulatory approval conditions (other than under the Hart–Scott–Rodino Antitrust Improvements Act of 1976, if required), nor provide for any expense reimbursement or break-up amount; (3) constitute an irrevocable offer by such competing bidder to complete its proposed purchase upon the terms set forth therein, and must confirm that it is irrevocable until closing of the sale of the Purchased Assets to the Successful Bidder (as defined below), and provide for an outside date that is on or before January 15, 2015; (4) provide for the purchase of substantially all of the Purchased Assets; (5) be accompanied by a marked-up version that shows all differences between such asset purchase agreement and the form of asset purchase agreement to be filed by KiOR (which form of asset purchase agreement was filed with the Court as an exhibit to the Motion); (6) contain a list of KiOR's executory contracts and unexpired leases with respect to which the bidder seeks assignment from KiOR; (7) fully disclose the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid (collectively, a "Qualified Bid"); and (8) indicate whether such competing bidder agrees to act as the Back-Up Bidder (as defined below) in the event that such competing bidder is not the Successful Bidder (as defined below), as well as identify any date past which it would not serve as the Back-Up Bidder.

If the competing bidder is an entity formed for the purpose of a Sale transaction, then such entity must provide (x) Financials of the equity holder(s) and debt financing source(s) of the competing bidder or such other form of financial disclosure as is acceptable to KiOR, in consultation with the Prepetition Secured Lenders and the Committee, that demonstrates such competing bidder's financial ability to consummate a competing sale transaction; and (y) a written commitment or commitments acceptable to (and enforceable by) KiOR (including with respect to the conditions set forth therein) of the equity and debt financing source(s) of such competing bidder sufficient to satisfy the competing bidder's obligations in connection with a sale transaction.  A competing bidder also must establish that it has the financial ability to consummate its proposed transaction by no later than January 15, 2015.  In order to participate in the bidding process, receive due diligence materials (including access to an online data room maintained by Guggenheim), and/or otherwise be

considered for any purpose hereunder, a competing bidder must first
deliver an executed confidentiality agreement in form and substance
satisfactory to KiOR and its counsel, which confidentiality agreement will
be made available to, among others, those interested parties that contact
Guggenheim (Attn: Alex C. Fisch), provided that if any competing bidder
is or is affiliated with a competitor of KiOR, KiOR will not be required to
disclose to such competing bidder any trade secrets or proprietary
information.  If KiOR determines that a competing bidder does not
constitute a Qualified Bidder (as defined below), then such competing
bidder's ability to receive due diligence access or additional non-public
information shall terminate, except as otherwise agreed by KiOR.  Upon
receipt of any bid, KiOR shall distribute copies of such bid to the Stalking
Horse Bidder.

   b.  <u>Qualified Bidders</u>.  Any initial overbid for the Purchased Assets must
include a cash component of at least $17,135,000, and with each subsequent overbid
providing an incremental amount of at least $250,000 of value to KiOR, or such greater
amount as designated by KiOR.  In the event that KiOR, in consultation with the
Prepetition Secured Lenders and the Committee, shall reasonably determine that such bid
is a higher and better bid than that set forth in the PSA, the Stalking Horse Bidder shall
have the right to amend the PSA as necessary in its reasonable discretion, as agreed with
KiOR, in order to cause the Stalking Horse Bidder's bid format to be comparable to such
higher and better bid (for the avoidance of doubt, the amendment of the PSA by the
Stalking Horse Bidder will in no event result in the cancellation of the Auction if KiOR
has received at least one (1) other Qualified Bid, and that the amendment will not be with
respect to the proposed purchase price).  Only those persons or entities who have
submitted a Qualified Bid in compliance with this Order shall be a "<u>Qualified Bidder</u>";
*provided, however*, that the Stalking Horse Bidder shall be deemed to be a Qualified
Bidder for all purposes under the Bid Procedures.  Each Qualified Bidder shall be invited
to attend the Auction at the office of KiOR's counsel, King & Spalding, LLP, 1100
Louisiana, Suite 4000, Houston, Texas 77002, which Auction must be attended in person
by the Qualified Bidder or an authorized representative of the Qualified Bidder.

