**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KiOR, Inc.,[1] | Case No. 14-12514 (CSS) |
| Debtor. | Hearing Date: Jan. 23, 2015 at 11:00 a.m. |
| | Objections Due: Jan. 16, 2105 at 4:00 p.m. |
| | Re: Docket No. 154 |

**OBJECTION OF THE MISSISSIPPI DEVELOPMENT AUTHORITY TO THE**
**DEBTOR'S MOTION TO APPROVE DISCLOSURE STATEMENT**

The Mississippi Development Authority (the "MDA"), the largest unsecured creditor of KiOR, Inc. (the "Debtor") in this Chapter 11 case, objects to (the "Objection") the Debtor's Motion for an Order (I) Approving Disclosure Statement, (II) Approving Solicitation Package, (III) Establishing Voting Record Date for Entitlement to Solicitation Package and to Vote on Plan of Reorganization, (IV) Approving Procedures for Distribution of Solicitation Package, (V) Approving Form of Ballots, (VI) Establishing Last Date for Receipt of Ballots, (VII) Approving Procedures for Vote Tabulation, (VIII) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan of Reorganization, and (IX) Approving Form of Manner of Notice of Confirmation Hearing and Related Issues [Docket No. 154] (the "Motion"). The MDA objects to the Motion as follows:

**BACKGROUND**

1.    On November 9, 2014, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

---

[1]    The Debtor and the last four digits of its taxpayer identification number are: KiOR, Inc. (2233).  The Debtor's mailing address is 13001 Bay Park Road, Pasadena, Texas 77507.

2.    The Debtor is a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this case.

3.    No committee of unsecured creditors has been appointed in this chapter 11 case.

4.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to § 157(b).

5.    A more fulsome description of the factual circumstances underlying this case are set forth in MDA's Motion to Convert and Dismiss [Docket No. 168, pages 3-20] and DIP Financing Objection [Docket No. 180, pages 3-20], each of which is incorporated herein by reference.[2]

## OBJECTION

6.    As an initial matter, the Debtor only recently submitted a substantially revised plan, and the Disclosure Statement does not accurately address or describe the amended plan.

7.    The Court should not approve the Disclosure Statement because it does not contain adequate information as required by section 1125 of the Bankruptcy Code.

8.    A debtor may only solicit votes to accept or reject a chapter 11 plan after the Court has approved the debtor's written disclosure statement as containing "adequate information." 11 U.S.C. §1125(b). Section 1125(a) of the Bankruptcy Code defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to . . . a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.]

---

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion to Convert or Dismiss or the DIP Financing Objection, as applicable.

11 U.S.C. § 1125(a)(1).

9.    Given the reliance creditors and bankruptcy courts place on disclosure statements in considering whether to vote to accept or reject a plan, the Third Circuit has stated that "we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code['s] standard of adequate information." *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988).

10.    A disclosure statement must contain "simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).  Simply put, creditors cannot make an informed decision when voting on a plan without adequate disclosure.

11.    The disclosure duty imposed on debtors by the Bankruptcy Code extends to "***potential*** causes of action."  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir. 2003) (emphasis in original).  The claims that must be disclosed include those that "the debtor has enough information … prior to confirmation to suggest that it may have a possible cause of action".  *See id.* at 323 (citing *In re Coastal Plains*, 179 F.3d 197, 208 (5th Cir. 1999)) (alteration in original).

12.    To adequately disclose causes of action a debtor must specify the claims.  *See Krystal Cadillac-Oldsmobile GMC Truck*, 337 F.3d at 321.  Mere "boilerplate" or generalized descriptions are inadequate to provide the level of notice required.  *Id.* at 320 n.9, 321.  At a minimum, the disclosure statement should disclose the existence of causes of action, the possible amount of recovery, the basis for those actions and the intent to pursue them.  *See In re Texas Wyoming Drilling, Inc.*, 647 F.3d 547 (5th Cir. 2011).

13.    Here, the Debtor's proposed Disclosure Statement fails to provide adequate information as required by the Bankruptcy Code and should not be approved.

**The Disclosure Statement Fails to Adequately**
**Describe the Restructuring Transaction**

14.    Section I(B)(1) of the Disclosure Statement -- the description of the "Restructuring Transaction" -- fails to inform creditors of what is really happening in this case and with the Debtor's business.

