# **Exhibit A**

(Exit Financing Letter)

**EXECUTION VERSION**

PASADENA INVESTMENTS, LLC
1760 The Alameda
Suite 300
San Jose, CA 95126

March 16, 2015

KiOR, Inc.
13011 Bay Park Road
Pasadena, Texas 77507

Ladies and Gentlemen:

Reference is hereby made to that certain Second Amended Chapter 11 Plan of Reorganization, dated as of March 16, 2015 (the "Plan"), of KiOR, Inc., a Delaware corporation ("KiOR"). Each capitalized term used but not defined herein shall have the meaning ascribed to it in the Plan, except as otherwise provided herein.

This letter agreement (this "Agreement") sets forth the commitment of Pasadena Investments, LLC, a Delaware limited liability company (the "Investor"), subject to the terms and conditions contained herein, to make a cash investment in Reorganized KiOR in exchange for shares of preferred stock following the Effective Date of the Plan (collectively, the "Financing").

1. Commitment Amount. The Investor hereby agrees, subject to the terms and conditions set forth herein (including, without limitation, the provisions of Sections 2, 8 and 9 below and Exhibit A), that it will provide Reorganized KiOR on and after the Effective Date of the Plan with Financing in an aggregate amount not to exceed $29,500,000 (the "Commitment Amount"). The Investor may effect the Financing directly or indirectly through one or more affiliates and/or other designated third parties; provided, that the ability of the Investor to effect the Financing through such affiliates and/or other third parties will not affect the Investor's obligations hereunder.

2. Conditions. The obligation of the Investor to invest, or cause the investment of, the Commitment Amount shall be subject to (i) KiOR achieving the applicable production benchmark set forth on Annex A to Exhibit A to the satisfaction of the Investor in its sole and absolute discretion, (ii) the negotiation and execution of definitive documentation with respect to the Financing containing the terms and conditions set forth in Exhibit A and other terms and conditions acceptable to the Investor in its sole and absolute discretion, (iii) the satisfaction in full (or waiver with the prior written consent of the Investor) of the conditions to the Effective Date set forth in the Plan, (iv) the entry by the Bankruptcy Court of the Confirmation Order no later than May 31, 2015, in form and substance reasonably satisfactory to the Debtor and the Plan Support Parties, (v) the Effective Date of the Plan shall have occurred no later than September 30, 2015, (vi) none of Fred Cannon, Chris Artzer, or John Kasbaum has resigned, has been terminated or is otherwise unable to continue his employment with KiOR or Reorganized KiOR; however, if one of the three of them were to resign, be terminated or unable to continue

their employment and within ten (10) days after such resignation, termination or inability to continue employment, KiOR or Reorganized KiOR has not retained a replacement or otherwise reallocated duties among existing personnel in a manner, in each case, that the Investor has consented to in writing in its reasonable discretion, (vii) the absence of any filing of a formal action or claim by the SEC against KiOR or any of its respective officers, employees or directors, other than a protective proof of claim filed in the KiOR bankruptcy case, and (vii) the absence of any other event or development, which, in the determination of the Investor, could be expected to have a Material Adverse Effect (as defined in the DIP Credit Agreement) or an Additional Material Adverse Effect (as described in Section 9(k) of the DIP Credit Agreement).

3. <u>No Modification; Entire Agreement</u>. No amendment, modification or waiver of any provision hereof shall be enforceable unless approved by the Investor and KiOR in writing. Together with the Plan Support Commitment, dated as of January 8, 2015, by the Investor, KFT Trust, Vinod Khosla, Trustee, VNK Management, LLC, and Khosla Ventures III, LP in favor of KiOR, this Agreement contains the entire agreement between the parties and supersedes all prior agreements, understandings and statements, written or oral, between the Investor or any of its affiliates existing on the date hereof, on the one hand, and KiOR or any of its affiliates existing on the date hereof, on the other hand, with respect to the subject matter hereof and the transactions contemplated hereby.

