**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KiOR, Inc.,[1] | Case No. 14-12514 (CSS) |
| Debtor. | **Docket Numbers: 397**<br>**Hearing Date: April 8, 2015 at 12:00 pm. ET** |

**OBJECTION OF THE MISSISSIPPI DEVELOPMENT AUTHORITY TO DEBTOR'S**
**MOTION FOR ENTRY OF ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND 364 TO**
**APPROVE FIRST AMENDMENT TO SENIOR SECURED**
**AND SUPERPRIORITY FINANCING AGREEMENT**

The Mississippi Development Authority (the "MDA")[2] files this Objection to the Debtor's Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105, 363 and 364 to Approve First Amendment to Senior Secured and Superpriority Financing Agreement [Docket No. 397] (the "Additional DIP Financing Motion"), and respectfully states as follows:

### I. INTRODUCTION

On January 16, 2015, during the Final DIP Hearing[3] concerning approval of the initial $15 million DIP Facility, the Court found that approval of the DIP Facility presented a close case.[4] However, the Court authorized the initial DIP Facility in order to allow the Debtor and

---

[1]    The Debtor and the last four digits of its taxpayer identification number are: KiOR, Inc. (2233). The Debtor's mailing address is 13001 Bay Park Road, Pasadena, Texas 77507.

[2]    No creditors' committee has been appointed. The MDA is the largest arms-length unsecured creditor of the Debtor. The Court has noted that the MDA is economically motivated and pursuing a course of action that provides protection for the bankruptcy estate and creditors of the Debtor. *See* Transcript of January 16, 2015 Hearings on Final DIP Order, at page 122.

[3]    Unless otherwise defined herein, capitalized terms shall have meanings set forth in the Final DIP Order, entered by this Court on January 23, 2015 [Doc. No. 275].

[4]    *See* Transcript of January 16, 2015 Hearings on Final DIP Order, at page 115. The Court concluded as follows:

> This is a close case, because there's only so far to go. There's only so much money. And while it certainly is a goal of Chapter 11 to confirm a plan, it is not the end-all be-all of Chapter 11 or bankruptcy to confirm a plan. And if it's a question of spending money to get to confirm a plan that doesn't do anybody any

the Khosla Parties[5] an opportunity to attempt to confirm the First Amended Chapter 11 Plan of

Reorganization (the "First Amended Plan")[6] they had submitted prior to the Final DIP Hearings.

The Final DIP Order entered by the Court set February 12, 2015 as the deadline for confirmation

of the proposed plan.  The Final DIP Order also set February 27, 2015 as the deadline for the

effective date of such plan.[7]

Now, after failing to promptly pursue confirmation of the proposed First Amended Plan,

and allowing the exclusivity period to expire,[8] the Debtor and Khosla Parties are back.  This time

they seek approval of an additional $14 million in superpriority secured post-petition financing

and extension of the plan effective date deadline to September 30, 2015.[9]  The Debtor and the

Khosla Parties have also proposed a new Second Amended Chapter 11 Plan of Reorganization

("Second Amended Plan")[10], but this new plan is no more feasible than the prior proposed plans.

Among other things, there is still no committed exit funding.[11]

---

good, we're better off not spending the money. And I think that's really the heart
of the MDA's objection.

The Court went on to note that the Debtor would face some "headwinds", but concluded such headwinds were "not
sufficiently stiff winds at [that] point to stop the case."  *Id.* at page 122.  The MDA submits that in the interim the
Debtor has failed to tack forward.

[5]    Vinod Khosla, Pasadena Investments, LLC, VNK Management, LLC, Khosla Ventures III, LP, and KFT Trust,
Vinod Khosla Trustee are collectively referred to herein and in other pleadings filed by the parties (including the
Khosla Parties) as the "Khosla Parties".  The Khosla Parties compose the Debtor's supermajority controlling
principal shareholders, the DIP Lender, holders of the vast majority of all pre-petition secured claims, proposed
recipients of all post reorganization equity in the Debtor, and the proposed providers of any exit financing for the
Debtor.

[6]    *See* First Amended Chapter 11 Plan of Reorganization [Doc. No. 219], filed on January 14, 2015.

[7]    *See* Doc. No. 275, page 146.

[8]    The exclusivity period under 11 U.S.C. § 1121(b) expired without extension on March 9, 2015.

[9]    *See, generally*, Additional DIP Financing Motion [Doc. No. 397].

[10]    *See* Second Amended Chapter 11 Plan of Reorganization [Doc. No. 395], filed on March 16, 2015.

[11]    On March 17, 2015, the Debtor and Khosla Parties filed a Notice of Plan Supplement (the "Plan Supplement")
[Doc. No. 404].  Attached to the Plan Supplement as Exhibit A [Doc. No. 404-1] is an "Exit Financing Letter" from

The additional $14 million in DIP funding (the "Additional DIP Funding") proposed by the Debtor and the Khosla Parties should not be authorized.  The stated purpose of the Additional DIP Funding is to finance pursuit of unnecessary litigation against the MDA in the Debtor's bankruptcy case (the "Bankruptcy Case").[12]  As evidenced by the $7.6 million budget[13] for legal and professional fees attached to the Additional DIP Financing Motion, such litigation will be expensive.  It will also (a) be time consuming, (b) prejudice the substantive rights of creditors and parties in interest, (c) provide no reasonable certainty of resolution or reorganization, and (d) substantially increase potential superpriority adequate protection and deficiency claims against the bankruptcy estate.  Moreover, the bankruptcy estate has no revenues and no assets from which to pay any such additional superpriority claims.  Furthermore, while increased funding further subordinates other creditors to the superpriority claims of the Khosla Parties, there is no potential corresponding benefit for the non-insider creditors of the bankruptcy estate.

