# **EXHIBIT B**

**The Reply**

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| KiOR, Inc.,[1] | Case No. 14-12514 (CSS) |
| Debtor. | Ref. Docket Nos. 7, 66, 130, 275, 397, 461 & 468<br>Hearing Date: 4/8/15 at 12:00 p.m. (ET) |

**REPLY AND JOINDER OF THE DIP AGENT TO THE DEBTOR'S REPLY TO THE OBJECTION OF THE MISSISSIPPI DEVELOPMENT AUTHORITY TO THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING FIRST AMENDMENT TO SENIOR SECURED AND SUPERPRIORITY FINANCING AGREEMENT**

Pasadena Investments, LLC ("Pasadena"), in its capacity as administrative agent under the DIP Credit Agreement,[2] hereby replies to, and joins the reply filed by KiOR, Inc. (the "Debtor") to, the *Objection of the Mississippi Development Authority to Debtor's Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105, 363 and 364 to Approve First Amendment to Senior Secured and Superpriority Financing Agreement* [Docket No. 461] (the "MDA Objection"), which was filed by the Mississippi Development Authority (the "MDA") on April 2, 2015.

**INTRODUCTION**

1. The MDA Objection is largely a restatement of the same theories, arguments, and authorities that the MDA previously used in its campaign to thwart the existing DIP Facility. As before, the MDA's wide-ranging objection is replete with generalized accusations about the allegedly illicit motives of the various parties involved in this chapter 11 case and the supposed

---

[1] The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is KiOR, Inc. (2233). The above-captioned Debtor's mailing address is 13011 Bay Park Road, Pasadena, Texas 77507.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the *Debtor's Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105, 363 and 364 to Approve First Amendment to Senior Secured and Superpriority Financing Agreement* [Docket No. 397] (the "Motion").

01:16934167.1

1

flaws in the Debtor's proposed plan of reorganization, but is devoid of facts or arguments that are actually relevant to this Court's consideration of the DIP Amendment. This Court overruled the Initial MDA Objection,[3] finding that the existing DIP Facility is fair, reasonable, in the best interests of the Debtor's estate, the best debtor-in-possession financing package available to the Debtor, and was negotiated in good faith. *See, e.g.*, Final DIP Order ¶¶ I & J. The same is true of the DIP Amendment, notwithstanding the MDA's reckless and already-rejected attacks.

    2.    Other than the "improper purpose" theories that this Court has already rejected, the remainder of the MDA Objection essentially amounts to complaints about the incremental costs the Debtor's estate will incur litigating the Dischargeability Complaint – costs that the MDA suggests could be avoided if the Khosla Parties (as defined in the MDA Objection) were to "simply seek to purchase the Debtor's assets and operations" rather than support confirmation of the Second Amended Plan. *See, e.g.*, MDA Obj. at 3. But the MDA misses the point – ***these incremental costs are of the MDA's own making***. The only reason it is necessary to extend the existing DIP Facility is that the MDA has made allegations of fraud involving its claims against the Debtor but refused to waive any potential theory that such claims are exempted from the Debtor's discharge. It should be obvious to the MDA that any party acquiring the equity of or providing exit financing to the reorganized Debtor would require a clean discharge, without the looming cloud of the MDA's potential post-bankruptcy claim. If the MDA does not want the Debtor to incur expenses litigating the Dischargeability Complaint, then the MDA should simply waive any potential argument regarding nondischargeability. The MDA's refusal to do so is particularly confusing in light of its acknowledgment that under its preferred alternative (a

---

[3] The "Initial MDA Objection" refers to the *Objection of the Mississippi Development Authority to Debtor's Motion for Interim and Final Orders: (I) Authorizing the Debtor to Obtain Postpetition Financing [etc.]* [Docket No. 180].

