## **EXHIBIT A**

(Blackline of Disclosure Statement)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------
                                                    :
In re:                                              :        Chapter 11
                                                    :
                                                    :        Case No. 14-12514 (CSS)
KIOR, INC.[1]                                       :
                                                    :
                                                    :
                         Debtor.                    :
---------------------------------------------------------------

**SECOND AMENDED DISCLOSURE STATEMENT FOR KIOR INC.'S SECOND
AMENDED CHAPTER 11 PLAN OF REORGANIZATION, AS REVISED DATED
APRIL 7, 2015**

KING & SPALDING, LLP                 RICHARDS, LAYTON & FINGER, P.A.

Mark W. Wege                         John H. Knight (No. 3848)
Edward L. Ripley                     Michael J. Merchant (No. 3854)
Eric M. English                      Amanda R. Steele (No. 5530)
1100 Louisiana Street, Suite 4000    One Rodney Square
Houston, Texas 77002                 920 North King Street
                                     Wilmington, Delaware 19801

**ATTORNEYS FOR KIOR, INC.**

**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE
SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE
STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL
BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1]     The Debtor in this Chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is KiOR, Inc. (2233). The above-captioned Debtor's mailing address is 13011 Bay Park Road, Pasadena, Texas 77507

## DISCLAIMER

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS.  FURTHERMORE, ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN, THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.  ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN, UNLESS SO SPECIFIED.  ALTHOUGH THE DEBTOR HAS MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR SHOULD EVALUATE THIS

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

## TABLE OF CONTENTS

**DISCLAIMER**………………………………………………………………ii

**TABLE OF CONTENTS**………………………………………………...iv

I.    **INTRODUCTION**.............................................................................1

    A.  Overview ..............................................................................1

    B.  Summary of the Plan ..........................................................1

        1. The Restructuring Transaction ................................1

        2. Payment of Allowed Claims .....................................4

        3. Summary of Classification and Treatment of Claims and Equity Interests ...............6

    C.  Voting and Confirmation Procedures .................................7

        1. Who May Vote .........................................................7

        2. Voting and Solicitation Procedures ..........................8

        3. Voting Instructions ..................................................9

        4. Acceptance and Rejection of the Plan.....................10

        5. Confirmation Hearing .............................................11

        6. Objections to Confirmation ....................................11

II.   **GENERAL INFORMATION ABOUT THE DEBTOR AND THE BANKRUPTCY CASE**.........................................................13

    A.  Formation, Business, and Capital Structure ......................13

    B.  SEC Filings ........................................................................17

    C.  Prepetition Litigation ........................................................17

    D.  Events Leading to the Commencement of the Chapter 11 Case ....................19

III.  **SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE**.........................20

    A.  First Day Pleadings............................................................20

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

B.  Second Day Pleadings, Including Retention of Professionals ..........................21

C.  Marketing of the Debtor's Assets and Entry of the Bid Procedures Order ...22

D.  Ongoing Discovery and Disputes with the MDA ...............................................23

E.  Appointment of Committee ...................................................................................24

F.  United States Trustee.............................................................................................24

G.  Rejection and Assumption of Executory Contracts and Unexpired Leases ...24

H.  Dissemination of Information About the Case .....................................................25

I.  Bar Date Order .......................................................................................................26

J.  Avoidance Actions...................................................................................................26

    1. Preferences ........................................................................................................26

    2. Fraudulent Transfers .......................................................................................27

K.  Derivative Claim .....................................................................................................28

L.  Mississippi State Court Lawsuit ...........................................................................27

M. The Nondischargeability Action ............................................................................28

IV.  **THE CHAPTER 11 PLAN**............................................................................................29

A.  Summary of Classification .....................................................................................29

B.  Summary of the Terms of the Plan .......................................................................29

    1.  Class 1 – First Lien Claims and DIP Financing Claims....................30

    2.  Class 2 – Second Lien Claims ..............................................................30

    3.  Class 3 – Third Lien Claims .................................................................31

    4.  Class 4 – Other Secured Claims ..........................................................31

    5.  Class 5 – Secured Tax Claims ..............................................................31

    6.  Class 6 – Priority Employee Claims ....................................................32

    7.  Class 7 – Continuing Trade Claims .....................................................32

    8.  Class 8 – Convenience Claims ..............................................................33

v

9.  Class 9 – General Unsecured Claims ................................................33

10. Class 10 – Subordinated Claims ....................................................34

11. Class 11 – Equity Interests ...........................................................34

C.  Means for Implementation of the Plan ....................................................35

1. Reorganization ...........................................................................35

2. Source of Funding ......................................................................35

3. Creation of the Liquidating Trust ..............................................35

4. Powers and Duties of the Liquidating Trustee ...........................37

D.  The Maintenance and Safekeeping of Liquidating Trust Assets....................38

1. Avoidance Actions .....................................................................38

E.  Provisions Regarding Distributions .........................................................39

1. Time and Method of Distributions ..............................................39

2. Reserve for Disputed Claims .....................................................40

3. Manner of Distribution Under Plan and Liquidating Trust .............40

4. Delivery of Distributions ...........................................................40

5. Undeliverable Distributions .......................................................40

6. Compliance with Tax Requirements/Allocation ..........................41

7. Time Bar to Cash Payments ......................................................41

8. Distributions After Effective Date ..............................................41

9. Fractional Dollars; De Minimis Distributions .............................41

10. Setoffs/Recoupment .................................................................42

11. Preservation of Subordination Rights by Estate............................42

V.      PROJECTED FINANCIAL INFORMATION.............................................42

VI.     EFFECTS OF CONFIRMATION ..............................................................43

A.  Compromise, Settlement of Claims, Equity Interests, and Controversies .....43

vi

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

B.  Discharge of Claims and Termination of Interests ..........................................43

C.  Certain Avoidance Actions Released .................................................................44

D.  Releases by Holders of Claims ...........................................................................44

E.  Injunction ............................................................................................................45

F.  Necessity and Approval of Releases and Injunctions .......................................45

G.  Exculpation ..........................................................................................................45

VII.    **CONFIRMATION AND CONSUMMATION PROCEDURES** ..........................46

A.  General Information ............................................................................................46

B.  Solicitation of Acceptances ................................................................................46

C.  Considerations Relevant to Acceptance of the Plan ........................................46

VIII.   **FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST** ........................47

A.  Feasibility of the Plan ........................................................................................47

B.  Best Interest of Creditors Test ..........................................................................48

C.  Application of Best Interests Test to the Liquidation Analysis and Valuation of the Debtor ....................................................................................48

IX.     **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...................................................................................................................50

X.      **CERTAIN RISKS TO CONSIDER** .....................................................................50

A.  Claims Estimation ..............................................................................................51

B.  Certain Risks of Nonconfirmation .....................................................................51

C.  Risk of Plan Support Parties Default ...............................................................51

D.  Risk in the Technology ........................................................................................51

E.  Tax Implications of the Plan ..............................................................................51

XI.     **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES** ...............................................................................................52

A.  Introduction ........................................................................................................52

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

**B.  Federal Income Tax Consequences to the Debtor** ..............................53

    **1. COD Income and Attribute Reduction** ..................................53

    **2. Treatment of Any Remaining NOLs; Section 382** .............53

**C.  Federal Income Tax Consequences to Holders of Claims** ................53

    **1. General** ...........................................................................54

    **2. Possible Treatment as Tax-Free Recapitalization** ..............54

    **3. Character of Gain or Loss; Loss Limitations** .....................55

    **4. Amounts Received in Respect of Accrued But Unpaid Interest** .........55

    **5. Treatment of the Liquidating Trust** ....................................56

    **6. Information Reporting and Backup Withholding** ...............56

**XII.**  **CONCLUSION AND RECOMMENDATION** .......................................57

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

# I.    **INTRODUCTION**

## A.  Overview

The Debtor, KiOR, Inc., hereby submits this  Second Amended Disclosure Statement (the "Disclosure Statement") for the Debtor's Second Amended Chapter 11 Plan of Reorganization, as revised dated April 7, 2015.[2]  This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan.  In the event of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan shall govern and such inconsistency shall be resolved in favor of the Plan.

The  purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote to make an informed decision in exercising their right to accept or reject the Plan.  [Pursuant to the Disclosure Statement Order dated [_____]April 8, 2015, a copy of which is attached hereto as Exhibit A, the Bankruptcy Court has found that this Disclosure Statement provides adequate information to enable holders of Claims that are Impaired under the Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan.]

## B.  Summary of the Plan

### 1.  The Restructuring Transaction

The Plan is intended to preserve the Debtor's business as a going concern, to retain the Debtor's employees and assets, and to reorganize the Debtor's capital structure through a debt-to-equity conversion.  Currently, the Debtor generates no revenue as its business operations are focused on research and development activities in continued development  of its bio-fuel technology through its ongoing operations in Pasadena, Texas.  Pursuant to the Plan, all of the Debtor's existing equity Interests will be cancelled and the Debtor will issue New Equity Interests to the Holders of the DIP Financing Claims and the Debtor's prepetition First Lien Claims in exchange for the cancellation of $29 million of such indebtedness (collectively, the "New Equity Interests").  In addition, the DIP Lenders and entities affiliated with Mr. Vinod Khosla have committed to provide new funding in the approximate amount of $30 million as an Exit Facility.  As set forth in other pleadings and the Debtor's publicly-available SEC filings, the DIP Financing Claims and the First Lien Claims are held by entities that are "Insiders" of the Debtor (as defined in §101 of the Bankruptcy Code), affiliated with Mr. Khosla.  The Plan also provides for the assumption of certain executory contracts and leases (the "Assumed Contracts").  The issuance of the New Equity Interests, the assumption of the Assumed Contracts, the Discharge, and the Exit Facility collectively are referred herein to as the "Restructuring Transaction."

The Restructuring Transaction will permit the Reorganized Debtor to continue development of its technology with the goal of achieving commercial viability.  The Reorganized Debtor will retain its scientists and specially trained work force at its Pasadena location.  The

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in Article I of the Plan.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

Debtor believes that the Restructuring Transaction is the best vehicle to continue the development of its technology.

Upon the Effective Date of the Plan, the Reorganized Debtor will effectuate the Plan by issuing New Equity Interests, the Assumed Contracts will be assumed by Reorganized Debtor, and the Debtor will be discharged, to the fullest extent permissible under sections 363, 365, 524, 1123, 1129, and 1141 of the Bankruptcy Code, of all existing liens, interests, claims, and encumbrances (the "Discharge").  The Plan also provides for the creation of a Liquidating Trust which will be funded with (i) cash designated for Class 7 continuing trade creditors, (ii) $100,000 and (iii) the transfer of certain claims and Causes of Action that belong to the Estate. The Reorganized Debtor will be funded through an Exit Facility consisting of a conversion of the DIP Financing Claims (under the current DIP Financing, in the approximate amount of $15,273,500 plus any amounts under the proposed DIP Amendment which seeks up to an additional approximately $14 million for a total of $29 million) and the conversion of any amounts of the Debtor's prepetition First Lien Claims.

The Restructuring Transaction was negotiated by the Debtor in conjunction with a comprehensive marketing and sale process, which is described in more detail herein.  Following arms-length and good faith negotiations with the Plan Support Parties, including the DIP Lenders, the Debtor executed a "Plan Support Agreement," which included the Plan Term Sheet setting forth the salient terms of the Restructuring Transaction.  Due to the then current facts and circumstances in early January, 2015, the Debtor elected not to seek Bankruptcy Court authority to assume the prepetition Plan Support Agreement.  The Debtor has nevertheless moved forward and complied with its obligations under the Plan Support Agreement and the Plan Support Parties have signed a letter dated January 8, 2015 expressing their continued support for the Restructuring Transaction.

Both before and after executing the Plan Support Agreement, the Debtor extensively marketed its assets and provided interested parties with the opportunity to propose an alternate transaction for the purchase of substantially all of the Debtor's assets (or the Debtor's equity).  In connection with this marketing process, the Debtor sought and obtained entry of the Order (A) Authorizing and Approving Bid Procedures to Be Employed In Connection With the Potential Sale Substantially All Of the Assets of KiOR, Inc.; (B) Scheduling an Auction And Sale Hearing; (C) Approving the Manner and Form of Notice of the Auction and Hearings; and (D) Granting Related Relief, entered by the Bankruptcy Court on December 8, 2014 (Docket No. 131) (the "Bid Procedures Order").  The Bid Procedures Order established a process for the submission of bids to compete with the Restructuring Transaction (which is referred to in the Bid Procedures Order as the "Stalking Horse Bid").  Thus, the Restructuring Transaction has been subject to a market test pursuant to a formal Bankruptcy Court approved bidding and auction process.  However, the Debtor received no Qualified Bids other than the Stalking Horse Bid and accordingly, per Notice filed January 8, 2015 (Docket No. 196), cancelled the auction, as provided by the Bid Procedures Order.

The Debtor believes that by extensively marketing its assets, negotiating the Restructuring Transaction, and establishing a competitive sale process to attract higher and better offers, the Debtor has taken appropriate steps to maximize value for creditors.  Having tested the market and invited higher and better offers through a Bankruptcy Court-approved bidding

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

process, the Debtor is confident that the Restructuring Transaction is the only viable means for preserving its business and avoiding a piecemeal liquidation of its assets.  Thus, the Debtor filed the Plan to effectuate the Restructuring Transaction and maximize value for creditors and parties in interest.

*Counsel for Mississippi Development Authority ("MDA"),which asserts that the MDA is the largest unsecured creditor of the Debtor, has requested that the following language be included in the Disclosure Statement:*

*The Debtor states that its business will be preserved as a "going concern," although the Debtor currently has no commercially viable product (nor has it ever), (ii) the Debtor needs significant additional time and capital (potentially hundreds of millions of dollars) to continue its effort to discover a workable product, and (iii) its efforts to commercialize a product may never be successful or profitable, as the Debtor concedes in Section X. D. hereof. As found by Judge Sontchi on the record at the conclusion of the final hearing on the DIP Financing, (x) the Debtor is a pre-revenue developmental research and development company with no immediate prospects of revenue and no immediate prospect of profitability, and (y) the Debtor's technology is not commercially viable as it exists, and further research, development and money will be required to get that technology to a place where even more money needs to be spent to take it to the next step.*

*Pursuant to the Plan, the Debtor will issue New Equity Interests in the Reorganized Debtor to holders of the DIP Financing Claims and the Debtor's prepetition First Lien Claims, which claims, as the Debtor readily admits, are held by Insiders of the Debtor and affiliated with Mr. Khosla.  Thus, the same Insider or closely related entities in control of the Debtor prior to bankruptcy will retain control over the Reorganized Debtor and its assets post-bankruptcy.  On the other hand, the Debtor's unsecured creditors will only receive ratable rights to the Liquidating Trust Assets, which could amount to little, if anything, in the way of recoveries.  In short, MDA believes that the DIP Lender and the holders of First Lien Claims have made a deal with themselves (via the Debtor and this chapter 11 case) that will ultimately benefit them to the detriment of the Debtor's other legitimate creditors.*

*Finally, the Debtor states its belief that it has taken "appropriate steps to maximize value for creditors."  But, the Debtor fails to fully disclose that the Restructuring Transaction and Plan only serve to maximize value for the holders of the DIP Financing Claims and the Debtor's prepetition First Lien Claims, all of which are Insiders of or closely related to the Debtor, while the Debtor's general unsecured creditors may receive nothing under the Plan. MDA believes this bankruptcy case was overly engineered by the Debtor's insiders and closely related entities to take the Debtor's assets for themselves at the expense of the legitimate creditors of the Debtor's estate.*

The Debtor disagrees with many of the MDA's assertions set forth above.  The Plan provides value to various groups of secured and unsecured creditors that have no relationship or affiliation with any Insiders and such value would not be available outside of the Plan.  No unsecured creditor is prejudiced or receiving less than such creditor would receive if the case were converted to a chapter 7 liquidation.  Moreover, Mr. Khosla and affiliated entities hold the

3

majority of the shares and voting control of the Debtor but do not control the Debtor. Those entities will become the holders of all the New Equity Interests in the Reorganized Debtor.

