**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>KiOR, Inc.,[1]<br><br>         Debtor. | Chapter 11<br><br>Case No. 14-12514 (CSS)<br><br>**Re: Docket Nos. 223, 432 & 433**<br>**Hearing Date: April 29, 2015 at 10:00 a.m.** |

**THE KHOSLA SECURED PARTIES' OPPOSITION TO THE MOTION OF
MISSISSIPPI DEVELOPMENT AUTHORITY FOR ORDER GRANTING LEAVE,
STANDING AND AUTHORITY TO COMMENCE AND PROSECUTE DERIVATIVE
CLAIMS ON BEHALF OF THE DEBTOR'S ESTATE**

The KFT Trust, Vinod Khosla, Trustee (the "KFT Trust"), VNK Management, LLC

("VNK"), and Khosla Ventures III, LP ("KV III" and collectively with the KFT Trust and VNK,

the "Khosla Secured Parties"), by and through their respective undersigned counsel, hereby

oppose the *Motion of Mississippi Development Authority for Order Granting Leave, Standing*

*and Authority to Commence and Prosecute Derivative Claims on Behalf of the Debtor's Estate*

[Docket No. 223] (as amended, the "MDA Standing Motion"), which was filed by the

Mississippi Development Authority (the "MDA") on January 14, 2015, and was subsequently

amended by the MDA on March 23, 2015 [Docket Nos. 432 & 433].

## I.    INTRODUCTION

1.    The MDA Standing Motion and the proposed form of complaint attached

thereto as Exhibit A (as revised by the MDA on March 23, 2015, the "Proposed Complaint")

paint with a wide brush, seeking permission to pursue recharacterization, equitable

subordination, and lien avoidance claims in respect of four materially different sets of so-

---

[1]    The Debtor in this chapter 11 case, along with the last four digits of the Debtor's federal tax identification number, is KiOR, Inc. (2233).  The above-captioned Debtor's mailing address is 13011 Bay Park Road, Pasadena, Texas 77507.

called "Capital Infusions" that occurred over more than $2^1/_2$ years, along with a generalized

request to pursue unspecified "other" claims.

2.　　　The Khosla Secured Parties believe the MDA's proposed claims are all

flawed, but nevertheless wish to narrow and focus the issues that must be decided by the

Court at this juncture.  Accordingly,

- The Khosla Secured Parties do *not* ask the Court now to decide whether colorable claims exist for the recharacterization or subordination of certain second-lien debt (referred to in the Proposed Complaint as the "October 2013 Capital Infusion" and the "March 2014 Capital Infusion").  Rather, the Khosla Secured Parties are willing to stipulate that such claims have been timely raised and will not be released under any DIP financing order.  The Khosla Secured Parties submit that a post-confirmation plan trustee or similar fiduciary is the appropriate party to pursue these claims if such fiduciary deems appropriate.  The Khosla Secured Parties believe the Debtor's proposed plan makes clear that such claims will be preserved for its liquidating trustee to evaluate.  Furthermore, the Khosla Secured Parties believe that it would be inefficient to litigate the MDA's claims regarding the second lien debt at this juncture given that it is not clear what, if any, recovery unsecured creditors will receive under the Debtor's plan; if it turns out that there will be no material recovery, then it would be a costly waste of time and resources to litigate about the validity, nature, or priority of the second lien debt.

- The Khosla Secured Parties do *not* here address the Proposed Complaint's allegations regarding certain third-lien debt (referred to in the Proposed Complaint as the "January 2012 Capital Infusion"), but instead defer to the separate objection to the MDA Standing Motion filed by 1538731 Alberta Ltd. as agent for the lenders under that credit facility.[2]

- The Khosla Secured Parties *do* request that the Court find that the MDA has failed to allege any colorable claims with respect to certain first-lien secured credit extended in July 2014 pursuant to that certain *Protective Advance Loan and Security Agreement* (the "PALSA Debt") and deny the MDA Standing Motion as it relates to the PALSA Debt.

- The Khosla Secured Parties also *do* request that the Court deny the MDA Standing Motion with respect to any generalized "other potentially viable" claims that are not specifically described in the MDA Standing Motion and not pled adequately (or at all) in the Proposed Complaint.  Since both the final DIP order and the Debtor's proposed plan preserve *all* such claims for either a chapter 7

---

[2]　　The Khosla Secured Parties further join in the Debtor's opposition to the MDA Standing Motion.

trustee or plan trustee, there is no need to accord the MDA an unspecified commission to pursue any claims that it believes it discovers at a later date.

3.      As detailed more fully below, the Proposed Complaint does not contain alleged factual matter that states a plausible claim for either recharacterization or equitable subordination of the PALSA Debt.  Instead, the Proposed Complaint on its face makes clear that many of the elements required for a successful recharacterization claim in this Circuit do not apply to the PALSA Debt, a fact that is confirmed by reference to the documentation under which that debt was extended.  Indeed, the notion that the parties would have intended this pre-bankruptcy first priority secured indebtedness to be equity contributions defies common sense.  Because it is abundantly clear that the PALSA Debt was structured and intended as senior secured indebtedness – secured debt that specifically primed all of the Debtor's other secured debt – the Debtor's resulting debt obligations are not candidates for recharacterization as equity as a matter of law and the MDA cannot satisfy its burden to show that the Debtor has failed to pursue colorable recharacterization claims.

4.      Likewise, the Proposed Complaint's suggested counts for equitable subordination of the PALSA Debt fail the test of colorability.  The sole conduct complained of is the Khosla Secured Parties' extension of secured debt to the Debtor and negotiation of a bankruptcy treatment that would provide appropriate recoveries on that debt.  As a matter of law, these are insufficient allegations of inequitable conduct – ones that would never justify the extreme remedy of equitable subordination.  Moreover, the Proposed Complaint does not – and cannot – credibly contend that other creditors were harmed by the Debtor's incurrence of the PALSA Debt or by any party's action in respect of that debt.

5.      Notably, the MDA's attempt to recharacterize or subordinate the PALSA Debt is a purely academic exercise that will not provide any benefit to unsecured creditors.

Under the Debtor's proposed plan, the existing DIP facility and the PALSA Debt will be converted into equity in the reorganized Debtor.  Importantly, distributions to the MDA or other unsecured creditors would not be affected by recharacterization or subordination of the PALSA Debt.  As a result, the Court should deny the MDA's request because it will only increase the estate's legal costs and waste judicial resources without any corresponding potential benefit to creditors or the estate.