   c.  <u>Identity of Bidders</u>.  In addition to the information required above, each
competing bidder other than the Stalking Horse Bidder shall, on or before **December 15,
2014**, provide written identification of the bidder, its principals, and the representatives
thereof who are authorized to appear and act on their behalf for all purposes regarding the
contemplated transaction and written disclosure of any connections or agreements with
KiOR, the Stalking Horse Bidder, the Prepetition Secured Lenders, and any other known
potential bidder (as defined below), and/or any officer, director, or direct or indirect
equity security holder of KiOR.

   d.  <u>The Auction</u>.  The Auction shall commence at 10:00 a.m. (prevailing
Eastern time) on **December 17, 2014**.  The Purchased Assets shall be sold free and clear

of all liens, claims, encumbrances, and interests to the fullest extent allowed under section 363(f) of the Bankruptcy Code.  The following rules shall govern the Auction:

i. At least 24 hours prior to the Auction, KiOR will (i) notify all Qualified Bidders in writing of the highest and best Qualified Bid, as determined by KiOR in its discretion (the "Baseline Bid"); and (ii) provide all Qualified Bidders with complete copies of all asset purchase agreements, amendments to the PSA, and all other bid materials submitted by each other Qualified Bidder.  During the course of the Auction, KiOR shall inform each participant which Qualified Bid reflects, in KiOR's view, the highest and best offer.  To the extent that such bid has been determined to be the highest and best offer entirely or in part because of the addition, deletion, or modification of a provision or provisions in the applicable asset purchase agreement, PSA or related ancillary agreement or, if applicable, in the Qualified Bid, other than an increase in the cash purchase price, KiOR may provide notice to each participant of the value ascribed by KiOR to any such added, deleted, or modified provision or provisions, assuming such modification can be quantified.

ii. Only Qualified Bidders may bid at the Auction.  If multiple Qualified Bids are received, each Qualified Bidder shall have the right to continue to improve its Qualified Bid at the Auction.  Only the authorized representatives of each of the Stalking Horse Bidder, any other Qualified Bidders, KiOR, the DIP Lenders, the Prepetition Secured Lenders, and the Committee shall be permitted to attend the Auction, except as otherwise expressly ordered by the Bankruptcy Court.  A Qualified Bidder may propose effectuating its bid through a plan of reorganization at the Auction, provided it can demonstrate the ability to perform obligation under a plan including exit financing consistent with that provided under the PSA as well as other obligations of a plan, including adequate assurance.

iii. At the conclusion of the Auction, after consultation with the Prepetition Secured Lenders and the Committee and subject to Court approval following the Auction, the highest and best offer shall be selected and announced as the successful bidder by KiOR (the "Successful Bidder"), and the bid of the bidder that submits the next highest and best bid, shall be selected and announced by KiOR (the "Back-Up Bid" by the "Back-Up Bidder"); *provided, however*, that designation of such bidder as the Back-Up Bidder must be consistent with the asset purchase agreement submitted in connection with such bidder's bid.  For the avoidance of doubt, if there are no Qualified Bidders who agree to act as the Back-Up Bidder, then there shall be no Back-Up Bidder.  There will be no further

bids or offers considered by KiOR following the conclusion of the Auction and the announcement of the Successful Bidder and, as applicable, the Back-Up Bidder.

iv. If KiOR does not receive at least one (1) Qualified Bid from a Qualified Bidder other than the Stalking Horse Bidder, then (1) no Auction or Sale Hearing shall be scheduled or conducted, KiOR and the Stalking Horse Bidder are authorized to move forward with the transactions contemplated by the PSA, the transaction consideration contemplated by the PSA will be determinative of the value of the Purchased Assets and of the value of any equity interests in KiOR, and the Court shall not consider any competing or alternative offers or proposals to purchase the Purchased Assets; and (2) KiOR will file on the docket of the Chapter 11 Case a "Notice of Cancellation of Auction and Sale Hearing and Intent to Proceed with Chapter 11 Plan."