15.    The Disclosure Statement's description of the Restructuring Transaction states the Debtor's business will be preserved as a "going concern", but does not inform creditors that (i) the Debtor has no commercially viable product, (ii) the Debtor needs significant additional time and capital in order to continue its efforts to discover a workable product – potentially hundreds of millions of dollars; and (iii) its efforts to commercialize a product may never be successful.

16.    The Restructuring Transaction description states that the new equity of the Debtor will be given to the DIP Lender and the holders of First Lien Claims, but it does not disclose that both of those entities are controlling insiders of the Debtor or that the First Lien Claims and other prepetition insiders secured claims are being challenged by the MDA.

17.    The Restructuring Transaction description states that "certain parties" will get releases under the Plan, but does not disclose who those parties are, and that many of those parties are the very insiders against whom the Debtor's estate may have claims.

18.    The Restructuring Transaction description states that the Restructuring Transaction was negotiated at arms-length and in good faith.  But, it does not mention that all such parties involved in that negotiation were insiders or otherwise closely related to the Debtor, nor does it

4

mention the MDA's motion to convert or dismiss this case on the basis of such parties' bad faith in filing and structuring this case to inure to the ultimate benefit of them.

19.   The Restructuring Transaction description states the Debtor's belief that it has taken "appropriate steps to maximize value for creditors", but does not mention that the legitimate general unsecured creditors of the estate will likely get nothing under their Plan.   Moreover, it fails to mention MDA's position that this case was overly engineered by insiders to take the Debtor's assets for themselves at the expense of the legitimate creditors of the estate.

20.   The Disclosure Statement fails to disclose why the proposed Plan is a superior alternative to a §363 sale of the Debtor's assets.

**The Disclosure Statement Fails to**
**Adequately Describe the Debtor's Business**

21.   Section II(A) of the Disclosure Statement purports to describe the Debtor's business, but does not mention that (i) the Debtor has no commercially viable product, (ii) the Debtor needs significant additional time and capital in order to continue its efforts to discover a workable product – potentially hundreds of millions of dollars; and (iii) its efforts to commercialize a product may never be successful.

22.   Section II(A) and IV(B)'s descriptions of the prepetition Capital Infusions fails to mention the insider and/or close relationship between the Debtor and the counterparties.   It additionally fails to note the MDA's position that these "credit" facilities are, in fact, disguised equity financings that can and should be recharacterized as equity interests.   The MDA has sought standing to pursue challenges to the alleged insider secured claims and has tendered a proposed complaint seeking, *inter alia*, recharacterization. *See MDA's Motion for an Order Granting Leave, Standing and Authority to Commence and Prosecute Derivative Claims on Behalf of the Debtor's Estate* [Docket No. 223] (the "Proposed Recharacterization Action").

5

**The Disclosure Statement Fails to Adequately Describe**
**What, If Any, Claims the Liquidation Trustee Could Pursue**

23.   The only source of distributions for holders of General Unsecured Claims under the proposed Plan is proceeds from estate causes of action, purportedly to be prosecuted by a Liquidating Trustee.   But, neither the description of avoidance actions in Section III(I) and IV(D)(1) or the treatment of General Unsecured Claims in Section IV(B)(9) describe any specific causes of action that the Liquidating Trustee could pursue, nor do they describe the due diligence the Debtor undertook as to potential estate causes of action – or rather the fact that the Debtor has not undertaken an analysis of any of such potential causes of action.

24.  Similarly, Section I(B)(2) of the Disclosure Statement which purports to describe "Payment of Allowed Claims" states that unsecured creditor's recovery from the prosecution of the Vested Causes of Action is "uncertain", but does not (i) mention that the reason for such uncertainty is that the parties against whom recoveries would be most likely are obtaining broad releases under the Plan; (ii) describe any specific cause of action that the Liquidating Trustee might pursue; or (iii) describe any due diligence (or lack thereof) undertaken by the Debtor as to any potential estate claims.

25.  Meanwhile, the Plan proposes to waive all avoidance causes of action against numerous insiders and claimholders, including without limitation, certain of the Debtor's shareholders, the insider DIP Lender, the Debtor's alleged prepetition "secured lenders", as well as avoidance actions against trade creditors who opt into the "Continuing Trade Claims" Plan class, and numerous other parties who are not specifically identified.  Thus, it is entirely unclear from the Disclosure Statement what, if any, causes of action there would be left for the Liquidating Trustee to pursue.