4. <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than the State of Delaware. The parties hereto agree that any action seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the Bankruptcy Court, and that any such action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such action and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action in any such court or that any such action brought in any such court has been brought in an inconvenient forum. Process in any such action may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

5. <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT PERMISSIBLE UNDER APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

6. <u>Representations and Warranties of the Investor</u>. The Investor hereby represents and warrants itself that (a) it has all limited liability company, corporate or other organizational power and authority to execute, deliver and perform this Agreement; (b) the execution, delivery and performance of this Agreement by the Investor has been duly and validly authorized and

approved by all necessary limited liability company, corporate or other organizational action by it; (c) this Agreement has been duly and validly executed and delivered by it and constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Agreement; (d) the Investor has available funds in excess of the sum of its Commitment Amount hereunder plus the aggregate amount of all other commitments and obligations it currently has outstanding; (e) subject to the entry of the Confirmation Order by the Bankruptcy Court, all consents, approvals, authorizations, permits of, filings with and notifications to, any governmental body necessary for the due execution, delivery and performance of this Agreement by the Investor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental body is required in connection with the execution, delivery or performance of this Agreement; and (f) the execution, delivery and performance of this Agreement by the Investor does not and will not (i) violate the organizational documents of the Investor, (ii) violate any applicable laws or court or governmental order to which the Investor or any of its assets are subject, or (iii) require any consent or other action by any Person or Entity under, constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in any breach of or give rise to any right of termination, cancellation, amendment or acceleration of, any right or obligation of the Investor, except in the case of clauses (a) through (f) above, where the failure of such representations and warranties to be true and correct, in the aggregate, would not reasonably be expected to have a material and adverse effect on the ability of the Investor to consummate the transactions contemplated by this Agreement.

       7.       <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts (including by facsimile or via email by .pdf delivery), each such counterpart when executed being deemed to be an original instrument, and all such counterparts shall together constitute one and the same agreement.

       8.       <u>Third Party Beneficiaries</u>.  This Agreement shall inure to the benefit of and be binding upon the Investor and KiOR.  The parties hereby agree that their respective representations, warranties and covenants set forth herein are solely for the benefit of the other party hereto and its respective successors and permitted assigns, in accordance with and subject to the terms of this Agreement, and this Agreement is not intended to, and does not, confer upon any Person or Entity other than the parties hereto and their respective successors and permitted assigns any rights or remedies hereunder or any rights to enforce the Commitment Amount, the Financing or any other provision of this Agreement.  In no event shall any of KiOR's creditors or any other Person or Entity have any right to enforce this Agreement or to cause KiOR to enforce this Agreement.

       9.       <u>Termination</u>.  This Agreement, and the obligation of the Investor to fund the Commitment Amount under this Agreement, will terminate automatically and immediately upon the earlier to occur of (a) the Effective Date of the Plan and  the effectiveness of definition documentation in connection with the Financing, (b) the termination or withdrawal of the Plan or the Confirmation Order, (c) KiOR or any of its representatives asserting or filing, directly or indirectly, any claim or action against any Related Party (as defined below) in connection with this Agreement, the Plan, the Confirmation Order or the transactions contemplated hereby or thereby or otherwise relating thereto, (d) following written notice by the Investor to KiOR, in the

event any Person or Entity other than KiOR attempts to enforce this Agreement, and (e) September 30, 2015.

10. <u>No Recourse</u>.  Notwithstanding anything that may be expressed or implied in this Agreement, each party hereto, by its acceptance of the benefits hereof, covenants, agrees and acknowledges that, notwithstanding that the Investor is a limited liability company, no recourse hereunder shall be had against any (i) Related Party of the Investor (other than the Investor) or (ii) any Related Party of any of such Related Parties (other than the Investor), in each case whether by the enforcement of any assessment or by any legal or equitable proceedings, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred (whether by or through attempted piercing of the corporate (or limited liability company) veil, by or through a claim by or on behalf of KiOR against any Related Party of the Investor, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any statute, regulation or applicable law, or otherwise) (x) by any Related Party of KiOR (other than KiOR) or (y) any Related Party of any of such Related Parties (other than KiOR), in each case, for any obligations of the Investor under this Agreement or for any claim based on, in respect of, or by reason of, this Agreement.  For the purposes of this Agreement, the terms "<u>Related Party</u>" and "<u>Related Parties</u>" shall mean any and all former, current or future directors, officers, employees, agents, attorneys, equity holders, controlling persons, managers, members, stockholders, representatives or affiliates of a Person or Entity.