More importantly, adding an additional $14 million in superpriority claims to fund litigation is wholly unnecessary.  In the proposed DIP Amendment the Khosla Parties state that, if such litigation does not go forward, the Khosla Parties will simply seek to purchase the Debtor's assets and operations.  Specifically, the proposed DIP Amendment provides that if the Court does not make a determination that obligations owed to the MDA are dischargeable or does not "allow the Borrower to remain in the Chapter 11 Case, without going forward with the timely prosecution of a plan", then the Khosla Parties "shall negotiate in good faith with the Borrower to acquire substantially all of the Borrower's assets that are subject to the DIP Liens in

---

the Khosla Parties which discusses exit funding.  As discussed in greater detail below, given that any potential funding contemplated by the Exit Financing Letter is "in the sole and absolute discretion" of the Khosla Parties, there is no actual commitment to fund.

[12]    *See* Additional DIP Financing Motion at page 2.

[13]    *See* Budget attached as Exhibit C to Additional DIP Financing Motion [Doc. No. 397-4].

satisfaction of the DIP Obligations." [14]  Let them do so now and avoid months of costly litigation and unwarranted delays that would unfairly prejudice and adversely affect the substantive rights of other creditors, while accomplishing nothing of value for the bankruptcy estate. [15]

Upon sale of the Debtor's operational assets as proposed by the Khosla Parties, an appropriate neutral estate fiduciary, serving the best interests of all creditors, not just Vinod Khosla, can be appointed by the Court to efficiently and fairly administer the bankruptcy estate.

## II. BACKGROUND [16]

### A.  The Debtor and Its Limited Assets

The Debtor commenced this Bankruptcy Case on November 9, 2014 (the "Petition Date") On the Petition Date, the Debtor's schedules reflect that the Khosla Parties and related parties asserted approximately $237 million in alleged secured claims. [17]  By comparison, the scheduled book value of the Debtor's assets was approximately $31 million. In its initial Disclosure Statement [Doc. No. 150], filed on December 15, 2014, the Debtor discloses that the estimated gross liquidation value of its assets is approximately $3 million.  The gross liquidation value, if any, of the Debtor's technology assets is estimated by the Debtor to be approximately $1 million. These values are repeated in the First Amended Disclosure Statement filed on March 16, 2015 [Doc. No. 396].

---

[14]    *See* proposed First Amendment to Senior Secured and Superpriority Financing Agreement (the "DIP Amendment") [Doc. No. 397-3] at pages 6-7.

[15]    If the Debtor's operational assets are sold and its does not continue to operate, under 11 U.S.C. 1141(d)(3) there will be no discharge issues to litigate with any creditor.

[16]    In addition to the facts set forth herein, the MDA incorporates by reference the facts set forth in the MDA's previously filed objections to the existing DIP Facility (the "MDA DIP Objections") [Doc. Nos. 128 and 180], together with all evidence adduced at evidentiary hearings held by this Court on January 15 and 16, 2015.  *See*, *generally*, Transcripts of the January 15 and 16, 2015 Final DIP Hearings.

[17]    As the Court is aware, the MDA has filed a motion for standing and an amendment thereto, seeking to assert challenges to the secured claims alleged by the Khosla Parties on behalf of the bankruptcy estate.  *See* Doc. Nos. 224 and 443.

B. **The Sale Motion and the DIP Facility**

On the Petition Date, the Debtor filed a motion to sell its assets to the highest bidder [Doc. No. 10]. Together with the sale motion, the Debtor sought approval of a $15 million superpriority secured post-petition DIP Facility to be extended by Pasadena Investments, LLC ("Pasadena Investments"). Pasadena Investments is one of the Khosla Parties and an insider of the Debtor [Doc. No. 7]. The stated purpose of the DIP Facility was to fund the sale process and, later, to get to plan confirmation in late February 2015.

In exchange for the initial DIP Facility, the Debtor promised, among other things, not to challenge the pre-petition secured claims asserted by the Khosla Parties. The Debtor also promised to pursue a plan of reorganization providing the broadest possible releases for the Debtor's officers, directors, and other insiders and related parties, which include certain agents and employees of the Khosla Parties. It appears the structure of the foregoing proposals was formulated primarily by the Khosla Parties and their counsel prepared the documents. *See, e.g.,* Testimony of Chris Artzer, Transcript of Final DIP Hearings on January 15, 2015, at page 52.

Under the terms of the sale motion, if no bidders for the Debtor's assets emerged under the terms proposed by the Debtor and the Khosla Parties, then the Khosla Parties proposed to swap the DIP Facility for the equity in the Reorganized Debtor pursuant to their proposed plan of reorganization for the Debtor  [Doc. Nos. 149 and 219]. Thus, under the plan proposed by the Debtor and the Khosla Parties, the Debtor would be acquired by the Khosla Parties, free and clear of the interests of arms-length parties and creditors, in exchange for amounts necessary to conduct this Bankruptcy Case.

Despite a costly and seemingly thorough marketing process, no qualified bids were received for the assets—not even from the Khsola Parties and their affiliates.

**C.**  **Litigation Initiated in State Court Among Non-Debtor Parties**

Prior to the Final DIP Hearings, on or about Friday, January 9, 2015, the Khosla Parties filed a receivership proceeding (the "Receivership Action") in the state court of Mississippi against KiOR Columbus, naming the MDA as a defendant therein.  The Receivership Action is styled, *KFT Trust, Vinod Khosla, Trustee, et. al. v. KiOR Columbus, LLC, et. al.*, Cause No. 2015-0022-B, Chancery Court of Lowndes County, Mississippi.

Also prior to the Final DIP Hearings, on or about January 13, 2015, the Attorney General of the State of Mississippi filed a direct action in Mississippi (the "Mississippi Non-Debtor Lawsuit") against Vinod Khosla and certain of the Khosla Parties, as well as certain individuals who are also officers and directors of the Debtor.  In the Mississippi Non-Debtor Lawsuit, the Attorney General alleges, among other things, misrepresentation by the non-debtor defendants named therein in connection with obtaining to a $75 million loan made by the MDA (the "MDA Loan") to the Debtor's subsidiary, KiOR Columbus, LLC.[18]

**D.**   **The First Amended Plan**

On January 14, 2015, the day before the Final DIP Hearings, in response to the MDA's objections to the proposed DIP Facility, the Debtor and the Khosla Parties filed their First Amended Plan for the Debtor [Doc No. 219] and revised their proposed Final DIP Order. Among other things, such amended plan purported to tighten the proposed releases for insiders. However, as the Debtor acknowledged and the Court noted at the Final DIP Hearings, the First Amended Plan lacked feasibility because, without limitation, the Debtor had no commitment for exit funding.