01:16934167.1

section 363 sale of the Debtor's assets to the Khosla Parties) the MDA would *not* have any claim that followed the Debtor's assets through the sale. *See, e.g.*, MDA Obj. at 16 (noting that "all issues concerning dischargeability will be moot" if the Debtor pursues an asset sale instead of a plan). In other words, because the MDA would not have a post-discharge claim if the Debtor pursued the MDA's suggested sale process, the MDA should likewise be willing to waive any post-discharge claim in the plan context, as doing so would leave the MDA no worse off and avoid the very litigation expense and delay about which the MDA complains. Instead of agreeing to this result, however, the MDA transparently hopes to deprive its litigation adversary of resources with which to litigate.

3. The DIP Amendment does not advantage Pasadena or deprive the Debtor's estate of any existing rights under the DIP Facility. The Final DIP Order contains extensive carveouts from the DIP liens and related claims for such matters as the estate's commercial tort claims, derivative claims, and chapter 5 avoidance actions. The DIP Amendment does not disturb these carveouts. And, since the Debtor's operations already cleared the market through a sale process and potential auction at a price equal to the amount of the existing DIP loan plus $1 million, increasing the amount of that loan as proposed in the DIP Amendment will not result in any additional value being realized by Pasadena, including under the Debtor's current proposed plan.

4. In short, none of the points raised by the MDA offers any basis to interfere with the Debtor's determination to proceed with the DIP Amendment. For the reasons discussed herein and in the Debtor's reply, and based on the evidence adduced at the hearing on the existing DIP Facility and at the hearing on the instant Motion, the MDA Objection should be overruled in its entirety.

01:16934167.1

3

**ARGUMENT**

A. **The MDA Objection Consists Primarily of Theories that Have Already Been Rejected by the Court**

5. The theme of the MDA Objection, as before, is that the DIP Amendment is part of some untoward scheme to benefit the Khosla Parties to the detriment of non-insider unsecured creditors. *See, e.g.*, MDA Obj. at 22-23 ("[T]here is no evidence the proposals before the Court will in any way preserve assets or operations or benefit creditors other than Vinod Khosla and the other Khosla Parties."); 17-18 (citing cases for the general prohibition against DIP loans that benefit DIP lenders at the expense of other creditors). In support of this theory, the MDA dusts off the very same cases it cited in its opposition to the existing DIP Facility. *Compare* MDA Obj. at 17-19 (citing *In re Berry Good LLC*, 400 B.R. 741 (Bankr. D. Ariz. 2008); *In re Phase-I Molecular Toxicology Inc.*, 285 B.R. 494 (Bankr. D.N.M. 2002); *In re Tenny Vill. Co., Inc.*, 104 B.R. 568 (Bankr. D.N.H. 1989); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990); *In re Crouse Grp.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987)), *with* Initial MDA Obj. at 20-22 (discussing the same cases). Pasadena has already explained why those authorities are inapposite, and need not repeat that analysis here. *See* Docket No. 202 (the "Initial Pasadena Reply") at 9-10 & n.9.[4]

6. This Court has already agreed with the Debtor and Pasadena by finding that the Khosla Parties engaged in good faith, arms' length negotiations with the Debtor and its advisors over the terms of the DIP Facility, use of cash collateral, and plan terms. *See* Final DIP Order ¶¶ H, I(iii) & 16. As the Court concluded, "the process evidence that was put forward really was very thorough and very strong that this has been an arm's length negotiation, ***that there was not***

---

[4] Pasadena incorporates the Initial Pasadena Reply by reference as if fully set forth herein, together with all evidence and argument presented at the Final DIP Hearing.

*any improper insider pressure being brought*," and that all parties proceeded in good faith. *See* Jan. 16, 2015 Hr'g Tr. at 121:3-11 (emphasis added). Accordingly, the Court had "no problem making a good faith finding" despite the MDA's accusations of some sinister scheme by the Khosla Parties. *Id*. at 121:11. The present MDA Objection offers no new evidence casting doubt on the Khosla Parties' good faith in negotiating the DIP Facility or the DIP Amendment, and should be denied on that basis.