## 2. Payment of Allowed Claims

The Plan provides for payment of Allowed Administrative Claims, Priority Tax Claims,[3] Priority Employee Claims, Secured Tax Claims, and Other Secured Claims in full, provided that a condition to the occurrence of the Effective Date is that Administrative Claims and Priority Claims shall not exceed the sum of (i) the aggregate amounts set forth in the DIP Budget plus (ii) $250,000 absent the written consent of the Plan Support Parties. Holders of Allowed General Unsecured Claims will receive ratable rights to participate in a Liquidating Trust which will be vested with $100,000 and the Vested Causes of Action, consisting of all Chapter 5 causes of action of the Debtor's estate (collectively, the "Avoidance Actions") and other Causes of Action, but not any of the Excluded Actions. Excluded Actions include Chapter 5 causes of action against designated, continuing trade creditors who enter into agreements obligating them to continue to provide goods and services to Reorganized Debtor on ordinary and customary trade terms. Excluded Actions do not include any claims or Causes of Action including derivative claims owned by the Estate against any non-debtor, other than all claims or Causes of Action that were previously deemed released as a result of the passing of the challenge deadline under the DIP Orders. As noted, the Liquidating Trust will be funded with $100,000 in cash for administrative purposes and for any other use as determined by the Liquidating Trustee. **IT IS UNCERTAIN WHAT UNSECURED CREDITORS WILL RECEIVE, IF ANYTHING, FROM THE PROSECUTION OF THE VESTED CAUSES OF ACTION. IF PROSECUTION OF THE VESTED CAUSES OF ACTION FAILS TO YIELD SUBSTANTIAL NET PROCEEDS, GENERAL UNSECURED CREDITORS WILL LIKELY RECEIVE VERY LIMITED OR NO RECOVERIES UNDER THIS PLAN.**

Unsecured creditors who are identified by the Plan Support Parties and the Debtor as eligible to receive the continuing trade creditor treatment shall be entitled to opt into the Continuing Trade Creditor Class (Class 7). Members of that Class will receive (i) the same treatment accorded general unsecured creditors, plus (ii) a cash payment on the Effective Date equal to 50% of the Allowed amount of their Claim, plus (iii) a waiver of any Chapter 5 causes of action against them; provided, however, that in no event will a Continuing Trade Creditor receive more than the full amount of its Allowed Claim. Trade Creditors who elect such treatment must vote to accept the Plan and agree to continue to provide goods and services to Reorganized Debtor on ordinary and customary trade terms for at least twelve months following the Effective Date.

On or as soon as practicable following the Effective Date, all general unsecured creditors whose Allowed claims total less than $5,000, or who agree to reduce all their Allowed unsecured claims to $5,000, shall be entitled to opt in and receive, in lieu of the treatment accorded to the

---

[3] The Debtor's Exit Facility assumes an Allowed Priority Tax Claim to the State of Mississippi in the amount of $1.1 million for franchise taxes; however, the State has filed a proof of claim in the amount of $1.6 million. If the Allowed amount of the State of Mississippi's franchise tax claim is greater than $1.1 million, the amount of funding under the Exit Facility would increase by such higher amount.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

holders of general unsecured claims, a single payment equal to 50% of the total of their Allowed Claims (Class 8); provided, however, that in no event shall the aggregate amount of all payments on account of claims in this Class exceed $75,000 (in the event that the payments to creditors opting into Class 8 exceeds $75,000, each holder of an Allowed Class 8 Claim will instead receive a pro rata share of the maximum aggregate payment amount).

The Plan provides that the DIP Lenders and Holders of the First Lien Claim will convert certain of their debt into the New Equity Interests of the Reorganized Debtor as part of the Exit Facility.  The Plan provides that the Holders of Allowed Second Lien Claims will participate ratably in any distributions from the Liquidating Trust.  The Plan does not contemplate any distributions to the Holders of the Third Lien Claims on account of their secured claims; however, the Plan does recognize and implement a Subordination Agreement so that any distribution on account of the Third Lien Claims will be distributed to the holders of Second Lien Claims.

The Plan classifies all Claims and Interests of the Debtor into 11 Classes.  The following table summarizes the classification and treatment afforded under the Plan as further described in Article IV of this Disclosure Statement.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

### 3. Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting Rights | Percentage Recovery |
|---|---|---|---|---|
| 1 | First Lien Claims and DIP Financing Claims | Impaired | Entitled to Vote | Converted into New Equity Interests and the Exit Facility |
| 2 | Second Lien Claims | Impaired | Entitled to Vote | Undetermined |
| 3 | Third Lien Claims | Impaired | Deemed to Reject | None anticipated |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept | |
| 5 | Secured Tax Claims | Impaired | Entitled to Vote | 100% |
| 6 | Priority Employee Claims | Impaired | Entitled to Vote | 100% |
| 7 | Continuing Trade Creditors | Impaired | Entitled to Vote | 50% plus an undetermined amount |
| 8 | Convenience Class Claims | Impaired | Entitled to Vote | Up to 50% |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote | Undetermined |
| 10 | Subordinated Claims | Impaired | Deemed to Reject | 0% |
| 11 | Equity Interests | Impaired | Deemed to Reject | 0% |

The Debtor believes that any alternative to confirmation of the Plan, such as conversion to a Chapter 7 case under the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation, costs, and/or impaired recoveries. As discussed below, the value of the Debtor's assets is greatly exceeded by the amount of its secured liabilities. Thus, any recovery to unsecured creditors from a Chapter 7 liquidation would be highly unlikely. Moreover, the Debtor believes that holders of Allowed Claims will receive greater and earlier recoveries under the Plan than those that would be achieved pursuant to a converted Chapter 7 case or under an alternative plan. **FOR THESE REASONS THE DEBTOR URGES YOU TO RETURN YOUR BALLOT "ACCEPTING" THE PLAN.**

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

*Counsel for MDA has requested that the following language be included in the Disclosure Statement:*

> *MDA disagrees with the Debtor's assertion that any alternative to confirmation of the Plan, including converting the case to a chapter 7 liquidation or the filing of a competing chapter 11 plan, would result in significant delays, litigation, costs and/or impaired recoveries. For instance, if this case was converted to a chapter 7 liquidation, a chapter 7 trustee could take control of the case and, among other things, immediately pursue claims and causes of action that the Debtor's Estate may have against the Debtor's Insiders and/or Persons (as defined in 11 U.S.C. § 101(41)) closely related to the Debtor, including without limitation, for recharacterization of secured debt to equity. If successful, the litigation could result in substantial recoveries for unsecured creditors, both from the proceeds realized from such litigation (which could be substantial) and recharacterization of the secured debt to equity, which would be subordinate to unsecured creditors in priority of payment. The same is true for a competing chapter 11 plan. If a competing plan is filed, it would likely contain limited or no releases and provide a means for a representative of the Debtor's estate to pursue claims and causes of action against the Debtor's Insiders and/or other Persons closely related to the Debtor. In addition, a competing chapter 11 plan would likely provide for a far more favorable structure that would yield far more recoveries for unsecured creditors than contemplated under the Debtor's Plan, which provides for unsecured creditors receiving virtually nothing. Thus, a chapter 7 liquidation or competing chapter 11 plan would likely provide unsecured creditors with a greater likelihood of recoveries, which could be substantial, than the Plan proposed by the Debtor.*

The Debtor disagrees with the MDA's assertions set forth above. Importantly, the Estate and the Liquidating Trust are receiving the benefit of any Causes of Action against any Insiders. No Estate Causes of Action against Insiders are being waived or released under the Plan, and thus, a chapter 7 trustee would not have any better rights or Causes of Action than the Liquidating Trustee. Further, any alleged Causes of Action for "recharacterization" or subordination of the Prepetition Lenders' Claims, even if such Causes of Action were valid, provide no recovery to the Estate or the Liquidating Trust. At best, if any the Prepetition Lenders' Claims were "recharacterized" or subordinated there would be fewer secured claims with priority over general unsecured creditors and fewer unsecured deficiency claims sharing any available recovery. Based on the liquidation analysis attached hereto as Exhibit E, such alleged "success" would provide no benefit to unsecured creditors because there are not anticipated to be recoveries or other assets available to pay such creditors. Lastly, the Liquidating Trustee receives the sum of $100,000 which can be used to investigate Claims and Causes of Action or used to make payments to creditors; these monies are only available if the Plan is confirmed.

### C. Voting and Confirmation Procedures

#### 1. Who May Vote

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan of reorganization under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan. Any Class that is "unimpaired" is not entitled to vote to accept or reject a plan of

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

reorganization and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a Class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered. Holders of Interests (Class 11) will not receive or retain any property under the Plan on account of such Interests and are, therefore, deemed to reject the Plan and are not entitled to vote.

A Claim must be "Allowed" for purposes of voting in order for the holder of such Claim to have the right to vote. Generally, for voting purposes a Claim is deemed "Allowed" absent an objection to the Claim if (i) a proof of claim was timely filed before the Bar Date, or (ii) if no proof of claim was filed, the Claim is identified in the Debtor's Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim (greater than zero) is specified in the Schedules, in which case the Claim will be deemed Allowed for the specified amount. In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or allows the Claim for voting purposes. Accordingly, if you did not receive a Ballot and believe that you are entitled to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by [DATE]May 6, 2015, or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTOR, THE REORGANIZED DEBTOR AND THE LIQUIDATING TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN.**

### 2.    Voting and Solicitation Procedures

On December 16, 2014, the Debtor filed a motion for an order (i) approving this Disclosure Statement; (ii) approving the Solicitation Package (as defined in the Solicitation Order); (iii) establishing the voting record date for entitlement to the Solicitation Package and to vote on the Plan; (iv) approving procedures for the distribution of the Solicitation Package, (v) approving the form of ballots; (vi) establishing the last date for receipt of ballots; (vii) approving procedures for vote tabulation; (viii) establishing the deadline and procedures for filing objections to confirmation of the Plan; and (ix) approving the form and manner of notice of confirmation hearing and of related issues (the "Solicitation Motion"). (Docket No. 154). The Bankruptcy Court entered an Order granting the Solicitation Motion on [_____]April 8, 2015 (the "Solicitation Order"). (Docket No. [__]).

Among other things, the Solicitation Order established the following deadlines related to voting and confirmation of the Plan:

| Event | Date |
|---|---|
| Record Date | [insert]April 8, 2015 |
| Solicitation Date | [insert]On or before April 22, 2015 |
| | |

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

| Deadline to Return Ballots | [insert]May 20, 2015 |
|---|---|

The Solicitation Order further approved the Ballots to be submitted to Holders of Claims permitted to vote on the Plan.  Among other things, the Ballots permit Holders of Claims to "opt-out" of the release provisions set forth in Article X of the Plan.

### 3.  Voting Instructions

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with this Disclosure Statement.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed [DATE] April 8, 2015 (the "Record Date") as the date for the determination of the holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

The Bankruptcy Court has approved the following voting procedures and standard assumptions to be used in tabulating Ballots:

(a)     For purposes of the numerosity requirements of § 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated as if such creditor held one Claim against the Debtor in such Class, and the votes related to such Claims will be treated as a single vote to accept or reject the Plan.

(b)     Creditors must vote all of their Claims within a particular Class whether to accept or reject the Plan and may not split their vote.  Accordingly, a Ballot (or multiple Ballots with respect to multiple Claims within a single Class) that partially rejects and partially accepts the Plan will be counted as a single affirmative vote to accept the Plan.

(c)     Ballots that fail to indicate an acceptance or rejection of the Plan, but that are otherwise properly executed and received prior to the Ballot Return Date, will not be counted.

(d)     Only Ballots that are timely received with original signatures or electronic signatures will be counted.  Unsigned Ballots will not be counted.  Facsimile Ballots, other than Ballots that comply with the procedures noted in the Motion, will not be counted.

(e)     Any Ballot that is illegible or contains insufficient information to permit the identification of the claimant will not be counted.

(f)     Any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan will not be counted.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

(g)    Any creditor who has filed or purchased duplicate Claims will be provided with only one Solicitation Package and one Ballot and be permitted to vote only a single Claim, regardless of whether the Debtor has objected to such duplicate claims.

After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits, please indicate your acceptance or rejection of the Plan on the Ballot and return such Ballot in the enclosed envelope to the Debtor's Voting Agent, Epiq Bankruptcy Solutions, LLC no later than 4:00 p.m. (prevailing Eastern Time), either by (i) mailing the original Ballot by regular mail to KiOR, Inc., c/o Epiq Bankruptcy Solutions, LLC, Attn: KiOR Inc. Ballot Processing, FDR Station, PO Box 5014, New York, NY 10150-5014 or (ii) delivering such original Ballot by hand or overnight mail to KiOR, Inc., Ballot Processing Center, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.

**BALLOTS MUST BE *COMPLETED AND RECEIVED* BY EPIQ NO LATER THAN 4:00 P.M. (PREVAILING EASTERN TIME) ON [DATE]MAY 20, 2015, WHICH IS THE VOTING DEADLINE.   ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON WILL NOT BE COUNTED.   ANY BALLOT THAT IS EXECUTED BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE. EXCEPT AS AGREED TO BY THE DEBTOR, ANY BALLOT THAT IS EMAILED WILL NOT BE COUNTED IN THE VOTING TO ACCEPT OR REJECT THE PLAN.**

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact the office of the Debtor's legal counsel, as listed above.  If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the office of the Debtor's legal counsel, as listed above.  Copies of the Plan, Disclosure Statement and other documents filed in this Chapter 11 case may be obtained free of charge on the Voting Agent's website at http://dm.epiq11.com/KiOR. Documents filed in this case may also be examined between the hours of 8:00 a.m. and 4:00 p.m., Prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

### 4.    Acceptance or Rejection of the Plan

The Bankruptcy Code requires, as a condition to confirmation of a plan, that each Class of Claims against, or equity Interests in, the Debtor that is impaired under a proposed plan vote to accept such plan.  The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in that Class that cast Ballots for acceptance or rejection of the plan.

The Debtor will seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code due to the deemed rejection of the Plan by Class 3 Third Lien Claims, Class 10 Subordinated Claims and Class 11 Interests.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the rejection of the plan by one or more impaired Classes of Claims or

10

Interests.  Under that Bankruptcy Code section, a plan may be confirmed if (a) the plan has been accepted by at least one impaired Class of Claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting Classes.

### 5.  Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.  Pursuant to Section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing to commence on [　　　　　]June 3, 2015 at 10:00 a.m. (prevailing Eastern Time), or as soon thereafter as counsel may be heard, before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 5th Floor Wilmington, Delaware 19801.  A notice setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

### 6.  Objections to Confirmation

Bankruptcy Rule 2002(b) requires at least 28 days' notice to parties in interest of the time fixed for filing objections to confirmation of a plan.  Any objection, comment, or response to the confirmation of the Plan (including any supporting memoranda) must (a) be in writing; (b) state the grounds for the objection, if any, and the legal and factual bases thereof; (c) reference with specificity the text of the Plan to which the objection, if any, is made; (d) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; and (e) be served on the parties identified below, and be filed with the Bankruptcy Court, together with proof of service, such that they are actually received by such parties and the Court by 4:00 p.m. on [　　　　　]May 20, 2015.  Objections to confirmation of the Plan should be served on the following parties:

*To the Debtor:*

KiOR Inc.
13001 Bay Park Road
Pasadena, Texas 77507
Attn: Chief Executive Officer
Attn: General Counsel

*To the Debtor's Counsel:*

King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, TX 77002
Attention: Mark W. Wege, Esq. and Edward L. Ripley, Esq.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

-and-

Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, Delaware 19801
Attn: John H. Knight, Esq. and Michael J. Merchant, Esq.

*To Counsel for Khosla Ventures III, LP:*

Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Attn: Debra Grassgreen, Esq.

-and-

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Attn: Peter Keane, Esq.

*To Counsel for Pasadena Investments, LLC, the KFT Trust, Vinod Khosla, Trustee, and VNK Management, LLC:*

Klee, Tuchin, Bogdanoff & Stern LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Attn: Thomas E. Patterson, Esq. and Whitman L. Holt, Esq.

-and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn: Michael R. Nestor, Esq.

*To the Office of the United States Trustee for the District of Delaware:*

Office of the United States Trustee for the District of Delaware
J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Wilmington Delaware 19801
Attn: Jane Leamy, Esq.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

*To Counsel for the MDA:*

Greenberg Traurig, LLP
1000 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn: Shari L. Heyen, Esq.

Greenberg Traurig, LLP
3333 Piedmont Road, Suite 2500
Atlanta, Georgia 30305
Attn: David Kurzweil, Esq.

-and-

McCraney, Montagnet, Quin & Noble, PLLC
602 Steed Road, Suite 200
Ridgeland, Mississippi
Attn: Doug Noble, Esq.

## II.    GENERAL INFORMATION ABOUT THE DEBTOR AND THE BANKRUPTCY CASE

### A.  Formation, Business and Capital Structure

The Debtor and KiOR Columbus (together, the "KiOR Entities") are development stage, renewable fuels companies based in Pasadena, Texas and Columbus, Mississippi, respectively. The Debtor was founded in 2007 as a joint venture between Khosla Ventures, LLC and BIOeCon B.V.  KiOR Columbus was formed as a wholly-owned subsidiary of the Debtor on October 6, 2010, in connection with the acquisition of property and the construction of a manufacturing facility in Columbus, Mississippi.  The Debtor's primary business is the development and commercialization of a ground-breaking proprietary technology designed to generate a renewable crude oil from non-food cellulosic biomass (e.g., trees, grasses, etc.), which can be refined into gasoline, diesel, and aviation fuels.  The fuels produced by the Debtor's highly specialized process are true hydrocarbon fuels that are molecularly consistent with their traditional petroleum-based counterparts.  However, the Debtor estimates that its cellulosic hydrocarbon fuels reduce lifecycle greenhouse gases by over 60% when compared to traditional fossil fuels.