6.      Finally, the MDA's catch-all request for standing to pursue "other" claims falls flat.  The MDA cannot satisfy its burden to demonstrate that colorable claims exist if it does not identify the subject claims in the first place.  Likewise, given the provision included in paragraph 6 of the final DIP financing order entered by this Court [Docket No. 275], a chapter 7 trustee, plan trustee, or other estate fiduciary will have a fresh "Challenge Period," so the MDA cannot argue that valuable claims will be lost if its request for standing as to these "other" claims is denied.

7.      In the final analysis, the primary issue the Khosla Secured Parties believe the Court needs to decide at this juncture is whether the MDA has alleged colorable claims regarding the PALSA Debt.  Because the MDA has failed to do so, the MDA's request for standing to pursue those claims, as well as "other" generalized claims, should be denied.

## II.      RELEVANT ALLEGED FACTUAL BACKGROUND[3]

8.      Following an initial public offering in June 2011, the Debtor was a publicly traded development-stage company engaged in the research and development of renewable energy

---

[3]      The factual background in this section is based solely on: (a) the allegations set forth in the Proposed Complaint; (b) documents referenced in the Proposed Complaint, including the form of PALSA Debt credit agreement attached as **Exhibit A** hereto (the "PALSA Credit Agreement"); (c) publicly available documents; (d) findings made by the Court in the form of final DIP financing order [Docket No. 275] (the "Final DIP Order"); and (e) statements made by the Court on January 16, 2015, after a contested evidentiary hearing on the Debtor's proposed final DIP financing.  These are materials of which the Court may properly take judicial notice.  *See, e.g.*, *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); *see also* ¶ 20, *infra*.

technologies.  Proposed Compl. ¶¶ 5, 36 & 100.  At the end of 2011, the Debtor had approximately $132 million of cash on its balance sheet.  *Id.* ¶ 152.

9.      The Debtor obtained $75 million of secured debt financing in January 2012.  *See id.* ¶¶ 129 & 141.  Of this amount, $25 million was lent by the KFT Trust, and $50 million was lent by investments funds affiliated with the Alberta Investment Management Corporation.  *See id.* ¶¶ 68 & 131.

10.     In October 2013 and March 2014, the KFT Trust, VNK, and KV III provided additional loans to the Debtor.  *See id.* ¶¶ 166, 168, 185 & 187.  Although later in time, these additional loans were made on a basis senior to the January 2012 financing.  *See id.* ¶¶ 178 & 197.

11.     The Debtor had a shortage of liquidity by early 2014.  *See id.* ¶¶ 200-201.  In May 2014, the Debtor determined to pursue a potential sale process to be led by Guggenheim Securities, but needed liquidity to fund that process and the company's operations pending the outcome of that process and accordingly requested short-term funding to bridge the Debtor "through an expedited sale/refinancing process to explore strategic alternatives."  *See* PALSA Credit Agreement at p. 1, pp. 11-12 (defining "Sale/Refinancing Milestones" and "Sale/Refinancing Process"), § 7.16 (covenant regarding status updates about the Sale/Refinancing Process and the Sale/Refinancing Milestones) & §§ 9.11 & 9.13 (default triggers relating to the Sale/Refinancing Milestones and the termination of Guggenheim); *see also* Proposed Compl. ¶ 210 & 218 (noting interconnectedness of the PALSA Debt with the Guggenheim engagement and related marketing process).

12.     The PALSA Debt was denominated and structured as debt financing.  The PALSA Credit Agreement represents a standard form of documentation for the incurrence of secured credit.  Among other things, the PALSA Credit Agreement:

- Contemplates that the lenders thereunder will make advances that represent debt obligations of the Debtor.  *See* PALSA Credit Agreement § 2.1.

- Contains a specified maturity date of October 31, 2014, upon which all obligations become due and payable.  *See id.* at p. 8 (definition of "Maturity Date") & § 2.1(d)(ii); *see also* Proposed Compl. ¶ 217.

- Includes a fixed rate of interest of 8.00% per annum.  *See* PALSA Credit Agreement at p. 10 (definition of "Protective Advance Loan Interest Rate") & § 2.1(d)(i); *see also* Proposed Compl. ¶ 214.

- Does not include any voting rights, warrants or other "equity kicker," or other features that would allow for the enjoyment of upside potential in the Debtor.

- Does include various covenants and rights that are typical aspects of debtor-creditor relationships.  *See, e.g.*, PALSA Credit Agreement §§ 6.1, 6.3, 7.1, 7.3, 7.4, 7.6, 7.7, 7.16, 7.17, 8.2, 8.4, 10.2, 10.5, 10.6, 11.12 & 11.15.

13.     The Debtor's financial condition in July 2014 made putting in more equity or unsecured debt economically irrational and contrary to common sense.  *See* Proposed Compl. ¶¶ 223-224.  Accordingly, the KFT Trust required that the PALSA Debt be secured by a first priority security interest on all of the Debtor's assets.  *See* PALSA Credit Agreement §§ 3, 5.2, 7.2 & 7.14.  Obtaining such a senior lien required that all of the Debtor's preexisting secured indebtedness be subordinated to the PALSA Debt, which it all was.  *See id.* at p. 2 & § 4.1(h); *see also* Proposed Compl. ¶¶ 145, 178, 197 & 220.  Thus, the PALSA Debt was not subordinate to the claims of any other creditors.  To the contrary, prior to the Debtor's bankruptcy filing, the PALSA Debt was the most senior obligation in the Debtor's entire capital structure.

14.     The proceeds of the PALSA Debt were not used to acquire any capital or other assets.  To the contrary, the purpose of the PALSA Debt – as the name "protective advance" implies – was "to preserve, protect, prepare for sale or disposition the Collateral, or any portion

thereof and to enhance the likelihood and maximize the amount of repayment of the Existing

Secured Obligations and the Secured Obligations hereunder." PALSA Credit Agreement at p. 2;

*see also* Proposed Compl. ¶ 212 (asserting that the PALSA Debt was to be used to "preserve" the

Debtor's assets rather than to acquire any capital or other asset). The PALSA Debt thus

effectively functioned as a pre-bankruptcy version of the DIP financing that was approved by

this Court. Indeed, the Proposed Complaint itself alleges that "[t]he purpose of the protective

advances appears to have been to protect the Defendants' controlling interests in KiOR and its

assets, fund the Guggenheim process, and provide a bridge to bankruptcy." Proposed Compl.