v. The Auction may be adjourned from time to time by KiOR, provided that no such adjournment shall affect the rights of the Stalking Horse Bidder under the PSA or the DIP Lenders under the DIP Credit Agreement or DIP Order.  Reasonable notice of such adjournment and the time and place for the resumption of the Auction shall be given to the Stalking Horse Bidder, all Qualified Bidders that have submitted a Qualified Bid, and counsel to the Committee.

e.    Successful Bidder.  KiOR may base the selection of the Successful Bidder and Back-Up Bidder on the following factors, among others:  purchase price, liabilities assumed in the bid (provided that in no event shall the cash component required for a Qualified Bid be reduced as a result of a bidder's proposed assumption of liabilities), retention of KiOR employees and the markup of the form of asset purchase agreement filed by KiOR submitted with the bid.  After consultation with the Prepetition Secured Lenders and the Committee, KiOR may (a) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of KiOR, its estate, and its creditors; and/or (b) refuse to consider any bid that fails to comply with the Bid Procedures.  After the determination of the Successful Bidder, KiOR shall (i) if the Successful Bidder is a bidder other than the Stalking Horse Bidder, promptly execute the asset purchase agreement previously executed and submitted by such Successful Bidder, together with any changes thereto necessitated by the parties' actions at the Auction, or (ii) if the Successful Bidder is the Stalking Horse Bidder, move forward with the transactions contemplated by the PSA.  All rights of the Stalking Horse Bidder, any Prepetition Secured Lender and the Committee (if any) to object to KiOR's selection of a Successful Bidder or Back-Up Bidder, or to object to the consummation of the sale transaction represented by either such bid, are preserved.

f.    Back-Up Bidder.  If the Successful Bidder fails to consummate an approved sale in accordance with the applicable asset purchase agreement or such agreement is terminated (or, in the event that the Stalking Horse Bidder is the Successful Bidder, the Parties fail to consummate the transactions contemplated by the PSA or the PSA is terminated), (i) KiOR shall be authorized to deem the Back-Up Bid the Successful Bid, and KiOR shall be authorized to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court (or, in the event that the Stalking Horse Bidder is the Back-Up Bidder, move forward with the transaction contemplated by the PSA), *provided, however*, that if the Stalking Horse Bidder is the Successful Bidder, the Back-Up Bidder shall remain the Back-Up Bidder in accordance with the Back-Up Bidder's asset purchase agreement; and (ii) the Deposit provided by such defaulting bidder shall be forfeited to KiOR in accordance with the defaulting bidder's asset purchase agreement, be treated as cash collateral for all purposes under the DIP Order, be subject to any obligations of KiOR under the DIP Credit Agreement, and be subject to the provisions of the Back-Up Bidder's asset purchase agreement.  KiOR specifically reserves the right to seek all appropriate damages or equitable remedies from a defaulting Successful Bidder or Back-Up Bidder.  If the Back-Up Bidder varies materially from the form of asset purchase agreement as filed with the Court, KiOR reserves the right to seek Court approval of the sale.

g.    Modification of Bidding and Auction Procedures.  After consultation with the Prepetition Secured Lenders and the Committee, KiOR may modify the Bid Procedures with respect to the Bid Deadline (which shall not be extended past the outside date in the DIP Order other than as permitted by the DIP Order), whether a bid that materially complies with the requirements of the Bid Procedures (as determined by KiOR in the reasonable exercise of its business judgment consistent with its fiduciary duties) is a Qualified Bid, and the time (which shall not be extended past the outside date in the DIP Order other than as permitted by the DIP Order), manner, and place of the Auction; *provided*, *however*, that the Bid Procedures may not be otherwise modified except with the express written consent of KiOR, the Stalking Horse Bidder, and the Prepetition Secured Agents; *provided*, *further*, *however*, that in no event may the Bid Procedures be modified (i) to reduce the required cash component of a Qualified Bid or (ii) in a fashion inconsistent with any requirement under the DIP Order.  All rights of the Stalking Horse Bidder and any Prepetition Secured Lender in respect of any modification of the Bid Procedures by KiOR are preserved.  KiOR may, following consultation with the Prepetition Secured Lenders and the Committee, make such modification to the Auction Procedures as are necessary and not inconsistent with this Order and its obligations under the DIP Order.