HOU 408261633v2

26.    Moreover, the Debtor admits that the Liquidation Analysis does not include recoveries for any avoidance actions at all: "The Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions." Exhibit E to Motion, Docket No. 150-5 p. 3 par. 5.  If the Debtor believes there are no avoidance actions to pursue under any scenario, then the Disclosure Statement should specifically state that, rather than providing creditors a false hope of recovery.

**The Disclosure Statement Fails to Adequately**
**Describe the Estate Claims Being Released**

27.    Sections VI(C), (D), (F), (G) and (H) of Disclosure Statement addressing releases and exculpation fail to describe any of the particular causes of action the Debtor proposes to release under the Plan, or the potential value those claims may have.

28.    Through the Plan, the Debtor intends to release a host of parties and individuals who otherwise may face scrutiny and causes of action with respect to their prepetition conduct, purported claims and exercise of control over the Debtor.  The recipients of these generous releases include certain of the Debtor's shareholders, the insider DIP Lender, the Debtor's alleged prepetition "secured lenders", and others.

29.    The Disclosure Statement does not describe why all these parties are entitled to releases, what consideration they all granted in exchange for such releases, what claims the estate might have against these parties which will be released, and why these releases are "integral and crucial" to the Debtor's plan as averred by Section VI(F) of the Disclosure Statement.

30.    Moreover, certain trade vendors may obtain releases of estate claims against them by opting into the "Continuing Trade Claim" class, whereby such creditors agree to continue prepetition service terms for 12 months in exchange for a 50% recovery on their claim.  The Debtor estimates a total amount of $1.7 million of trade claims may be eligible to opt into this

class.  But the Disclosure Statement provides <u>no</u> information as to the value of the claims the

estate is waiving against these parties in return, so it is impossible to understand the economic

effect of such releases on the recoveries for General Unsecured Claims.

**The Disclosure Statement Fails to**
**Describe Who is Getting A Release**

31.   The Plan contains broad releases for the benefit of numerous parties, many of whom

are not identified.  The descriptions of such releases in sections VI(C), (D), (F), (G) and (H) of

the Disclosure Statement similarly fail to specifically identify numerous release recipients, nor

does it describe what, if any, diligence the Debtor undertook in determining whether to release

such unidentified parties.   For instance, in addition to releasing the Debtor's alleged major

"secured" claimholders, the Plan also proposes to release their respective:

- successors and predecessors,
- current and former control persons,
- trustees or beneficiaries,
- direct or indirect shareholders or members,
- officers,
- directors,
- employees,
- affiliates,
- principals,
- agents (and each of their respective attorneys, consultants, financial advisors, investment bankers, accountants, and other retained professionals).

32.   None of the forgoing individuals or entities are actually identified in the Disclosure

Statement.  Such disclosure is particularly important in cases such as this one, where insider

controlling parties of the Debtor are the same "secured" creditors obtaining the benefit of such

releases.

33.   The Disclosure Statement suffers from the same defect with respect to the balance of

the broad releases granted to, *inter alia*, the "Plan Support Parties" who are also insiders of the

Debtor, and the DIP Lender –yet another insider.

8

34. The Disclosure Statement has no description of any diligence undertaken by the Debtors in determining why to release these unidentified parties, and what consideration any such unidentified party has provided to the Debtor.

**The Disclosure Statement Fails to Provide**
<u>**Sufficient Information on Feasibility**</u>

35. Section VIII(A) of the Disclosure Statement fails to adequately describe the financial needs of the Reorganized Debtor and how those needs will be met.

36. The Disclosure Statement fails to disclose that Debtor may require hundreds of millions of dollars in further investment to commercialize a saleable product, and that it has no commitment from any party to fund its operations beyond the limited Exit Financing, which financing, the Debtor has testified, is not yet in place or agreed to. There is no disclosure of any commitment letter or other agreement of anyone to provide any such further funding. Whether and on what terms the Debtor may obtain Exit Financing or any required funding thereafter directly impacts the feasibility of the Debtor's proposed plan and should therefore be disclosed in the Disclosure Statement.