11. <u>No Assignment</u>.  The benefits and obligations under this Agreement may not be assigned by KiOR without the prior written consent of the Investor and any attempted assignment in derogation of the foregoing shall be null and void and of no force and effect.  The Investor shall be permitted to assign all or any part of its rights and obligations under this Agreement without the consent of KiOR to one or more of its affiliates and/or other designated third parties; provided that no such assignment shall relieve the Investor of its obligations hereunder if the assignee(s) do not perform such obligations.  Any purported assignment in violation of the preceding sentence shall be null and void.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Sincerely,

PASADENA INVESTMENTS, LLC

By: _____
    Name: Vinod Khosla
    Title: _____

Agreed to and accepted as of this 16th day of March, 2015:

KIOR, INC.

By: _____
    Name: Christoph A. Artzer
    Title: President

# EXHIBIT A

## EQUITY FINANCING TERM SHEET

| | |
|---|---|
| Company | KiOR, Inc., a Delaware corporation, as reorganized under the Plan |
| Equity Investor | Pasadena Investments, a Delaware limited liability company, and its affiliates and designees |
| Maximum Equity Financing Amount | $29,500,000 |
| Initial Equity Financing on the Effective Date | $19,200,000[1] |
| Additional Equity Financing After the Effective Date | $10,300,000 on or prior to the date that is 6 months from the Initial Equity Financing if the specified benchmark set forth on Annex A is achieved by KiOR as determined to the satisfaction of the Investor in its sole and absolute discretion |
| Preferred Stock | Series A Preferred Stock on terms and conditions substantially similar those set forth in the National Venture Capital Association's Model Legal Documents at a valuation to be determined by the parties based upon, among other things, technical progress made between the date hereof and the Effective Date of the Plan. |
| Conditions Precedent to Additional Equity Financing After the Effective Date | The equity financing shall be conditioned upon, among other things, (i) the Company shall have complied with or performed in all material respects all of the covenants, agreements, obligations and conditions set forth in the Series A financing agreement and related agreements, to be dated as of the Effective Date of the Plan, by and between the Company and the Investor (the "Series A Financing Agreements") that are required to be complied with or performed by the Company on or before such funding date, (ii) the Company shall have delivered to the Investor a certificate from the Company's Chief Financial Officer, dated as of such funding date, certifying that the matters in foregoing clause |

---

[1] This amount assumes an allowed priority claim to the State of Mississippi of $1.1 million for franchise taxes; however, the State has filed a proof of claim seeking approximately $1.6 million. If the allowed amount of the State of Mississippi's franchise tax claim is greater than $1.1 million, the amount of funding would increase by such higher amount.

| | |
|---|---|
| | (i) have been satisfied, (iii) the Company shall have issued the shares of Series A Preferred Stock at the applicable price per share and executed and delivered to the Investor certificates representing such shares free of any and all liens, (iv) the Company shall have obtained the approvals and authorizations of, filings and registrations with, and notifications to governmental authorities required for consummation of each applicable equity financing and the proposed use of proceeds on such funding date, and (v) the satisfaction of the conditions to any additional equity financing after the Effective Date of the Plan as described above. |
| Termination Events | The Series A Financing Agreements shall be subject to termination by the Investor if, among other things, (i) the Company fails to pay one or more items of indebtedness when due, or any such indebtedness is accelerated prior to its stated maturity, in an aggregate amount of $100,000 or more, (ii) any money judgment, writ or warrant of attachment involving greater than $100,000 is entered or filed against the Company, (iii) in the event of a voluntary or involuntary bankruptcy proceeding involving the Company or the Company is unable to pay its debts as they become due, (iv) following the failure by the Company to comply with or perform in all material respects any of its covenants, agreements, obligations and conditions set forth in the Series A Financing Agreements, (v) following the six months following the Effective Date of the Plan unless prior to such time, the Company achieves production benchmarks as set forth on Annex A applicable to such time period, (vi) any of Fred Cannon, Chris Artzer, or John Kasbaum has resigned, has been terminated or is otherwise unable to continue his employment with the Company and within ten (10) days after such resignation, termination or inability to continue employment, the Company has not retained a replacement or otherwise reallocated duties among existing personnel in a manner, in each |