At the Final DIP Hearings, the Debtor and the Khosla Parties represented to the Court that exit funding was necessary for the Reorganized Debtor to emerge from bankruptcy and

---

[18]    KiOR Columbus, LLC ("KiOR Columbus") is not a debtor in this Bankruptcy Case.

continue research and development.  They further represented that such exit funding would be provided by the Khosla Parties or their affiliates.

While no business plan was put forth for a Reorganized Debtor to rehabilitate its business or achieve commercial viability, the Debtor and the Khosla Parties indicated that exit funding would be provided in an amount ranging from $15 million to $35 million.  *See*, *e.g.*, Testimony of Chris Artzer, Transcript of January 15, 2015 Final DIP Hearing, at pages 83-84.

E. **The Final DIP Order**

On January 23, 2015, the Court entered the Final DIP Order [Doc. No. 275].    In the Final DIP Order, while authorizing the Debtor to obtain the requested post-petition financing from Pasadena Investments under Section 364 of the Bankruptcy Code, the Court was careful to, among other things:

(a) exclude certain potentially valuable assets from the DIP Collateral and from being subjected to any superpriority administrative claims granted as adequate protection or otherwise, including, without limitation, derivative claims against officers and directors and commercial tort claims,

(b) limit any potential releases strictly to claims against the Khosla Parties in their roles as lenders to the Debtor and challenges to their secured claims, and

(c) preserve the rights of parties in interest and any post reorganization estate fiduciaries to challenge the Khosla Parties' secured claims and to bring claims against the Khosla Parties on behalf of the Debtor's bankruptcy estate.

*See*, *generally*, Final DIP Order [Doc. No. 275].

The Final DIP Order also required that a Chapter 11 plan proposed by the Debtor and the Khosla Parties be confirmed on or before February 12, 2015 and that the effective date of such plan occur on or before February 27, 2015. [19]

### F. The Debtor and the Khosla Parties Fail to Move Forward with Confirmation

The Debtor did not obtain a commitment for exit funding from the Khosla Parties. As such, the Debtor did not seek confirmation of the proposed plan in February as promised. At depositions conducted on March 5 and 7, 2015, when asked about the status of any anticipated exit funding, both the chief executive officer and lead director of the Debtor had little or no knowledge or information to provide concerning exit funding. Instead, they would state only that negotiations were ongoing. [20]

### G. The Dischargeability Complaint and Further Delays

Subsequently, on March 16, 2015, the Debtor filed an adversary proceeding against the MDA. In such adversary proceeding the Debtor seeks declaratory relief as whether the Debtor's guaranty obligations pursuant to the MDA Loan to the Debtor's subsidiary are dischargeable under 11 U.S.C. §§ 1141(d)(1)(A) and 1141(d)(6)(A). *See* Complaint for Determination of the Dischargeability of Alleged Debt of the State of Mississippi, Mississippi Development Authority (the "Dischargeability Complaint") [Doc. No. 394]. According to the Dischargeability Complaint, the Debtor and the Khosla Parties are concerned that, pursuant to 11 U.S.C. § 1141(d)(6)(A), the Debtor's guaranty obligations with respect to the MDA Loan are not

---

[19]    *See* Doc. No. 275, page 146.

[20]    The exclusivity period provided by 11 U.S.C. § 1121(b), during which only the Debtor may submit a Chapter 11 plan, subsequently expired on March 9, 2015, and the Debtor did not seek extension thereof.

dischargeable by a reorganized Debtor if, among other things, the MDA Loan was obtained by misrepresentation or fraud. [21]

At the same time, on March 16, 2015, the Debtor and the Khosla Parties filed (a) the Additional DIP Financing Motion [Doc. No. 397], (b) a Second Amended Plan [Doc. No. 395], and (c) a First Amended Disclosure Statement [Doc. No. 396]. The stated purpose of the proposed Additional DIP Funding is to allow the Debtor to engage in litigation against the MDA in this Bankruptcy Case.[22] The Debtor and the Khosla Parties also seek to push out the proposed plan confirmation and effective date deadlines to May 31, 2015 and September 30, 2015.

Although the MDA has not asserted that its claims against the Debtor are nondischargeable, the Khosla Parties now propose to provide, on what appears to be a purely discretionary basis, an additional $14 million dollars of debtor-in-possession priming, secured, superpriority loans in order finance efforts to seek declaratory relief that the Debtor's obligations with respect to the MDA Loan are dischargeable. See Additional DIP Financing Motion [Doc. No. 397]. Such proposed Additional DIP Funding would double the size of the DIP Facility, increasing the priming, first in priority secured, superpriority DIP Facility extended by the Khosla Parties from $15 million to in excess of $29 million.

According to the "Proposed 6-month DIP Extension Budget" attached as Exhibit C to the Additional DIP Financing Motion, while the proposed Additional DIP Facility is approximately $14 million,[23] over $7.6 million is budgeted for legal fees. In conjunction therewith, on March 20, 2015, the Debtor filed a supplemental application [Doc. No. 425] (the "Supplemental

---

[21]   11 U.S.C. §1141(d)(6)(A) excepts from discharge, among other things, claims against a corporate debtor by a state government for money, property, services or extensions of credit obtained by misrepresentation or actual fraud.

[22]   See Additional DIP Financing Motion at page 2.

[23]   The MDA notes that there is at least one reference in the proposed DIP Amendment to Total Term Loan Commitments of $33 million, as opposed to $29 million.