7.      Furthermore, the Court should not lose sight of the hypocrisy in the MDA's theory that the Motion should be denied because of some alleged motive to benefit the Khosla Parties at the expense of non-insiders. As stated in the Motion, the purpose of the DIP Amendment is to "provide[] funding for the time period expected to resolve the Dischargeability Complaint" the Debtor filed against the MDA. Motion at 2. Thus, in opposing the Motion, the MDA seeks to prevent the Debtor from pursuing litigation *against the MDA itself*. If there is any party with dubious motives, it is the MDA, who transparently seeks to avoid a determination on the merits of the Dischargeability Complaint by cutting off the source of funding for that litigation – litigation that became necessary only as a result of the MDA's own recent actions in other forums, and litigation that the MDA could easily eliminate.

8.      It bears emphasis that Pasadena has no desire to loan millions of additional dollars to the Debtor to litigate with the MDA and will receive no economic benefit from its extension of more credit. As the current plan contemplates a conversion to the exact same equity to which the existing DIP Facility would be converted, Pasadena is not anticipating any enhanced or additional recovery in this case. Moreover, the incremental amounts made available to the Debtor under the DIP Amendment will not be secured by any additional collateral or have an enhanced priority vis-à-vis assets of the estate that are not presently subject to Pasadena's liens

01:16934167.1

5

and priority claims. Simply put, no new economic or tactical benefit for Pasadena will result under the DIP Amendment. To the contrary, Pasadena is funding millions of dollars to solve a problem that the MDA created and that the MDA can easily eliminate. This is hardly a situation that unduly advantages any of the Khosla Parties.

9. The MDA Objection also renews the MDA's previously-rejected theory that DIP financing is inappropriate because the Debtor is an as-yet unprofitable development-stage technology company that has no present means to repay the debt. *Compare* MDA Obj. at 18-19 (asserting that the DIP Amendment is improper because, *inter alia*, the Debtor has not generated any revenues and its technology is not yet commercially viable), *with* Initial MDA Obj. at 23-24 (same). This Court has already made clear that the Debtor's lack of financial success to date does not render DIP financing inappropriate. *See* Jan. 16, 2015 Hr'g Tr. at 113:23-114:5 (noting that "[i]mplicit in the [MDA]'s argument, I think, is the position that you can't use Chapter 11 to reorganize for pre-revenue research and development or a developmental stage company. And I disagree. I think Chapter 11 is flexible enough to provide for the reorganization of all types of businesses and enterprises, including enterprises that are in a developmental stage and will require additional funding, perhaps for some time, before they're in a place where they might be profitable.").[5] Once again, the Debtor's lack of profitability does not provide a basis on which to deny the Motion.

10. Overall, the MDA Objection amounts to an attempt to take a second bite at the apple on the MDA's overarching but spurious theories about this bankruptcy case in general and the DIP Facility in particular. As before, this Court should reject those theories.

---

[5] The Court did put the onus on the Debtor to come forward at a later date and show that it would be able to obtain longer-term funding, *id*. at 114:9-19, which is precisely what the Debtor has done, *see generally* Exit Financing Letter (as defined in the MDA Objection).

01:16934167.1

**B.     The MDA Objection Is a Premature Attempt to Litigate Plan Confirmation Issues**

11.     The MDA Objection reads more like an objection to plan confirmation than to the proposed DIP Amendment. It contains pages upon pages discussing how the Debtor's Second Amended Plan allegedly is not feasible, *see* MDA Obj. at 11-13, 15-16 & 23-24, will release valuable estate claims, *id.* at 5, 16, 17 & 20, and does not "adequately address" certain claims, *id.* at 25. Tellingly, nearly every reference to the DIP Amendment is accompanied by a reference to the Debtor's other "proposals" (*i.e.*, the plan and the Dischargeability Complaint). *See, e.g.*, MDA Obj. at 14 (lumping together the DIP Amendment, Second Amended Plan, and Dischargeability Complaint as "proposals [that], if adopted, will increase superpriority claims . . . [and] diminish the estate") & 17 (arguing that the "Additional DIP Funding and related proposals" are not in the best interests of the estate). But the Debtor's other "proposals" – including the Second Amended Plan – are not before the Court at this juncture.