The Debtor maintains corporate offices, research and development facilities and a test-scale demonstration facility in Pasadena, Texas.  Currently, the Debtor employs approximately 71 people.  In mid-2012, the KiOR Entities completed construction of an initial-scale production facility with a design capacity for approximately 500 bone dry tons of biomass feedstock per day in Columbus, Mississippi (the "Columbus Facility").  When the Columbus Facility opened in 2012, it was the first large-scale plant in the U.S. to convert cellulosic non-food biomass into

13

hydrocarbon gasoline and diesel. KiOR Columbus operated the Columbus Facility during 2013, producing and selling cellulosic fuels that met certain contractual specifications. However, KiOR Columbus encountered certain challenges at the Columbus Facility, including operational, production, and capacity issues as well as difficulties related to optimizing catalyst performance. In January 2014, KiOR Columbus suspended operations at the Columbus Facility, and has since idled and decommissioned the Columbus Facility, to minimize ongoing costs. Certain of the Prepetition Lenders filed a receivership action in Mississippi against KiOR Columbus, LLC. Recently, by agreement among KiOR Columbus, the MDA and the Prepetition Lenders, an independent third party, Mr. Derek Henderson, was appointed as a receiver under Mississippi law for the Columbus Facility. The Debtor continues, however, to maintain its research and development facilities, as well as a test scale demonstration facility, in Pasadena, Texas, and also continues to provide certain shared services such as accounting, legal and human resources and other management to KiOR Columbus.

The Debtor's corporate offices, research and development facilities, as well as its test-scale demonstration facility, are maintained in Pasadena, Texas. As referenced in Paragraph I(B)(1) above, the Debtor currently generates no revenue as it continues development of its technology. The Debtor needs additional time and capital to continue this technology development and through its post-reorganization business plan and the Exit Facility has the commitment from entities affiliated with Mr. Khosla to provide new funding of approximately $30 million. These funds will run out in about one (1) year, and additional capital will be required to continue research and development activities unless at that time another commercial transaction takes place such as the Reorganized Debtor entering into licensing or joint venture agreements. The Debtor is currently a publicly-owned company with two classes of common stock, the majority of which is owned by certain of the Prepetition Lenders. The Debtor's stock was listed on NASDAQ before being delisted on or about October 27, 2014. The Debtor is currently party to the following credit facilities:[4]

First Lien Prepetition Secured Debt. Pursuant to the Prepetition First Lien Loan Agreement and the Prepetition First Lien Loan Documents, by and among the Debtor and the Prepetition First Lien Secured Parties, the Prepetition First Lien Secured Parties agreed to extend loans and other financial accommodations to the Debtor pursuant to the Prepetition First Lien Loan Agreement. As of the Petition Date, approximately $16,273,500 in principal is due and owing under the Prepetition First Lien Obligations.

2013 Second Lien Prepetition Secured Debt. Pursuant to the 2013 Second Lien Purchase Agreement and the 2013 Second Lien Note Documents, by and among the Debtor and the 2013 Second Lien Secured Parties, the 2013 Second Lien Secured Parties agreed to purchase notes and extend other financial accommodations pursuant to the 2013 Second Lien Purchase Agreement. As of the Petition Date, approximately $95,700,000 in principal is due and owing under the 2013 Second Lien Obligations.

---

[4] Capitalized terms used but not defined in the following summary of the Debtor's credit facilities shall have the meanings ascribed to such terms in the Interim DIP Order.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

2014 Second Lien Prepetition Secured Debt.  Pursuant to the 2014 Second Lien Purchase Agreement and the 2014 Second Lien Note Documents, by and among the Debtor and the 2014 Second Lien Secured Parties, the 2014 Second Lien Secured Parties agreed to purchase notes and extend other financial accommodations pursuant to the 2014 Second Lien Purchase Agreement. As of the Petition Date, approximately $10,400,000 in principal is due and owing under the 2014 Second Lien Note Documents.

Third Lien Prepetition Debt.  Pursuant to the Prepetition Third Lien Loan Agreement by and among the Debtor and the Prepetition Third Lien Parties, the Prepetition Third Lien Parties agreed to extend loans and other financial accommodations pursuant to the Prepetition Third Lien Loan Agreement.  As of the Petition Date, there is approximately $115,000,000 in principal and interest due and owing under the Prepetition Third Lien Obligations.

Prepetition Liens, Collateral and Amounts Owed.  As recognized in the Final DIP Order, the Debtor has stipulated to the validity of the liens held by the Prepetition First Lien Secured Parties, the 2013 Second Lien Secured Parties, the 2014 Second Lien Secured Parties, and the Prepetition Third Lien Parties described above.  As recognized in the Final DIP Order, the Debtor has also stipulated to the amounts owed under the Prepetition Loan Documents, as follows: as of the Petition Date, the Debtor owed the Prepetition Secured Parties, pursuant to the Prepetition Loan Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of loans made by the Prepetition Secured Parties, (a) protective advances in the amount of not less than $16,273,500  pursuant to the Prepetition First Lien Loan Documents, (b) notes in the principal amount of not less than $95,700,000 pursuant to the 2013 Second Lien Loan Documents, and (c) notes in the principal amount of not less than $10,400,000 pursuant to the 2014 Second Lien Loan Documents, in each case plus all accrued and hereafter accruing and unpaid interest thereon and any additional fees, expenses (including, without limitation, any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents), and other amounts now or hereafter due under the Prepetition Loan Documents.  However, as set forth in the Final DIP Order, the Debtor's stipulations as to the amount and validity of the Prepetition Lenders' Claims and liens are not generally binding for the periods of time specified therein on the Liquidating Trustee or any other trustee that might be appointed in the case or on the MDA to the extent that the MDA (i) obtains an order from the Bankruptcy Court authorizing it to pursue particular causes of action and (ii) in fact pursues any such actions within the timeframe ordered by the Bankruptcy Court.

As described in Paragraph III. D. below, the MDA contends that these three credit facilities should be recharacterized as equity interests and thus the Prepetition Lenders would not have valid Liens in the Debtor's assets.  The Debtor and the Pre-Petition Lenders disagree and the Court has scheduled a hearing for April 29, 2015 to consider the MDA's request for legal standing to assert its claims.

DIP Credit Facility.  As described in detail below, the Debtor is party to the DIP Credit Agreement between the Debtor and the DIP Lenders, providing for an aggregate borrowing commitment of $15,000,000.  The Bankruptcy Court overruled the MDA's objection and approved the DIP Financing following a two-day contested hearing.  Further, the Debtor has

15

filed a motion for approval of an amendment and extension of the DIP Credit Facility to provide for an additional approximately $14 million (for a total of $29 million if the entire amounts were ultimately drawn) in funding through a potential Effective Date of September 30, 2015 as reflected in the Amendment to the DIP Credit Agreement filed on March 16, 2015, (Docket No. 397).

*Counsel for MDA has requested that the following language be included in the Disclosure Statement:*

> *Although stated elsewhere in this Disclosure Statement, the Debtor's description of the credit facilities above fails to mention the Insider and/or close relationship between the Debtor and the counterparties to those credit facilities. MDA believes these "credit" facilities are, in fact, disguised equity financings that can and should be recharacterized as equity interests. To wit, MDA has filed a Motion for an Order Granting Leave, Standing and Authority to Commence and Prosecute Derivative Claims on Behalf of the Debtor's Estate [Docket No. 223] (as amended from time to time, the "Standing Motion"). The Standing Motion was recently amended on March 23, 2015 [Docket Nos. 432 & 433]. Therein, MDA seeks standing and authority to pursue (on behalf of the Debtor's estate) challenges to the alleged Insider secured claims and has filed a proposed amended complaint under seal (attached as an exhibit to the Standing Motion), as amended from time to time, seeking, among other things, recharacterization of the Debtor's alleged secured debt to equity. The Debtor is only allowing certain information to be made publicly available by arbitrarily labeling all documents as "confidential," when, in fact, such documents are not confidential and should be made available to the public for purposes of full disclosure. MDA filed the proposed amended complaint and redacted exhibits thereto under seal because the information contained therein can only be made publicly available upon consent of the Debtor. No such consent was provided by the Debtor and, therefore, MDA had no choice but to file these documents under seal and redacted, as the case may be.*

> *If MDA is granted standing to pursue its challenges and ultimately prevails on its claims, then these credit facilities would no longer constitute secured debt (having priority in payment over general unsecured creditors) but rather would be recharacterized as equity, which is subordinate to general unsecured creditors in priority of payment.*

The Debtor disagrees with certain of the MDA's assertions set forth above. Among other issues, the Debtor has not arbitrarily labeled documents as confidential. The Debtor has, as part of far-ranging and extensive discovery requested by the MDA, marked what it believes is confidential business and trade secret information. As a technology-based company with various licenses, patents and related assets, it is critical that all such proprietary information be protected. Further, as discussed above, even if there were viable recharacterization or subordination claims against the Prepetition Lenders, those type of claims provide no affirmative recoveries into the Estate for distribution by the Liquidating Trust.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

**B. SEC Filings**

As a public company, the Debtor has been required to file appropriate reports with the SEC, including quarterly statements of its operational and financial status and reports of significant events. All of the Debtor's public securities filings are available at http://www.sec.gov/edgar.shtml.

**C. Prepetition Litigation**

Prepetition, the Debtor was party to the following pending litigation and investigations:

| Caption of Matter and Case No. | Nature of Proceeding | Court or Agency, Location | Status |
|---|---|---|---|
| GARY GEDIG, Derivatively on Behalf of KiOR, Inc., Plaintiff, v. FRED CANNON, JOHN KARNES, SAMIR KAUL, DAVID PATERSON, WILLIAM ROACH, and GARY WHITLOCK, Defendants, -and- KiOR, INC., a Delaware Corporation, Nominal Defendant, Civil Action No. 13-cv-03773 | Derivative Action | United States District Court, Southern District of Texas | The Debtor disputes the allegations. Claims against the Debtor have been stayed. Defendants' motions to dismiss are pending. Plaintiffs and the individual defendants have asked that the court stay the action for six months to allow KiOR's bankruptcy to proceed. |

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

| | | | |
|---|---|---|---|
| MICHAEL BERRY, Individually and on behalf of all others similarly situated, Plaintiff v. KIOR, INC., FRED CANNON, and JOHN K. KARNES, Defendants., Civil Action No. 13-cv-02443<br><br>Severed claims now docketed as:<br><br>DAVE CARLTON and SHARON KEGERREIS, Individually and on behalf of all others similarly situated, Plaintiffs, vs. FRED CANNON, JOHN KARNES and VINOD KHOSLA, Defendants, Civil Action No. 4:15-cv-00012 | Putative Class Action alleging violation of securities laws based on allegedly false statements about projections | United States District Court, Southern District of Texas | The Debtor disputes the allegations. Claims against the Debtor have been stayed and severed. Plaintiffs have filed an amended complaint (under Docket No. 4:15-cv-00012) against individual defendants Cannon and Karnes, in which they have added Vinod Khosla as a defendant. Defendants' motions to dismiss were due March 27, 2015. |
| Ross, Mark vs. KiOR, Inc., Case Nos. 6-3280-14-056 and 2014SOX0045 | Sarbanes-Oxley | US Department of Labor - OSHA | The Secretary of Labor has issued a finding that the complaint is not meritorious. A hearing before an administrative law judge was scheduled for January 7, 2015. The Debtor has filed a Notice of Bankruptcy. |

18

| Smith, Edward vs. KiOR, Inc., EEOC Charge No. 460-2014-04031 | EEOC | US Equal Employment Opportunity Commission (EEOC) | The Debtor has filed a Notice of the Bankruptcy. |
|---|---|---|---|
| Subpoena issued pursuant to a Formal Order of Investigation dated January 28,2014 | Formal Order of Investigation | U.S. Securities and Exchange Commission (SEC) | The Debtor has provided requested information to the SEC and the matter remains pending. |

**D. Events Leading to the Commencement of the Chapter 11 Case**

Prepetition, the Debtor faced challenges in commercializing its technology and scaling its production to the volumes necessary to meet its targets.  At present, due to the idling of the Columbus Facility, the KiOR Entities generate no revenues, but continue to incur the ongoing costs related to their operations, including the Debtor's continued work on optimization of their technology, the cost of ongoing research and development, payment of obligations owed to employees, vendors, and governmental authorities, and substantial debt.

Most recently, the operations of the Debtor and KiOR Columbus have been funded by the Senior Lender Parties.  Since 2013 the Senior Lender Parties, and since April 2014 the KFT Trust, have financed the KiOR Entities' continued operations, the idling of the Columbus Facility (including comprehensive decommissioning and clean-out of equipment and tankage at that site), and a robust sale, marketing, and potential reorganization process for the KiOR Entities conducted by Guggenheim Securities, LLC ("Guggenheim").

The Debtor and KiOR Columbus have, beginning in 2013 and continuing into 2014, evaluated a number of options to respond to their operational and liquidity issues.  To this end, the Debtor engaged multiple professionals to assist in developing a business strategy and potential sale of some or all assets of either entity and/or investment process.  In late May 2014, the Debtor retained Guggenheim to evaluate and assist the Debtor in identifying and implementing various strategic options, including but not limited to, the raising of additional capital, a sale of some or all assets and/or a restructuring transaction.  Guggenheim has spent considerable time and resources evaluating and analyzing the Debtor's operations and capital structure, as well as those of KiOR Columbus, and has made such information available to third parties on a confidential basis.  The Debtor's marketing efforts are described in detail below in Section III(C).

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

### III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

#### A. First Day Pleadings

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware, commencing Case No. 14-12514 (CSS).

On or about the Petition Date, the Debtor filed certain "first day" motions and applications with the Bankruptcy Court seeking certain relief to aid in the efficient administration of this case and to facilitate the Debtor's transition to debtor-in-possession status. The Bankruptcy Court held a hearing on these first-day motions on November 13, 2014.  Among other things, the Bankruptcy Court signed orders which:

- authorized the Debtor to maintain its bank accounts and operate its cash management system during the Chapter 11 case in substantially the same manner as it was operated prior to the commencement of the Chapter 11 case. (Docket No. 50).

- authorized payment of certain prepetition employee salaries, wages, and benefits and reimbursement of prepetition employee business expenses, which ensured that payroll and benefits to employees during the Chapter 11 case would not be disrupted. (Docket No. 52).

- prohibited, on an interim basis, any alleged utilities from terminating services to the Debtor and provided a means for utilities to request deposits or other adequate protection mechanisms. (Docket No. 51).[5]

- authorized the Debtor to retain Epiq Bankruptcy Solutions as the claims and noticing agent for the Debtor. (Docket No. 49).

In addition, as part of the "first day" motions, the Debtor filed its *Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507 and 552 for Interim and Final Orders: (I) Authorizing The Debtor To Obtain Postpetition Financing; (II) Authorizing use of Cash Collateral; (III) Granting Adequate Protection to the Prepetition Secured Parties; (IV) Granting Liens and Providing Superpriority Administrative Expense Status; (V) Modifying Automatic stay; and (VI) Scheduling A Final Hearing* (the "DIP Financing Motion").  The DIP Financing Motion sought authorization for the Debtor to obtain senior secured priming and superpriority postpetition financing, in the amount of $15,000,000 (the "DIP Facility"), pursuant to the terms and conditions of the DIP Credit Agreement.

The DIP Financing Claims are secured by, among other things, senior secured priming liens upon substantially all of the Debtor's assets, and super priority administrative claims, all

---

[5] This motion was approved on a final basis by Order dated December 8, 2014 (Docket No. 132).

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

subject to certain Prepetition Prior Liens (defined in the Final DIP Order) and a "Carve-Out" for U.S. Trustee and Bankruptcy Court fees and certain Professional Fee Claims.

On November 14, 2014, the Bankruptcy Court granted the DIP Financing Motion on an interim basis in the Interim DIP Order (Docket No. 66), permitting the Debtor to borrow up to $2,500,000 pending entry of a final order. The Mississippi Development Authority (the "MDA") objected to entry of the Final DIP Order at the December 8, 2014 hearing scheduled for that purpose. To resolve the MDA's objection, the Debtor agreed to postpone a final hearing on the DIP Financing Motion for more than one month, until January 15, 2015, and sought and obtained entry of a "bridge order" (Docket No. 130) extending and modifying the Interim DIP Order accordingly.

On December 3, 2014, Southern Ionics Incorporated ("Southern Ionics") filed a limited objection to the DIP Financing Motion, asserting that the budget attached to the DIP Financing Motion was ambiguous about whether the Debtor intended to pay postpetition obligations owing to Southern Ionics related to its lease with the Debtor. (Docket No. 94). The Debtor resolved the objection by permitting Southern Ionics to reserve its rights on the disputed issues and by confirming its intention to pay all valid postpetition lease obligations.