¶ 210.

15.    Unfortunately, the Guggenheim process did not yield a third-party purchaser or

investor, making a bankruptcy filing necessary. The KFT Trust and the other Khosla Secured

Parties engaged in good faith, arms' length negotiations with the Debtor and its advisors over the

terms of a DIP credit facility, use of cash collateral, and plan terms. *See* Final DIP Order ¶¶ H

(at pp. 15-16), I(iii) (at pp. 16-17) & 16 (at pp. 53-54). As the Court concluded, "the process

evidence that was put forward really was very thorough and very strong that this has been an

arm's length negotiation, that ***there was not any improper insider pressure being brought***," and

that all parties proceeded in good faith. *See* Jan. 16, 2015 Hr'g Tr. at 121:3-11 (emphasis

added). Accordingly, the Court had "no problem making a good faith finding" despite the

MDA's accusations of some sinister scheme by the Khosla Secured Parties. *Id.* at 121:11.

16.    The Debtor has continued to maintain its business in bankruptcy by using the DIP

facility the same way it used the PALSA Debt pre-bankruptcy – i.e., to maintain the Debtor's

operations until a value realization event (such as an asset sale or confirmation of a chapter 11

plan) occurs. The theories that the MDA now advances against the PALSA Debt effectively

mirror its already-rejected arguments about an "equity DIP" and the "over engineering" purportedly associated with the negotiation of the Debtor's DIP financing. *See* Proposed Compl. ¶¶ 204-225.

## III.    ARGUMENT

17.    The MDA should not be granted derivative standing to file the Proposed Complaint with respect to the PALSA Debt or any unspecified "other" claims. In order to obtain derivative standing, the moving party must affirmatively establish each of the following requirements: "(i) the debtor-in-possession has unjustifiably refused to pursue the claim or refused to consent to the moving party's pursuit of the claim on behalf of the debtor-in-possession; (ii) the moving party has alleged colorable claims; and (iii) the moving party has received leave to sue from the bankruptcy court." *In re Optim Energy, LLC*, 2014 Bankr. LEXIS 2155, at *17 (Bankr. D. Del. May 13, 2014) (citing *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548 (3d Cir. 2003)), *aff'd*, *Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy, LLC)*, --- B.R. ----, 2015 U.S. Dist. LEXIS 31005 (D. Del. March 13, 2015). The party seeking standing bears the affirmative burden of demonstrating that it has satisfied all of the prerequisites for derivative standing. *See Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141,145 (D. Del. 2004). Here, the MDA Standing Motion fails to satisfy any of these requirements with respect to the PALSA Debt or any generalized "other" claims, and thus the MDA Standing Motion should be denied.

**A.     The MDA's Proposed Complaint Fails to Articulate Colorable Claims Regarding the PALSA Debt**

18.    The MDA's Proposed Complaint falls well short of presenting "colorable claims" regarding the PALSA Debt. The MDA's vague and conclusory allegations do not provide any

grounds for the purported recharacterization and equitable subordination claims (and corresponding lien avoidance and lien transfer claims) that it advances.  Moreover, the MDA's allegations of an untoward scheme designed to afford the Khosla Secured Parties a "leg up over legitimate creditors," *see* Proposed Compl. ¶ 127, which have been repeated by the MDA throughout this case, are implausible on their face, inconsistent with the alleged facts set forth in the Proposed Complaint, and undermined by the terms of the Final DIP Order and the Debtor's proposed plan.  For the reasons set forth below, the MDA does not allege colorable claims.

### 1.    Applicable Legal Standard

19.    In determining whether the MDA has presented a colorable claim, the inquiry is similar to that undertaken in connection with a motion to dismiss a complaint for failure to state a claim.  *See, e.g.*, *Optim Energy*, 2015 U.S. Dist. LEXIS 31005, at *7 (citing *In re Centaur, LLC*, 2010 Bankr. LEXIS 3918 (Bankr. D. Del. Nov. 5, 2010)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

20.    In considering whether the allegations in a proposed complaint support a colorable claim, the Court may consider exhibits attached to the proposed complaint, if any (here, there are none), or incorporated therein by reference, as well as underlying documents that form the basis of the claims asserted.  *See JNA-1 Corp. v. Uni-Marts, LLC (In re Uni-Marts, LLC)*, 404 B.R. 767, 788 (Bankr. D. Del. 2009) (citations omitted).  Courts should not assume the truth of allegations contradicted by documents relating to the transactions described in such allegations.  *Sierra Invs. LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005) (noting that if the allegations set forth in a complaint "are contradicted by documents

made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint" (quoting *ESI, Inc. v. Coastal Power Prod. Co.*, 13 F. Supp. 2d 495, 497 (S.D.N.Y. 1998))).

21.    "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 537 (Bankr. D. Del. 2009) (quoting *Twombly*, 550 U.S. at 555). Furthermore, "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (citations and footnote omitted). Consequently, conclusory assertions cannot establish a colorable claim, much less when contradicted by the documents relied on to substantiate those allegations. *See Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations or legal conclusions." (internal quotation marks and citation omitted)). Here, the Proposed Complaint consists primarily of bare and conclusory allegations that are insufficient to state a claim.

### 2.    Recharacterization

22.    Count Ten of the Proposed Complaint, which seeks to recharacterize the PALSA Debt as equity, is both factually and legally deficient. The MDA ignores the express terms of the loan documents referenced in the Proposed Complaint and posits inherently implausible and internally inconsistent intent. Furthermore, the Proposed Complaint relies on conclusory allegations that are insufficient to state any claim for recharacterization and reflects a fundamental misunderstanding of the law regarding causes of action for recharacterization.

### a.    Recharacterization Standard

23.    "[T]he determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction."  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 457 (3d Cir. 2006) ("*SubMicron*").  "That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances."  *Id.* at 456.[4]  To support a claim for recharacterization, a litigant must allege specific facts supporting the inference that the parties intended the transactions to be disguised capital contributions.  *See In re Fedders*, 405 B.R. at 554 ("Simply alleging, in a conclusory fashion, that the Lenders knew the 'loans' they provided to Fedders would be in default at the time the agreements providing the loans were executed is not enough to state a claim for recharacterization.").  Based on these principles, the MDA's purported recharacterization claim is not colorable.