h.    Contract Cure Procedures.  To the extent a Qualified Bidder seeks approval in the Sale Order (defined in the Motion) of assumption and assignment of executory contracts and/or unexpired leases, the following procedures (the "Cure

<u>Procedures</u>") shall apply for notifying counterparties to executory contracts and unexpired leases of potential Cure Amounts (as defined below).[5]

    i.   Within two days (2) days after the Bid Deadline the Debtor will file a notice of potential assumption, assignment and/or transfer of executory contracts and unexpired leases identified by each Qualified Bidder (the "<u>Designated Executory Contracts</u>"), substantially in the form hereto as <u>Exhibit 4</u> (the "<u>Notice of Assumption and Assignment</u>"), and serve such notice on all non-debtor parties to the Designated Executory Contracts (the "<u>Contract Notice Parties</u>").

    ii.   The Notice of Assumption and Assignment shall identify the calculation of the cure amounts, if any, that the Debtor believes must be paid to cure all defaults outstanding under each Designated Executory Contract (the "<u>Cure Amounts</u>") as of such date.  The Notice of Assumption and Assignment shall also contain information regarding how a non-debtor party to a Designated Executory Contract may obtain adequate assurance of future performance information from the applicable Qualified Bidder (the "<u>Adequate Assurance Information</u>").  The Notice of Assumption and Assignment shall provide that a non-debtor party to a Designated Executory Contract may object to the Cure Amount, the Adequate Assurance Information or the assumption and assignment of such contract or lease at the hearing to approve the sale or Sale Hearing or at a later hearing, as determined by the Debtor subject to the Court's calendar.

**(ii)**    **Approval of the PSA and Authorization for the Debtor to Assume the PSA**

20.    The Debtor further seeks approval of the PSA and approval for the Debtor to assume the PSA.  As set forth above, the PSA and the Plan Term Sheet provide the framework for consummating the transactions negotiated between the Debtor and the Stalking Horse Bidder.

**(iii)**    **Scheduling and Notice**

21.    Pursuant to Annex 1 to the Senior Secured and Superpriority Financing Agreement dated as of November 9, 2014 (the "<u>DIP Credit Agreement</u>"), the hearing to approve the Bid Procedures must occur by December 1, 2014, provided that failure to meet such deadline

---

[5]    To the extent a Qualified Bidder, like the Stalking Horse Bidder, seeks assumption and assignment of executory contracts and unexpired leases pursuant to a bankruptcy plan, these procedures will not apply.

shall constitute a Default and shall mature into an Event of Default if such Milestone is not met by December 5, 2014.  Further, the Debtor is further required to obtain entry of the Bid Procedures Order and the final DIP order within three (3) days of the hearing to consider the bid procedures, to hold an Auction, if applicable under the Bid Procedures, on December 17, 2014, and to hold the hearing to approve the winning bidder, if applicable under the Bid Procedures, on or about December 22, 2014, provided that failure to meet the December 22, 2014 deadline shall constitute a Default and shall mature into an Event of Default if such Milestone is not met by December 30, 2014.  As set forth above, the failure to satisfy these deadlines, among the others set forth in the milestones, permits the Stalking Horse Bidder to terminate the PSA and violates the DIP Credit Agreement.