37. Moreover, even if the Debtor had included in its filing the 12 month budget referenced as (currently blank) Exhibit E to the Disclosure Statement, the Debtor admits that "it will not generate substantial revenues during the 12-24 months following the Effective Date." Thus, the Disclosure Statement it is unclear as to how the Reorganized Debtor will be able to operate after it burns through the limited Exit Financing, if any, obtained by the Debtor.

<u>**The Liquidation Analysis is Deficient**</u>

38. The Debtor concludes in Section I(B)(3) and Section VIII(C) of the Disclosure Statement that holders of claims will receive greater and earlier recoveries under their Plan rather than in a Chapter 7. But, these conclusions and the accompanying Liquidation Analysis are

unsupported and deficient in their description of the potential values available for unsecured creditors.

39. Initially, the recovery for General Unsecured Creditors under the Plan is solely related to the "Vested Causes of Action", which exclude potential actions against a host of parties receiving releases under the Plan. In a chapter 7 case, no such releases would be granted, so the potential for a greater recovery in chapter 7 is plainly evident.

40. The Liquidation Analysis also fails to either describe or attempt to ascribe any range of value for any of the causes of action that could be asserted by the Estate against any party in a liquidation scenario, and is thus deficient.

41. Moreover, the Debtor's Liquidation Analysis also assumes that the Capital Infusions would all be treated as allowed claims in a chapter 7 case. As set forth in the MDA's Proposed Recharacterization Action, such "claims" for Capital Infusions are really disguised equity interests, and MDA submits that a chapter 7 trustee would seek to recharacterize such claims accordingly.

**The Disclosure Statement Should Describe MDA's
Pending Actions, Motions, Objections and Reasons Therefor**

42. Section III of the Disclosure Statement, addressing Significant Events During the Chapter 11 Case, should inform the voting creditors of the ongoing litigation between the Debtor and MDA and the MDA's positions therein, including with respect to (i) the impropriety of the insider DIP Financing and the use of such manufactured currency to disenfranchise the estate's legitimate creditors; (ii) the MDA's motion to convert or dismiss this chapter 11 case as a bad faith filing; and (iii) the MDA's Proposed Recharacterization Action.

43. Moreover, MDA filed a lawsuit in Mississippi against various of the Debtor's current and former officers and directors alleging certain state law causes of action relating to,

*inter alia*, the MDA's loans to the Debtor's subsidiary, which are guaranteed by the Debtor.  The MDA contends that this action constitutes a material proceeding that should be disclosed, together with the facts supporting it.

## RESERVATION OF RIGHTS

44. The MDA reserves its rights to supplement or amend this Objection, or file additional Objections, as necessary or appropriate should the Debtor file an amended disclosure statement to reflect the provisions of the amended proposed chapter 11 plan.

## CONCLUSION

For the reasons stated herein, the MDA respectfully requests that the Court deny the Debtor's request to approve the Disclosure Statement.

Respectfully submitted, this 16th day of January, 2014.

**GREENBERG TRAURIG, LLP**

*/s/ Dennis A. Meloro*
Dennis A. Meloro (Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE  19801
Telephone:  (302) 661-7000
Facsimile: (302) 661-7360
Email: MeloroD@gtlaw.com

 - and -

David B. Kurzweil (Admitted *Pro Hac Vice*)
R. Kyle Woods (Admitted *Pro Hac Vice*)
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Telephone:  (678) 553-2680
Facsimile:  (678) 553-2681
Email: KurzweilD@gtlaw.com
Email: WoodsK@gtlaw.com

 - and -

*HOU 408261633v2*

Shari L. Heyen (Admitted *Pro Hac Vice*)
1000 Louisiana, Suite 1700
Houston, Texas 77002
Telephone:  (713) 374-3564
Facsimile:  (713) 818-3795
Email: HeyenS@gtlaw.com

- and -

**MCCRANEY MONTAGNET QUIN &
NOBLE, PLLC**

Douglas C. Noble (Admitted *Pro Hac Vice*)
William M. Quin II (*Pro Hac Vice Pending*)
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone: (601) 707-5725
Facsimile: (601) 510-2939
Dnoble@mmqnlaw.com
Wquin@mmqnlaw.com

***ATTORNEYS FOR MISSISSIPPI
DEVELOPMENT AUTHORITY***

*HOU 408261633v2*