155153.1

| | |
|---|---|
| | case, that the Investor has consented to in writing in its reasonable discretion, (vii) following any filing of a formal action or claim by the SEC against the Company or any of its respective officers, employees or directors, or (vii) following any other event or development, which, in the determination of the Investor, could be expected to have a Material Adverse Effect (as defined in the DIP Credit Agreement) or an Additional Material Adverse Effect (as described in Section 9(k) of the DIP Credit Agreement). |
| Representations and Warranties | The Series A Financing Agreements shall contain customary representations and warranties regarding the Company, including organization, good standing, qualification, authorization, capitalization, consents, enforcement, intellectual property, contracts, taxes, absence of changes, litigation, insurance, compliance with laws, environmental matters, valid issuance, no registration, no alternate financings, reservation of securities, historical financial information, and budget. |
| Covenants | The Series A Financing Agreements shall contain customary covenants of the Company, including the Company's agreement to comply with the budget attached as Annex B and applicable laws, provide notice, information and access to the Investor, limitations and liens and indebtedness, and use reasonable best efforts to increase the percent of carbon in C5+ exiting the riser. |
| Indemnification | The Company shall indemnify, defend and hold harmless the Investor and its directors, officers, members, managers, affiliates, agents and representatives from and against all fees, expenses, claims, losses, liabilities and costs of whatever nature arising out of or related to any breach by the Company of the Series A Financing Agreements |
| Governing Law | Delaware |
| Amendments | The Series A Financing Agreements may not be amended without the prior written consent of the Investor and the Company |
| Assignments and Transferability | The rights and obligations of the Company under the Series A Financing Agreements |

155153.1

|  | cannot be assigned or transferred without the prior written consent of the Investor.  The rights and obligations of the Investor (including with respect to the shares of Series A Preferred Stock issued to the Investor) may be assigned or transferred without the consent of the Company. |
|---|---|

## ANNEX A

## PRODUCTION BENCHMARKS

| Date | Percent of Carbon in C5+ Exiting the Riser* |
|---|---|
| Effective Date | 42.4 |
| Six Months After the Effective Date | 44.5 |

- \*      Calculated by taking the sum of carbon found in C5+ molecules in the three phases emerging from the top of the KCR riser (oil, gaseous and aqueous) and dividing such number by the total amount of carbon in the biomass entering the unit to create a percentage of carbon recovered in the C5+, consistent with the terms and methodology set forth below.  For purposes of satisfaction of each Production Benchmark, the following definitions shall apply:
    - o "Operating Conditions" shall mean the key operating parameters (type of catalyst, catalyst activation, catalyst addition rate, operating temperature, additives, etc.) at the KCR.
    - o A "Run" shall be defined as the period of steady state operations at the KCR commencing after a one hour line-out period and lasting until feed to the unit is stopped.
    - o "Balance Tolerance" shall mean a closure range between 97.5% and 102.5% on absolute basis for both overall mass balances and carbon balances.
    - o "Target Oxygen" shall mean oxygen by weight of not more than nominally 20% at the top of the riser.
    - o "Data Point" shall mean a mass and carbon balance consisting of at least one hour during a Run within the Balance Tolerance.
- Reported values comprising the metric (percent carbon recovered in C5+ exiting the riser) will be an average of at least 10 Data Points taken from a minimum of three Runs, with each Run performed at the same Operating Conditions.
- As part of its verification of achievement of the metric to Investor, Company shall:
    - o List the Operating Conditions for the Runs; and
    - o Upon request, provide both the raw data from the KCR and the calculation spreadsheets containing the calculations made.