<u>Application</u>"), seeking to expand the role of Wilmer Cutler Pickering Hale and Dole, LLP

("<u>WilmerHale</u>"), as special counsel to the Debtor.  According to the Supplemental Application,

WilmerHale also represents "the Khosla Entities and Individuals".[24]   The Supplemental

Application contemplates that WilmerHale will prosecute the Dischargeability Complaint and

represent the Debtor in other matters related to the MDA and the Debtor's obligations with

respect to the MDA Loan.

### H.  <u>The Additional DIP Funding Is Discretionary</u>

The proposed Additional DIP Funding is in the discretion of the Khosla Parties.  The

Khosla Parties attach additional conditions, covenants, and/or events of default to the Additional

DIP Facility, including, without limitation:

Covenants and representations:

<u>Compliance with SEC Investigation and Contest of Any Action.</u>  The Borrower shall continue to comply in good faith with the current investigation conducted by the SEC, and shall continue to comply with all reasonable requests of the SEC for information or other requests for materials, documents or other requests. The Borrower shall oppose any formal action or claim by the SEC against the Borrower, its directors, officers or employees, other than the filing of a protective proof of claim filed in the Chapter 11 case on or prior to the deadline for filing such a claim.

<u>Continued Operations and Research and Development Activities.</u> The Borrower shall continue to pursue research and development activities related to its technology consistent with its existing efforts and consistent with any proposed milestones contemplated in exit financing proposals related to the Borrower's Plan as filed in the Chapter 11 Case.

Events of default:

<u>Officers.</u> Any of Fred Cannon, Chris Artzer, or John Kasbaum resigns, is terminated or is otherwise unable to continue his employment with the Borrower and within ten (10) days after such resignation, termination or inability to continue employment, the Borrower has not retained a replacement or otherwise reallocated duties among existing personnel in a manner, in either case, that the

---

[24]    *See* Supplemental Application at para. 3 on page 2.

Agent [i.e. the Khosla Parties] has consented to in writing in its reasonable discretion.

Additional Material Adverse Effect. The Agent or the Required Lenders determine at any time in good faith after consultation with the Borrower, that on or after March 16, 2015 (i) the Borrower has missed a material research and development milestone or otherwise experienced a material adverse technical result or (ii) a material adverse change has occurred in a sector of the macro-economic or regulatory climate that is adverse to the market for renewable fuels such that, in the case of either (i) or (ii), there is no longer a reasonable prospect of the Borrower commercializing its technology on a commercially viable basis within a reasonably foreseeable time.

See proposed DIP Amendment [Doc. No. 397-3]

## I. The Khosla Parties Propose to Buy the Debtor's Assets and Operations

At the same time, however, in the proposed DIP Amendment, the Khosla Parties make clear their intention to acquire the technology, assets, and operations of the Debtor, without regard to whether the Additional DIP Facility is authorized or their other demands are met. The DIP Amendment provides:

Nondischargeability Determination. Notwithstanding anything to the contrary in the DIP Financing Agreement (including but not limited to this Amendment) if on or before the Maturity Date, the Bankruptcy Court has determined that (1) it will not conduct an adjudication of litigation giving rise to the issue of whether the claim of the State of Mississippi (or the Mississippi Development Authority, as may be applicable) is dischargeable pursuant to 11 U.S.C. § 1141(d)(6) (the "Discharge Action") in a manner that would be determined prior to the Maturity Date, or (2) it will not approve or allow the Borrower to remain in the Chapter 11 Case, without going forward with the timely prosecution of a plan, while the issues raised in the Discharge Litigation are decided; then, in such event, the **Lenders shall negotiate in good faith with the Borrower to acquire substantially all of the Borrower's assets that are subject to the DIP Liens in satisfaction of the DIP Obligations**.

See, proposed DIP Amendment [Doc. No. 397-3], at pages 6-7 (emphasis added).

## J. The Contemplated Exit Funding Is Discretionary

On March 17, 2015, the Debtor and the Khosla Parties filed a Plan Supplement [Doc. No. 404]. Attached to the Plan Supplement is what the Debtor and the Khosla Parties characterize as

an "Exit Financing Letter".  The Exit Financing Letter provides that the Khosla Parties may, in their sole discretion, provide "equity financing" commencing on the effective date of a confirmed plan, in amount between $19.2 million and $29.5 million.[25]

The Exit Financing Letter contains numerous subjective conditions and, at the end of the day, leaves any decision to provide exit funding to the complete discretion of the Khosla Parties. For example, the Exit Financing Letter provides the following conditions:

> "2. Conditions. The **obligation of the Investor to invest**, or cause the investment of, the Commitment Amount **shall be subject to** (i) KiOR achieving the applicable production benchmark set forth on Annex A to Exhibit A **to the satisfaction of the Investor in its sole and absolute discretion**, (ii) the negotiation and execution of definitive documentation with respect to the Financing containing the terms and conditions set forth in Exhibit A and other terms and conditions **acceptable to the Investor in its sole and absolute discretion**, (iii) the satisfaction in full (or waiver with the prior written consent of the Investor) of the conditions to the Effective Date set forth in the Plan, (iv) the entry by the Bankruptcy Court of the Confirmation Order no later than May 31, 2015, in form and substance reasonably satisfactory to the Debtor and the Plan Support Parties, (v) the Effective Date of the Plan shall have occurred no later than September 30, 2015, (vi) none of Fred Cannon, Chris Artzer, or John Kasbaum has resigned, has been terminated or is otherwise unable to continue his employment with KiOR or reorganized KiOR; however, if one of the three of them were to resign, be terminated or unable to continue their employment and within ten (10) days after such resignation, termination or inability to continue employment, KiOR or Reorganized KiOR has not retained a replacement or otherwise reallocated duties among existing personnel in a manner, in each case, that **the Investor has consented to in writing in its reasonable discretion**, (vii) the absence of any filing of a formal action or claim by the SEC against KiOR or any of its respective officers, employees or directors, other than a protective proof of claim filed in the KiOR bankruptcy case, and (vii) the absence of any other event or development, which, **in the determination of the Investor**, could be expected to have a Material Adverse Effect (as defined in the DIP Credit Agreement) or an Additional Material Adverse Effect (as described in Section 9(k) of the DIP Credit Agreement)."