12.     The sole issue before the Court is whether the DIP Amendment should be approved because the terms thereof are in the best interests of the Debtor's estate and are the result of the Debtor's prudent exercise of reasonable business judgment. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of a lender."); *In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."). For the reasons set forth in the Motion, the terms of the DIP Amendment are fair, reasonable, and in the best interests of the estate.

13.     Nothing in the MDA Objection suggests otherwise. For all of its rhetoric and wide-ranging attacks, the MDA Objection is short on specific objections to the Motion before the Court. For example, the section of the MDA Objection entitled "*The Terms of the [DIP Amendment] Are Not Fair and Reasonable Under the Circumstances*" fails to discuss or even

01:16934167.1

7

cite to a single provision of the DIP Amendment or the DIP Credit Agreement; instead, it focuses on an alleged shortcoming of the Second Amended Plan. *See* MDA Obj. at 19-21 (discussing the "paltry and inadequate" funding of the litigation trust under the plan). But the Debtor's inevitable clash with the MDA over plan confirmation is a fight for another day; this Court should not entertain the MDA's attempt to prematurely litigate those issues in the context of the present Motion.

14. Finally, even though the MDA's generalized complaints about this case and the Second Amended Plan are not germane to the Motion, it must be mentioned that the MDA Objection contains many material inaccuracies in its descriptions thereof. **First**, the MDA is flatly incorrect in its assertion that "if the Second Amended Plan is confirmed as proposed, the bankruptcy estate will be deprived of officer and director liability claims, as well as numerous other potentially valuable causes of action." *Id.* at 15. The Debtor has dramatically narrowed the scope of the plan releases throughout the successive iterations of the plan; the Second Amended Plan does ***not*** release the estate's claims against any officers or directors of the Debtor or against any of the Khosla Parties. Indeed, the only parties receiving estate releases under the Second Amended Plan are continuing trade creditors. *See* Second Amended Plan, Art. X.C. **Second**, the Debtor's plan exclusivity period has ***not*** expired. *Cf.* MDA Obj. at 2 n.8. Because the Debtor filed its initial plan on December 15, 2014 – well before 120 days after the petition date of November 9, 2014 – the Debtor's exclusivity period will expire (absent an extension) only 180 days after the petition date, on May 8, 2015. *See* 11 U.S.C. § 1121(c). **Third**, it is not true that the plan is not feasible because "there is still no committed exit funding." MDA Obj. at 2. As the MDA acknowledges, Pasadena has provided the Debtor with an exit financing commitment of up to $29,500,000. Although the MDA attempts to denigrate the Exit Financing

Letter because Pasadena's commitment is subject to certain conditions, including the achievement of specified performance milestones, such conditions are customary and market-standard for equity financings of development-stage companies. The Exit Financing Letter is the result of heavy negotiation over a lengthy period of time, and it provides a sufficient foundation on which the Debtor's plan may stand.

### C. The Second Amended Plan Is Superior to an Asset Sale

15. Setting aside the MDA's already-rejected arguments about the Khosla Parties' improper motives and its premature confirmation objections, what remains is the MDA's assertion that rather than funding the Dischargeability Complaint and subsequently proceeding to confirmation of the Second Amended Plan, the Debtor should simply sell its assets to the Khosla Parties. *See* MDA Obj. at 14-17. The MDA asserts that this would be a more efficient process that would result in greater benefits for the estate and unsecured creditors. However, upon closer examination, it is evident that the MDA's real reason for attempting to sabotage the Motion and Second Amended Plan in favor of an asset sale is not to generate value for the estate or other creditors, but rather to gain litigation advantages for itself.