On December 8, the Bankruptcy Court entered an Order extending and modifying the terms of the Interim DIP Financing Order, and permitting the Debtor to borrow up to $6,000,000 pending the entry of a final order. (Docket No. 130). On January 23, 2015, the Court entered the Final DIP Order permitting the Debtor to borrow up to $15,000,000. (Docket No. 275). The DIP Facility has permitted the Debtor to, among other things, (i) fund ongoing working capital, general corporate expenditures, and other financing needs of the Debtor, (ii) pay certain transaction fees and other costs and expenses of administration of the Case, and (iii) potentially pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Agent and the DIP Lenders under the DIP Credit Agreement and related documents.

### B.  Second Day Pleadings, Including Retention of Professionals

The Debtor filed a series of applications and motions to retain professionals and to streamline the administration of this Case. During this Chapter 11 case, the Bankruptcy Court has authorized the Debtor to retain certain professionals. In particular, on November 14, 2014, the Debtor filed applications to retain each of the following Professionals:

- King & Spalding LLP, as bankruptcy co-counsel for the Debtor
- Richards Layton and Finger, as bankruptcy co-counsel for the Debtor
- Alvarez & Marsal, as financial advisor for the Debtor
- Guggenheim Securities, LLC, as investment banker for the Debtor
- WilmerHale, as special counsel for the Debtor
- EPIQ Bankruptcy Solutions, as claims and Voting Agent for the Debtor

The U.S. Trustee's office provided comments and proposed revisions to the Debtor's proposed orders to retain certain of the Professionals. The Debtor, along with each affected

21

professional, worked cooperatively to address and resolve those concerns through negotiation with the U.S. Trustee's office and the submission of revised orders.    As noted above, the Bankruptcy Court signed an Order approving the retention of Epiq Bankruptcy Solutions, LLC (Docket No. 49), on November 13, 2014 and on December 5, 2014, the Bankruptcy Court signed orders approving retention of the other Professionals.  (Docket Nos. 117-122).

In addition, on December 5, 2014, the Bankruptcy Court entered two administrative orders.  First, the Bankruptcy Court entered an order approving the Debtor's retention of certain attorneys and accountants in the ordinary course of business to provide services relating to, among other things audits, tax returns, various legal services, and other matters requiring the advice and assistance of professionals.  (Docket No. 113).  Second, the Bankruptcy Court signed an order approving procedures for compensating professionals during the Case. (Docket No. 114).

### C.  Marketing of the Debtor's Assets and Entry of the Bid Procedures Order

The KiOR Entities, with support from Guggenheim, embarked on a fulsome marketing process designed to elicit from third parties expressions of interest in all, or portions, of the KiOR Entities' business and assets.  Specifically, since July 2014 Guggenheim has executed this process by contacting over 165 potentially interested parties, holding introductory conversations, and distributing marketing materials.  Over twenty parties expressed interest and executed non-disclosure agreements.  These parties were granted access to an electronic data room and provided a detailed confidential information memorandum describing the Debtor and KiOR Columbus, their operations, and opportunities.  Guggenheim has continued to facilitate the due diligence process throughout December 2014, hosting numerous telephonic discussions between interested parties and management as well as over ten in person site visits and management presentations that have taken place in the months prior to and the weeks since the Petition Date.

Although several entities expressed continuing interest in pursuing a transaction involving all, or a portion of, the assets of one or both of the Debtor or KiOR Columbus, no entities other than the Plan Support Parties ever provided a firm bid for any of the Debtor's assets or was willing to fund the continuing costs of operating the Debtor's business and restructuring process.    The Debtor continued the marketing process during this case in conjunction with the auction process set forth in the Bid Procedures Order.

While the Debtor's marketing process was ongoing, and in the absence of any other firm offers for the Debtor's assets, the Debtor and the Plan Support Parties engaged in arm's length, good faith negotiations regarding the formulation of the Plan Term Sheet.  On the Petition Date, the Debtor filed a motion for entry of the Bid Procedures Order, which initially sought approval for the Debtor to assume the Plan Support Agreement, in addition to approval of bidding and auction procedures.  The MDA objected to various aspects of the initially-proposed bid procedures, including the time tables for the bidding and auction process and the approval of the Plan Support Agreement.  The Debtor, after negotiations with the MDA, and with the consent of the DIP Lenders, agreed to delay certain deadlines related to the sale process and omit any approval of the Plan Support Agreement from the Bid Procedures Order.  On December 8, 2014, the Bankruptcy Court entered the Bid Procedures Order, in the form that that had been revised following negotiation and agreement by the parties.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

The Bid Procedures Order established an orderly and transparent process for the submission of bids and an auction for the purchase of substantially all of the Debtor's assets. The Bid Deadline under the Bid Procedures Order was January 7, 2015, and the Debtor received no Qualified Bids other than the Stalking Horse Bid by that date. Accordingly, as provided by the Bid Procedures Order, the Debtor cancelled the auction scheduled for January 9, 2015. The Debtor withdrew its request for assumption of the Plan Support Agreement because events occurred that mooted most of the relief requested. The Plan Support Parties have executed a letter confirming their continued support of the Plan which includes a term sheet for the Exit Facility.

In sum, the process described above enabled the Debtor and Guggenheim to continue the marketing process while at the same time assuring that the Debtor's promising technology, jobs, operations, and creditor distribution were preserved through the transaction described in the Plan Term Sheet since no other bids were submitted.

### D.  Ongoing Discovery and Disputes With the MDA

As described above, the MDA objected to the DIP Financing Motion and to entry of the Bid Procedures Order as initially proposed. The Debtor worked in good faith to resolve those objections. Nonetheless, on December 2, 2014, the MDA served a request purportedly pursuant to Bankruptcy Rule 2004 to take the examination of the Debtor, including both production of extensive documentation and an examination under oath. The Debtor asserted its formal objections and responses to the requested discovery. The MDA, through its counsel, deposed Christopher Artzer, the President, General Counsel and Interim CFO of the Debtor as well as Mr. Samir Kaul, as a representative of Khosla Ventures III (and other Khosla-related entities, as well as in his capacity as a Director of the Debtor). The MDA also deposed Mr. Vinod Khosla as well as Mr. Alex Fisch of Guggenheim Securities. The Debtor and the Khosla-related entities have produced hundreds of thousands of pages of documents to the MDA. Further, the MDA has issued subpoenas to each of the current members of the Debtor's Board of Directors seeking their depositions. Recently, the MDA deposed Mr. Fred Cannon, Chief Executive Officer and a member of the Board of Directors as well as Mr. Gary Whitlock, one of the three current independent directors who serves as the Chairman of the Board and Chairman of the Audit Committee.

The MDA filed its formal objection to the DIP Financing Motion on December 30, 2014 (Docket No. 180). The Debtor and the Plan Support Parties filed replies (Docket Nos. 201 and 202, respectively). The MDA submitted a competing DIP order, which was approved with certain modifications by the Court over the Debtor's and the Plan Support Parties' objections.

Moreover, the MDA filed a Motion to Convert this Chapter 11 Case to Chapter 7, or in the Alternative, to Dismiss (the "Conversion Motion") (Docket No. 168). The Debtor filed an Opposition to that Conversion Motion on January 8, 2015. (Docket No. 194). The Plan Support Parties also filed an opposition to the Conversion Motion (Docket No. 195). In its Conversion Motion, the MDA contends that the Debtor's bankruptcy case was not filed in good faith and that the Debtor has no ongoing business operations to reorganize. The Debtor and the Plan Support Parties strongly disagree. The MDA raised and litigated these and similar objections in connection with the final approval of the DIP Financing and the Bankruptcy Court, following a

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

two-day hearing, expressly overruled some of the MDA's objections and contentions noting, among other things, that the DIP Financing was and is in good faith and serves a valid purpose. The Court determined that the Debtor acted properly and negotiated the DIP Financing at arms-length with the DIP Lenders which are Insiders of the Debtor and affiliated with Mr. Khosla. The issues contested and litigated by the MDA in support of its objection to the final DIP Financing duplicate those alleged in the Conversion Motion.  The Court observed on the record at the conclusion of the final hearing on the DIP Financing that, (x) the Debtor is a pre-revenue developmental research and development company with no immediate prospects of revenue and no immediate prospect of profitability, and (y) the Debtor's technology is not commercially viable as it exists, and further research, development and money will be required to get that technology to a place where even more money needs to be spent to take it to the next step. However, the Court refused the MDA's request to make formal findings on these points by striking such a proposed finding from the MDA's proposed Final DIP Order.  Lastly, the MDA has recently filed the Standing Motion (as amended on March 23, 2015), wherein the MDA seeks to be appointed as the Estate's representative to pursue certain alleged Estate Causes of Action. The Debtor and the Plan Support Parties will be filing objections to the Standing Motion. As noted above, the Standing Motion has been set for hearing on April 29, 2015 before the Bankruptcy Court.  As discussed above, through the Standing Motion, the MDA contends that the credit facilities evidenced by the First Lien Claims, the Second Lien Claims and the Third Lien Claims are disguised equity investments and should be recharacterized as equity interests instead of debt.  The Debtor and the Pre-Petition Lenders dispute this contention.   Further, by agreement, the MDA's Conversion Motion will be continued until the Confirmation Hearing.

### E.  Appointment of Committee

No official committees have been appointed in this Case.

### F.  United States Trustee

The U.S. Trustee has assigned Jane Leamy to oversee this Chapter 11 Case.  The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office during this case.

### G.  Rejection and Assumption of Executory Contracts and Unexpired Leases

The Debtor reviewed certain of its executory contracts and unexpired leases to determine those contracts that were no longer beneficial to its business operations.  As a result of this analysis, the Debtor obtained approval from the Bankruptcy Court to reject certain of its executory contracts and unexpired leases.  Pursuant to a Bankruptcy Court Order dated December 5, 2014 the Debtor rejected the contract with Matheson Tri-Gas ("Matheson"), which dealt with certain equipment owned by Matheson intended for KiOR Columbus and located at the Columbus facility.   The Debtor and Matheson agreed on a form of order rejecting the Matheson contract, which was signed by the Court on December 5, 2014 (Docket No. 112).  On December 2, 2014, the Debtor filed a motion to reject its Intralinks Inc. contract which was approved by Order dated December 19, 2014. (Docket No. 165)

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

The Plan provides that, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, as applicable, any executory contract or unexpired lease that has not expired by its own terms on or prior to the Effective Date, (i) which the Debtor has not assumed and/or assigned or rejected with the approval of the Bankruptcy Court, (ii) that is not identified as an Assumed Liability, or (iii) is not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Debtor, and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejection pursuant to Sections 365(a) and 1123 of the Bankruptcy Code.  Parties whose contracts are rejected must file proofs of claim for rejection damages on or before thirty (30) days from the Effective Date.

The Reorganized Debtor will assume the Assumed Contracts on the Effective Date of the Plan. The Debtor shall demonstrate at the Confirmation Hearing, through a combination of the Exit Facility as well as any other proposed support of the Reorganized Debtor, the appropriate adequate assurance necessary for the assumption of the Assumed Contracts. The Reorganized Debtor shall cure any default in respect of each of the Assumed Contracts, to the extent required under section 365(b) of the Bankruptcy Code, unless otherwise agreed to between the Reorganized Debtor and the applicable contract counterparty ("Cure Obligations"). The Plan provides that the Reorganized Debtor will pay the Cure Obligations on or within a reasonable time after the Effective Date. The list(s) of the Assumed Contracts will be filed and served on the relevant counterparties at least 14 days prior to the Plan voting deadline and, as may be agreed with the counterparty and the Debtor, may be modified from time to time prior to the Effective Date.

The proposed list of the Assumed Contracts, which may be modified by the Debtor prior to the Confirmation Hearing, shall identify the executory contract(s) and/or unexpired lease(s) sought to be assumed, the counterparties thereto, the proposed Cure Obligations as of the projected Effective Date, including any cure amounts that the Debtor believes must be paid, and a description of the proposed adequate assurance of future performance as required by section 365 of the Bankruptcy Code.  Any objection to (a) the amount of any cure payments for the Assumed Contracts, (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, shall be filed and served on the Debtor within 14 days after the filing of the relevant list of Assumed Contracts.  In the event an objection is filed, the Debtor shall attempt to resolve such objection prior to the Plan voting deadline.  To the extent the parties are unable to consensually resolve such objection prior to the Plan voting deadline, such objection and any amounts to be paid under section 365 of the Bankruptcy Code will be determined at the Confirmation Hearing or as otherwise agreed to by the parties or ordered by the Court.

The Reorganized Debtor shall have no liability for any liabilities or obligations of the Debtor or KiOR Columbus except as expressly assumed under the Plan, including Cure Obligations and obligations under the Assumed Contracts first arising after the Effective Date. The rejection of any executory contract shall have no effect on the right of the applicable non-debtor counterparty to assert an administrative priority claim on account of goods and/or services provided to KiOR under such contract on and after the Petition Date; provided that all rights are

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

reserved with respect to the ability of any party to object to the amount of such administrative priority claim.

### H.  Dissemination of Information About the Case

The Debtor has been actively engaged in providing information about the Debtor's business and proceedings in this case to various parties-in-interest.   The Debtor provided creditors extensive information about the Debtor's financial, corporate, and operational status in its Schedules and Statement of Financial Affairs (Docket Nos. 92, 93) in the monthly operating reports filed with the Bankruptcy Court throughout this case (Docket Nos. 80, 172), and through required filings with the Securities and Exchange Commission.   In addition, the Debtor has complied with the applicable Bankruptcy Rules and Local Rules in serving all pleadings on parties in interest, and has provided formal and informal updates to various creditors through email, mail and various scheduled and unscheduled calls over the course of this case.  Finally, Epiq has made all pleadings filed in the case available on its website: http://dm.epiq11.com/KiOR.

### I.  Bar Date Order

Pursuant to an Order of the Bankruptcy Court dated January 5, 2015 (Docket No. 187), **February 9, 2015** is the deadline for all non-governmental pre-petition creditors to file proofs of claim (unless such claim has been allowed by other Bankruptcy court order).  Pursuant to that same order, **May 8, 2015** is the deadline for Governmental Units to file proofs of claim.

### J.  Avoidance Actions

On and after the Effective Date, the trustee of the Liquidating Trust will be a representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3) and as such will have the power to prosecute, in the name of the Liquidating Trust, any Vested Causes of Action, which includes Avoidance Actions, *provided that*, all Avoidance Actions that may be asserted against a vendor, supplier or other Trade Creditor of the Debtor that becomes a holder of a Class 7 Continuing Trade Claim shall be forever waived and released under the Plan.  **UPON THE EFFECTIVE DATE, ALL OF THE DEBTOR'S TRANSFERRED AVOIDANCE ACTIONS WILL BE TRANSFERRED TO THE LIQUIDATING TRUST, AND THE LIQUIDATING TRUST WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL TRANSFERRED AVOIDANCE ACTIONS.**

#### 1.  Preferences

Under federal bankruptcy law, a debtor-in-possession may avoid pre-petition transfers of assets of a debtor as "preferential transfers."   To constitute a preferential transfer, the transfer must be (1) of the debtor's property; (2) to or for an antecedent debt; (3) made while the debtor was insolvent; (4) made within 90 days before the filing of a bankruptcy petition or made within

one year if to an "insider"[6]; and (5) a transfer that enables the creditor to receive more than it would receive under chapter 7 liquidation of the debtor's assets.    For this purpose, the Bankruptcy Code creates a rebuttable presumption that the debtor was insolvent during the 90 days immediately before the filing of the bankruptcy petition.    All payments made by the Debtor to creditors within 90 days prior to the filing of the bankruptcy petition are listed under question 3(b) of the Debtor's statements of financial affairs.    A copy of the relevant portions of the Debtor's statements of financial affairs relating to payments made within 90 days prior to the filing of the bankruptcy petition are attached hereto as **Exhibit B**.    All payments made by the Debtor to "insiders" within one year prior to the filing of the bankruptcy petition are listed under question 3(c) of the Debtor's statements of financial affairs.    A copy of the relevant portions of the Debtor's statements of financial affairs relating to payments made to Insiders within one year prior to the filing of the bankruptcy petition are attached hereto as **Exhibit C**.    The Debtor has performed **no** analysis of the potential range of recoveries including any potential reductions due to affirmative defenses.    **UPON THE EFFECTIVE DATE, THE LIQUIDATING TRUST WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL TRANSFERRED PREFERENCE ACTIONS.**

## 2.    Fraudulent Transfers

Fraudulent transfer law generally is designed to avoid two types of transactions: (i) conveyances that constitute "actual fraud" upon creditors, and (ii) conveyances that constitute "constructive fraud" upon creditors.    In the bankruptcy context, fraudulent transfer liability arises under sections 548 and 544 of the Bankruptcy Code.    Section 548 permits the debtor-in-possession to "reach back" for a period of two years to avoid fraudulent transfers made by the Debtor or fraudulent obligations incurred by the Debtor, and Section 544 permits the debtor-in-possession to apply applicable state fraudulent transfer law to any such action.    Assuming that Texas state law were to apply, the debtor-in-possession could challenge conveyances, transfers, or obligations made or incurred by the Debtor within the past four (4) years if similar requirements are met.    The Debtor has performed **no** analysis of the potential range of recoveries including any potential reductions due to affirmative defenses.    **UPON THE EFFECTIVE DATE, THE LIQUIDATING TRUST WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL TRANSFERRED FRAUDULENT TRANSFER ACTIONS.**

---

[6] Section 101(31) of the Bankruptcy Code defines an "Insider", in relevant part, as:

        (B) if the debtor is a corporation−

           (i)   director of the debtor;

           (ii)  officer of the debtor;

           (iii) person in control of the debtor;

      (iv)  partnership in which the debtor is a general partner;

      (v)   general partner of the debtor; or

      (vi)  relative of a general partner, director, officer, or person in control of the debtor.