### b.    The Proposed Complaint Does Not Allege a Colorable Recharacterization Claim

24.    Although the MDA offers an unsupported theory of an alleged scheme to disguise the PALSA Debt as a secured loan when it was really meant to be equity, the MDA pleads no facts in support of its theory of the parties' intent.  The facts alleged in the Proposed Complaint and applicable case law squarely foreclose the MDA's hope to recharacterize the PALSA Debt.

25.    In the Third Circuit, *SubMicron* is the controlling case on recharacterization.  In *SubMicron*, the court rejected efforts to recharacterize secured claims similar to those held by the

---

[4]    *See also, e.g., In re Fedders*, 405 B.R. at 554 ("The Third Circuit has held that the overarching inquiry with respect to recharacterizing debt as equity is whether the parties to the transaction in question intended the loan to be a disguised equity contribution." (citing *SubMicron*, 432 F.3d at 455-56)); *Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (stating that the inquiry centers on the "intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction")).

KFT Trust as equity investments.  432 F.3d at 458.  Among other things, the court relied on the facts that (i) the investments were labeled as debt in the applicable transaction documents; (ii) the investments had a maturity date and interest rate; (iii) the debtor recorded the investments as secured debt on its SEC filings; and (iv) UCC-1 financing statements were filed with respect to the financings.  *Id.* at 457.  ***All*** of these important factors are present in connection with the PALSA Debt,[5] but they did not exist in the lone case cited in the MDA's recharacterization analysis, which involved attempted recharacterization of ***unsecured*** debt.  *See* MDA Standing Mot. at 7 (citing *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 572 (Bankr. D. Del. 2012)).  The MDA overlooks – and cannot overcome – the bar that has been set by the Third Circuit and applied by other courts[6] for attacking debt that, like the PALSA Debt, was drafted, treated, and perfected as secured debt under applicable state law.

26.    The MDA Standing Motion and the Proposed Complaint also overlook that the recharacterization analysis is fundamentally different when "existing lenders make loans to a distressed company," because "they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."  *SubMicron*, 432 F.3d at 457 (quoting *Cohen v. KB Mezzanine Fund II, L.P.*

---

[5]    The existence of each of these factors can be found in one or more paragraphs of the Proposed Complaint itself, the documents referenced therein, or publicly available documents.  *See* Proposed Compl. ¶¶ 209 (the applicable transaction document was a "Loan and Security Agreement" with KFT Trust serving as agent and lender thereunder), 214 (the PALSA Debt bears interest at 8% per annum) & 217 (the stated maturity date of the PALSA Debt was October 31, 2014); KiOR Inc., Quarterly Report on Form 10-Q, filed with the SEC on August 11, 2014, at pp. 20-21 (describing the PALSA Debt in the "Long-Term Debt" section of the 10-Q and stating the Debtor "granted the Lenders a security interest in all or substantially all of KiOR's tangible and intangible property"); **Exhibit A** hereto (PALSA Credit Agreement); **Exhibit B** hereto (UCC-1 filings in Delaware by the KFT Trust with respect to the PALSA Debt).

[6]    *See, e.g.*, *Devices Liquidation Trust v. Pinebridge Vantage Partners, L.P.* (*In re Personal Commc'n Devices, LLC*), --- B.R. ----, 2015 WL 1540405, at *8 (Bankr. E.D.N.Y. Apr. 3, 2015); *In re Optim Energy, LLC*, 2014 Bankr. LEXIS 2155, at *20-31; *In re Gen. Motors Corp.*, 407 B.R. 463, 498-99 (Bankr. S.D.N.Y. 2009); *Radnor Holdings Corp.*, 353 B.R. at 838-39.

*(In re SubMicron Sys. Corp.)*, 291 B.R. 314, 325 (D. Del. 2003)); *see also Official Unsecured*

*Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe,*

*LLC)*, 444 B.R. 51, 94 (Bankr. D. Del. 2010) (Sontchi, J.) (noting that, in light of *SubMicron*, a

party seeking to recharacterize loan made by existing lender to distressed borrower

"[u]ltimately . . . has an uphill climb").

27.     Here, the facts alleged in the Proposed Complaint make clear that the KFT Trust

extended the PALSA Debt as an "existing lender[] mak[ing] loans to a distressed company" in

an effort to "protect [its] existing loans."  The Proposed Complaint is rife with allegations about

the Debtor's financial distress, including in July 2014, when the Debtor and the KFT Trust

entered into the PALSA Debt.  *See, e.g.*, Proposed Compl. ¶¶ 223-224.  As the Proposed

Complaint acknowledges, the Khosla Secured Parties had already loaned at least $142.5 million

(excluding accrued interest) to the Debtor prior to July 17, 2014.  *See id.* ¶¶ 131, 138, 168 & 187.

With its financial performance falling below expectations, the Debtor had defaulted on its loan

with the MDA and entered into a forbearance agreement to stave off foreclosure by the MDA.

*See id.* ¶¶ 218 & 224.  These alleged facts indicate that the purpose of the PALSA Debt was to

preserve the value of the collateral securing the KFT Trust's existing loans and keep the Debtor

in business.  Although the KFT Trust certainly anticipated a better outcome when it originally

loaned money to the Debtor in 2012, such was the "economic reality of the surrounding

circumstances," *SubMicron*, 432 F.3d at 456, when the parties entered into the PALSA Debt.

28.     Unable to escape the fact that both the economic reality of the situation and the

terms of the documents themselves reveal that the parties intended to create a legitimate secured

loan, the MDA cherry picks a handful of factors that, in other cases involving completely

different facts, courts have found to be indicative of a disguised equity contribution.  *See* MDA

01:16968670.1

Standing Mot. ¶ 19.  None of those factors, however, supports the MDA's attempt to

recharacterize the PALSA Debt.  Each of the factors cited by the MDA is discussed below:

- ▪ ***"Certain of the Capital Infusions did not provide for any interest whatsoever."***
  This factor does not apply to the PALSA Debt, as the Proposed Complaint
  acknowledges that it bore interest at a rate of 8%.  *See* Proposed Compl. ¶ 214.

- ▪ ***(i) "The Debtor's revenues and cash flow were insufficient to make cash interest
  payments, and any such payments were made pursuant to 'Payment in Kind'
  provisions," and (ii) "The Debtor had no ability to pay interest or repay the Capital
  Infusions from its cash flow."***  The KFT Trust does not dispute that the Debtor did
  not have sufficient cash flow to make cash interest payments on the PALSA Debt.  As
  noted above, however, the PALSA Debt was extended to preserve the collateral
  securing the KFT Trust's existing loans, fund an out of court orderly sale process, and
  save the Debtor's business.  Under such circumstances, "factors . . . such
  as . . . ability to pay cash interest . . . do not apply as they would when lending to a
  financially healthy company."  *SubMicron*, 432 F.3d at 457.  *See also Optim Energy*,
  2015 U.S. Dist. LEXIS 31005, at *10 (explaining how a lender to "an inadequately
  capitalized company" may properly "have a pre-existing interest in the borrower that
  it is trying to protect").