22.    Consistent with these requirements and the local rules, the Debtor proposes the following timeline for conducting the sale process, subject to this Court's availability:

| Event | Deadline |
| --- | --- |
| Bid Procedures Hearing | December 1, 2014[6] |
| Bid Deadline | December 15, 2014 |
| Auction | December 17, 2014 |
| Sale Hearing (Cash Buyer) | December 22, 2014[7] |
| Closing of Cash Sale | January 15, 2015 |
| Confirmation of Plan (Stalking Horse Buyer) | February 12, 2015 |
| Plan Effective Date (Stalking Horse Buyer) | February 27, 2015 |

23.    Given the Debtor's extensive prepetition marketing efforts, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for

---

[6]    The failure to meet the December 1, 2014 deadline shall constitute a Default and shall mature into an Event of Default if such Milestone is not met by December 5, 2014.

[7]    The failure to meet the December 22, 2014 deadline shall constitute a Default and shall mature into an Event of Default if such Milestone is not met by December 30, 2014.

the Assets.  The most likely competing bidders are among those who previously submitted a letter of intent or had access to the data room during the prepetition process.  Thus, these parties need minimal time to submit competing bids.  If new bidders emerge, the proposed timeline will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture.

24.    *Notice of Bid Procedures Hearing*.  On the date the notice of motion and hearing of this Motion is filed, the Debtor proposes to serve by overnight delivery this Motion and all exhibits hereto, including the APA, the PSA, the Bid Procedures and a copy of the proposed Bid Procedures Order, by first-class mail, postage prepaid, upon (a) the United States Trustee for the District of Delaware; (b) counsel to agent under the DIP Credit Agreement; (c) the creditors listed on the Debtor's list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtor; (f) each of the Debtor's landlords and any notice parties identified in the Leases; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that have been identified by the Debtor or its advisors as a potential buyer of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency; (l) local, state and federal authorities and agencies that have issued licenses or permits to the Debtor with respect to the operation and use of the Assets; and (m) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Motion Notice Parties").

25.     *Notice of Sale*.  Within two (2) days of the entry of the Bid Procedures Order or as soon thereafter as practicable, the Debtor shall cause to be served, by first-class mail, postage prepaid, upon the Sale Motion Notice Parties and each of the Debtor's creditors, a sale notice (the "Notice of Auction and Sale Hearing") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as **Exhibit 2**.

26.     *Post-Auction Notice*.  As soon as possible after the conclusion of the Auction, the Debtor shall file, but not serve, a notice identifying the highest and best bid selected and announced by the Debtor as the successful bidder (the "Successful Bidder"), and the bid of the bidder that submits the next highest and best bid (the "Back-Up Bid" by the "Back-Up Bidder"), *provided*, *however*, that if the Stalking Horse Bidder is the Successful Bidder, the Debtor will file, but not serve, a "Notice of Successful Bid and Intent to Proceed with Chapter 11 Plan."

**B.      Sale Order**

27.     The Debtor requests that this Court set the Sale Hearing on or about December 22, 2014.  At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bid Procedures, the Debtor intends to seek entry of a Sale Order (A) approving the sale, free and clear of all liens, claims, interests, charges and encumbrances (collectively, "Interests"), and (B) authorizing the assumption and assignment of certain executory contracts and leases.

**BASIS FOR RELIEF REQUESTED**

28.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'"

*Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 462

(D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc*

*Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 555 n.111

(D. Del. 2008).  Thus, this Court should grant the relief requested in this Motion if the Debtor

demonstrates a sound business justification therefor.  *See In re Del. Hudson Ry. Co.,* 124 B.R.

169, 179 (Bankr. D. Del. 1991).

29.     As discussed above, the Debtor determined that the most effective way to

preserve the value of the Debtor's assets for the benefit of its stakeholders is through the

comprehensive reorganization contemplated by the PSA and Plan Term Sheet, subject to the

possibility that a superior transaction may be available through a sale of the Debtor's assets

following a thorough marketing process.  The Debtor submits that the Debtor's assumption of

the PSA and implementation of the Bid Procedures and the timeline proposed herein, will

achieve such goal.  In the absence of the PSA reorganization or a higher and better sale

transaction conducted in accordance with such timeline, the Debtor faces a likely piecemeal

liquidation.  As such, the Debtor submits that it has demonstrated a sound business justification

for the relief requested herein.