**EXECUTION VERSION**

**ANNEX B**

**BUDGET**

**(see attached)**

155153.1

KiOR Inc.
Exit Facility Forecast
$'s
Privileged & Confidential
DRAFT - Subject to Change

| Kior Inc. | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month Ending | | 10/31/2015 | 11/30/2015 | 12/31/2015 | 1/31/2016 | 2/29/2016 | 3/31/2016 | 4/30/2016 | 5/31/2016 | 6/30/2016 | 7/31/2016 | 8/31/2016 | 9/30/2016 | 12 Month |
| **Disbursements** | | | | | | | | | | | | | | |
| Employee, Payroll, Benefits and Other | $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 $ | 912,973 | $ 10,955,676 |
| Laboratory / R&D | | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 96,500 | 1,158,000 |
| KCR / Pilot / Catalyst | | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 129,500 | 1,554,000 |
| Demo Facility | | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 169,000 | 2,028,000 |
| CapEx Improvements | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 23,800 | 285,600 |
| Rents, Insurance and Taxes | | 92,200 | 56,200 | 56,200 | 793,200 | 406,200 | 56,200 | 157,200 | 56,200 | 56,200 | 92,200 | 56,200 | 56,200 | 1,934,400 |
| Professional Fees | | 254,000 | 314,000 | 279,000 | 292,500 | 219,000 | 304,000 | 229,000 | 269,000 | 219,000 | 229,000 | 219,000 | 219,000 | 3,046,500 |
| IT Fees | | 81,810 | 18,935 | 18,935 | 42,310 | 14,935 | 18,935 | 45,610 | 124,935 | 19,935 | 151,310 | 18,035 | 15,935 | 571,620 |
| Miscellaneous | | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 180,000 |
| Production Disbursements | | 1,774,783 | 1,735,908 | 1,700,908 | 2,474,783 | 1,986,908 | 1,725,908 | 1,778,583 | 1,796,908 | 1,641,908 | 1,819,283 | 1,640,008 | 1,637,908 | 21,713,796 |
| **Plan Costs** | | | | | | | | | | | | | | |
| Admin. | | 776,000 | 886,000 | 2,602,000 | - | - | - | - | - | - | - | - | - | 4,264,000 |
| Priority (1) | | 1,197,446 | - | - | - | - | - | - | - | - | - | - | - | 1,197,446 |
| Secured | | 680,000 | - | - | - | - | - | - | - | - | - | - | - | 680,000 |
| Contract Cure | | 95,696 | - | - | - | - | - | - | - | - | - | - | - | 95,696 |
| Continuing Trade Creditor Class | | 870,090 | - | - | - | - | - | - | - | - | - | - | - | 870,090 |
| Convenience Class | | 75,000 | - | - | - | - | - | - | - | - | - | - | - | 75,000 |
| Plan Disbursements | | 3,694,232 | 886,000 | 2,602,000 | - | - | - | - | - | - | - | - | - | 7,182,232 |
| Total Disbursements | $ | 5,469,015 $ | 2,621,908 $ | 4,302,908 $ | 2,474,783 $ | 1,986,908 $ | 1,725,908 $ | 1,778,583 $ | 1,796,908 $ | 1,641,908 $ | 1,819,283 $ | 1,640,008 $ | 1,637,908 | $ 28,896,028 |

(1) This Priority amount includes ~$1.1M in    Mississippi State Franchise Tax.  The asserted amount of Priority claims filed by Mississippi State is ~$1.6M which KiOR plans to challenge.
Should the challenge be unsuccessful, the    full ~$1.6M would be owed in connection with Plan confirmation.