> "Additional Equity Financing After the Effective Date - $10,300,000 on or prior to the date that is 6 months from the Initial Equity Financing if the specified benchmark set forth on Annex A is achieved by KiOR as determined **to the satisfaction of the Investor in its sole and absolute discretion**".

---

[25]    It appears such "equity financing", if any, would be provided solely in exchange for issuance of additional shares of stock in the Reorganized Debtor.

"Termination Events - The Series A Financing Agreements shall be subject to termination by the Investor if, among other things, (i) the Company fails to pay one or more items of indebtedness when due, or any such indebtedness is accelerated prior to its stated maturity, in an aggregate amount of $100,000 or more, (ii) any money judgment, writ or warrant of attachment involving greater than $100,000 is entered or filed against the Company, (iii) in the event of a voluntary or involuntary bankruptcy proceeding involving the Company or the Company is unable to pay its debts as they become due, (iv) following the failure by the Company to comply with or perform in all material respects any of its covenants, agreements, obligations and conditions set forth in the Series A Financing Agreements, (v) following the six months following the Effective Date of the Plan unless prior to such time, the Company achieves production benchmarks as set forth on Annex A applicable to such time period, (vi) any of Fred Cannon, Chris Artzer, or John Kasbaum has resigned, has been terminated or is otherwise unable to continue his employment with the Company and within ten (10) days after such resignation, termination or inability to continue employment, the Company has not retained a replacement or otherwise reallocated duties among existing personnel in a manner, in each case, that the Investor has consented to in writing **in its reasonable discretion**, (vii) following any filing of a formal action or claim by the SEC against the Company or any of its respective officers, employees or directors, or (vii) following any other event or development, which, **in the determination of the Investor**, could be expected to have a Material Adverse Effect (as defined in the DIP Credit Agreement) or an Additional Material Adverse Effect (as described in Section 9(k) of the DIP Credit Agreement)."

(emphasis added.)

Moreover, the Second Amended Plan and accompanying First Amended Disclosure Statement set forth no business plan by which a Reorganized Debtor could hope to rehabilitate its business or achieve commercial viability.    Rather, the Debtor admits that it is not commercially viable and there is no evidence to suggest it ever will be.    *See*, *generally*, First Amended Disclosure Statement.

### K.  <u>The SEC Investigation, Securities Class Action and Shareholder Derivative Suit</u>

The Second Amended Plan fails adequately to address other pending litigation which could have a profound adverse effect on the Debtor's ability, if any, to reorganize.  For example, there is a pending formal Securities and Exchange Commission (the "<u>SEC</u>") investigation

concerning the Debtor and certain representations made to the public markets in the marketing and sale of its securities (the "SEC Investigation").  It is conceivable that such investigation could lead to imposition of heavy fines against the Debtor and any successor entity, such as a reorganized debtor.  The plan proposals of the Debtor and the Khosla Parties fail adequately to address this possibility.

In addition, there are a number of lawsuits pending against the Debtor and its insiders, including agents and employees of the Khosla Parties, alleging misrepresentations in violation of the federal securities laws and other claims.  *See*, *e.g.*, *Berry v. KiOR et. al.*, Civil Action No. 4:13-cv-2443, U.S.D.C. S.D. Texas (the "Securities Class Action"); *[Sealed filer] v. Cannon, et. al.*, Civil Action No 4:13-mc-2915, U.S.D.C. S.D. Texas (the "Shareholder Derivative Action").

### III.    LAW AND ARGUMENT[26]

#### A.  Efficiency of Administration and Equity Dictate That the Court Accept the Khosla Parties' Proposal to Negotiate for Acquisition of the Assets

In the interests of efficient administration of the bankruptcy estate and equitable treatment of all creditors, the Court should accept the Khosla Parties' offer to negotiate for the purchase of the Debtor's assets and operations.  The proposed Additional DIP Funding, discretionary exit funding, additional litigation, and Second Amended Plan will not only be costly and unnecessarily delay this Bankruptcy Case, but will provide no benefit to the bankruptcy estate and its non-insider creditors.  Instead, such proposals, if adopted, will increase superpriority claims which the Debtor has no means to pay, diminish the estate, and adversely affect the substantive rights of arms-length creditors.  A relatively simple sale of the Debtor's

---

[26]    The reasons for declining to authorize DIP financing in this Bankruptcy Case advanced by the MDA in its previously filed objections (the "MDA DIP Objections") [Doc. Nos. 128 and 180] are increasingly applicable.  As such, the prior MDA DIP Objections are incorporated by reference as if fully set forth herein, together with all arguments presented at Final DIP Hearings.  *See*, *generally*, Transcripts of the January 15 and 16, 2015 Final DIP Hearings.

operations to the Khosla Parties, as the Khosla Parties propose in the DIP Amendment, would be more efficient and of greater benefit to all concerned (including, the MDA submits, the Khosla Parties).

1. The path advocated by the Debtor and the Khosla Parties is inefficient and lacks reasonable certainty as to an exit from bankruptcy

The path advocated by the Debtor and the Khosla Parties is inefficient, unduly expensive, benefits only insiders, and lacks reasonable certainty that there will be an exit from Chapter 11. Among other things, the Khosla Parties ask the Court to (a) authorize the proposed Additional DIP Funding, (b) confirm the proposed Second Amended Plan, and (c) allow the Khosla Parties, acting through the Debtor, to pursue the possibility of declaratory relief holding that the Debtor's guaranty obligations to the MDA are dischargeable.  If the Court authorizes all this, then, under the terms of the DIP Amendment and the Exit Financing Letter, the Khosla Parties may choose, in their discretion, to provide none, all, or a portion of: (i) the Additional DIP Funding and (ii) additional equity investments necessary for a Reorganized Debtor to exit bankruptcy under the proposed Second Amended Plan.  If the Khosla Parties decide, at any point, in their discretion, not to move forward, no resolution can be achieved by taking this uncertain and expensive path.