16. The chief benefit of an asset sale, according to the MDA, is that it could be completed quickly and cheaply, without the need to litigate the Dischargeability Complaint. But if that were the MDA's real concern, the MDA could simply agree to waive any argument it could attempt to advance against the reorganized Debtor under Bankruptcy Code section 1141(d)(6) and allow the Second Amended Plan to proceed to confirmation forthwith. Doing so would put the MDA in no worse a position than would a sale of the Debtor's assets because, as the MDA acknowledges, its guaranty claim clearly would not follow the assets into the hands of the Khosla Parties if purchased in a section 363 sale. *See* MDA Obj. at 16 (acknowledging that "all issues concerning dischargeability will be moot" if the assets are sold); *see also* 11 U.S.C.

01:16934167.1

9

§ 363(f). The MDA, however, apparently refuses to waive its potential post-discharge claim.[6] The MDA's refusal to take an action that would have the same practical effect as the alternative transaction suggested in the MDA Objection indicates that the MDA is actually more concerned with litigation tactics than with preserving any value for the estate.

17. In any event, even if the result in a hypothetical sale scenario were relevant to whether the Second Amended Plan is confirmable (it is not), the MDA submits no evidence indicating that an asset sale would be materially faster or less expensive than proceeding with the Second Amended Plan. The DIP Amendment provides that if certain conditions are met "the Lenders ***shall negotiate in good faith*** with the Borrower to acquire substantially all of the Borrower's assets." DIP Amendment at 6-7 (emphasis added). Those negotiations have obviously not begun. If forced to pursue the asset sale route, there is no telling how long it would take or how much it would cost to, *inter alia*, negotiate the terms of an asset purchase agreement (assuming mutually agreeable terms could be reached in the first place), file a motion for approval of said agreement, conduct a sale hearing, prepare a sale order, and close the sale. The entire process could result in substantial costs to the estate; costs that could easily equal or exceed the costs of proceeding with confirmation if the MDA would simply waive its nondischargeability argument.

18. Moreover, a sale would not produce any better result for the MDA or other creditors than the Second Amended Plan. In such a transaction, Pasadena would likely bid the DIP Facility to acquire all the DIP Collateral, likely without any cash consideration. Without such cash, the estate might be left without the ability to fund further administrative expenses.

---

[6] Although the MDA Objection coyly states that "the MDA has not asserted that its claims against the Debtor are nondischargeable," MDA Obj. at 9, the MDA has not waived its right to argue that such claims are nondischargeable, which leaves the same uncertainty overhang that necessitated the Dischargeability Complaint.

01:16934167.1

Indeed, an asset sale would presumably only exacerbate the MDA's stated concerns about the seed money for the litigation trust under the Second Amended Plan, as an asset sale could result in *no* seed money being provided and no litigation trust to pursue the claims to which the MDA apparently ascribes so much value. With no cash and no way to fund administrative expenses, it is possible that there would be no recovery for prepetition creditors, including the MDA.

[remainder of page intentionally left blank]

## CONCLUSION

WHEREFORE, for all the reasons set forth above, in the Motion, and in the Debtor's reply, Pasadena respectfully urges this Court to (i) grant the Motion, (ii) overrule the MDA Objection in its entirety, and (iii) grant such other and further relief as is just and proper.

Dated:  April 7, 2015
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
Margaret Whiteman Greecher (No. 4652)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253

-and-

KLEE, TUCHIN, BOGDANOFF & STERN LLP
David M. Stern (admitted *pro hac vice*)
Thomas E. Patterson (admitted *pro hac vice*)
Whitman L. Holt (admitted *pro hac vice*)
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Telephone: (310) 407-4000
Facsimile:  (310) 407-9090

*Counsel for DIP Agent Pasadena Investments, LLC*

01:16934167.1