   . . .

      (E) affiliate or insider of an affiliate as if such affiliate were the debtor.

11 U.S.C. § 101(31).

27

### K. Derivative Claim

As noted in the discussion listing pending litigation in paragraph II. C. above, there is currently pending, but stayed, certain derivative litigation in the United States District Court for the Southern District of Texas, Houston Division (Civil Action No. 13-cv-03773). Although the Debtor disputes the Plaintiffs' allegations and filed a motion to dismiss that lawsuit, any such derivative claim of the Estate that exists will be transferred to the Liquidating Trust. From and after the Effective Date, the Liquidating Trustee will have sole authority to decide how such action will proceed, if at all. Since the Debtor has taken the position that there is no merit to any potential claims or causes of action belonging to the Estate arising from this lawsuit, it has **not** performed any analysis of potential recoveries. However, in the event there is any net recovery from this action, or other similar actions, such net proceeds will belong to the Liquidating Trust and will be distributed per the Liquidating Trust Agreement. Other than this lawsuit, the Debtor is not aware of any similar allegations that the Estate may own other claims or causes of action against Insiders including directors and officers. Importantly, no releases are being provided so that if any such other claims or causes of action exist, they will be transferred to the Liquidating Trust.

### L. Mississippi State Court Lawsuit

The State of Mississippi, through its State Attorney General filed a state court action on or about January 13, 2015 against certain current and former directors, officers and/or employees of the Debtor, as well as Mr. Khosla and certain entities affiliated with Mr. Khosla, alleging it is seeking damages in connection with the loan by the MDA to KiOR Columbus. It is unclear why the MDA itself was not named as the plaintiff since it is the named party and signatory to the contracts. Neither the Debtor nor KiOR Columbus are named as parties to the lawsuit; however, the lawsuit alleges that the Debtor was not named because of its bankruptcy filing. The MDA contends that this recently filed litigation is a material proceeding and should be disclosed to creditors. Further, the State of Mississippi, through the MDA, filed a proof of claim in this case in the approximate amount of $79 million.

### M. The Nondischargeability Action

To satisfy a condition precedent to the Effective Date under its Plan, the Debtor filed an adversary proceeding against the State of Mississippi, the Mississippi Development Authority pursuant to Bankruptcy Rule 4007 to determine that the claim asserted by the State against the Debtor and the Estate is subject to being discharged pursuant to Bankruptcy Code sections 1141(d)(1) (Adv. Proc. No. 15-50238). The filing of this action was caused by the allegations made by the State of Mississippi in the state court lawsuit it recently filed, as discussed in subpart L., above. Clearly, the Debtor and Reorganized Debtor need to know that the State of Mississippi's unsecured claim is subject to being discharged similar to all other unsecured claims as part of confirmation. Moreover, the DIP Lenders and the Class 1 Creditors (which are Insiders) have stated their justifiable concerns about moving forward towards Effective Date if the State of Mississippi's claim is not discharged.

28

## IV.    THE CHAPTER 11 PLAN

### A.  Summary of Classification

| Class | Claim | Status | Voting Right | Est. Amount[7] | Members of Class |
|---|---|---|---|---|---|
| 1 | First Lien Claims and DIP Financing Claims | Impaired | Entitled to Vote | $16,273,500 plus $15,000,000 DIP Claims | Certain Prepetition Lenders; DIP Lenders |
| 2 | Second Lien Claims | Impaired | Entitled to Vote | $106,100,000 | Certain Prepetition Lenders |
| 3 | Third Lien Claims | Impaired | Deemed to Reject | $115,000,000 | Certain Prepetition Lenders |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept | [$0]$0 | [ ] |
| 5 | Secured Tax Claims | Impaired | Entitled to Vote | Estimated: $680,000 | Harris County and City of La Porte, TX |
| 6 | Priority Employee Claims | Impaired | Entitled to Vote | $218,852 | Current and Former Employees |
| 7 | Continuing Trade Creditors | Impaired | Entitled to Vote | $1,765,986 | Vendor/ Suppliers |
| 8 | Convenience Class Claims | Impaired | Entitled to Vote | $126,452 | Unsecured Creditors Owed $5,000 or Less |
| 9 | General Unsecured Claims | Impaired | Entitled to Vote | $4,270,665[8] | Unsecured Creditors Not in Classes 7 or 8 |
| 10 | Subordinated Claims | Impaired | Deemed to Reject | [unknown] | Securities Claims, Including Any Related Rights of Reimbursement or Contribution |
| 11 | Equity Interests | Impaired | Deemed to Reject | N/A | Stock Publicly Held |

---

[7] These estimates are subject to revision based on additional information, including the filing of Proofs of Claim.

[8] This amount is subject to adjustment based on the following: (1) the MDA has filed an unsecured proof of claim in the amount of $78,572,515.34, but the Debtor believes that such claim will be reduced based on the MDA's recovery from KiOR Columbus; (2) certain creditors may instead elect to be classified in Classes 7 or 8; and (3) the liquidation of claims scheduled as unliquidated, contingent or disputed.  In addition, the Plan provides that Holders of Allowed Claims in Classes 2 and 3 are entitled to pro rata distributions with Class 9 creditors.

29

### B.    Summary of the Terms of the Plan

#### 1.    Class 1 – First Lien Claims and DIP Financing Claims

The First Lien Claims are more fully described in Section II. A., above.  This class is owed not less than $16,273,500 plus accrued and unpaid interest and fees as of the Petition Date.  As part of the Restructuring Transaction, this group of creditors will convert their debt into a portion of the New Equity Interests in the Reorganized Debtor as part of the Exit Facility.  Class 1 also includes the Allowed DIP Financing Claims; the Holders of DIP Financing Claims have also agreed to convert that debt into a portion of the New Equity Interests in the Reorganized Debtor as part of the Exit Facility.  The Class 1 Claims will be Allowed by operation of the Plan, if they have not been already Allowed by prior Bankruptcy Court order.  For the avoidance of doubt, such conversions shall not reduce, waive or diminish, or otherwise affect, any separate liability of KiOR Columbus with respect to any of the First Lien Claims, and, to the extent KiOR Columbus is separately liable, all such claims, and any and all existing liens and security interests securing such claims in favor of the holders of the First Lien Claims shall remain outstanding and enforceable against KiOR Columbus and its assets after confirmation of the Plan.

#### 2.    Class 2 – Second Lien Claims

The Second Lien Claims are more fully described in Section II. A., above.  This class is owed collectively, not less than $106,100,000.  Currently, it appears that there is no value for the collateral securing these claims and thus, the claims in this class would be General Unsecured Claims in Class 9 entitled to participate ratably in whatever distribution is available to all Class 2 and Class 9 creditors.  In all events, the Holders of Class 2 Claims retain all their rights under the Subordination Agreement, including with respect to the Subordination Agreement's provisions regarding turnover from subordinated creditors in Class 3.  For the avoidance of doubt, the treatment and any distributions under the Plan shall not reduce, waive or diminish, or otherwise affect, any separate liability of KiOR Columbus with respect to the Second Lien Claims, all of which claims, and any and all existing liens and security interests securing such claims in favor of the holders of the Second Lien Claims remain outstanding and enforceable against KiOR Columbus and its assets after confirmation of the Plan.

#### 3.    Class 3 – Third Lien Claims

The Third Lien Claims are more fully described in Section II. A., above.  This class is owed collectively, not less than $115,000,000 plus accrued and unpaid interest and fees as of the Petition Date.  Currently, it appears that there is no value for the collateral securing these claims and thus, the claims in this class would be General Unsecured Claims in Class 9 entitled to whatever Pro rata distribution is available to all Class 9 creditors.   Any consideration or distribution otherwise available on account of any Class 3 Claim shall be assigned to the Holders of the Class 2 Claims pursuant to and to the extent required by the Subordination Agreement, including all rights to receive a Pro Rata distribution from the Liquidating Trust on account of any Allowed Class 3 Claims. For the avoidance of doubt, the treatment and any distributions under the Plan shall not reduce, waive or diminish, or otherwise affect, the separate liability of KiOR Columbus with respect to the Third Lien Claims, all of which claims, and any and all

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

existing liens and security interests securing such claims in favor of the holders of the Third Lien Claims remain outstanding and enforceable against KiOR Columbus and its assets after confirmation of the Plan

### 4. Class 4 – Other Secured Claims

At this time, the Debtor is not aware of any creditor holding an Other Secured Claim. However, if such creditor does exist, the Debtor proposes to satisfy such claim, in full, on or as soon as practicable following the Effective Date, at the sole discretion of the Debtor, or Reorganized Debtor, as applicable: (i) Cash equal to the Allowed amount of such Other Secured Claim; (ii) receipt of any Collateral securing such Claim; (iii) treatment that leaves unaltered the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the Holder of such Claim; or (iv) such other treatment as may be agreed upon with the Holder of such Allowed Other Secured Claim, on the one hand, and the Debtor or the Reorganized Debtor, as applicable, on the other hand.  On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Other Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.

### 5. Class 5 – Secured Tax Claims

Class 5 comprises the Allowed Secured Claims held by Governmental Units which includes Harris County, Texas and the City of La Porte, Texas.  Collectively these 2 taxing authorities are owed approximately $680,000 for taxes incurred for the year 2014.  The Reorganized Debtor will pay the Allowed Class 5 claims  through quarterly payments of principal and interest over a five (5) year period from the Petition Date, with interest accruing at the statutory rate of interest, or as otherwise agreed.  The Reorganized Debtor will start making these payments on the later of (i) thirty (30) days following the end of the first calendar month after the Effective Date, or (ii) the first Business Day in the calendar month after such claim becomes an Allowed Claim.  The Holder of a Class 5 Claim shall retain its Lien in the same property owned by the Reorganized Debtor solely and to the same extent it held such Liens in the Debtor's assets.  Upon full and complete payment of each Allowed Class 5 Claim, such Holder's liens and security interests shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.  Further, the Plan provides for certain default provisions in the event the Reorganized Debtor does not timely make its Plan payments to Class 5 creditors.

### 6. Class 6 – Priority Employee Claims

Class 6 comprises the Allowed Priority portion of Employee Claims most of which relate to paid time off ("PTO") under the current policies.  Out of an aggregate of $746,297 for all PTO claims scheduled, the Debtor has scheduled $218,852 as the priority portion pursuant to the limitations in Bankruptcy Code section 507.  To the extent a Class 6 Claim has not already been satisfied pursuant to prior Bankruptcy Court order, each Holder of an Allowed Class 6 Claim shall, in full and final satisfaction of such Allowed Claim, receive deferred Cash payments of a

31

value, as of the Effective Date, equal to the Allowed amount of such Claim, or as otherwise permitted pursuant to Bankruptcy Code Section 1129(a)(9)(B), such payments to commence on the later of fifteen (15) days following (i) the Effective Date or (ii) after such claim becomes an Allowed Claim, unless the Debtor or Reorganized Debtor and the holder of a Class 6 Claim otherwise agree.  Unless the Reorganized Debtor otherwise agrees, the portion of a PTO claim that is not entitled to priority treatment as a Class 6 Claim, approximately $527,445 in total, will become Class 9 General Unsecured Claims and entitled to be paid pro rata similar to all other Class 9 claims

### 7.  Class 7 – Continuing Trade Claims

Class 7 comprises the Allowed Claims held by Trade Creditors, as identified by the Debtor in the Plan Supplement and that elect to provide trade credit to the Reorganized Debtor from and after the Effective Date, in the greatest amount and on the most favorable terms and conditions that such Trade Creditor was providing to the Debtor during the ninety (90) days before the Petition Date, for at least twelve (12) months after the Effective Date.  The Debtor has identified approximately 15 creditors as potential Class 7 candidates.  The total amount of the pre-petition claims of eligible Trade Creditors is $1,765,986.  In total, in the 90 day period prior to the Petition Date, these 15 creditors received payments in the approximate amount of $1.3 million.  The Debtor has conducted an analysis of the potential preference recoveries against these 15 creditors and after evaluating affirmative defenses of contemporaneous exchange, new value and ordinary course believes there could be a potential net recovery of approximately $304,000.  A further reduction from that amount would occur related to settlement ranges and contingency fees and costs associated with filing avoidance actions, which would reduce the potential total preference recovery to approximately $153,069.  The benefit to the Estate and the Reorganized Debtor through the plan process and the amount of the continuing trade credit easily outweighs the potential avoidance action recovery that is being waived.

The Plan provides  that each Holder of an Allowed Class 7 Claim shall, in full and final satisfaction of such Allowed Claim, receive on, or as soon as practicable following the Effective Date, (i) a Cash payment equal to fifty percent (50%) of the Allowed amount of such Claim plus (ii) the same treatment accorded to General Unsecured Creditors in Class 9; _provided_, _however_, that in no event shall a Class 7 Creditor receive an amount greater than the Allowed amount of its Claim.  In order to elect treatment as a Class 7 creditor, a Trade Creditor must (i) be identified as eligible for such treatment in the Plan Supplement, (ii) affirmatively elect such treatment by marking the box on its Class 7 ballot and (iii) vote to accept the Plan.  The amount and terms of the continuing trade credit to be provided to the Reorganized Debtor must be satisfactory to the Debtor, in its sole discretion.  In addition, by electing treatment as a Class 7 creditor, each such eligible and electing Trade Creditor will receive a full and complete release from any potential Avoidance Action by the Debtor, the Reorganized Debtor, the Estate or the Liquidating Trust. For clarity, the release in favor of Class 7 creditors is limited to Avoidance Actions; the Debtor or Reorganized Debtor, as applicable, shall retain any and all other claims, defenses or Causes of Action related to all Class 7 creditors such as a warranty claim.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

### 8. Class 8 – Convenience Claims

Class 8 comprises the Allowed Convenience Claims. This class consists initially of all claims equal to or less than $5,000. Per the Debtor's schedules, there is an aggregate of $126,452 owed for such claims. However, creditors that hold claims greater than $5,000 may elect to reduce the entire portion of all their claims down to $5,000 and be treated as a Class 8 Claim. Any creditor who wishes to do so must mark or elect on its Class 8 ballot. Further, by making this election, any creditor with a claim greater than $5,000 cannot also receive treatment as a General Unsecured Creditor in Class 9. A Claim may be either a Class 8 Claim or a Class 9 Claim, but not both. Each Holder of an Allowed Class 8 Claim shall, in full and final satisfaction of such Allowed Claim, receive on, or as soon as practicable following, the later of (i) the Effective Date or (ii) fifteen (15) days after such Claim becomes an Allowed Claim, Cash in the amount equal to fifty percent (50%) of such Allowed Claim; _provided_, _however_, that the aggregate of all Class 8 payments shall not exceed $75,000. In such event, Class 8 creditors shall receive a Pro Rata portion of the $75,000 pool of funds. This payment will be made by the Liquidating Trustee from funds designated solely for Class 8 by the Reorganized Debtor from the Exit Facility.

### 9. Class 9 – General Unsecured Claims

Class 9 comprises the Allowed General Unsecured Claims. Based on the Debtor's schedules, the total amount of undisputed trade and similar clams is $4,270,665. However, this amount could be reduced by approximately $1.9 million which is the total claims in Classes 7 and 8. More importantly, this amount does not include the amount in excess of $200 million dollars owed to Class 2 and Class 3. Moreover, the amount on the chart does not include claims scheduled as undetermined or any amounts for rejection claims for any contracts that will be rejected during the Bankruptcy Case. For example, this amount does not include any claim by the MDA. The MDA has asserted that it is owed approximately $79 million. However, if that amount is accurate, it does not reflect any credit or reduction for the value of the collateral held by the MDA at KiOR Columbus. Moreover, that number does not reflect any reduction for amounts the State of Mississippi is seeking to recover from its recently filed state court lawsuit in connection with the MDA loan and guaranty. Each Holder of an Allowed Class 9 Claim shall receive, in full and final satisfaction of such Allowed Claim, ratable rights to the Liquidating Trust Assets. The allowance and distributions from the Liquidating Trust will be determined by the Liquidating Trustee, as otherwise governed by the Plan and the Liquidating Trust Agreement. Further, as provided above, any creditor electing treatment as a Class 8 Convenience Class Claim shall not be eligible to receive any treatment or distribution as a Class 9 Creditor.