- ▪ ***"Repayment of the Capital Infusions was wholly contingent upon the success of the
  Debtor's research and development."***  This allegation is contradicted by the facts
  alleged in the Proposed Complaint.  The PALSA Debt was secured by a first priority
  lien on substantially all of the Debtor's assets.  *See* Proposed Compl. ¶¶ 219-220.
  This Court has correctly observed that "true" lenders generally look to one or both of
  two potential sources of repayment: the borrower's earnings *or* a lien on the
  borrower's assets.  *Autobacs*, 473 B.R. at 574-75.  When, as here, a lender has a lien
  on substantially all assets, the fact that repayment of the loan is also tied to the
  success of the borrower's assets does not indicate that the loan was intended to be an
  equity contribution.  *See id.* at 575 (citing *In re Autostyle Plastics, Inc.*, 269 F.3d 726
  (6th Cir. 2001)).

- ▪ ***"The proceeds of the Capital Infusions primarily funded the development and later
  the preservation of the Debtor's biofuel technology – its main capital asset."***
  Similarly, the Proposed Complaint alleges that the proceeds of the PALSA Debt were
  "used to preserve KiOR's intellectual property that constitutes its major capital asset."
  Proposed Compl. ¶ 212.  This factor strongly militates against recharacterization of
  the PALSA Debt.  The case law holds that this factor concerns "whether the advances
  were used to ***acquire*** capital assets.  Use of advances to meet the daily operating
  needs of the corporation, rather than to ***purchase*** capital assets, is indicative of bona
  fide indebtedness."  *Autobacs*, 473 B.R. at 580 (emphasis added; citation and internal
  quotation marks omitted).  The MDA does not allege that the proceeds of the PALSA
  Debt were used to acquire capital assets.  Indeed, given that the Columbus facility had
  already been shuttered, the primary use of the proceeds was payment of the Debtor's
  70-plus employee research and development team, as well as other day-to-day

expenses of the Debtor; exactly the sort of "daily operating needs of the corporation" that indicate true indebtedness.

- ■ ***"The Khosla Entity Defendants are shareholders and insiders of the Debtor . . . ."*** This factor focuses not on mere overlap of shareholders and creditors, but on ***proportionality***. *See, e.g.*, *Broadstripe*, 444 B.R. at 98-99. Here, the KFT Trust holds 100% of the PALSA Debt. Although the Proposed Complaint does not specify what percentage of the Debtor's equity is held by the KFT Trust, public SEC filings indicate that the KFT Trust holds just 30.1% of the Debtor's common stock.[7] These sharply disproportionate ownership percentages weigh against recharacterization. *See id.* (finding that this factor indicated true indebtedness where "[creditor's] ownership of 88.57% [of second lien debt] is vastly out of proportion to its 'equity' stake of 25%").

- ■ ***(i) "The Debtor was undercapitalized when the Capital Infusions were made," (ii) "No demands for payment were made," and (iii) "No arm's length lender would have extended financing on the terms of the Capital Infusions."*** Again, these factors have little to no relevance in the context of an existing secured lender extending additional financing to preserve a distressed company. *SubMicron*, 432 F.3d at 457. Moreover, it is well-settled that undercapitalization alone is insufficient to warrant recharacterization. *See, e.g.*, *In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006) ("a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim"); *Optim Energy*, 2015 U.S. Dist. LEXIS 31005, at *10 (finding allegation of inadequate capitalization insufficient to support recharacterization claim); *Official Comm. of Unsecured Creditors v. Foss (In re Felt Mfg. Co.)*, 371 B.R. 589, 630 (Bankr. D.N.H. 2007) ("Undercapitalization alone is insufficient, without something more, to trigger recharacterization of debt as equity."). Accordingly, these two factors do not help the MDA.

- ■ ***"No sinking fund was established for any of the Capital Infusions."*** It is true that no sinking fund was established for the PALSA Debt. The absence of a sinking fund, however, does not support recharacterization because the PALSA Debt was secured by a first priority lien on substantially all of the Debtor's assets. *See, e.g.*, *Autobacs*, 473 B.R. at 581 (noting that "securing loans with liens can obviate the need for a sinking fund" (citation and internal quotation marks omitted)).

29.    As the foregoing demonstrates, nothing in the MDA's laundry list of factors even

remotely suggests that the MDA has a colorable claim for recharacterizing the PALSA Debt.[8]

---

[7]    *See* Schedule 13D filed by, *inter alia*, the KFT Trust with the SEC on November 10, 2014, at p. 8 (copy attached as **Exhibit C** hereto). The MDA seeks to mask this inconvenient fact by focusing on voting rights. Proposed Compl. ¶ 71.

[8]    The MDA neglects to mention how many of the relevant factors – such as the lack of a fixed interest rate or required interest payments, repayment prospects being linked to the Debtor's success, availability of similar

*(FOOTNOTE CONTINUED)*

The MDA's position is further weakened by several material attributes of the PALSA Debt that are acknowledged in the Proposed Complaint but not mentioned in the MDA Standing Motion. For example, the PALSA Debt (i) is secured by a first lien on substantially all the Debtor's assets, *see Autobacs*, 473 B.R. at 578 ("Another factor in the [recharacterization] test is the presence or absence of security for the advances made under the alleged debt."); (ii) has a fixed maturity date of October 31, 2014, *see id.* at 573; (iii) bears interest at a fixed rate of 8%, *see id.* at 574; and (iv) does not afford the KFT Trust any voting rights, *see id.* at 581.  *See also, e.g.*, *Radnor*, 353 B.R. at 839-40 (concluding that loans were true debt instruments on the basis of certain facts, including that (1) the relevant loans were consistently referred to as debt or indebtedness in the transaction documents; (2) the debt contained a fixed maturity date; (3) the lender had the right to enforce payment of principal and interest; (4) the debt contained no voting rights; (5) the debt was treated as priority debt instruments; and (6) the loans were secured interests given priority in a liquidation or insolvency).  When considered as a whole, the *SubMicron* factors doom the MDA's effort to recharacterize the PALSA Debt.