### A.     **Bid Procedures**

30.     The Debtor submits that the Bid Procedures are appropriate to ensure that the

bidding process is fair and reasonable and will yield the maximum value for its stakeholders.

Among other things, the Bid Procedures (i) provide potential bidders with sufficient notice and

an opportunity to acquire information necessary to submit a timely and informed bid, especially

given the substantial pre-petition marketing described above, (ii) are designed to maximize the

value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, and (iii) will provide the Debtor with the opportunity to consider all competing offers and to select the highest or otherwise best offer for the sale of substantially all of the Assets. Notably, in the event of any overbid, the Stalking Horse Bidder will not be entitled to any breakup fee, expense reimbursement, or similar payment.

31.     The Debtor requests this Court's approval of the Bid Procedures, including the dates established thereby for an Auction and a Sale Hearing. Accordingly, the Debtor and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bid Procedures.

**B.      The Assumption and Assignment of Executory Contracts and Unexpired Leases and the Cure Procedures**

32.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3rd. Cir. 1989).

33.     The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."

*Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

34.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  *See In re Rickel Home Ctr., Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Doge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

35.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.,* 103 B. R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute

assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

36.    Adequate assurance of future performance with respect to any Successful Bidder who is not the Stalking Horse Bidder shall be presented at the Sale Hearing.  If necessary, the Debtor will adduce facts at the Sale Hearing to refute any objection, demonstrating the financial wherewithal of the Successful Bidder, and its willingness and ability to perform under the executory contracts and leases to be assumed and assigned.  The Sale Hearing therefore will provide this Court and other interested parties with ample opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the executory contracts and leases that the Debtor seeks to assume and assign.

37.    Accordingly, the Debtor respectfully submits that the procedures proposed herein for executory contracts and leases being assumed and assigned on the Closing Date are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Notice of Potential Assignment and Assumption of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

38.    Furthermore, to the extent that any defaults exist under any executory contract or lease that is to be assumed and assigned in connection with any sale of the Assets, the Successful

Bidder or the Debtor (as applicable under the Successful Bidder's asset purchase agreement) will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such executory contract or lease.

39.     Accordingly, this Court therefore has a sufficient basis to authorize the Debtor to assume and assign executory contracts and leases as may be set forth in any Successful Bidder's asset purchase agreement.

## C.    Approval of the PSA

40.     The terms and conditions of the PSA and the Plan Support Agreement attached thereto, are fair, reasonable, and the best available to the Debtor under the circumstances. The PSA was negotiated in good faith and at arms' length among the Parties and their respective professional advisors. For the reasons set forth herein, the Debtor's assumption of the PSA should be approved as a reasonable exercise of the Debtor's business judgment. *See Sharon Steel Corp.*, 872 F.2d at 39-40; *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462-64 (Bankr. S.D.N.Y. 2014) (concluding that debtors could appropriately assume a prepetition restructuring support agreement under Bankruptcy Code section 365).

## D.    Approval of the Sale

### (i)     The Sale is an Appropriate Exercise of the Debtor's Business Judgment

41.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale

or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction. *See, e.g., In re Eagle Picher Holdings, Inc.*, 2005 Bankr. LEXIS 2894, at ¶ 3 (Banter. S.D. Ohio 2005); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983). Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re S.N.A. Nut Co.*, 186 B.R. 98 (Bonier. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

42.    The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D.D.C. 1991); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action").

43.    The Debtor is proposing a full, fair, and open bidding process after already having run a robust prepetition marketing effort. The combined result achieves the objective of obtaining the highest or otherwise best offer for any potential sale of assets for the benefit of the Debtor's estate. The transactions contemplated by the PSA will be subject to competing bids,

enhancing the Debtor's ability to receive the highest or otherwise best value for its estate. Consequently, the fairness and reasonableness of the consideration to be received by the Debtor will ultimately be demonstrated by a "market check" through an open auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

44.    In addition, all creditors and parties-in-interest will receive adequate notice of the Bid Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in the Chapter 11 Case, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by any proposed sale transaction.