What is certain is that the Debtor's bankruptcy estate will continue to rack up superpriority debt and superpriority adequate protection and deficiency claims under the Final DIP Order without any means to repay the same.  Further, and without limitation, if the Second Amended Plan is confirmed as proposed, the bankruptcy estate will be deprived of officer and director liability claims, as well as numerous other potentially valuable causes of action, as to which little or no due diligence has been performed by the Debtor.  The proposed Additional DIP Funding and accompanying proposed Chapter 11 plan would adversely affect or eliminate

substantive rights of the estate and its arms-length creditors while providing little or no consideration or benefit.

    2.  <u>Sale of the assets is a superior alternative.</u>

On the other hand, as stated in the proposed DIP Amendment, if the Court does not agree to the requests of the Khosla Parties to delay the Bankruptcy Case and authorize running up more superpriority debt, then the Khosla Parties still intend to acquire the Debtor's assets and operations. In such circumstances, the Khosla Parties still may <u>choose</u> to provide funding for continued experimentation with the Debtor's speculative technology. The Khosla Parties would retain complete discretion as to whether to fund ongoing research and development efforts, retain the Debtor's employees, pay favored vendors, and so forth. However, they will do so: (a) without further erosion of the bankruptcy estate, (b) without running up additional superpriority claims the Debtor has no means to pay, (c) without causing the estate to release potentially valuable claims, and (d) without further prejudicing the substantive rights of arms-length creditors and other parties.

Any need for expensive dischargeability litigation will be avoided, as will the possibility of unfairly prejudicing substantive rights of non-debtor litigants in state court proceedings. If the Debtor's operations are sold to the Khosla Parties, then all issues concerning dischargeability will be moot as no discharge of the Debtor will occur pursuant to 11 U.S.C. 1141(d)(3). Accordingly, the MDA submits that the most efficient, certain, beneficial, and equitable way to administer this bankruptcy estate is to sell the operating assets of the Debtor and, if appropriate, appoint a neutral estate fiduciary to conduct any further administration and make any distributions.

From the perspective of the bankruptcy estate and its arms-length creditors, the proper choice seems clear.  No legitimate bankruptcy purpose would be served by the proposed Additional DIP Funding or the litigation it is designed to fund.  The Additional DIP Financing Motion should be denied.

**B.    The Proposed Additional DIP Funding Is Not in the Best Interests of Creditors or the Bankruptcy Estate.**

The proposed Additional DIP Funding is not in the best interests of creditors or the bankruptcy estate.  As discussed above, the Additional DIP Funding and related proposals of the Debtor and the Khosla Parties will, among other things, unreasonably delay administration, run up superpriority claims, release potentially valuable claims of the estate, and threaten to prejudice substantive rights of arms-length parties, while providing no significant value to the estate and its creditors, as well as no reasonable certainty of resolution or reorganization.

The overarching consideration employed by the courts in determining whether to approve proposed post-petition financing is whether the proposed financing is in the best interests of all creditors of a debtor's bankruptcy estate.  *See, e.g.*, *In re Tenny Village Co., Inc.*, 104 B.R. 568, 569 (Bankr. D.N.H. 1989) (the bankruptcy court denied a request for post-petition financing where the financing "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals . . . ."); *In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494, 496 (Bankr. D.N.M. 2002) ("The Court is not convinced that this reasoning supplies the requisite proof that the proposed post-petition financing...is in the best interests of creditors."); *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors, thereby leveraging the chapter 11 process by granting a lender

excessive control over the debtor or its assets to the prejudice of other parties in interest."); *In re Crouse Group., Inc.*, 71 B.R. 544, 549-551 (Bankr. E.D. Pa. 1987) (rejecting request for financing under section 364(c) because debtor's future viability was speculative, as was any prospect for distribution to unsecured creditors).  There is nothing about the proposed Additional DIP Funding and related proposals that is in the best interests of the bankruptcy estate and its creditors.

C. **Further "Loans" Are Not Appropriate.**

In addition to being unnecessary, expensive, and prejudicial to creditors, providing no significant benefit to creditors, threatening to lead to even deeper insolvency, diminishing the estate, and providing no reasonable certainty of resolution or reorganization, incurring additional indebtedness is also not appropriate because, among other things:

(1) The Debtor has no revenues and no prospect of revenues during the course of this Bankruptcy Case and for years beyond, if ever, but has continued to suffer heavy losses, and, if allowed to continue, will do so for the foreseeable future.

(2)   Despite over seven years of effort and consumption of over $600 million in capital, the Debtor's technology remains merely experimental and speculative. The Debtor's technology remains, at best, unproven and is not commercially viable.

(3)   There is no evidence that during the Bankruptcy Case the Debtor has achieved any improvements in its technology, or accomplished anything else, having monetary value.

(4)   The extensive marketing and sale process conducted by the Debtor's investment banker, Guggenheim Securities, LLC, demonstrated that there is no market for the Debtor's technology or other assets.  No one wants them, other than one of the founders of the Debtor, Vinod Khosla.

(5)   The Debtor has no collateral sufficient to collateralize the DIP Facility, let alone the Additional DIP Funding.

(6)   The Debtor has no means to repay the existing DIP Facility, let alone the proposed Additional DIP Funding.

(7)   The Debtor has no business plan for rehabilitation or commercial viability.

(8)   The Debtor still has no committed exit funding.

The MDA submits no arms-length lender would provide a loan in these circumstances. Moreover, no responsible management team or board of directors would allow their company to incur additional indebtedness which there is no means to repay and which would only serve to drive the debtor deeper into insolvency.