Prior to the Petition Date, the Debtor entered into that certain Forbearance Agreement dated as of July 3, 2014 (the "Forbearance Agreement") by and among KiOR Columbus, LLC, KiOR, Inc. and MDA. In the Forbearance Agreement, the Debtor and KiOR Columbus affirmed and acknowledged that (i) as of July 1, 2014, the outstanding amount owed by KiOR Columbus and the Debtor to MDA was $69,375,000.00 and (ii) this amount is a valid obligation of the Debtor and KiOR Columbus that is due and owing without defense, claim, setoff or counterclaim of any kind or nature whatsoever. KiOR Columbus further acknowledged in the Forbearance Agreement that as of July 1, 2014, issuance costs and interest have accrued and been incurred by MDA in the amount of $8,017,063.36. Notwithstanding the foregoing, the Debtor does not

33

admit or stipulate that the MDA has any allowable claim against its bankruptcy estate and reserves all rights, claims, and defenses regarding the allowance, priority, and amount of any asserted MDA claim.

### 10. Class 10 – Subordinated Claims

Class 10 comprises any Claims that are subject to subordination pursuant to Bankruptcy Code Section 510, including any and all Claims subject to subordination pursuant to Section 510(b) which includes any Claim arising from the rescission of a purchase or sale of a security of the Debtor or KiOR Columbus, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under Bankruptcy Code Section 502 on account of any such Claim. Allowed Class 10 Claims shall be automatically subordinated and receive no distribution on account of any such Claim without further notice, order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.

### 11. Class 11 – Equity Interests

Class 11 comprises the Equity Interests as they currently exist in the Debtor. No distributions shall be made under the Plan on account of any Equity Interest. As of the Effective Date, any and all Equity Interests will be cancelled and deemed discharged without any further notice or order.

### C. Means for Implementation of the Plan

#### 1. Reorganization

The Plan contemplates the reorganization of the Debtor with it emerging from bankruptcy and continuing to operate its business as the Reorganized Debtor with a completely restructured balance sheet. All of the property of the Estate and of the Debtor shall vest automatically in the Reorganized Debtor free and clear of any and all Claims, Liens and Equity Interests, except for those Claims and Liens expressly provided for in the Plan pursuant to Bankruptcy Code sections 1141(b) and (c),) without the need for any further notice or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity, except for any asset that is expressly excluded or disclaimed and the Liquidating Trust Assets.

Upon the Effective Date, the Assumed Liabilities shall be obligations of the Reorganized Debtor and shall no longer be obligations of the Debtor, the Estate, or the Liquidating Trust and any Holder of any Claim with respect thereto shall have no recourse on account of such Claim against the Debtor, the Estate or the Liquidating Trust, except as may be necessary to preserve any claims against policies of insurance. The Plan also provides that the Reorganized Debtor shall assume any and all indemnity and/or reimbursement obligations owed to any officer or director of the Debtor serving in such capacity from and after the Petition Date through and including the Effective Date; *provided, however,* that as to any officer or director who served in such capacity from and after the Petition Date but not on the Effective Date, "Assumed Liabilities" shall include only an obligation of the Debtor for indemnity or reimbursement for

34

fees and expenses incurred from and after the Petition Date during the period served by such officer or director (provided that any such officer or director shall retain the right to assert (i) an Administrative Claim and (ii) any other right or claim, in each case, in respect of any unpaid amount that is not an Assumed Liability); and *provided further*, that, for the avoidance of doubt, that "Assumed Liabilities" shall include, subject to the limitations of this section, fees and expenses (including, without limitation, those of professional legal and financial advisors) incurred by an officer and director that are indemnity or reimbursement obligations of the Debtor owed to such officer or director identified above in connection with or in any way related to the claims of the State of Mississippi, the Mississippi Development Authority, similar or related claims, and those related to the prosecution of the Bankruptcy Case.

## 2.  Source of Funding

On the Effective Date, the Reorganized Debtor will be capitalized with new money through the Exit Facility to be provided by the Plan Support Parties, along with the cash and other assets of the Debtor.  The term sheet identifying the major parts of the Exit Facility is attached to Plan as a Plan Supplement.  As set forth in the term sheet, the Plan Support Parties have committed to fund the Reorganized Debtor in the amount of approximately $30 million which will fund the Reorganized Debtor's operations for a 12 month period.  In addition to the Exit Facility, the consideration for the Restructuring Transaction is primarily the conversion to equity of a combined amount of the DIP Financing Claim and First Lien Claims totaling $16 million.  The Exit Facility, which will also include a roll-up of the remaining aggregate amount of the DIP Financing Claim and First Lien Claims, will enable the Debtor to pay priority and administrative claims and will permit the Reorganized Debtor to operate pursuant to its postpetition business plan.  Based on the Debtor's knowledge of and experience with the Plan Support Parties and their affiliated entities, the Debtor believes that the New Equity Interest Holders will have the financial wherewithal to provide the Exit Facility and to own and successfully manage the Reorganized Debtor.

Allowed Continuing Trade Creditor Class Claims will be paid by the Reorganized Debtor on the terms set forth in the Plan and summarized in Section III(B).  Allowed Convenience Claims in Class 8 will be paid by the Liquidating Trustee with designated funds from the Exit Facility. Allowed General Unsecured Claims will receive ratable rights to participate in the Liquidating Trust, which will include all Vested Causes of Action in addition to $100,000 in cash.

*Counsel for MDA has requested that the following language be included in the Disclosure Statement:*

*The Debtor states that the Plan Support Parties have committed to fund the Reorganized Debtor's operations for a twelve (12) month period.  However, the Debtor fails to discuss what will happen upon expiration of the twelve (12) month period if no additional funding is obtained.  Currently, no additional funding beyond the initial twelve (12) month period has been obtained, let alone a commitment to fund.  As stated herein by the Debtor, the Reorganized Debtor does not expect to generate any material amount of revenues for the first twenty-four (24) months following the Effective Date, i.e., well after the initial twelve (12) month*

35

*period ends. Thus, creditors should understand that there is a material risk that the Debtor will end up back in bankruptcy if the Reorganized Debtor is unable to secure additional financing beyond the initial twelve (12) month period.*

The Debtor disagrees with the MDA's assertions set forth above. The Debtor does not believe that there is any "material risk" to pre-petition creditors or distributions under the Plan and further disagrees that the Reorganized Debtor "will end up in bankruptcy" in the event the Exit Facility is fully drawn one year after the Effective Date. As discussed in Section X below, distributions to creditors, including unsecured creditors, under the Plan are completely unaffected by whether the Reorganized Debtor is ultimately successful or not. Distributions to unsecured creditors will be made from the proceeds of the Liquidating Trust.

### 3. Creation of the Liquidating Trust

Prior to the Effective Date, the Debtor will retain power and control over the Debtor's Estate. On the Effective Date, the Debtor and the Liquidating Trustee, on their own behalf and on behalf of Holders of Allowed General Unsecured Claims in Class 9, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries in accordance with the Plan.

On the Effective Date, the Debtor shall be deemed to have automatically transferred to the Liquidating Trust all of its right, title and interest in and to all of the Liquidating Trust Assets, and in accordance with Section 1141 of the Bankruptcy Code, all such assets shall automatically irrevocably vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the applicable Liquidating Trust Beneficiaries, as set forth in the Plan, and the reasonable fees and expenses of administering the Liquidating Trust, including, without limitation, the reasonable fees and expenses of the Liquidating Trustee, as provided in the Liquidating Trust Agreement. For clarity, any Estate Claims against Insiders are not released and are transferred to the Liquidating Trust, but only if and to the extent such claims are not Lapsed Challenge Period Claims. Thereupon, the Debtor shall have no interest in or with respect to such Liquidating Trust Assets or the Liquidating Trust. For the avoidance of doubt, the Liquidating Trust shall not be vested with any of the Excluded Actions, which include, without limitation, all Avoidance Actions that may be asserted against a vendor, supplier or other Trade Creditor of the Debtor that become a holder of a Class 7 Continuing Trade Claims and all of which Excluded Actions are forever waived and released under the Plan.

The Liquidating Trust will be irrevocably funded with (i) funds designated for Class 8, (ii) $100,000 in cash, and (iii) the Vested Causes of Action and proceeds thereof, on the Effective Date of the Plan.

The Debtor has identified Mr. Kurt Gywnne to serve as Liquidating Trustee, subject to approval by the Bankruptcy Court prior to the Effective Date. Mr. Gywnne is a very experienced bankruptcy lawyer which considerable experience as a trustee and liquidating agent. The Debtor believes that Mr. Gywnne is well-qualified and, importantly, is independent, having no connection with the Debtor, the Plan Support Parties (or any Khosla-affiliated entities) or any of the creditors of the Estate.

*Counsel for MDA has requested that the following language be included in the Disclosure Statement:*

> *Other than describing the claims and causes of action that do not vest in the Liquidating Trust, i.e., the Excluded Actions, the Debtor fails to state with particularly what claims and causes of action are being transferred to the Liquidating Trust for the Liquidating Trustee to pursue. As the claims and causes of action vesting in the Liquidating Trust form the bases for recoveries for general unsecured creditors, such creditors cannot, absent adequate disclosure, make an informed decision in voting whether to accept or reject the Plan. In short, general unsecured creditors must fully understand what they are getting under the Plan before they can decide whether to vote to accept or reject the Plan.*

> *The MDA proposes that the non-Insider beneficiaries of the Liquidating Trust select the person or entity that will act as the liquidating trustee.*

The Debtor disagrees with the MDA's assertions set forth above. Except for Causes of Action against Class 7 Continuing Trade Creditors and Lapsed Challenge Period Claims, all Estate Causes of Action are being transferred into the Liquidating Trust. Accordingly, it makes no sense to attempt to identify every potential Cause of Action or put some artificial number on potential recoveries and thus risk providing defenses to parties. If there is a viable and valuable Cause of Action, it is being transferred into the Liquidating Trust so that the Liquidating Trustee can decide how best to pursue and monetize such claim.

### 4.  Powers and Duties of the Liquidating Trustee

From and after the Effective Date, the Liquidating Trustee shall serve as trustee of the Liquidating Trust and shall have all powers, rights and duties of a trustee, as set forth in the Liquidating Trust Agreement. Among other things, the Liquidating Trustee shall:  (i) hold and administer the Liquidating Trust Assets, including the Vested Causes of Action, (ii) have the sole authority and discretion on behalf of the Liquidating Trust to evaluate and determine strategy with respect to the Vested Causes of Action, and to litigate, settle, transfer, release or abandon and/or compromise in any manner any and all such Vested Causes of Action on behalf of the Liquidating Trust on any terms and conditions as it may determine in good faith based on the best interests of the Liquidating Trust Beneficiaries, (iii) have the power and authority to retain, as an expense of the Liquidating Trust, attorneys, advisors, other professionals and employees as may be appropriate to perform the duties required of the Liquidating Trustee hereunder or in the Liquidating Trust Agreement, (iv) make distributions to the Liquidating Trust Beneficiaries as provided in the Liquidating Trust Agreement and the Plan, (v) have the right to receive reasonable compensation for performing services as the Liquidating Trustee and to pay the reasonable fees, costs and expenses of any counsel, professionals, advisors or employees as may be necessary to assist the Liquidating Trustee in performing the duties and responsibilities required under the Plan and the Liquidating Trust Agreement, (vi) file, litigate, settle, compromise or withdraw objections to Claims as set forth in Section VIII.A herein, (vii) be considered an estate representative under Section 1123 of the Bankruptcy Code with respect to the Liquidating Trust Assets and (viii) have the right to provide periodic reports and updates to its Liquidating Trust Beneficiaries regarding the status of the administration of the Liquidating

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

Trust Assets, including the Vested Causes of Action, and the assets, liabilities and transfers of the Liquidating Trust. For the avoidance of doubt, the Liquidating Trust shall not be funded with, and the Liquidating Trustee shall not have any authority, powers, or duties with respect to any of the Excluded Actions. The Liquidating Trust and the Liquidating Trustee shall have no obligation to file any tax returns for the Debtor.

### D. Maintenance and Safekeeping of Liquidating Trust Assets

The Debtor, the Reorganized Debtor, and the Liquidating Trustee, as applicable, shall: (i) take commercially reasonable efforts to preserve all records and documents (including any electronic records or documents) related to the Liquidating Trust Assets (including the Vested Causes of Action) for a period of five (5) years from the Effective Date or, if actions with respect to any applicable Vested Causes of Action are then pending, until the Liquidating Trustee notifies the Liquidating Trust Beneficiaries such records are no longer required to be preserved; and (ii) provide the Liquidating Trust, the Liquidating Trust Beneficiaries and their respective counsel, agents and advisors, with reasonable access to such records and documents including at a reasonable time and location.

### 1. Avoidance Actions

On and after the Effective Date, the Debtor will not be responsible for any review of any Avoidance Actions. The Liquidating Trust will have all responsibility for reviewing, analyzing and prosecuting Avoidance Actions under the Plan and the Liquidating Trust Agreement; *provided that*, all Avoidance Actions that may be asserted against a vendor, supplier or other Trade Creditor of the Debtor that becomes a holder of a Class 7 Continuing Trade Claims shall be forever waived and released under the Plan.

The Liquidating Trust will have the sole authority to prosecute the Vested Avoidance Actions. **ALL CREDITORS AND RECIPIENTS OF PAYMENTS OR TRANSFERS WITHIN 90 DAYS OF THE PETITION DATE (OR WITHIN ONE YEAR FOR INSIDERS) OR WHO RECEIVED PAYMENTS OR TRANSFERS FOR LESS THAN REASONABLY EQUIVALENT VALUE WITHIN FOUR YEARS OF THE PETITION DATE, WITH ACTUAL OR CONSTRUCTIVE NOTICE OF THIS BANKRUPTCY CASE, ARE HEREBY PUT ON NOTICE THAT SUCH TRANSACTIONS WILL BE REVIEWED FOR POTENTIAL RECOVERY. EXCEPT AS PROVIDED IN THE PLAN WITH RESPECT TO HOLDERS OF CLAIMS IN CLASS 7, THE PLAN IS NOT INTENDED AND DOES NOT WAIVE ANY OF THE DEBTOR'S CHAPTER 5 CAUSES OF ACTION or any claims or causes of action asserted in the litigation pending in the lawsuit styled Gary Gedig, Derivatively on Behalf of KiOR, Inc., Plaintiff, v. Fred Cannon, John Karnes, Samir Kaul, David Patterson, William Roach, and Gary Whitlock, Defendants, -and- KiOR, INC., a Delaware Corporation, Nominal Defendant, Civil Action No. 13-cv-03773 pending in the United States District Court for the Southern District of Texas, Houston Division, AS ALL SUCH ACTIONS ARE EXPRESSLY PRESERVED FOR THE BENEFIT OF THE LIQUIDATING TRUST.**

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

### E.  Provisions Regarding Distributions

#### 1.  Time and Method of Distributions

Any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for by the Plan.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

*Liquidating Trust Distributions*

The Liquidating Trustee, on behalf of the Liquidating Trust, or such other Person or Entity as may be designated in accordance with the Liquidating Trust Agreement, will make the distributions to Liquidating Trust Beneficiaries required under the Plan in accordance with the Liquidating Trust Agreement and in accordance with the priorities set forth herein and the other provisions of the Plan, and administer and liquidate any assets in the Liquidating Trust and otherwise wind down the Estate, including the following:  (a) general administration costs (*e.g.*, trustee/trust fees, etc.), (b) access to and review of information for any and all potential Claims, (c) access to and review of information for any and all Vested Causes of Action, (d) analysis and assessment related to Claims objection/resolution, (e) analysis and assessment related to Vested Causes of Action, (f) preparation of Claims objection/resolution, (g) preparation of Vested Causes of Action (excluding the actual prosecution thereof) and (h) distribution of proceeds (*e.g.*, claims agent, etc.).  Whenever any distribution to be made under the Plan or the Liquidating Trust Agreement is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

#### 2.  Reserve for Disputed Claims

The Debtor, the Reorganized Debtor, or Liquidating Trustee, as applicable, may maintain a reserve for any distributable amounts required to be set aside on account of Disputed Claims and will distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Liquidating Trust Agreement, as such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date, provided that no interest shall be distributable or accrue with respect thereto.

#### 3.  Manner of Distribution Under Plan and Liquidating Trust

Any distribution in Cash to be issued under the Plan or the Liquidating Trust Agreement shall, at the election of the issuer, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

### 4. Delivery of Distributions

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided in the Plan, distributions and deliveries to Holders of record of Allowed Claims shall be made at the address of each such Holder set forth on the Debtor's books and records unless superseded by the address set forth on Proofs of Claim filed by any such Holders. By the Effective Date, the Debtor shall provide the Liquidating Trustee with the addresses and access to other books and records relating to the Liquidating Trust Beneficiaries, including all taxpayer identification information.

### 5. Undeliverable Distributions

*Holding of Undeliverable Distributions*

If any distribution to the Holder of an Allowed Claim under the Plan or the Liquidating Trust Agreement is returned as undeliverable, no further distributions shall be made to such Holder unless and until the issuer of the distribution is notified in writing of such Holder's then-current address. Any Holder ultimately receiving a distribution that was returned as undeliverable shall not be entitled to any interest or other accruals of any kind on such distribution. Nothing contained in the Plan or the Liquidating Trust Agreement shall require the issuer of any distribution to attempt to locate any Holder of an Allowed Claim.