30.     Although a strong majority of the relevant elements tilt strongly against the claim, it is equally important that the Court look at the transaction as a whole when evaluating the MDA's proposed recharacterization claim.  After all, at its core, the recharacterization doctrine operates "not by applying any specific factor, but through a *common sense* evaluation of the facts and circumstances."  *Radnor*, 353 B.R. at 839.  This comports with the plausibility determination used for motions to dismiss, which invokes "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

---

financing from third parties, and the use of proceeds to acquire capital assets – would apply equally to the MDA's **unsecured** debt.

31.     Here, the MDA's suggestion that the PALSA Debt was intended to operate as equity defies common sense.  Given the Debtor's apparent financial distress and then-existing capital structure, including the large MDA guaranty claim, it would have been economically irrational for the Khosla Secured Parties to make additional equity investments in the Debtor in July 2014.  Indeed, the substance of the transaction was precisely the *opposite* – new funds would be advanced only on a first-priority basis, with liens and claims made contractually senior to the rest of the Debtor's secured indebtedness, with no provision that would accord the lender any equity upside through conversion rights, warrants, or the like.  The MDA's suggestion that the PALSA Debt was intended to be or operated as equity capital is effectively the same as its prior arguments that the Khosla Secured Parties should have provided an "equity DIP" to help the Debtor fund its chapter 11 case.  The Court, drawing on its judicial experience and common sense, concluded that making equity contributions in such a situation would be irrational, illogical, and effectively result in "throwing good money after bad."  *See* Jan. 16, 2015 Hr'g Tr. at 118:3 – 120:20.  Exactly the same analysis applies to the PALSA Debt; the KFT Trust intended to put in senior secured debt financing because in July 2014 when, as the MDA notes, "KiOR had no operating revenue," Proposed Compl. ¶ 215, and had "$268.2 million of debt and its equity was then a severely negative $203 million," *id.* ¶ 223, senior secured debt was the only funding mechanism which would make any sense.  The Court can easily draw on its common sense and experience to conclude that the PALSA Debt was not *intended* to be equity because that would not have been a coherent financing decision.  As with an "equity DIP," it is readily apparent that "[y]ou wouldn't do that."  Jan. 16, 2015 Hr'g Tr. at 119:22.  As application of the various *SubMicron* elements confirms, the KFT Trust not only logically *would not* provide the Debtor with equity financing in July 2014, but in fact *did not* do so.

32.     In short, the MDA's assertions are supported by nothing more than unsubstantiated rhetoric, are contradicted by the very allegations of its Proposed Complaint, are inconsistent with the operative documentation, and defy common sense.  Indeed, the MDA's thesis boils down to the notion that the only way an "insider" creditor may provide funding to a financially distressed entity is as equity capital.  Judge Shannon's opinion in *Optim Energy*, which was recently affirmed by District Judge Stark, reveals the fallacies in this thesis and strongly supports the conclusion that nothing in the MDA Standing Motion or the Proposed Complaint provides any basis, let alone a "colorable" one, for a claim to recharacterize the PALSA Debt as equity.  *See* 2015 U.S. Dist. LEXIS 31005, at *9-12; 2014 Bankr. LEXIS 2155, at *20-31.

### 3.     Equitable Subordination

33.     As an alternative to its recharacterization claim, the MDA asserts that the PALSA Debt should be subordinated to the claims of non-insider unsecured creditors.  MDA Standing Mot. ¶ 20; Proposed Compl. ¶¶ 268-273.  As with its recharacterization claim, however, the MDA pleads no facts that would support such an "extraordinary remedy."  *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 359 (5th Cir. 2008).  Rather, the MDA relies on unfounded theories and rhetorical flourishes.

#### a.     Equitable Subordination Standard

34.     The MDA's proposed claim for equitable subordination of the PALSA Debt seeks a "drastic and unusual remedy."  *Radnor*, 353 B.R. at 840 (citation omitted); *see also Waslow v. MNC Commercial Corp.( In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 117 (E.D. Pa. 1993) (stating that equitable subordination is an "extraordinary departure from the usual principles of equality of distribution and preference for secured creditors" (citation and internal quotation marks omitted)).  Equitable subordination of a claim is appropriate only in limited circumstances

when (i) the claimant engaged in some type of inequitable conduct, which (ii) resulted in an injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant, and (iii) equitable subordination of the claim is not inconsistent with the Bankruptcy Code.  *Schubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (quoting *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977)). Moreover, the "doctrine of equitable subordination is remedial, not penal, and in the absence of actual harm, equitable subordination is inappropriate."  *In re SI Restructuring*, 532 F.3d at 361; *see also SubMicron*, 432 F.3d at 462.

> **b.    The Proposed Complaint Does Not Allege a Colorable Equitable Subordination Claim**

35.    Although the MDA emphatically asserts that the KFT Trust and the other Khosla Secured Parties engaged in a nefarious scheme designed to allow the Khosla Secured Parties to abscond with the Debtor's assets, the MDA has failed to plead any facts that support a finding of inequitable conduct.  Similarly, the MDA has not alleged any facts that demonstrate any harm; in essence, the MDA simply complains about the fact that the KFT Trust has a secured claim and the MDA does not.

36.    "Inequitable conduct is conduct which may be lawful, yet shocks one's good conscience."  *In re Beverages Int'l Ltd.*, 50 B.R. 273, 281-82 (D. Mass. 1985) (internal quotation marks and citation omitted).  The most common examples of inequitable conduct are fraud, illegality, breach of fiduciary duty, improper self-dealing, and intentional non-disclosure.  *See, e.g.*, *Radnor*, 353 B.R. at 841.  The MDA has not alleged that the KFT Trust engaged in any of the aforementioned types of misconduct with respect to the PALSA Debt.

37.    Indeed, it is exceedingly difficult to discern what, if any, misconduct the MDA alleges.  Notably, there is no allegation that the KFT Trust or entities affiliated with it received

any payments on account of their debt claims, or took any other action that advantaged

themselves over the interests of creditors.  At bottom, it appears that the basis for the MDA's

equitable subordination claim is that the KFT Trust loaned money to the Debtor on a secured

basis at a time when the Debtor was undercapitalized.  *See, e.g.*, Proposed Compl. ¶¶ 223 & 224

(alleging that all of the Khosla Secured Party loans to the Debtor were made at times when the

Debtor "was undercapitalized" and "no independent lender would have provided debt

financing").  Although undercapitalization can be a relevant factor, "[u]ndercapitalization alone,

however, is an insufficient given to subordinate the claim of an insider; some inequitable conduct

must be shown."  *In re Beverages*, 50 B.R. at 282.[9]

      38.     The only paragraph in the Proposed Complaint that appears to hint at alleged

inequitable conduct with respect to the PALSA Debt is the allegation that "[t]he purpose of the

protective advances appears to have been to protect the Defendants' controlling interests in

KiOR and its assets, fund the Guggenheim process, and provide a bridge to bankruptcy."