45.    Given the Debtor's financial condition and circumstances, the Debtor reasonably determined that the most effective way to preserve the value of the Debtor's assets for the benefit of its stakeholders is through the comprehensive reorganization to be effected through the PSA, subject to the possibility that there may be a superior transaction based on the sale of the Assets following a thorough marketing process.

### (ii)    Sale Free and Clear of Liens and Encumbrances

46.    Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of such Interests in property if:

(a)    applicable nonbankruptcy law permits a sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such

> property is to be sold is greater than the value of all liens on such property;
>
> (d)    such interest is in *bona fide* dispute; or
>
> (e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

47.    Because Section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Assets "free and clear" of Interests.  *Mich. Emp't Sec. Comm'n v. Wolverine  Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)."); *Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that Section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of Section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens).  If applicable, the Debtor is prepared to demonstrate at the Sale Hearing that it has satisfied one or more of these conditions.

### (iii)    The Successful Bidder Should be Entitled to the Protections of Section 363(m)

48.    Pursuant to Section 363(m) of the Bankruptcy Code, a good faith buyer is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts Dairies*, 788 F.2d at 147; *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st

Cir. 1993); *In re Willemain V. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

49.     Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, Case No. 92 CIV. 7054 (PKL), 1993 WL 159969, *3 (S.D.N.Y. May 10, 1993) (*quoting In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 at 147).  *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith buyers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

50.     If applicable, the Debtor will adduce facts at the Sale Hearing demonstrating that the Successful Bidder for the Assets had negotiated at arm's length, with all parties represented by their own counsel.  Accordingly, the Sale Order will include a provision that the Successful Bidder for the Assets, is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code.  The Debtor believes that providing any Successful Bidder engaging in a sale transaction with such protection will ensure that the maximum price will be received by the Debtor for the Assets and that closing of any sale will occur promptly.

**E.      Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

51.      Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."  The Debtor requests that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

The Debtor shall serve a copy of this Motion by overnight delivery upon:  (a) the United States Trustee for the District of Delaware; (b) counsel to the Debtor's DIP Lender; (c) the creditors listed on the Debtor's list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtor; (f) each of the Debtor's landlords and any notice parties identified in the Leases; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets or that have been identified by the Debtor or its advisors as a potential buyer of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency; (l) local, state and federal authorities and agencies that have issued licenses or permits to the Debtor with respect to the operation and use of the Assets; and (m) all parties requesting notice pursuant to Bankruptcy

Rule 2002.    In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

## **NO PRIOR REQUEST**

No prior motion for the relief requested herein has been made to this Court or any other Court.

## **CONCLUSION**

WHEREFORE, the Debtor requests this Court to enter the Bid Procedures Order, the Sale Order (if applicable), and such other and further relief as the Court may deem just and appropriate.

Date:   November 9, 2014                    /s/ John H. Knight
        Wilmington, Delaware                John H. Knight (No. 3848)
                                            Michael J. Merchant (No. 3854)
                                            Amanda R. Steele (No. 5530)
                                            RICHARDS, LAYTON & FINGER, P.A.
                                            920 N. King Street
                                            Wilmington, Delaware 19801
                                            Telephone:  302-651-7700
                                            Facsimile:  302-651-7701
                                            Email: knight@rlf.com
                                                   merchant@rlf.com
                                                   steele@rlf.com

                                                    -and-

                                            Mark W. Wege (Texas Bar No. 21074225)
                                            Edward L. Ripley (Texas Bar No. 16935950)
                                            Eric M. English (Texas Bar No. 24062714)
                                            KING & SPALDING, LLP
                                            1100 Louisiana, Suite 4000
                                            Houston, Texas  77002
                                            Telephone:  713-751-3200
                                            Facsimile:  713-751-3290
                                            Email: MWege@kslaw.com
                                                   ERipley@kslaw.com
                                                   EEnglish@kslaw.com

                                            Proposed Attorneys For Debtor and Debtor in
                                            Possession