### D.   The Terms of the Proposed Additional DIP Funding Are Not Fair and Reasonble Under the Circumstances.

The proposals of the Khosla Parties and factual situation is far afield those present in typical DIP loan-financed cases such as *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990).[27]   In *Ames*, the court initially declined to approve proposed unsecured superpriority financing from third party bank because the proposed financing failed to provide an appropriate carve-out in a reasonable amount to pay fees of committee counsel and possible trustee's counsel.  Such carve-outs are necessary "to preserve the adversary system" and insure fairness.  *Id.* at 38.   The *Ames* court ultimately approved amended terms of financing which included, among other provisions ensuring fairness, a five million dollar carve-out for professional fees to pursue claims against insiders.  Thus, the bankruptcy process was not perverted or improperly leveraged for the benefit of a single party in interest.  However, the court cautioned, "[A] proposed financing will not be approved where it is apparent that the purpose of

---

[27]     The *Ames* opinion provides an arguably thorough review of analyses most often employed by courts to determine whether proposed debtor-in-possession financing should be approved.

the financing is to benefit a creditor rather than the estate." *Id.* at 39.  The *Ames* court went on to state:

> These cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing [does not] leverage the bankruptcy process and powers or its purpose is not so much to the benefit the estate as it is to benefit a party-in-interest.

*Id.* at 40.

By comparison, in the instant case, even if confirmable, the Second Amended Plan and related proposed funding advocated by the Debtor and the Khosla Parties would provide no benefit of significance for arms-length creditors of the Debtor and would prejudice their substantive rights.  Such proposed plan contemplates establishing a litigation trust for the benefit of creditors, but funds such trust with a paltry and inadequate $100,000 in seed money, while stripping the bankruptcy estate and the trust of officer and director liability claims, claims against insiders, and other potentially valuable claims, such as numerous avoidance actions.  Further, such creditors' trust would be presided over by a trustee of the Debtor's choosing, as opposed to a neutral trustee or one chosen by arms-length creditors and parties in interest.  None of this is in the best interests of arms-length creditors or the bankruptcy estate.

The proposed Additional DIP Funding will not preserve assets of the Debtor's bankruptcy estate.  Rather, it will cause "further deterioration of the position of unsecured creditors" and diminish or eliminate the value of assets available for distribution. *In re St. Mary Hospital*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).  The proposals of the Khosla Parties, if successfully pursued to conclusion, would leave a bankruptcy estate stripped of assets and inadequate funding to complete appropriate administration of remaining issues.  Therefore, the

proposed Additional DIP Funding are related proposals are not fair, reasonable, and adequate, and should not be approved.

**E. The Additional DIP Funding Is Designed to Allow Vinod Khosla to Indirectly Pursue Litigation of Non-Bankruptcy Issues at the Expense of the Bankruptcy Estate**

The purpose of the Additional DIP Funding and delay in effecting a Chapter 11 plan is to allow the Khosla Parties indirectly to pursue litigation of non-bankruptcy issues in this Court at the expense of the bankruptcy estate. This is an improper purpose.

1. Khosla is engaging in improper forum shopping with respect to non-bankruptcy issues.

The Khosla Parties, under the direction of Vinod Khosla, propose to make, on a discretionary basis, additional superpriority loans to the Debtor in order fund prosecution of the Dischargeability Complaint by their own lawyers (WilmerHale), acting as special counsel to the Debtor. The Khosla Parties appear to be hoping this Court will provide them with a ruling they can take such to court in Mississippi and attempt to assert some sort of preclusive effect in the Mississippi Non-Debtor Lawsuit.

If the Discharge Complaint is allowed to proceed, but this Court rules that the Debtor engaged in fraud and misrepresentation, then the Khosla Parties can simply seek to acquire the Debtor's assets as they intend to do anyway. In such instance, the Khosla Parties will not be a direct party to the Dischargeability Complaint, and they will undoubtedly attempt to argue that this Court's ruling has no preclusive effect with respect to the non-debtor defendants in the Mississippi Non-Debtor Lawsuit.

It remains to be seen whether a ruling, if any, against the MDA with respect to the Dischargeability Complaint would have any preclusive effect in the Mississippi Non-Debtor Lawsuit. However, this whole exercise is arguably nothing more than an inappropriate effort at

forum shopping, seeking to make an end run around the jurisdiction of the state courts with respect to non-bankruptcy issues that are the subject of litigation in which the Debtor is not a party.  Bankruptcy reorganization is not properly used as a litigation tactic among non-debtors concerning disputes outside the bankruptcy case.

2.    The proposed additional DIP financing serves only Khosla.

At the same time, there is no evidence the proposals before the Court will in any way preserve assets or operations or benefit creditors other than Vinod Khosla and the other Khosla Parties.

In *In re Tenny Village Co., Inc.*, 104 B.R. 568 (Bankr. D.N.H. 1989), the bankruptcy court denied a request for post-petition financing where the financing "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt."

In *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) the Court held:

> While certain favorable financing terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts do not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender. [citation omitted] Thus, courts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors, thereby leveraging the chapter 11 process by granting a lender excessive control over the debtor or its assets to the prejudice of other parties in interest.

Similarly, in *In re St. Mary Hospital*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988), the bankruptcy court denied approval of post-petition financing by the debtor's parent, refusing to "enter an order which encourages further deterioration of the position of unsecured creditors".  In *St. Mary* the bankruptcy court found that the proposed post-petition lender, which was the debtor's parent, "completely dominate[d]" the debtor.  Since the parent was not an outside lender

but a "puppeteer of a marionette-debtor" who had tailored the debtor's emergency itself for its own economic benefit, the court held that the parent "should not be permitted to foist off any unavoidable negative economic consequence upon other parties." *Id.* at 401-2.  The *St. Mary* court "refuse[d] to find the terms 'fair, reasonable, and adequate' under the circumstances." *Id.* at 402.  *See also, In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494, 496 (Bankr. D.N.M. 2002) (request for financing under section 364(c) not approved where proposed post-petition lender was the debtor's largest shareholder and a pre-petition secured creditor, the future viability of the debtor was speculative, and the debtor failed to show that the proposed financing was in the best interests of other creditors).

Again, the purpose of this Bankruptcy Case should not be to provide a tactical forum for Vinod Khosla to litigate non-bankruptcy issues with the MDA.  The Khosla Parties' proposed Additional DIP Funding and attendant delays in the administration of the bankruptcy estate serve only Vinod Khosla, further diminish the bankruptcy estate, and threaten to adversely impact the substantive rights of other creditors.