*Failure to Claim Undeliverable Distributions*

Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan or the Liquidating Trust Agreement to receive a distribution within three (3) months from and after the date such distribution is returned as undeliverable shall have such Holder's Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Debtor, the Reorganized Debtor, the Liquidating Trust, the Liquidating Trustee and its respective professionals, or the Liquidating Trust Assets. In such case, any consideration held for distribution on account of such Claim shall belong to the Liquidating Trust for distribution by the Liquidating Trustee to the remaining Liquidating Trust Beneficiaries in accordance with the terms of the Plan and the Liquidating Trust Agreement. After final distributions have been made in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of undeliverable Cash remaining is less than $15,000, the Liquidating Trustee, in his or her sole discretion, may donate such amount to a charity without further notice or order of the Bankruptcy Court.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

### 6. Compliance with Tax Requirements/Allocation

The issuer of any distribution under the Plan or the Liquidating Trust Agreement shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan or the Liquidating Trust Agreement shall be subject to any such applicable withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest, if any.

### 7. Time Bar to Cash Payments

Checks issued on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the issuer of the check by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made within three (3) months from and after the date of issuance of such check. After such date, all Claims in respect of voided checks shall be discharged and forever barred, and the Liquidating Trust shall be entitled to retain all monies related thereto for distribution to the Liquidating Trust Beneficiaries in accordance with the terms of the Plan and Liquidating Trust Agreement.

### 8. Distributions After Effective Date

Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later become Allowed, shall be deemed to have been made on the Effective Date. Except as otherwise specifically provided in the Plan or the Liquidating Trust Agreement, no interest shall be payable on account of any Allowed Claim not paid on the Effective Date.

### 9. Fractional Dollars; De Minimis Distributions

Notwithstanding anything contained herein or in the Plan to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan or the Liquidating Trust would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. No payment shall be made on account of any distribution less than twenty-five dollars ($25) with respect to any Allowed Claim unless a request therefor is made in writing to the issuer of such payment on or before ninety (90) days after the Effective Date; *provided*, *however*, the Liquidating Trustee may make a payment of any amount with respect to any Allowed Class 9 Claim in its sole discretion.

### 10. Setoffs/Recoupment

The Debtor, Reorganized Debtor or the Liquidating Trustee (as applicable) may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan or Liquidating Trust Agreement on account thereof (before any distribution is made on account of such Claim), the Claims, rights and Causes of

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

Action of any nature the Debtor, Reorganized Debtor or the Liquidating Trust may hold against the Holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, Reorganized Debtor or Liquidating Trust of any such Claims, rights and Causes of Action that the Debtor or the Liquidating Trust may possess against such Holder; and, *provided*, *further*, that nothing contained herein is intended to limit any Creditor's rights of setoff or recoupment prior to the Effective Date in accordance with the provisions of Sections 362 and 553 of the Bankruptcy Code, or other applicable law.

### 11.  Preservation of Subordination Rights by Estate

Except as otherwise provided in the Plan, all subordination rights and claims relating to the subordination by the Debtor or the Liquidating Trustee of any Allowed Claim shall remain valid, enforceable and unimpaired in accordance with Section 510 of the Bankruptcy Code or otherwise; *provided, however,* that nothing in the Plan will revive or otherwise allow for the pursuit of any Lapsed Challenge Period Claims by any Person or Entity.

### V.    PROJECTED FINANCIAL INFORMATION

Attached hereto as Exhibit D is the Reorganized Debtor's projected one-year budget.   In the near term, the Reorganized Debtor intends to continue its research and development activities and to fund such activities with the Exit Facility.  The Reorganized Debtor does not expect to generate any material amount of revenues for the first twenty four (24) months following the Effective Date of the Plan.

*Counsel for MDA has requested that the following language be included in the Disclosure Statement:*

*The Debtor states that the Exit Facility will allow the Reorganized Debtor to continue its research and development activities for twelve (12) months.  However, the Debtor fails to discuss what will happen upon expiration of the twelve (12) month period if no additional funding is obtained.  The Debtor also states elsewhere that no additional funding beyond the initial twelve (12) month period has been obtained, let alone a commitment to fund.  As stated herein by the Debtor, the Reorganized Debtor does not expect to generate any material amount of revenues for the first twenty-four (24) months following the Effective Date, i.e., well after the initial twelve (12) month period ends thus, creditors should understand that there is a material risk that the Debtor will end up back in bankruptcy if the Reorganized Debtor is unable to secure additional financing beyond the initial twelve (12) month period.*

The Debtor disagrees with the MDA's assertions set forth above.  These assertions are duplicative of the MDA's assertions in Section IV.C.2, above.  The Debtor does not believe that there is any "material risk" to creditors or distributions under the Plan and further disagrees that the Reorganized Debtor "will end up in bankruptcy" in the event the Exit Facility is fully drawn one year after the Effective Date.  As discussed in Section X, below, distributions to creditors, especially unsecured creditors, under the Plan are completely unaffected by whether the Reorganized Debtor is ultimately successful or not.  Distributions to unsecured creditors will be made from the proceeds of the Liquidating Trust.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

## VI.   EFFECTS OF CONFIRMATION

### A.   Compromise and Settlement of Claims, Equity Interests, and Controversies

Pursuant to Sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Equity Interests, and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim or Equity Interest may have with respect to any Claim or Equity Interest or any distribution to be made on account of such Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and Holders, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle claims against it.

### B.   Discharge of Claims and Termination of Interests

Pursuant to Section 1141(a), (c) and (d) of the Bankruptcy Code, and notwithstanding any language to the contrary in such sections, except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created pursuant to the Plan, the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release of Claims, Equity Interests, and Causes of Action of any nature whatsoever by any Person or Entity, including any interest accrued on any Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in, the Debtor, the Estate, or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services performed by employees of the Debtor before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt, right, or Equity Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Equity Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Equity Interest has accepted the Plan.  Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, the Confirmation Order shall be a judicial determination of the complete and full discharge of all Claims and Equity Interests by any Person or Entity, subject to the Effective Date occurring.  Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all property of the Estate shall vest in the Reorganized Debtor, free and clear of all Claims and Equity Interests of

43

any Person or Entity and with the full and complete discharge of any and all Claims, Equity Interests or Causes of Action of any Person or Entity.   For the avoidance of doubt, nothing in the Plan shall discharge any claim, right, or causes of action that any Creditor or other Person or Entity owns and holds for its own account against KiOR Columbus.  For the avoidance of doubt, any alleged direct claims held by the MDA or claims in which the MDA is granted standing to prosecute against any non-Debtor party shall not be released, waived, discharged or impaired.

*Counsel of the Class Action[9] requested that the following language be included in the disclosure statement:*

*Representative Plaintiffs[10] believe that their claims against the Debtor are non-dischargeable and that Representative Plaintiffs' claims against the Debtor should be permitted to go forward in U.S. District Court of the Southern District of Texas to the extent Debtor's insurance coverage.  Further, Representative Plaintiffs request that nothing in the Plan or the Confirmation Order including the compromises, releases, discharges and injunctions set forth in Article X of the Plan, shall be deemed to release, enjoin, bar, or otherwise impair the Representative Plaintiffs' or Securities Plaintiffs'[11] Claims against any current or former officer, director, control person, auditor or securities underwriter of the Debtor.*

The Debtor disagrees with the Representative Plaintiffs' assertions above.  If there is any Allowed Claim resulting from the securities litigation, it is subordinated pursuant to Bankruptcy Code section 510(b).  Further, any such Allowed Claim does not fall within the scope of Bankruptcy Code section 1141(d)(6).

## C.  Certain Avoidance Actions Released

*All Avoidance Actions that have been or could be assessed against a vendor, supplier or other Trade Creditor that becomes a holder of a Class 7 Continuing Trade Claim shall be forever waived, released or extinguished under the Plan.*

## D.  Releases by Holders of Claims

*As of the Effective Date, for good and valuable consideration, unless otherwise noted on its ballot, each Holder of a Claim that has affirmatively voted to accept the Plan shall be deemed to have unconditionally released and discharged the Released Parties from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any Claims or Causes of Action that have been or could be asserted by or on behalf of the Debtor or the Estate or that are derivative or duplicative of any such*

---

[9]     "Class Action" shall mean (a) the consolidated securities putative class action entitled Berry v. KiOR, Inc. et al., Civil Action No. 4:13-cv-2443; and (b) the severed putative class action entitled Berry v. Cannon, et al., Civil Action No. 4:15-cv-00012 both pending in the United States District Court for the Southern District of Texas on behalf of the Securities Plaintiffs.

[10]     "Representative Plaintiffs" shall mean Dave Carlton and Sharon Kegerreis, or any other person the Court shall designate, in their capacity as lead plaintiff and/or representative plaintiffs in the Class Action.

[11]     "Securities Plaintiffs" shall mean all persons who acquired the securities of KiOR, Inc. between November June 24, 2011 and March 17, 2014, inclusive, and who are represented by the Representative Plaintiffs in the Class Action.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

*Claims or Causes of Action, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Holder of a Claim could have been legally entitled to assert in its own right (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, in any way relating or pertaining to (w) the purchase or sale, or the rescission of a purchase or sale, of any security of the Debtor, (x) the Debtor or the operation or conduct of the business of the Debtor, (y) the Chapter 11 Case and/or (z) the negotiation, formulation and preparation of the Plan, or any related agreements, instruments or other documents; <u>provided</u> that these releases will have no effect on the liability of any Released Party arising from any act, omission, transaction, agreement, event or other occurrence, constituting fraud, criminal conduct, gross negligence or willful misconduct. The releases set forth in this paragraph shall be binding upon and shall inure to the benefit of the Liquidating Trustee and any other successor to the Debtor or the Estate. Each ballot will have a place for a party to opt out of the release provided herein. Nothing in the foregoing or elsewhere in the Plan constitutes a waiver or release of (1) any claim, right, or causes of action that any Creditor or other Person or Entity owns and holds for its own account against KiOR Columbus; or (2) any right to receive distributions from the Liquidating Trust or any portion of a Claim supporting such right.*

### E. Injunction

*Except as otherwise expressly provided in the Plan, all Persons and Entities shall be permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or relating to any Claim or Equity Interest against the Debtor, the Estate or its assets or the Reorganized Debtor or its assets, unless a previous order modifying the stay provided under Section 362 of the Bankruptcy Code was entered by the Bankruptcy Court; (b) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor, the Estate or its assets or the Reorganized Debtor (c) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of the Debtor, the Estate or its assets or the Reorganized Debtor in each case in respect of any Claims or Equity Interests arising prior to the Petition Date; and (d) commencing or continuing in any manner any Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any Claims or Causes of Action that have been or could be asserted by or on behalf of the Debtor or the Estate or that are derivative or duplicative of any such Claims or Causes of Action, that are released pursuant to the Plan or the Confirmation Order.*

### F. Necessity and Approval of Releases and Injunctions

The releases and injunctions set forth in this Article X of the Plan are integral and critical parts of the Plan and the settlements implemented pursuant to the Plan, the approval of such releases pursuant to the Confirmation Order is a condition to the occurrence of the Effective Date, and all the Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights under the Plan.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

Pursuant to Bankruptcy Code Sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases and injunctions set forth in Article X of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such releases and injunctions are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtor, the Estate, and all Creditors; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the releasing parties as set forth herein asserting any Claims or Causes of Action released pursuant to such release.

### G. Exculpation

*The Debtor, the Reorganized Debtor, the Liquidating Trustee, and the Liquidating Trust, and their respective officers, directors, employees (and their respective attorneys, consultants, financial advisors, investment bankers, accountants, and other retained professionals) shall neither have nor incur any liability to any Person or Entity (including any Holder of a Claim or Equity Interest) for any pre- or post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation or occurrence of the Effective Date, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtor or the Chapter 11 Case.*

The Debtor believes that the foregoing release, discharge, injunction and exculpation provisions are reasonable and appropriate under the circumstances. The Debtor has analyzed the potential claims being released by the Debtor and has determined that the benefits of the Plan, of which the release provisions are an integral part, outweigh the value to the Debtor's Estate of retaining any potential claims being released. Notwithstanding anything to the contrary herein, the foregoing release, discharge, injunction and exculpation provisions shall not in any way prejudice any party's rights to object to such provisions at or prior to any hearing on confirmation of the Plan.

## VII.   CONFIRMATION AND CONSUMMATION PROCEDURES

### A. General Information

All creditors whose Claims are impaired by the Plan (except those parties holding Claims in Classes 3 or 10 or Interests in Class 11 or who are unimpaired) may cast their votes for or against the Plan. As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims votes to accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of Impaired Claims as acceptance by holders of at least two thirds of the dollar amount of the Class and by more than one half in number of Claims. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan. Voting is accomplished by completing, dating, signing and returning the Ballot by the Voting

46

Deadline.  Ballots will be distributed to all creditors entitled to vote on the Plan and is part of the Solicitation Package accompanying the Disclosure Statement.  The Ballot indicates (i) where the Ballot is to be filed and (ii) the deadline by which creditors must return their Ballots.  See Article I of this Disclosure Statement for a more detailed explanation of who will receive Ballots and voting procedures.

### B.  Solicitation of Acceptances

[This Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information" to permit creditors and equity interest holders to make an informed decision whether to accept or reject the Plan.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to, or concurrently with, such solicitation.]

### C.  Considerations Relevant To Acceptance Of The Plan

The Debtor's recommendation that all Creditors should vote to accept the Plan is premised upon the Debtor's view that the Plan is preferable to other alternatives, such as conversion of the Bankruptcy Case to a chapter 7 bankruptcy case which would likely be more time-consuming, more expensive, and likely result in reduced Distributions to creditors.  It appears unlikely to the Debtor that an alternate plan of reorganization or liquidation can be proposed that would provide for payments in an amount equal or greater than the amounts proposed under the Plan.  If the Plan is not accepted, it is likely that the interests of all creditors will be further diminished.

## VIII.   FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST

### A.  Feasibility of the Plan

The Bankruptcy Code requires that, for the Plan to be confirmed, the Debtor must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.   The Debtor believes that the Reorganized Debtor will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

As set forth in the one-year budget attached hereto as Exhibit D, the Reorganized Debtor intends to continue its research and development activities but will not generate substantial revenues during the 12-24 months following the Effective Date of the Plan.

In the absence of material revenues during the 12-month period following the Effective Date of the Plan, the Reorganized Debtor will be funded entirely by the Exit Facility.  The Debtor believes that the Plan Support Parties have the desire and the ability to fund the Exit Facility, as required by the Plan.  Affiliates of the Plan Support Parties have consistently provided funds to support the Debtor's reorganization process and the Debtor is confident that the Plan Support Parties will provide the Exit Facility and consummate the Restructuring Transaction.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

Payments to creditors under the Plan, along with the other transactions contemplated by the Plan, will be funded through the Exit Facility and the proceeds of Avoidance Actions.  The Reorganized Debtor's ongoing operations will not be used to fund the Plan obligations.

**HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE RISK FACTORS INCLUDED IN ARTICLE X OF THIS DISCLOSURE STATEMENT THAT MAY AFFECT THE FINANCIAL FEASIBILITY OF THE PLAN.**

*Counsel for MDA has requested that the following language be included in the Disclosure Statement:*

> *Section VIII(A) above fails to adequately describe the financial needs of the Reorganized Debtor and how those needs will be met post-confirmation.  Among other things, the Debtor fails to disclose that it may require hundreds of millions of dollars in further investment to commercialize a saleable product, and that it has no commitment from any party to fund its operations beyond the limited Exit Financing.  Whether and on what terms the Debtor may obtain limited Exit Financing or any required funding thereafter directly impacts the feasibility of the Debtor's Plan and should therefore be disclosed in this Disclosure Statement. Indeed, the Debtor admits in Section V hereof that "[t]he Reorganized Debtor does not expect to generate any material amount of revenues for the first twenty four (24) months following the Effective Date of the Plan."  With no financing in place beyond the limited Exit Financing (which, according to the Debtor, would only fund the Reorganized Debtors for one (1) year following the Effective Date of the Plan) and no revenues projected for at least two (2) years following the Effective Date of the Plan, the Debtor's Plan is simply not feasible and therefore cannot be confirmed.*

> *The Disclosure Statement is unclear as to how the Reorganized Debtor will be able to operate after it burns through the limited Exit Financing obtained by the Debtor. Further, the MDA asserts that the plan is not feasible, let alone confirmable.*

The Debtor disagrees with the MDA's assertions set forth above.  The Debtor believes that the Exit Facility it has negotiated in the approximate amount of $30 million satisfies the Reorganized Debtor's anticipated needs for the next year.  The Debtor believes that the Plan is both feasible and confirmable.  Feasibility is one of the confirmation requirements that will be determined the Bankruptcy Court.