Proposed Compl. ¶ 210.  Even assuming *arguendo* that this allegation is true, it does not support

a claim for equitable subordination.  Numerous courts have recognized that there is nothing

inherently inequitable about a shareholder or other insider of a distressed entity providing

secured debt financing to keep a business alive – precisely the conduct in which the KFT Trust

engaged when it extended the PALSA Debt.  As explained by the Seventh Circuit Court of

Appeals:

> The trustee objects to the $862,841.30 that the debtor's insiders supplied to the
> debtor under the Loan Agreement, or more precisely to the $300,000 secured

---

[9]   *See also, e.g., Wood v. Richmond (In re Branding Iron Steak House)*, 536 F.2d 299, 302 (9th Cir. 1976)
(explaining that "subordination requires some showing of suspicious, inequitable conduct beyond mere initial
undercapitalization of the enterprise"); *Blasbalg v. Tarro (In re Hyperion Enters.)*, 158 B.R. 555, 563 (D.R.I.
1993) ("A finding of inequitable conduct requires more than a showing of undercapitalization. There must be
evidence of other inequitable conduct.").

claim the insiders still had against the company when the bankruptcy petition was filed. But we do not see the injury or inequity in this infusion of working capital. This case is not an example of the insiders' converting a pre-existing equity claim into debt. ***The insiders here contributed fresh working capital. They were under no obligation to do so.*** Assuming there was no deception, we see no reason to treat an insider's loan to a company more poorly than that of a third party's. To hold otherwise would discourage those most interested in a corporation from attempting to salvage it through an infusion of capital.

*In re Lifschultz Fast Freight*, 132 F.3d 339, 347 (7th Cir. 1997) (citation and internal quotation marks omitted; emphasis added).[10] Indeed, as in *Optim Energy*, the MDA "merely describes the mechanics of secured versus unsecured lending," but in the process ignores how "[i]t is not inequitable for a lender, even an insider lender, to obtain a lien on the borrower's assets in order to secure its position above other creditors in the event of the borrower's default." *See* 2015 U.S. Dist. LEXIS 31005, at *17-18.

39.    The Proposed Complaint appears to suggest that the Khosla Secured Parties somehow used their "superior access to critical business and financial information concerning KiOR and efforts to develop its technology" to their own advantage, Proposed Compl. ¶ 10, but there are no specific allegations in support of this outrageous claim, and no explanation of what information the Khosla Secured Parties allegedly possessed nor how they possibly could have exploited such information for their own advantage, particularly with respect to the PALSA Debt. This lack of factual specificity dooms the MDA's equitable subordination claim. A plaintiff must provide the grounds for its entitlement to relief beyond mere "labels and

---

[10]    *See also, e.g.*, *Sinclair v. Barr (In re Mid-Town Produce Terminal, Inc.)*, 599 F.2d 389, 392 (10th Cir. 1979) ("We are unwilling to find a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor. To hold the debt may be subordinated on that basis alone would discourage owners from trying to salvage a business, and require all contributions to be made in the form of equity capital. We do not think that is desirable as social policy, nor required by the cases."); *Mobile Steel*, 563 F.2d at 701 (expressing the "desire not to discourage those most interested in a corporation from attempting to salvage it through an infusion of capital"); *Braas Sys., Inc. v. WMR Partners (In re Octagon Roofing)*, 157 B.R. 852, 858 (N.D. Ill. 1993) ("Any other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company.").

conclusions," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555), and "Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief," *Fedders*, 405 B.R. at 537 (citation and internal quotation marks omitted).

40.    It also bears noting that the MDA's recharacterization and equitable subordination claims are internally inconsistent.  The gist of the recharacterization claims is that the Debtor was and remains a failing, worthless enterprise to which no legitimate lender would ever loan funds. Yet the equitable subordination claim imagines a scheme in which the Khosla Secured Parties conspired to "protect the Defendants' controlling interests in KiOR and its assets."  *See* Proposed Compl. ¶ 210.  As the MDA tells it, the Khosla Secured Parties are somehow simultaneously throwing their money away by financing a worthless enterprise ***and*** scheming to enhance the value of their interest in said enterprise at the expense of unsecured creditors.  This absurd contradiction demonstrates that the Proposed Complaint is based on a story that the MDA would like to tell rather than actual or even plausible facts.

41.    Furthermore, "[t]he fatal blow to [the MDA's] Complaint, however, lies in its failure to allege facts that [unsecured creditors] w[ere] at all injured by [the Khosla Secured Parties'] conduct relating to [the Debtor]."  *Lyme Regis Partners, LLC v. Icahn (In re Blockbuster, Inc.)*, 2011 Bankr. LEXIS 1025, at *11 (Bankr. S.D.N.Y. Mar. 17, 2011).  As in *Blockbuster*, the MDA here appears to argue that it has been harmed by the fact that its unsecured claim is junior to the KFT Trust's secured PALSA Debt claim.  Although the MDA fails to allege any specific harm caused by the KFT Trust's extension of the PALSA Debt, the MDA implies that that the KFT Trust improperly denominated the PALSA Debt as debt when it really is equity, thereby reducing recoveries for unsecured creditors.  This claimed harm, however, presupposes that all of the Debtor's secured debt is actually equity; if this is not the

case, then unsecured creditors are deeply out of the money and were not harmed by the Debtor's incurrence of the PALSA Debt.  More importantly, the MDA concedes that the proceeds of the PALSA Debt were used to preserve the intellectual property that is the lifeblood of the Debtor's business.  Proposed Compl. ¶ 212.  When the proceeds of a loan are used to "keep the company in operation," unsecured creditors suffer no harm.  *In re SI Restructuring*, 532 F.3d at 362; *see also Spacek v. Thomen (In re Universal Farming Indus.)*, 873 F.2d 1334, 1337 (9th Cir. 1989) (rejecting claims for equitable subordination and concluding that the risk of not being paid "follows inevitably from [the creditor's] status of junior creditor," not the misconduct, if any, of the senior lienholder).