### F.   The Proposed Plan Is Not Feasible and All Further Funding Is Merely Discretionary

The Second Amended Plan is not feasible because, among other things, the Khosla Parties still have not committed to provide funding for the proposed plan or for the Debtor to continue operating post effective date.  In fact, given the discretionary provisions and subjective conditions of the proposed Additional DIP Funding, the Khosla Entities have not, in actuality, committed to providing the Additional DIP Funding.

1.   The proposed Additional DIP Funding is discretionary.

The Khosla Parties attach additional conditions, covenants, and events of default to the Additional DIP Funding, including, without limitation, meeting experimental milestones to the

satisfaction and as determined <u>in the discretion</u> of the Khosla Parties, retaining and/or replacing management to the satisfaction of the Khosla Parties, the absence of any internal or external conditions which the Khosla Parties deem <u>in their discretion</u> to have a potential adverse effect, and so forth.   *See* proposed DIP Amendment [Doc. No. 397-3]

    2.   <u>The contemplated exit funding is discretionary.</u>

The proposed exit funding is even more discretionary in nature that the proposed Additional DIP Funding.  The "Exit Financing Letter" tendered by the Khosla Parties with the Plan Supplement provides that the Khosla Parties may make additional equity contributions in their "sole and absolute discretion".   The Exit Financing Letter does not rise to the level of binding commitment, and, at the end of the day, leaves any decision to provide exit funding to the discretion of the Khosla Parties.

    3.   <u>The proposed plan would not result in rehabilitation of the Debtor.</u>

Further, the proposed Second Amended Plan and accompanying First Amended Disclosure Statement set forth no business plan by which a Reorganized Debtor could hope to rehabilitate its business or achieve commercial viability.  Rather, it is admitted that the Debtor is not commercially viable and there is no evidence to suggest it ever will be.  *See*, *generally*, First Amended Disclosure Statement.  Even if the Khosla Parties ultimately provide every dollar of discretionary funding contemplated by the DIP Amendment and the Exit Financing Letter, the same would not rehabilitate the Debtor.  Nor would such funding allow the Debtor to continue in operation for more than 12 months.  If the Khosla Parties' proposals are approved by this Court, before another year has passed the Debtor will have to be 'restructured' once again.

4. <u>The proposed plan does not adequately address certain material adverse circumstances.</u>

Finally, among other things, the proposed Second Amended Plan and proposed exit funding do not adequately address the very real possibility that the SEC may impose heavy fines on the Debtor pursuant to the pending SEC Investigation, and does not address the effects of adverse decisions in the Securities Class Action or the Shareholder Derivative Suit.

**G. The Dischargeability Complaint Is Subject to Dismissal.**

Adding to the uncertainty of resolution provided by the proposals of the Debtor and the Khosla Parties is the fact that the Dischargeability Complaint is subject to dismissal on numerous grounds. As such, the MDA intends to file a motion to dismiss or otherwise summarily dispose of the Dischargeability Complaint.  The myriad reasons for dismissal will be set forth in the MDA's motion to dismiss.

**H. This Bankruptcy Case Is Being Pursued and Funded for Improper Purposes.**

Nothing being proposed in connection with the Additional DIP Funding constitutes a legitimate attempt to rehabilitate, restructure, or reorganize the Debtor. Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business." *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 516 (8th Cir. 2004). Rehabilitation requires more than the mere ability to propose a confirmable plan. *See In re Brutsche*, 476 B.R. 298, 301 (Bankr. D.N.M. 2012) ("'Rehabilitation' is a different and, unfortunately for Debtor, much more demanding standard than 'reorganization'"). It is a substantive inquiry "whether the debtor's business prospects justify continuance of the reorganization effort." *Id.* (quoting 7 Collier on Bankruptcy ¶ 1112.04[6][a][ii] (Alan J. Resnick and Henry J. Sommer eds., 16th ed.)).

There is nothing on the table that seeks to accomplish this bankruptcy reorganization mandate.  Instead, this Bankruptcy Case, as conducted, has been all about shedding shareholders

who purchased equity in the Debtor on the public markets, stiffing arms-length creditors, and attempting to insulate insiders from responsibility and liability for past misconduct.

## IV.  **CONCLUSION**

For the reasons stated herein, the MDA respectfully requests that: (a) the Additional DIP Financing Motion be denied, and (b) the Court grant such other relief as it deems just, equitable and proper.

Respectfully submitted, this 2nd day of April, 2015.

**GREENBERG TRAURIG, LLP**

*/s/ Dennis A. Meloro*
Dennis A. Meloro (Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE  19801
Telephone:  (302) 661-7000
Facsimile: (302) 661-7360
Email: MeloroD@gtlaw.com

- and -

David B. Kurzweil (Admitted *Pro Hac Vice*)
R. Kyle Woods (Admitted *Pro Hac Vice*)
Terminus 200
3333 Piedmont Road, NE, Suite 2500
Atlanta, Georgia 30305
Telephone:  (678) 553-2680
Facsimile:  (678) 553-2681
Email: KurzweilD@gtlaw.com
Email: WoodsK@gtlaw.com

- and –

Shari L. Heyen (Admitted *Pro Hac Vice*)
1000 Louisiana, Suite 1700
Houston, Texas 77002
Telephone:  (713) 374-3564
Facsimile:  (713) 818-3795
Email: HeyenS@gtlaw.com

- and -

**MCCRANEY MONTAGNET QUIN &
NOBLE, PLLC**

Douglas C. Noble (Admitted *Pro Hac Vice*)
William M. Quin II (*Pro Hac Vice Pending*)
602 Steed Road, Suite 200
Ridgeland, MS 39157
Telephone: (601) 707-5725
Facsimile: (601) 510-2939
Dnoble@mmqnlaw.com
Wquin@mmqnlaw.com

***ATTORNEYS FOR MISSISSIPPI
DEVELOPMENT AUTHORITY***