### B.  Best Interest of Creditors Test

In certain circumstances, to be confirmed, the Plan must pass the "Best Interest Of Creditors Test" incorporated in section 1129(a)(7) of the Bankruptcy Code.  The test applies to individual creditors and Interest holders (stockholders) that are both (i) in Impaired Classes under the Plan, and (ii) do not vote to accept the Plan.  Section 1129(a)(7) of the Bankruptcy Code requires that such Creditors and Interest holders receive or retain an amount under the Plan not less than the amount that such holders would receive or retain if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

48

In a typical chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid first from the sales proceeds of properties securing their liens. If any assets are remaining in the bankruptcy estate after the satisfaction of secured creditors' claims from their collateral, Administrative Claims generally are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their Allowed claims in relationship to the total amount of Allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

### C. Application of Best Interests Test to the Liquidation Analysis and Valuation of the Debtor

The Debtor believes that the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code because members of each Impaired Class will receive at least as much consideration under the Plan as they would receive in a liquidation in a hypothetical chapter 7 case. As set forth in the liquidation analysis attached hereto as Exhibit E, creditors will receive an equal or better recovery through the distributions contemplated by the Plan because the professionals proposing the Plan have been working in this Bankruptcy Case since their inception and are familiar with the background and progress of this Bankruptcy Case. On the other hand, conversion of this Bankruptcy Case to a chapter 7 liquidation proceeding will require the appointment of a trustee, who will likely will need additional time to become familiar with the Bankruptcy Case, and a statutory fee will be paid to the chapter 7 trustee. The Debtor does not believe there will be any unencumbered funds available to a chapter 7 trustee and no ability of a chapter 7 trustee to obtain financing from the DIP Lenders or any other third party. While gaining familiarity with this case, a chapter 7 trustee will expend time payable by any remaining cash on hand in the Debtor's Estate, thereby reducing the potential distribution to creditors. Under the Plan, distributions to creditors will commence as soon as practicable (and in accordance with the Plan) after the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, whereas conversion of this case to a chapter 7 liquidation proceeding will substantially delay distributions and reduce the amount of distributions currently available to creditors.

In addition, the value of the Debtor's assets is greatly exceeded by the amount of debt secured by those assets. Thus, in a liquidation, all assets (or their value) would be recovered by secured creditors, leaving unsecured creditors with no realistic possibility of recovery. This scenario is described in detail in Exhibit E. Further, a chapter 7 trustee would likely have to reject (or be deemed to reject) all of the Debtor's executory contracts and leases, a significant amount of which will likely be assumed under the Plan. In this event, there will be substantial contract rejection damage claims which would dilute even more the potential recovery any individual creditor receives on account of any avoidance actions. In contrast to the likely chapter 7 result, the Plan provides a distribution of 50% of the face amount of Allowed Continuing Trade Creditor Class 7 Claims and Allowed Convenience Class 8 Claims, and provides for Allowed General Unsecured Claims to receive the proceeds from transferred Vested

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

Causes of Actions.  Plus, as noted above, the majority of executory contracts and leases will likely be assumed under the Plan thereby eliminating many contract rejection damage claims. Thus, the Debtor believes that the Plan satisfies the "best interests" test.

The liquidation analysis indicates that the liquidation value of the Debtor's assets is not sufficient to satisfy all the administrative and priority claims, Secured Tax Claims, plus the DIP Financing Claims.  In this scenario, there is no net value available for distribution to the Class 1 First Lien Claims, the Class 2 Second Lien Claims or the Class 3 Third Lien Claims.  Thus, the MDA's contention that these three credit facilities should be recharacterized as equity, even if successful (which the Debtor disputes) makes no difference in the ultimate hypothetical chapter 7 liquation analysis as to general unsecured creditors.

*Counsel for MDA has requested that the following language be included in the Disclosure Statement:*

*The Debtor concludes that holders of claims will receive greater and earlier recoveries under their Plan rather than in a Chapter 7 liquidation. But, these conclusions and the accompanying Liquidation Analysis are unsupported and deficient in their description of the potential estate value available for distribution to unsecured creditors. The Liquidation Analysis also fails to either describe or attempt to ascribe any range of value for any of the causes of action that could be asserted by the Estate against any party in a liquidation scenario, and is thus deficient. Moreover, the Debtor's Liquidation Analysis also assumes that the Debtor's alleged prepetition secured claims would all be treated as allowed secured claims in a Chapter 7 liquidation. As set forth in the MDA's Standing Motion, such "secured claims" are really disguised equity interests, and MDA submits that a Chapter 7 trustee would seek to recharacterize such "secured claims" accordingly. If the alleged prepetition secured claims are recharacterized as equity interests, they will be subordinate to general unsecured claims in priority of distribution.*

The Debtor disagrees with the MDA's assertions set forth above.  Among other issues, the current value of the Debtor's assets is not sufficient to satisfy the amount of the DIP Financing Claims and the Secured Tax Claims.  Thus, whether the Prepetition Secured Claims are recharacterized or subordinated makes no difference as to whether there is "value" available for unsecured creditors.  Moreover, if there are viable recharacterization or subordination claims, such claims are not waived, and instead, are transferred to the Liquidating Trust.

## IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords holders of Claims the potential for the greatest return and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) an alternative plan or plans of reorganization or liquidation, although the Debtor is aware of no other viable plan of reorganization; or (b) conversion of this Bankruptcy Case to a chapter 7 bankruptcy case.  The Debtor believes that the Plan provides a substantially greater return to holders of Claims than would an alternative plan of liquidation or conversion of this Bankruptcy Case under chapter 7 of the Bankruptcy Code.

50

Underlying the liquidation analysis set forth in Exhibit E are a number of estimates and assumptions that, although developed and considered reasonable by the Debtor, are inherently subject to significant economic uncertainties and contingencies beyond the control of the Debtor. The liquidation analysis is also based upon assumptions with regard to liquidation decisions that are subject to change.

## X.    CERTAIN RISK FACTORS TO CONSIDER

The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the exhibits attached hereto.  You should carefully consider the risks described below in addition to the other information contained in this document. It is recommended that you consult your legal, financial, and tax advisors regarding the risks associated with the Plan and the Distributions you may receive thereunder.

### A.  Claims Estimation

There can be no assurance that the estimated Claim amounts assumed for the purposes of preparing the Plan are correct.  The actual amount of Allowed Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.   Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated for the purpose of preparing the Plan.

### B.  Certain Risks of Nonconfirmation

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A rejecting Creditor or holder of an Interest might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court were to determine that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization.

### C.  Risk of Plan Support Parties Default

Based on the Debtor's extensive experience with the Plan Support Parties and their affiliated entities, the Debtor is confident that the Plan Support Parties have the ability and willingness to consummate the Restructuring Transaction, to fund the Exit Facility, and to fund payments to Allowed Continuing Trade Creditor Class Claims and Allowed Convenience Class Claims, as provided in the Plan.  However, there is no certainty that the Plan Support Parties will take these actions.

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

### D.      Risk in the Technology

While the Debtor strongly believes in its technology and has continued improving aspects alternatively of its technology during the bankruptcy case, there is no guaranty that it will be successful in developing the technology to the point of commercial viability.  As such, even with the infusion of approximately $30 million in new money it may be necessary to obtain additional capital in the form of loans or equity after the Exit Facility has been fully funded.  However, in such event, the unsecured creditors of the Debtor will not be affected by any ongoing technology risk and their distributions under the Plan will not change whether the Reorganized Debtor is ultimately successful or not.

### E.  Tax Implications of the Plan

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor does not intend to seek any ruling from the IRS on the tax consequences of the Plan. Even if the Debtor decides to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.   In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtor has taken, or intends to take, with respect to the tax treatment of the Plan, or that a court would not sustain such a challenge.

### XI.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

#### A.  Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain Holders of Claims. This discussion does not address the U.S. federal income tax consequences to Holders of Claims who are unimpaired, otherwise entitled to payment in full in Cash under the Plan, or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary (or less favorable) position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary or different position would not be sustained by a court.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

consequences of the transactions to certain classes of taxpayers subject to special rules (including, without limitation, Holders that are not "United States persons" as defined in the Tax Code, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons that acquired Claims at a "market discount," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address U.S. federal taxes other than income taxes.

This discussion assumes that the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

*The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon a Holder's individual circumstances.*

### B.  Federal Income Tax Consequences to the Debtor

#### 1.  COD Income and Attribute Reduction

As of December 31, 2013, the Debtor had a consolidated federal income tax net operating loss ("NOL") carryforward of approximately $238.3 million, in addition to substantial other tax attributes.  The Debtor expects that it will incur an additional NOL for the tax year ending December 31, 2014.

In general, cancellation of debt income ("COD") realized by a debtor on the discharge of debts in the context of a bankruptcy proceeding will not result in taxable income to the debtor, although it will cause the reduction in certain of the debtor's tax attributes (such as NOLs, capital loss carryforwards, tax credits, and tax basis in assets).  The amount of COD realized equals the excess of the adjusted issue price of indebtedness discharged over the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).  If advantageous, the borrower can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where a debtor (such as the Debtor) joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group also be reduced.

The Debtor expects to realize a substantial amount of COD in connection with the implementation of the Plan as a result of the satisfaction of certain Claims that qualify as

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

indebtedness for federal income tax purposes at a discount or for no consideration. As a result, the Debtor expects that a substantial amount of its tax attributes will be reduced following the implementation of the Plan.

Any reduction in tax attributes under the COD rules does not occur until after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD is realized.

## 2.  Treatment of Any Remaining NOLs; Section 382

To the extent the Debtor has any NOLs remaining after implementation of the Plan, the Debtor's ability to utilize those NOLs may be limited under Section 382 of the Tax Code. Section 382 contains certain rules limiting the amount of NOLs a corporate taxpayer can utilize in each taxable year following an "ownership change." In general, an "ownership change" occurs whenever the percentage of the stock of a corporation owned, directly or indirectly, by "5-percent stockholders" (within the meaning of Section 382) increases by more than 50 percentage points over the lowest percentage of the stock of such corporation owned, directly or indirectly, by such 5-percent stockholders at any time over the preceding three-year period. Certain special rules under Section 382 apply to corporations that experience an ownership change in connection with a bankruptcy proceeding and allow for conversion of qualifying debt to equity without causing an ownership change.

The Debtor believes it is possible that the consummation of the Plan will not result in an ownership change under Section 382 because of the substantial overlap in ultimate beneficial ownership among the Holders of Claims that will receive New Equity Interests pursuant to the Plan, on the one hand, and the Holders of Equity Interests, on the other hand and because new equity interests are being received in exchange for qualifying debt and the Debtor is in a chapter 11 proceeding. The Debtor is continuing to evaluate whether the Plan would result in an ownership change, and, if so, the potential impact of Section 382 (including certain relief provisions of Section 382 that may apply to an ownership change resulting from a bankruptcy restructuring) on its ability to utilize any NOLs that may remain following the implementation of the Plan and the application of the attribute reduction rules discussed above.

## C.  Federal Income Tax Consequences to Holders of Claims

### 1.  General

Subject to the discussion in the following paragraphs, (i) a Holder of an Allowed Claim generally will recognize taxable gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the "amount realized" in respect of such Claim under the Plan and its tax basis in such Claim, (ii) the Holder's tax basis in any property received generally should equal the fair market value of such property as of the Effective Date, and (iii) the Holder's holding period for the property should begin on the day following the Effective Date. In general, a Holder's amount realized will equal the amount of cash plus the fair market value of any property received (or deemed received in the case of Holders that are beneficiaries of the Liquidating Trust) in respect of such Claim (or, if the property received in respect of a Claim is a

54

debt instrument for federal income tax purposes, the "issue price" of such debt instrument as determined under applicable Treasury regulations).

## 2.    Possible Treatment as Tax-Free Recapitalization

If a Holder of a Claim that is classified as a "security" of the Debtor for U.S. federal income tax purposes receives from the Debtor in respect of such Claim property that constitutes stock of or a "security" issued by the Debtor, then the exchange of such Claim for such property may qualify as a "recapitalization" under Section 368 of the Tax Code. In that case, a Holder generally (i) should not recognize any gain or loss on its receipt of such property, (ii) should have a tax basis in the property received equal to its tax basis in such Claim and (iii) should have a holding period for such property that includes its holding period for such Claim. However, a Holder may be required to recognize gain if, in addition to receiving property that is a "security," the Holder receives cash or other property that is not a "security" in respect of such Claim.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. As applied to debt obligations, the meaning of the term "security" is unclear. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt obligation, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether the debt obligation is intended to give the holder a continuing proprietary interest in the issuer. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of 10 years or more constitute securities. Holders are urged to consult their own tax advisors regarding the possibility that the receipt of property in respect of a Claim pursuant to the Plan may qualify as a recapitalization.

## 3.    Character of Gain or Loss; Loss Limitations

The character of any gain or loss recognized by a Holder as capital or ordinary and, in the case of capital gain or loss, as long-term or short-term, will be determined by a number of factors, including, but not limited to, the tax status of the holder, the nature of the applicable Claim in the Holder's hands, the purpose and circumstances of its acquisition of the Claim, the Holder's holding period of the Claim, the extent to which the Holder previously claimed a bad debt deduction for all or a portion of the Claim, and the extent, if any, to which the Holder acquired the Claim at a market discount. The deductibility of capital losses is subject to certain limitations. In addition, other special rules could apply that might preclude a Holder from claiming a current deductible loss for tax purposes that would otherwise be allowed upon consummation of the Plan. Holders are urged to consult their own tax advisors regarding the characterization of any gain or loss recognized, and the possible application of any rules limiting the deductibility of any loss recognized, in connection with the Plan.

55

### 4.  Amounts Received in Respect of Accrued But Unpaid Interest

Pursuant to the Plan, amounts received in respect of Allowed Claims will be allocated for tax purposes first to the principal amount of such Claims, with any excess allocated to any unpaid accrued interest.  However there is no assurance that the IRS will respect such allocation for federal income tax purposes.  In general, to the extent that an amount received (whether stock, cash or other property) by a Holder of a Claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income.  Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income.  Holders of Claims are urged to consult with their tax advisors regarding the allocation of consideration and deductibility of unpaid interest (including the characterization of any deductible loss in respect of any unpaid interest as a capital or ordinary loss).

### 5.  Treatment of the Liquidating Trust

The Liquidating Trust will be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust.  For all federal income tax purposes, all parties (including the Debtor, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) are required to treat the transfer of the Liquidating Trust Assets by the Debtor to the Liquidating Trust (as set forth in the Liquidating Trust Agreement) as a transfer of such assets by the Debtor to the Liquidating Trust Beneficiaries entitled to distributions from the Liquidating Trust Assets, followed by a transfer by such beneficiaries to the Liquidating Trust.  Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

The Liquidating Trustee will file tax returns with the IRS for the Liquidating Trust as a grantor trust in accordance with Treasury Regulation Section 1.671-4(a).  The Trustee will also send to each beneficiary of the Liquidating Trust a separate statement setting forth the beneficiary's allocable share of items of income, gain, loss, deduction or credit and will instruct the beneficiary to report such items on such beneficiary's federal income tax return.

The Liquidating Trustee may invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust in accordance with the Liquidating Trust Agreement.  However, the scope of any such investments will be limited to include only those investments that a Liquidating Trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury regulations, or any modification in the IRS guidelines (whether set forth in IRS rulings, other IRS pronouncements or otherwise).

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

The Liquidating Trustee will require any Liquidating Trust Beneficiary or other party receiving a distribution to furnish to the Liquidating Trustee in writing such beneficiary's social security number or other taxpayer identification number ("TIN") as assigned by the IRS and the Liquidating Trustee may condition any distribution to any Liquidating Trust Beneficiary or other party receiving a distribution upon receipt of such TIN.

### 6.  Information Reporting and Backup Withholding

All amounts paid to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements.  Under certain circumstances, interest, dividends, and other reportable payments, may be subject to "backup withholding," currently at a rate of 28%.  Backup withholding generally applies if the holder (a) fails to furnish its TIN, (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.

## XII.    CONCLUSION AND RECOMMENDATION

Based on the foregoing analysis of the Debtor, its assets, and the Plan, the Debtor believes that the best interests of all parties would be served through confirmation of the Plan. **FOR THESE REASONS, THE DEBTOR URGES ALL CREDITORS THAT ARE ENTITLED TO VOTE ON THE PLAN TO VOTE TO "ACCEPT" THE PLAN.**

[SIGNATURE ON NEXT PAGE]

DMSLIBRARY01\22196\231001\25332889.v5-4/7/15
RLF1 11792692v.1

By: _____
Christopher A. Artzer
President and Interim Chief Financial
Officer of the KiOR, Inc.

SIGNATURE PAGE TO DISCLOSURE STATEMENT
DMSLIBRARY01:25237529.1
*HOU 408294871v4*

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A: Disclosure Statement Approval Order

Exhibit B: Debtor's Statement of Financial Affairs Response to Question 3b

Exhibit C: Debtor's Statement of Financial Affairs Response to Question 3c

Exhibit D: Reorganized Debtor's One-Year Budget (to be filed)

Exhibit E: Liquidation Analysis