42.     As a practical matter, the economic realities of this bankruptcy case render the MDA's attempt to equitably recharacterize or subordinate the PALSA Debt a purely academic exercise.  The PALSA Debt will be converted into equity in the reorganized Debtor under the Debtor's proposed plan.  *See* Docket No. 395 at § III.B.1(b).  Thus, even absent recharacterization or subordination of the PALSA Debt, the plan's treatment of the PALSA Debt will in no event dilute the recoveries of the MDA or other unsecured creditors.  Accordingly, litigating issues regarding equitable recharacterization or subordination of the PALSA Debt would result in no benefit to the estate, the MDA, or other unsecured creditors.  Instead, such litigation would only increase costs while burdening the parties and this Court.

43.     Finally, the record in this case, including the Court's good faith findings regarding the DIP facility and the use of cash collateral in the DIP financing orders, demonstrates that the Debtor, acting through its independent directors and third-party advisors, agreed to the proposed DIP orders, bid procedures, plan support agreement, and plan only after multiple rounds of good faith, arms' length negotiations.  *See, e.g.*, Jan. 16, 2015 Hr'g Tr. at 121:3-11; Final DIP Order

¶¶ H (at pp. 15-16), I(iii) (at pp. 16-17) & 16 (at pp. 53-54).  Thus, the Proposed Complaint's overarching theory of an engineered bankruptcy scheme designed to afford inappropriate protections to the Khosla Secured Parties, *see* Proposed Compl. ¶ 210, has already been rejected by the Court.  Once again, the Court can draw on its prior rulings and judicial experience to determine that the Proposed Complaint's central narrative is implausible and insufficient to state a colorable subordination claim.

44.    As the MDA has failed to sufficiently plead either that the KFT Trust engaged in inequitable conduct or that such conduct caused injury to the Debtor or its creditors, the MDA's claim for equitable subordination of the PALSA Debt is not colorable.  In addition, given the terms of the Debtor's proposed plan, there would be no economic or other benefit to the Debtor's estate, the MDA, or any other party from a successful pursuit of this putative claim.  Therefore, as in the *Optim Energy* case, the Court should deny the request for standing to pursue this non-colorable and entirely academic claim.  *See* 2015 U.S. Dist. LEXIS 31005, at *12-19; 2014 Bankr. LEXIS 2155, at *31-35.

### 4.    Lien Avoidance and Lien Preservation

45.    The MDA's claims for lien avoidance and lien preservation are wholly predicated on the claims for recharacterization and equitable subordination.  *See, e.g.*, Proposed Compl. ¶¶ 267 & 275.  Because the latter two claims are not colorable, neither are the MDA's corresponding knock-on claims to avoid or transfer the liens held by the KFT Trust to secure the PALSA Debt.  *See, e.g.*, *Optim Energy*, 2014 Bankr. LEXIS 2155, at *16-17 n.8 (noting that claim for "lien avoidance" failed when other asserted claims were not established to be colorable).

**B.      The MDA Should Not Be Granted Standing Regarding Any "Other" Claims**

46.      The MDA Standing Motion generally seeks authority for the MDA to prosecute "other potentially viable Estate Claims," but fails to identify any of those claims, apparently due to "the impending deadline for such actions to be commenced."  *See, e.g.*, MDA Standing Mot. ¶ 3.  The Court should deny this request for two separate reasons, particularly in light of the substantial discovery and two-month period that the MDA has enjoyed since it filed the initial MDA Standing Motion, during which it has already prepared a substantially revised Proposed Complaint.

47.      *First*, the MDA simply cannot meet its affirmative burden of proving the three elements required for derivative standing under the *Cybergenics* without identifying specific claims it seeks to pursue.  Without limitation, it is impossible for the Court to find that the MDA has alleged any "colorable claims" if the claims themselves go unidentified.  *See, e.g.*, Jan. 16, 2015 Hr'g Tr. at 129:8-14 (the Court explaining to MDA's counsel that "if you haven't articulated claims you're not going to get authority to pursue them").  Accordingly, there is no, and logically can never be any, predicate foundation from which the Court could grant the vague relief requested by the MDA.

48.      *Second*, the MDA's stated basis for why it should obtain generalized standing was mooted by the form of the Final DIP Order entered by the Court.  The MDA and the Debtor submitted competing forms of the Final DIP Order, and one of the provisions that the MDA included effectively "resets" the challenge rights regarding any potential releases under the Final DIP Order such that a true estate fiduciary (which the MDA decidedly is not) would be able to revisit any claims or causes of action that otherwise would be subject to release under the Final DIP Order.  More specifically, that form of order provides, in language added by the MDA's counsel, that:

01:16968670.1

> If a chapter 7 trustee or a chapter 11 trustee or post plan confirmation trustee or other estate fiduciary is appointed, then the Challenge Period with respect to such trustee or post plan confirmation trustee or other estate fiduciary only, shall be the date that is sixty (60) calendar days after the date on which such trustee or post plan confirmation trustee or other estate fiduciary is appointed.

Final DIP Order ¶ 6 (at p. 39).  This provision is included in the Final DIP Order as entered by the Court.  As such, there is no exigency or other basis for the MDA to be granted generalized standing, even if such relief were theoretically appropriate under *Cybergenics* (which it is not).

[remainder of page intentionally left blank]

# IV.    CONCLUSION

49.    For all the reasons set forth above, the Khosla Secured Parties respectfully urge

this Court to (i) deny the MDA Standing Motion with respect to the PALSA Debt and any

unspecified "other" claims and (ii) grant such other and further relief as is just and proper.

Dated: April 14, 2015
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael R. Nestor*
Michael R. Nestor (No. 3526)
Margaret Whiteman Greecher (No. 4652)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253

    -and-

KLEE, TUCHIN, BOGDANOFF & STERN LLP
David M. Stern (admitted *pro hac vice*)
Thomas E. Patterson (admitted *pro hac vice*)
Whitman L. Holt (admitted *pro hac vice*)
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067
Telephone:    (310) 407-4000
Facsimile:    (310) 407-9090

*Counsel for Creditors the KFT Trust, Vinod Khosla, Trustee, and VNK Management, LLC*

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Peter J. Keane*
Dean A. Ziehl (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
John W. Lucas (admitted *pro hac vice*)
Peter J. Keane (No. 5503)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400

*Counsel for Creditor Khosla Ventures III, LP*