IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| KiOR, Inc., | Case No. 14-12514 (CSS) |
| Debtor. | **Hearing Date: April 29, 2015 at 10:00 a.m. (ET)**<br>**Extended Response Deadline: April 14, 2015**<br>**at 4:00 p.m. (ET)**<br>**Related Docket Nos. 223, 432, 466** |

# OPPOSITION OF PREPETITION THIRD LIEN AGENT
## TO MOTION OF MISSISSIPPI DEVELOPMENT
## AUTHORITY FOR ORDER GRANTING LEAVE, STANDING
## AND AUTHORITY TO COMMENCE AND PROSECUTE
## <u>DERIVATIVE CLAIMS ON BEHALF OF THE DEBTOR'S ESTATE</u>

**ASHBY & GEDDES, P.A.**
Amanda Winfree Herrmann (I.D. #4615)
Karen B. Skomorucha Owens (I.D. #4759)
Stacy L. Newman (I.D. #5044)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
Tel:  (302) 654-1888
Fax:  (302) 654-2067

-and-

**STRADLING YOCCA CARLSON & RAUTH, P.C.**
Fred Neufeld, Esq. (admitted *pro hac* vice)
100 Wilshire Blvd., 4th Floor
Santa Monica, CA 90401
Tel: (424) 214-7000
Fax: (424) 214-7010

*Attorneys for Alberta Investment Management*
*Corp., 1538731 Alberta Ltd., and 1538716 Alberta*
*Ltd.*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................1

II.     MDA DOES NOT HAVE A COLORABLE RECHARACTERIZATION CLAIM
        AGAINST THE ALBERTA LENDERS...........................................................................4

        A.      The Terms of the Loan Agreement Establish What the Parties Intended...............5

        B.      In Light of What the Loan Agreement Provides, the MDA's Proposed
                Recharacterization Claim Against the Alberta Lenders is Not Plausible .............14

        C.      The MDA's Proposed Recharacterization Claim Against the Alberta Lenders is
                Outside of the Four Corners of Established Legal Precedents .............................17

                1.      The Names Given to the Instruments Evidence Debt, not Equity .............17

                2.      The Presence of a Maturity Date and a
                        Schedule of Payments Evidence Debt, not Equity....................................18

                3.      The Presence of a Fixed Rate of Interest and
                        Actual Interest Payments Evidence Debt, not Equity...............................18

                4.      The Source of Repayments Evidences Debt, not Equity ...........................19

                5.      The Adequacy of the Capitalization at the Time of the
                        Making of the Term Loan Evidences Debt, not Equity ...........................20

                6.      A Single Board Seat Through June 2012 and 7% of
                        the Equity is not Evidence of a Disguised Equity Investment..................21

                7.      The Security for the Term Loan Evidences Debt, not Equity....................23

                8.      The Alberta Lenders are "Outside Lenders"..............................................24

                9.      That the Term Loan Was Not Subordinated to the
                        Claims of Outside Creditors at the Time that
                        the Term Loan Was Made, Evidences Debt, not Equity............................25

                10.     That the Term Loans Were Made to Fund the Debtor's
                        Operations, is Evidence of Debt, not an Equity Investment.....................26

                11.     The Term Loans Were Fully Secured; No Sinking Fund was Required ...27

                12.     Other Recharacterization Considerations Evidence Debt, not Equity .......27

III.    MDA DOES NOT HAVE A COLORABLE CLAIM FOR
EQUITABLE SUBORDINATION AGAINST THE ALBERTA LENDERS .................28

    A.    MDA's Proposed Complaint States No Facts Plausibly Evidencing Inequitable
Conduct or Unfair Advantage on the Part of the Alberta Lenders ........................29

IV.    THERE IS NO BENEFIT TO THE ESTATE IN THE PROPOSED COMPLAINT;
THE COST OF LITIGATION WILL EXCEED THE VALUE OF THE ESTATE.........30

V.    CONCLUSION...................................................................................................................31

1538731 Alberta Ltd., agent for the lenders under the Loan and Security Agreement dated as of January 26, 2012 (the "Loan Agreement") entered into between the lenders thereunder and KiOR, Inc. (the "Debtor") and its non-debtor subsidiary KiOR Columbus LLC as borrowers, by and through its undersigned counsel, hereby submits this opposition to Mississippi Development Authority's ("MDA") *Motion . . . for Order Granting Leave, Standing and Authority to Commence and Prosecute Derivative Claims on Behalf of the Debtor's Estate* [Docket No. 223, as amended by Docket No. 432, the "Motion"] and requests that the Court deny the Motion to the extent it seeks derivative standing to pursue recharacterization, equitable subordination and other unspecified claims against the Alberta Lenders (defined below). 153871 Alberta Ltd. is referred to in the Court's final order approving DIP financing in this case [Docket No. 275, the "DIP Financing Order"] as the Prepetition Third Lien Agent, and in support of its Opposition, respectfully states as follows:

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

1.      The lenders under the Loan Agreement are 1538731 Alberta Ltd. and 1538716 Alberta Ltd. (together, the "Alberta Lenders"), and the KFT Trust (Vinod Khosla, trustee).   The Alberta Lenders are investment funds managed by Alberta Investment Management Corp. ("AIMCo").  AIMCo is a Crown corporation of Alberta, Canada, and was created in 2007 by an enactment of the Alberta legislature.  AIMCo manages approximately $75 billion of public employee pension funds and monies of various Alberta governmental entities, and the Alberta Lenders' loans to the Debtor in January 2012 were made on behalf of those public employee pension funds and Alberta governmental entities.

2.      In April 2010, the Alberta Lenders purchased $30 million of Series B preferred stock of the Debtor.  In April 2011, the Alberta Lenders purchased $20 million of Series C

preferred stock of the Debtor.  In June 2011, upon the closing of the Debtor's initial public

offering, the preferred stock held by the Alberta Lenders was converted to 7,786,616 shares of

Class A common stock.  At the present time, those 7,786,616 shares of common stock represent

a 7% equity interest in the Debtor, but with the ability to vote only 1.45% of the common stock

of the Debtor.[1]  The Alberta Lenders have not acquired any common or preferred stock of the

Debtor since June 2011.[2]

       3.      In January 2012, pursuant to the Loan Agreement, the Alberta Lenders loaned the

Debtor $50 million, and the KFT Trust loaned the Debtor $25 million, in both cases secured by

substantially all of the Debtor's assets and certain personal property and fixtures owned by the

Debtor's subsidiary KiOR Columbus LLC.  At the time the loans were made, the Debtor had no

other material secured debt and, as acknowledged in the MDA's proposed complaint (the

"Proposed Complaint"), the Debtor separately held more than $130 million in cash – the loans

were oversecured, and the Debtor was not undercapitalized.  The loans under the Loan

Agreement remained first priority secured loans for 20 months, until the Khosla affiliates began

making the loans that are described in the DIP Financing Order as the Prepetition First and

Second Lien Debt.  As demonstrated below, all of the terms of the Loan Agreement and UCC-1

filings evidence straightforward secured loans, and no facts have been plead by MDA regarding

the circumstances of the loans or any act by the Alberta Lenders to the contrary.

---

[1]  The Alberta Lenders also own 6.2% of the equity interests in Khosla Ventures III, LP ("KV III").  KV III owns 23.5% of the stock of the Debtor, with the ability to vote 3.13% of the Debtor's shares.  As a result, the Alberta Lenders indirectly own, through KV III, an additional equity interest of 1.4% in the Debtor, and additional voting shares in the Debtor of approximately one-fifth of one percent.

[2]  Documentation of the Alberta Lender's acquisition of the preferred stock of the Debtor and the conversion of that preferred stock to common stock can be found in the registration statement that went effective with the Securities and Exchange Commission ("SEC"), which was filed on June 22, 2011, and can be found at:
http://www.sec.gov/Archives/edgar/data/1418862/000095012311060902/h80686a7sv1za.htm.

4.     The Alberta Lenders did not make a loan to the Debtor with the intent that the loan would be a disguised equity contribution, and the MDA has not and cannot plead any fact, express or implied, to support an attack by the estate on the validity of the Alberta Lenders' debt. The Alberta Lenders know how to purchase equity of the Debtor, as they did in 2010 and 2011, and the acquisition of the earlier equity was as clearly documented as the subsequent loan.  In both cases – the earlier equity and the later loan – the documentation fits well within the four corners of standard market practices, with no unusual provisions that could now support a recharacterization complaint.

5.     In its initial Proposed Complaint attached to the Motion (filed on January 14, 2015, Docket No. 223), MDA did not allege equitable subordination claims against the Alberta Lenders.  In the Amended Motion and revised Proposed Complaint (filed on March 23, 2015, Docket No. 432), MDA created an all-inclusive "Defendants" defined term, and now asserts against the Alberta Lenders all of the same equitable subordination claims they previously asserted only against the Khosla Entities.  Yet no new facts have been alleged against the Alberta Lenders in the new version of the Proposed Complaint.  MDA does not allege a single act of inequitable conduct on the part of the Alberta Lenders; and MDA does not allege that the $50 million loaned by the Alberta Lenders to the Debtor, <u>at approximately the same time as the $75 million loan made by MDA to the Debtor's subsidiary, KiOR Columbus, LLC</u>, conferred an unfair advantage on the Alberta Lenders.  The claim for equitable subordination is not plausible.[3]

---

[3]  The Alberta Lenders also request that the Court deny the MDA Motion with respect to any generalized "other potentially viable" claims that are not specifically described in the MDA Motion or pled in the Proposed Complaint.  Such unidentified claims cannot, by their very nature, satisfy the standard for derivative standing.

## II. MDA DOES NOT HAVE A COLORABLE RECHARACTERIZATION CLAIM AGAINST THE ALBERTA LENDERS

6.      A bankruptcy court has the power to authorize an individual creditor to sue derivatively to pursue claims on behalf of a bankruptcy estate. *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004).  A creditor seeking derivative standing bears the burden of demonstrating that (1) the debtor has a colorable claim, (2) the debtor unjustifiably refused to pursue the claim, and (3) the bankruptcy court has authorized derivative standing to pursue the claim.  *Id.* The purpose of these prerequisites is to "ensure that the Chapter 11 debtor's gate-keeping role is not arbitrarily usurped . . . ." *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 543 (W.D. Pa. 2005).

7.      In deciding whether there is a colorable claim, a bankruptcy court undertakes the "same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." *In re Optim Energy, LLC*, No. 14-10262 (BLS), 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014), *aff'd*, 2015 WL 1190152 (D. Del. Mar. 13, 2015) (quoting *In re Centaur, LLC*, No. 10-10799 (KJC), 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010)).  To survive a motion to dismiss, the complaint must contain sufficient factual matter that is plausible on its face and that does not just rely on conclusory statements.  *Official Comm. of Unsecured Creditors of Fedders North Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders North Am., Inc.)*, 405 B.R. 527, 537 (Bankr. D. Del. 2009); *Optim*, 2014 WL 1924908, at *5.

8.      The question posed by the MDA Motion, as it applies to the Alberta Lenders, asks this Court to determine whether "the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence they are equity)."

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455-56 (3d Cir.

2006)).  The determinative inquiry is the intent of the parties <u>at the time of the transaction</u>.  *Id.* at

457.  As demonstrated below, the Alberta Lenders expected to be repaid with interest under the

Loan Agreement at maturity, whether or not the Debtor's business plan succeeded.  The Alberta

Lenders had already made an equity investment and could readily have made another, but they

did not.

9.        MDA's Proposed Complaint consists primarily of bare and conclusory allegations

that are nothing more than recitations of the factors courts look at when deciding whether

recharacterization of debt to equity is called for.  Because the MDA is unable to meet its burden

of stating a plausible claim that the Debtor and Alberta Lenders intended to disguise an equity

investment with the trappings of a loan, the MDA Motion for derivative standing to pursue a

recharacterization claim against the Alberta Lenders should be denied.

        A.        <u>**The Terms of the Loan Agreement Establish What the Parties Intended**</u>.

10.        "In reviewing the sufficiency of the Complaint to state a claim, the Court may

review the loan documents, because they are referred to in the Complaint."  *Official Comm. Of*

*Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs, Inc.)*, 299 B.R. 732, 740

(Bank. D. Del. 2003) (citing *Pension Benefit Guar., Corp. v. White Consol., Indus., Inc.*, 998

F.2d 1192, 1196 (3d Cir. 1993)).  Bankruptcy courts should not assume the truth of allegations in

a complaint if they are contradicted by documents described in such allegations.  *Sierra Invs.*

*LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005) (if the allegations

set forth in a complaint "are contradicted by documents made a part thereof, the document

controls and the Court need not accept as true the allegations of the complaint" (quoting *ESI, Inc.*

*v. Coastal Power Prod. Co.*, 13 F. Supp. 2d 495, 497 (S.D.N.Y. 1998))).  True and correct copies

of the Loan Agreement, three amendments thereto and the Second Amended and Restated

Subordination Agreement ("Subordination Agreement") are attached hereto as Exhibits A, B and

C, respectively.[4]

11.     In determining whether a complaint adequately states a claim for

recharacterization, courts in this District often use as benchmarks the *AutoStyle* factors,[5] which

look at: (1) the names given to the instruments evidencing the indebtedness; (2) the presence or

absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed

rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or

inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from

outside lending institutions; (9) the extent to which the advances were subordinated to the claims

of outside creditors; (10) the extent to which the advances were used to acquire capital assets;

and (11) the presence or absence of a sinking fund to provide repayment.  *See, e.g.*, *Friedman's*

*Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512,

---

[4]  The Loan Agreement is Exhibit 10 to a Current Report on Form 8-K filed with the SEC on January 27, 2012, and can be found at
http://www.sec.gov/Archives/edgar/data/1418862/000119312512026061/d290496dex101.htm.
Amendment No. 1 to the Loan Agreement  was entered into on March 17, 2013 and was filed with the SEC as Exhibit 99.1 to a Current Report on Form 8-K on March 18, 2013, and can be found at:
http://www.sec.gov/Archives/edgar/data/1418862/000119312513111083/d503489dex991.htm.
Amendment No. 2 to the Loan Agreement was entered into on October 21, 2013 and was filed with the SEC as Exhibit 99.1 to a Current Report on Form 8-K on October 21, 2013, and can be found at:
http://www.sec.gov/Archives/edgar/data/1418862/000119312513405324/d615051dex991.htm.
Amendment No. 3 to the Loan Agreement was entered into on March 31, 2014, and  was filed with the SEC as Exhibit 99.3 to a Current Report on Form 8-K filed on April 1, 2014, and can be found at:
http://www.sec.gov/Archives/edgar/data/1418862/000119312514124951/d705165dex993.htm.
The Second Amended and Restated Subordination Agreement, entered into on July 17, 2014, was filed as Exhibit 99.3 to a Current Report on Form 8-K filed with the SEC on July 17, 2014, and is set forth at the following link:
http://www.sec.gov/Archives/edgar/data/1418862/000119312514271594/d758603dex993.htm.

[5]  *See Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001).

519 (Bankr. D. Del. 2011); *Exide,* 299 B.R. at 741-74. Almost all of the questions asked in the *AutoStyle* factors are answered by review of the Loan Agreement.

12. **The names given to the instruments, if any, evidencing the indebtedness.** The documents evidencing the funds advanced by the lenders to the Debtor under the Loan Agreement establish that the intent of the parties was to make a secured loan and not an equity investment. The governing document was entitled a "Loan and Security Agreement." The lenders were identified therein as "Lenders" and the Debtor and its subsidiary KiOR Columbus LLC were identified as "Borrowers." The Loan Agreement and ancillary documents and agreements were collectively referred to as the "Loan Documents." Among these, the specific instrument evidencing the indebtedness, attached as Exhibit B to the Loan Agreement, is a "Secured Term Promissory Note" ("Term Note") to be issued to each "Lender" by the Debtor as "Borrower." The due execution and delivery of the Term Note by the Debtor to the Lenders was a specific condition precedent to the Lenders' obligation to make the Term Loan Advance (Loan Agreement § 4.1(i)).

13. **The presence or absence of a fixed maturity date and schedule of payments.** In both the Loan Agreement and the Term Note issued to the Lenders thereunder, the loans advanced to the Debtor were given a fixed maturity date of February 1, 2016. In Section 1 of the Loan Agreement, "Term Loan Maturity Date" is defined as February 1, 2016, and Section 2.1(d)(i) of the Loan Agreement specifies that "The entire Term Loan Advance principal balance and all accrued but unpaid interest hereunder (including PIK Interest), shall be due and payable on the Term Loan Maturity Date." Section 11.3 of the Loan Agreement required that the prior written consent of all Lenders affected thereby be required to extend the Term Loan Maturity Date.

14.     The Loan Agreement also contained a fixed amortization schedule of payments of

principal over 30 months.  Section 2.1(d)(i) of the Loan Agreement provides as follows:

> Beginning on the Principal Commencement Date[6] and continuing on the first day of each
> month thereafter, Borrowers shall repay the principal balance of the Term Loan Advance
> in 30 monthly installments equal to $1/30^{th}$ of the aggregate Term Loan Advance principal
> balance (including any PIK Interest) that is outstanding on the Principal Commencement
> Date.  Each principal payment shall be accompanied by the payment in cash of accrued
> interest thereon calculated at the Term Loan Interest Rate.

In addition to principal payments, the Loan Agreement contained a fixed schedule of interest

payments.  Section 2.1(d)(i) of the Loan Agreement provides, in part, "Borrowers will pay

interest on the Term Loan Advance on the first day of each calendar month, beginning on the

first day of the month immediately following one full month after the Closing Date…".

15.     Section 2.1(d)(i) of the Loan Agreement also contains a proviso allowing the

Debtor, under certain circumstances, to elect to pay interest as "PIK Interest," that is interest

"paid in kind by adding such interest then due to the unpaid principal amount of the Term Loan

Advance." (Loan Agreement § 1).  The Debtor exercised the option to accrue interest as PIK.

Nevertheless, Section 2.1(d)(i) clearly states that payment of PIK Interest was required as part of

the scheduled payments of principal and, ultimately, at the Term Loan Maturity Date. As

evidenced by the express terms of the Loan Agreement, the accrual of PIK Interest was not

intended to be a permanent deferral of the Debtor's repayment obligations under the Term Loan,

as there was a very clear schedule of repayment for PIK Interest, just as there was for principal.

Moreover, as described below, PIK Interest itself accrued interest charges under the Term Loan,

making it no different from the obligations for loan principal.

---

[6] Principal Commencement Date means "the first calendar day of the month occurring immediately after
eighteen full calendar months after the Closing Date." (Loan Agreement § 1.1).

16.     Section 2.1 also clearly states that the repayment obligations of principal, interest and PIK were absolute and unconditional: "Borrowers shall make all payments under this Agreement without setoff, recoupment or deduction and regardless of any counterclaim or defense." (Loan Agreement § 2.1(d)(i)).  Section 8.1 of the Loan Agreement makes this point even more starkly, evidencing an indisputable expectation on the part of the Lenders that the Debtor and each Debtor subsidiary that was or became a party to the Loan Agreement would be jointly and severally liable for the repayment obligations under the Term Loans:

> Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Agent and each Lender the prompt payment and performance of, all Secured Obligations and all agreements under the Loan Documents. Each Borrower agrees that its guaranty obligations hereunder with respect to the obligations of the other Borrowers hereunder constitute a continuing guaranty of payment and not of collection, that such obligations shall not be discharged until the full and final cash payment of all Secured Obligations, and that such obligations are absolute and unconditional…

Loan Agreement § 8.1.  As evidenced on the execution pages of the Loan Agreement, the Debtor's subsidiary KiOR Columbus LLC executed the Loan Agreement as a Borrower.

17.     __The presence or absence of a fixed rate of interest and interest payments__. The Loan Agreement defines the "Term Loan Interest Rate" for the Lenders' term loans to the Debtor  under the Loan Agreement at a fixed rate as "for any day a per annum rate of interest equal to 16.00%."  Section 2.1(c) of the Loan Agreement required that "the principal balance of the Term Loan Advance shall bear interest thereon from the Closing Date at the Term Loan Interest Rate based on a year consisting of 365 days, with interest computed daily based on the actual number of days elapsed."

18.     __The source of repayments.__  There is nothing in the Loan Agreement evidencing or even implying that the repayment of the Term Loan was conditioned upon the performance of the Debtor's business or that repayment would only be made if corporate earnings by the Debtor

were sufficient.  To the contrary, the repayment obligations under the Loan Agreement were unconditional and absolute.  (Loan Agreement § 2.1(d)(i); Loan Agreement § 8.1).  As a secured loan, in the event that the Debtor was unable to pay, the Lenders had recourse against substantially all of the Debtor's assets, which were subject to a security interest and lien in favor of the Lenders as security for the repayment of the loans.  Any failure by the Debtor to pay any amount due under the Term Loan was an Event of Default under the Loan Agreement (Loan Agreement § 9.1), and the Lenders had recourse to their collateral as a source of repayment not just upon the final Maturity Date but at any time that the Debtor was unable to make scheduled payments of interest and principal, which were to be made on a fixed schedule.  *See generally* Section 9 of the Loan Agreement, *Events of Default*.

19.      **The adequacy or inadequacy of capitalization.**  The Loan Agreement contains a number of provisions evidencing the Lenders intent that they would make and maintain the loans only for so long as the Debtor was solvent and had adequate cash reserves.  First, the Debtor was required to provide detailed and frequent financial reporting to the Lenders, including: delivery of an unaudited balance sheet and income statement each month (Loan Agreement § 7.1(a)); unaudited interim and year-to-date financial statements each quarter, certified by the Debtor's CEO or CFO (Loan Agreement § 7.1(b)); and audited annual financial statements (Loan Agreement § 7.1(c)).  In addition, the Lenders required the Debtor to deliver, on a monthly basis, "a projected six month cash flow forecast showing all projected operating cash requirements of the Borrowers for the upcoming six month period." (Loan Agreement § 7.1(d)).  All of these reporting covenants evidence a concern on the part of the Lenders to monitor the financial condition and liquidity of the Debtor over the life of the loans.  Second, the Lenders imposed specific fundraising requirements and deadlines on the Debtor as a condition of the Loans made

10

to the Debtor. Under Section 7.14 of the Loan Agreement, the Debtor was required to raise

additional cash through the sale of equity by a date certain unless it could demonstrate that its

cash on hand was sufficient to repay the loans:

> The Company shall consummate the First Equity Event[7] on or before March 31, 2013; provided, however, that if the First Equity Event shall not have occurred on or before March 31, 2013, Borrowers shall not be deemed in breach of this Section 7.14 for so long as Borrowers have Qualified Cash[8] in an amount greater than the projected operating cash requirements of the Borrowers for the upcoming six month period, calculated as of any date of determination using the most recently provided 6 Month Operating Cash Forecast delivered to Agent and the Lenders in accordance with Section 7.1(d).

Loan Agreement § 7.14.

20.    Third, as is typical in a secured lending transaction, among the Events of Default

itemized in Section 9 of the Loan Agreement was any event or evidence of the Borrower's

insolvency, broadly construed, including if the Debtor: "(i) shall make an assignment for the

benefit of creditors; or (ii) shall admit in writing that it is unable to pay its debts as they become

due, or unable to pay the Secured Obligations under the Loan Documents, or shall become

insolvent…" (Loan Agreement § 9.5). Section 10.1 of the Loan Agreement gave the Lenders

broad remedies against the Borrower and its assets in the event of any such insolvency event,

including acceleration in full of the outstanding Term Loan principal (including PIK) and

interest, demand of payment directly from the Debtor's account debtors, and collection and

foreclosure against the Term Loan collateral, including cash accounts under the Lenders' control.

21.    **The security, if any, for the advances**. Under Section 3 of the Loan Agreement,

the Debtor as Borrower granted to the Lenders a first priority security interest and lien in

substantially all assets of the Debtor as security for "the prompt, complete and indefeasible

---

[7]  First Equity Event means "the Company has received, after December 1, 2011, gross cash proceeds in an aggregate amount of Fifty Million Dollars ($50,000,000) from the sale, in one or more transactions, of the Company's equity securities." (Loan Agreement § 1.1).

[8]  Qualified Cash means unrestricted cash held by the Borrower in an account under the control of the Lenders. (Loan Agreement § 1.1).

payment" of the obligations for borrowed money under the Loan Agreement and the Term

Notes.  Section 10.6 of the Loan Agreement gives the Lenders broad powers to exercise

remedies against the collateral, including the Debtor's grant of a power of attorney to the agent

for the Lenders to act as the Debtor's attorney and agent-in-fact for the purpose of exercising

those remedies (Loan Agreement § 10.6).

      22.      **The extent to which the advances were subordinated to the claims of outside**

**creditors**.  At the time of the transaction, and for an additional 20 months until the Debtor issued

notes under the Prepetition Second Lien debt, the Lenders' Term Loans were not subordinated in

any way to the claims of the Debtors' other creditors.  The Loan Agreement contains strict

controls on distributions or other payments to the Debtor's equity holders, and the Debtor's

incurrence of additional debt (except with the consent of the Required Lenders).  Section 7.6(b)

of the Loan Agreement, for example, has a blanket prohibition on the repurchase or redemption

of any class of stock or other equity interest of the Debtor (Loan Agreement § 7.6(b)) or on the

declaration or payment of any cash dividend or distribution on any class of Debtor stock or any

other equity interest in the Debtor.  Similarly, Section 7.3 of the Loan Agreement prohibits the

Borrowers (including the Debtor's subsidiary KiOR Columbus LLC) from creating, incurring,

assuming, guaranteeing or being liable for any indebtedness except "Permitted Indebtedness,"

and such "Permitted Indebtedness" was limited to customary negotiated baskets for trade

creditors, leasehold creditors, unsecured indebtedness to MDA, and certain other debt that was

subject to an intercreditor agreement satisfactory to the Lenders.  In order to be "permitted," any

other indebtedness was required to be "Subordinated Indebtedness," that is, debt "subordinated

to the Secured Obligations [to the Lenders] in amounts and on terms and conditions satisfactory

to the Required Lenders in their sole discretion."  (Loan Agreement § 1.1).  Importantly,

"Required Lenders" is defined as holders of Term Loans in excess of 50%, which meant, as a practical matter, the Alberta Lenders, because the Alberta Lenders hold 66.66% of the Term Loan debt.  Accordingly, the Alberta Lenders had an express right to seniority over any other indebtedness other than indebtedness for which an allowance was made at the time the Term Loans were negotiated.

23.     Finally, under Section 11.3(f) of the Loan Agreement, the prior written consent of all Lenders affected thereby was required in order for the Debtor to contractually subordinate the Lenders' liens in any collateral.

24.     **The presence or absence of a sinking fund to provide repayments**.  In this case, the fact that the Lenders were fully secured by a lien on substantially all of the Debtor's assets obviated the need for a sinking fund to provide for repayment of the Term Loans.  The Lenders had recourse to the collateral and other remedies in the event the Debtor at any time failed to make a required payment under the Loan Documents.

25.     Thus, after review of the Loan Agreement, 8 of the 11 *AutoStyle* factors evidence that the MDA's claim for relief is not plausible.  The other three *AutoStyle* factors – the extent to which the advances were used to acquire capital assets, the identity of interest between the creditor and the stockholder, and the corporation's ability to obtain financing from outside lending institutions – only <u>further</u> evidence that the MDA's Proposed Complaint is not plausible. As demonstrated below:

- MDA alleged no facts that the $75 million of loans made by the lenders were used to acquire capital assets.

- There is no correlation at all between the Alberta Lenders' loans and their equity position in the Debtor.  The Alberta Lenders own only 7% of the Debtor's common stock but loaned 66% of the total loan under the Loan Agreement.

- The Debtor was able to obtain loans from outside lending institutions.  The Alberta Lenders were "outside lending institutions."  The Alberta Lenders were not incorporators of the Debtor, had no say over the day to day operations of the business of the Debtor, and held a small, non-controlling position in the equity.

26.     All eleven *AutoStyle* factors weigh against the plausibility of the Proposed Complaint, evidencing that the Court should not grant derivative standing to the MDA to bring a complaint on behalf of the Debtor contesting the validity of the Alberta Lenders' loans.

**B.     In Light of What the Loan Agreement Provides, the MDA's Proposed Recharacterization Claim Against the Alberta Lenders is Not Plausible.**

27.     In support of its recharacterization claim, MDA alleges the following against the Lenders under the Loan Agreement:

28.     *The terms of the transactions had equity features and provided for equity-like returns.*  Proposed Complaint, ¶ 2.  But the only feature of the 48 page Loan Agreement that the MDA refers to is the Debtor's ability to pay PIK interest, and no federal court has ever found the payment of PIK interest as sufficient to recharacterize as equity otherwise valid debt.

29.     *The Capital Infusions were not at arm's length.*  Proposed Complaint, ¶ 83.  The Alberta Lenders are Alberta pension and governmental fund investment vehicles managed by AIMCo, and played no role in the day to day management of the Debtor, and none has been alleged.  The statement that the loans were not negotiated at arm's length is nothing but a conclusory statement not supported by a single fact.

14

30.    *The loan proceeds were used to develop the Debtor's intellectual property*.
Proposed Complaint, ¶ 172.  Presumably, MDA is implying that the loan proceeds were used to
purchase capital assets.  But MDA cites not a single fact to support this implied allegation.

31.    *Pursuant to the Subordination Agreement, the Alberta Lenders agreed to
subordinate the Term Loan Advances to the subsequent loans made by the Khosla affiliates*.
Proposed Complaint, ¶ 145.  <u>At the time the secured loans were made</u> in January 2012, the
Alberta Lenders did not agree to subordinate to any creditor.  Twenty months later, in October
2013, the Alberta Lenders agreed to subordinate to new secured debt.  It is a common banking
practice for a secured lender to consent to subordinate its loan to subsequent loans, and lien and
payment subordination to subsequent lenders is not evidence that the original loan was intended
to be anything but a loan.  The test for recharacterization looks at the contested transaction at the
time it was entered into, not 20 months later.

32.    *At the time that the Term Loan Advances were made in January 2012, the Debtor
had inadequate capital and could not repay the Term Loan Advances*.  Proposed Complaint,
¶ 148.  In fact, at the time the Term Loan Advances were made, the new debt was the Debtor's
only secured debt and MDA acknowledges, at ¶ 152 of the Proposed Complaint that the Debtor
was separately holding more than $130 million of cash at the time.  Therefore, <u>at the time of the
transaction</u>, the $75 million of Term Loan Advances were <u>oversecured</u> and the Debtor certainly
was not undercapitalized.

33.    *In January 2012, no independent lender would have made the Term Loan
Advances*.  Proposed Complaint, ¶ 149.  In fact, the Alberta Lenders <u>are</u> independent lenders, and
they made a loan to a start-up company in which they had also previously made an equity
investment.  No court has held that a minority shareholder cannot make a legitimate loan to a

company it has previously invested in.  As Judge Walsh explained in *Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings)*, 353 B.R. 820, 839 (Bankr. D. Del. 2006), sometimes it's only the shareholders who are willing to make a loan to a startup or struggling company.  MDA's reasoning is not based upon an analysis of the loan at the time it was made.  Rather, MDA's analysis is retrospective – the Debtor is failing, therefore the loans made by the Alberta Lenders to the Debtor must have always been intended to be equity investments.  No court has ever so held.

34.     *The Term Loan Advances were not secured by any stable asset of a third party*. Proposed Complaint, ¶ 154.  That is simply not true.  The Term Loan Advances were secured by substantially all assets of the Debtor, and certain personal property assets and fixtures of the Debtor's subsidiary KiOR Columbus LLC.

35.     *The issuance of warrants to purchase stock in the Debtor evidences that the Alberta Lenders would only advance funds to the Debtor in exchange for an equity-like return*. Proposed Complaint at ¶ 155.  Warrants were issued to the Alberta Lenders as additional consideration for the Term Loan Advances, as additional consideration for the payment of PIK interest, and as additional consideration for the First Amendment to the Loan Agreement, and it is not unusual for lenders to receive warrants.  Had the Debtor succeeded, the warrants may have had value, but the warrants have no value and were never exercised.

36.     Even if all of MDA's allegations are accepted as true, such conclusory statements, devoid of commercial and financial reality, are insufficient to state a claim for recharacterization. As demonstrated above, not only is the Loan Agreement replete with evidence of the parties' intent to create a lending (not shareholder) relationship, but the parties' subsequent actions and

the economic realities of the facts and circumstances presented here unequivocally support such a conclusion.  As shown below, when other courts have considered claims for recharacterization, they have rejected complaints, like MDA's Proposed Complaint, that are nothing more than formulaic recitations of the elements of the cause of action, gussied up with allegations that are either clearly untrue or immaterial.  Conclusory allegations cannot establish a colorable claim when they are contradicted by the documents referenced in the allegations.  *See Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001).

### C.    The MDA's Proposed Recharacterization Claim Against the Alberta Lenders is Outside of the Four Corners of Established Legal Precedents.

#### 1.    The Names Given to the Instruments Evidence Debt, not Equity

37.    In rejecting recharacterization claims, bankruptcy courts have analyzed whether money advanced was provided under a loan agreement, the advances were consistently referred to as loans and debt, the parties to the transaction were described as borrower and lender, and the borrower's obligation was referred to as a loan repayment; holding that these facts weigh against an allegation that the parties intended a disguised equity transaction.  *See, e.g.*, *Radnor Holdings*, 353 B.R. at 839; *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 95 (Bankr. D. Del. 2010); *Friedman's*, 452 at 520; *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs)*, 473 B.R. 525, 573 (Bankr. D. Del. 2012).  Here, it cannot be disputed that there is an instrument of indebtedness governing this transaction, and it is styled as the Loan and Security Agreement.  *See* Proposed Complaint, ¶ 129.  The Loan Agreement clearly uses the terms "Loan and Security Agreement," "Borrower," "Lender," "indebtedness," and Secured Obligations" throughout.  *See generally* Loan Agreement, Loan Amendments, and Subordination Agreement.  The Loan Agreement speaks for itself, and the MDA has failed to allege *any* facts from which this Court may infer that

17

the Loan Agreement was intended by the parties as anything other than a clear instrument of

indebtedness.

### 2. The Presence of a Maturity Date and a Schedule of Payments Evidence Debt, not Equity

38.     The Loan Agreement contains a fixed maturity date of February 1, 2016.  *See*

Loan Agreement at 13 (definition of Term Loan Maturity Date).  As set forth in the Proposed

Complaint, the Loan Agreement also contained a set payment schedule.  Proposed Complaint,

¶ 134 (30 equal monthly installments starting August 1, 2013); Loan Agreement, § 2.1(d).  These

are recognized debt features which clearly weigh against recharacterization.  *See, Autobacs*, 473

B.R. at 573 (quoting *Friedman's,* 452 B.R. at 520: "The absence of a fixed maturity date and a

fixed obligation to repay is an indication that the advances were capital contributions and not

loans"); *Broadstripe*, 444 B.R. at 95 (stated maturity date weighed in favor of debt); *Daewoo*

*Motor Am., Inc. v. Daewoo Motor Co. Ltd. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 738

(C.D. Cal. 2012), *aff'd*, 554 F. App'x 638 (9th Cir. 2014) ("The presence of both a fixed maturity

date and a fixed rate of interest weighs against recharacterization.").   Section 2.5 of the Loan

Agreement also requires the Debtor to pay the Alberta Lenders an end of term charge equal to

the sum of $6,750,000, plus cash in the amount of 9% of the aggregate amount of all PIK interest

– provisions in line with typical debt features.

### 3. The Presence of a Fixed Rate of Interest and Actual Interest Payments Evidence Debt, not Equity

39.     As MDA acknowledges in ¶ 134 of the Proposed Complaint, the Loan Agreement

includes a fixed loan interest rate of 16% per annum.  *See Autobacs*, 473 B.R. at 574 (quoting

*Friedman's*, 452 B.R. at 521, noting that absence of a fixed rate of interest and interest payments

is a strong indication that the investment was a capital contribution).  The Debtor had the right to

elect "payment in kind" interest (rolling the interest into the principal amount owed), but the presence of PIK interest is not decisive, especially in distressed investment context. *See Broadstripe*, 444 B.R. at 96. Moreover, the Proposed Complaint acknowledges, at ¶ 142, that PIK Interest was in fact paid.

### 4.      The Source of Repayments Evidences Debt, not Equity

40.      While MDA alleges that repayment of the obligations under the Loan Agreement was "wholly contingent on the success of the Debtor" (Proposed Complaint, ¶ 155), MDA has alleged no facts to support its assertion. MDA should not be permitted to proceed on the basis of this blanket assertion. MDA is required to set forth factual allegations in support but has failed to carry its burden here. Indeed, nothing in the Loan Agreement tied repayment to success of the business, or required that repayment may be made only out of corporate earnings. *See Exide*, 299 B.R. at 741 (noting that nothing in the credit agreement's lengthy repayment requirements tied repayment to the success of the debtor's business). Moreover, other sources of repayment are clear from the documents. The obligations under the Loan are secured by assets of the Debtor <u>and</u> its operating subsidiary, KiOR Columbus LLC. *Autobacs*, 473 B.R. at 575 (court will look to "underlying economic reality" and the "general tie between the loan's repayment and the success of the business," and where there is another source of repayment besides corporate earnings, *e.g.*, security interest in borrower's assets, that is a mitigating factor against recharacterization). Regarding repayment, the Loan Agreement also contained typical secured loan covenants regarding liquidity and capital expenditures. *See, e.g.*, Loan Agreement, §§ 7.3, 7.13 (prohibiting indebtedness and limiting certain capital expenditures). Finally, by MDA's own admission, the Debtor also had $131.6 million in cash on hand as of December 31, 2011 (just a few weeks before the loans were made under the Loan Agreement). *See* Proposed

Complaint, ¶ 152.  Thus, security interests and cash were just two forms of repayment available to the Debtor at the time it entered into the Loan Agreement, which belies MDA's allegation that repayment of the obligations under the Loan Agreement was "wholly contingent" on the success of the Debtor.

41.      That the Debtor had "no cash flow" and "little or no prospect of generating revenue" (Proposed Complaint, ¶¶ 150-51) is immaterial.  A loan to a start-up or venture business is not *per se* equity.  "[W]hile the success of any start-up venture is uncertain – and may entail significant losses – this uncertainty does not necessarily render it unreasonable for a creditor to advance funds (as debt, not equity) to such a struggling start-up."  *Daewoo Motor*, 471 B.R. at 741 (citing *Am. Processing & Sales Co. v. U.S.*, 371 F.2d 842, 856 (Ct. Cl. 1967)).  [A]ll extensions of credit depend on a company's success, and that risk alone – without more – does not indicate that they are capital contributions."  *U.S. v. State Street Bank and Trust Co.*, 520 B.R. 29, 76 (Bankr. D. Del. 2014) (citing *Joseph v. Feit (In re Liberty Brands, LLC)*, No. 07-10645, Adv. No. 09-50965, 2014 WL 4792053, *4 (Bankr. D. Del. Sept. 25, 2014)).  As noted by the court in *American Processing & Sales*, "fledgling enterprises often experience losses in their formative periods when they are incurring expenses for programs designed to expand into eventually profitable operations. . . . Cases abound where 'indebtedness' was found despite the weak financial condition and operating losses of the debtor corporations."  371 F.2d at 856.

**5.      The Adequacy of the Capitalization at the Time of the
Making of the Term Loan Evidences Debt, not Equity**

42.      The relevant time to determine capitalization is at the time of the transaction. *Daewoo Motor,* 471 B.R. at 741; *Optim,* 2014 WL 1924908, at *7.  MDA merely alleges, in a conclusory fashion, that at the time of the transaction "the Debtor had inadequate capital, speculative technology and no way of repaying such debt."  Proposed Complaint, ¶ 148.

However, at the time the Alberta Lenders made the Loan Advance, the Debtor was adequately capitalized and the Alberta Lenders were oversecured.  As acknowledged in the Proposed Complaint at ¶ 152, just prior to the January 2012 loan transaction, the Debtor had $131.6 million in cash.  Indeed, it was 20 months later, in October 2013, that the Debtor first borrowed again on a secured basis.  Thus, MDA has failed to allege facts to support a finding that the Debtor was undercapitalized at the time it entered into the Loan Agreement.

43.       Even if MDA had alleged facts that, if taken as true, would support a finding of undercapitalization, a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim.  *See, e.g.*, *Optim*, 2014 WL 1924908, at *7 (citing *In re Phase I Molecular Toxicology, Inc.*, 287 B.R. 571, 578 (Bankr. D.N.M. 2002) ("Whether the debtor was undercapitalized at the time of the transaction, though relevant, is not determinative.")).

### 6.       A Single Board Seat Through June 2012 and 7% of the Equity is not Evidence of a Disguised Equity Investment

44.       MDA's allegations that the Alberta Defendants are shareholders of the Debtor (Proposed Complaint, ¶ 71), and that they were also issued warrants pursuant to the terms of the Loan Agreement (*id.*, ¶ 139) are insufficient to support a finding that there was any identity of interest here.  Likewise, MDA's assertion that the Alberta Lenders had a director on the Debtor's board from 2010 to 2012 is also insufficient to support an identity of interests (*id.*, ¶ 68).

45.       A loan from an existing stockholder is not *per se* supportive of recharacterization. Rather, the advances made by the shareholder must be in proportion to its respective stock ownership to be indicative of an equity contribution, and even that, standing alone, is not sufficient.  *Autobacs*, 473 B.R. at 577-78 (quoting *Friedman's*, 452 B.R. at 522); *see also In re Med. Software Solutions*, 286 B.R. 431, 443-44 (Bankr. D. Utah 2002) (finding the weight of the evidence on balance supports the debt agreements as described, where the only factor favoring

recharacterization was the identity of interest insofar as the amount of money loaned to the

debtor roughly corresponded to the lenders' respective preferred stock ownership).  As noted in

*Autobacs*:

> If stockholders make advances in proportion to their respective stock ownership, an
> equity contribution is indicated.  On the other hand, a sharply disproportionate ratio
> between a stockholder's percentage interest in stock and debt is indicative of bona fide
> debt.  Where there is an exact correlation between the ownership interests of the equity
> holders and their proportionate share of the alleged loan this evidence standing alone is
> almost overwhelming.

*Autobacs,* 473 B.R. at 577-78 (quoting *Friedman's*, 452 B.R. at 522); *Broadstripe*, 444 B.R. at

97 (noting "the key to the 'identity of creditors and shareholders' factor is proportionality"

(quoting *AutoStyle*, 269 F.3d at 751)).  For example, in *Broadstripe*, the Court found that

lender's "ownership of 88.57% was vastly out of proportion to its 'equity' stake of 25%", thus

the factor weighed against recharacterization.  444 B.R. at 98-99.

46.     Here, there is *no correlation at all* between the Alberta Lenders' loans and their

equity position in the Debtor.  The Alberta Lenders own only 7% of the Debtor's common stock

but loaned 66% of the total loan under the Loan Agreement.  At the time the loans under the

Loan Agreement were made, the Alberta Lenders held the largest secured claim against a debtor

that had $130 million of cash on hand.

47.     Finally, the assertion that the Alberta Lenders had a representative on the

Debtor's board from 2010 to 2012 is irrelevant.  *See Radnor*, 353 B.R. at 839-40 (lender's

designation as a member of borrower's four-member Board of Directors was "immaterial");

*Med. Software*, 286 B.R. at 435-36, 443-44 (lender had two representatives on the board at the

time of the loan, which did not factor into the court's recharacterization analysis, and court

ultimately declined to recharacterize loan as equity).  "In *SubMicron*, the Third Circuit refused to

recharacterize debt as equity notwithstanding that the debtors' largest unsecured creditors held

half the seats on the debtor's board." *Radnor*, 353 B.R. at 839-40 (stating that it is "not unusual

for lenders to have designees on a company's board, particularly when the company [is] …

distressed." (quoting *Submicron*, 432 F.3d at 457-58)).

### 7.    The Security for the Term Loan Evidences Debt, not Equity

48.    In the Proposed Complaint, MDA acknowledges that the Debtor granted the

Alberta Lenders "a security interest in all or substantially all of its tangible and intangible

property, including intellectual property."  Proposed Complaint, ¶ 144.   And in fact, this is

precisely what the Loan Agreement provides.  *See* Loan Agreement, § 3 (granting security

interest in substantially all of the borrowers' assets, with certain limited exclusions).  Thus,

MDA has failed to allege facts which weigh against a finding that the Alberta Lenders' advances

were not secured.  *See Autobacs*, 473 B.R. at 578 (quoting *Friedman's*, 452 B.R. at 512: "The

absence of a security for an advance is a strong indication that the advances were capital

contributions rather than loans.").  Moreover, at the time the parties entered into the Loan

Agreement, the Alberta Lenders were oversecured.  Finally, the Loan Agreement included

requirements to ensure sufficient liquidity existed.  *See* Loan Agreement, § 7.13 (limiting certain

capital expenditures); § 7.14 (requiring certain capitalization efforts dependent on liquidity).

49.    Indeed, the Loan Agreement is replete with typical lending provisions intended to

protect and preserve collateral, acquire priority liens thereon, and to ensure repayment.  *See* Loan

Agreement, §§ 2.1(c) and 2.3 (defined rate of interest, including a default rate of interest);

§ 2.1(d)(i) (defined interest rate term, defined principal payment schedule); § 2.1(d)(i) (maturity

date); § 4.1(L) (facility charge); §§ 2.1(d)(i) & 2.8 (payments allocated by loan commitment);

§ 2.4 (prepayment permitted); § 3 (security interest granted); § 7.2 (borrower requirement to

execute and file all necessary documents to perfect and give agent a first priority lien on the

collateral); § 5.2 (representation and warranty that no other liens are allowed other than permitted liens); § 5.4 (representation and warranty of no material adverse effect, which includes occurrences of events that have a material adverse effect on the business, operations and financial condition of the company, the ability of the company to repay the secured obligations under the loan documents, and the ability of the lender or agent to enforce rights, remedies, collateral and liens); § 5.12 (requiring collateral information certification); § 2.5 ("end of term" charge); § 6.1(requirement to insure the collateral) § 7.4 (borrower requirement to keep all of its assets and property, including underlying security for the Loan Advances, and notify of legal processes affecting title to Collateral, or any pending or threatened litigation that would reasonably be expected to have a Material Adverse Effect); § 7.4 (no other liens on Collateral); §§ 7.7 & 7.8 (restrictions on transfers, sales and liquidations); § 7.10(a)-(b) (notice required in case of name change or limitations on Collateral relocation); § 7.15 (provision to ensure priority lien perfection on certain after-acquired Collateral); § 9 (typical lender events of defaults); and § 10 (typical lender remedies in the event of a default).

### 8.    The Alberta Lenders are "Outside Lenders"

50.    In the Proposed Complaint, MDA alleges that at the time the parties entered into the Loan Agreement, "no independent lender would have provided capital to the Debtor." Proposed Complaint, ¶ 149.  However, the very fact that the Alberta Lenders made loans to the Debtor is evidence that "outside lending institutions" would provide financing.  The Alberta Lenders are not incorporators or controlling shareholders of the Debtor and are also not affiliates of any such person or entity.  And there is nothing in the Loan Documents to suggest that the terms are more, or less, favorable to the Debtor than what another "independent" lender would have negotiated with the Debtor.

### 9. That the Term Loan Was Not Subordinated to the Claims of Outside Creditors at the Time that the Term Loan Was Made, Evidences Debt, not Equity

51.     Here, the Loan Agreement expressly provides that the Alberta Lenders are to be paid ahead of subordinated debt or equity, and only in certain specified and limited circumstances may the Debtor incur priority indebtedness.  *See* Loan Agreement, § 7.3 (no other indebtedness is permitted, with very limited exceptions, *e.g.*, purchase money security interests or capital lease obligations); § 7.6 (borrower may not declare or pay any cash dividend or make a cash distribution on any class of stock or other equity interest); § 10.2 (if there is an event of default, the agent may liquidate the collateral and apply proceeds to satisfy secured obligations before the obligations of junior lenders).  A right to payment above other creditors (as clearly provided in the Loan Agreement) is indicative of debt, not equity.  *Friedman's*, 452 B.R. at 523.

52.     Throughout the Proposed Complaint, MDA alleges that, pursuant to the Subordination Agreement, the liens granted to the Alberta Defendants in connection with the Loan Agreement are subordinate to those granted by the Debtor in connection with later loans. *See* Proposed Complaint, ¶¶ 145, 178, 220.  But that subordination was granted 20 months after the Loan Agreement advances were made, and the subordination was limited to new financing coming into the Debtor.  *See Optim*, 2014 WL 1924908, at *9 (holding that an agreement to subordinate until priority loans are paid in full is not indicative of an equity investment).

53.     The Subordination Agreement, the agreement to allow payment and accrual of PIK interest, and the change of loan terms to allow a single balloon payment at maturity rather than monthly installment payments – these are all actions taken by the Alberta Lenders to protect their loan in a distressed debt situation.  *See, e.g.*, *Daewoo Motor*, 471 B.R. at 738 ("That DWMC ultimately failed to collect any 'extension interest' from DMA does not undermine the

bankruptcy court's finding. Instead, DWMC's forbearance with respect to such interest appears to have been nothing more than a practical recognition of the economic reality facing the parties at the time—DMA was struggling to pay its bills, let alone *interest* on its bills."); *Optim,* 2014 WL 1924908, at *9 ("[T]he fact that the parties entered into the Forbearance Agreement lends support to the existence of a true creditor relationship. The Court further notes that '[i]n the case of a pre-existing lender, it is legitimate for the lender to take actions to protect its existing loans, including extending additional credit or granting forbearance.'") (quoting *In re Moll Indus., Inc.*, 454 B.R. 574, 583-84 (Bankr. D. Del. 2011) (noting that lender actions to ease the terms of loan agreements, to fail to declare defaults, to write down debt, to extend additional credit, and grant a forbearance are "actions typically taken by lenders seeking to preserve their overall position")); *Drake v. Franklin Equip. Co. (In re Franklin Equip. Co.)*, 416 B.R. 483, 512 (Bankr. E.D. Va. 2009) (lender's election to forebear from exercising rights and collection remedies is not indicative of equity where there is no evidence that lender "abandoned his intention ultimately to be repaid the amounts advanced").

### 10.   That the Term Loans Were Made to Fund the Debtor's Operations, is Evidence of Debt, not an Equity Investment

54.     The use of advances to meet daily operating needs of the corporation, rather than to purchase capital assets, is indicative of *bona fide* indebtedness. *Autobacs*, 473 B.R. at 580 (quoting *Friedman's*, 452 B.R. at 523 (citing *AutoStyle*, 269 F.3d at 752)).  In the Proposed Complaint, MDA alleges that the amounts received by the Debtor under the Loan Agreement "were used to develop the Debtor's intellectual property that constitutes its major capital asset." Proposed Complaint, ¶ 133.  However, MDA has failed to plead any specific facts showing that the advances under the Loan Agreement were used to purchase capital assets, or that the loan proceeds were not used for daily operating expenses.  "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice." *Optim*, 2014 WL

1924908, at *6 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

### 11.      The Term Loans Were Fully Secured; No Sinking Fund was Required

55.      In the Proposed Complaint at ¶ 146, MDA alleges the absence of a sinking fund.

However, "securing loans with liens can obviate the need for a sinking fund." *Autobacs*, 473

B.R. at 581 (citing *AutoStyle*, 269 F.3d at 753).  Here, the Alberta Lenders' loans were secured

with liens on the Debtor's assets, and thus the need for a sinking fund was obviated.  *See Moll*

*Indus., Inc.*, 454 B.R. at 585 (noting that many debt arrangements do not have sinking funds and

highlighting that their presence varies "depending on whether the loan is secured or the company

is well-capitalized").

### 12.      Other Recharacterization Considerations Evidence Debt, not Equity

56.      One additional recharacterization consideration is "'a troubling lack of

formalities.'"  *See Autobacs*, 473 B.R. at 581 (citing *In re Cold Harbor Assocs., L.P.*, 204 B.R.

904, 916 (Bankr. E.D. Va. 1997)).  Here, no such informalities could possibly be alleged by

MDA.  All of the loan-related documents, including the Subordination Agreement, were

discussed in the Debtor's regular reports to the SEC, attached thereto as exhibits, and described

as secured debt therein.  UCC-1 financing statements were also recorded to perfect the security

interests.  *See SubMicron*, 432 F.3d at 457 (noting the district court "found evidence of the

parties' intent to create a debt instrument outside the lending documents.  For example, it noted

that '[t]he 1999 notes were recorded as secured debt on SubMicron's 10Q SEC filing and UCC-1

financing statements.'") (quoting *In re Submicron Sys.*, 291 B.R. 314, 319 (D. Del. 2003)); *see*

*also Daewoo Motor*, 471 B.R. at 737 (same).

57.     MDA has failed to carry its burden of establishing a colorable recharacterization claim.   MDA has pled no facts which, even if taken as true, could be the basis of a Court finding that the parties intended to treat the Loan Agreement as anything other than a debt instrument. MDA's recharacterization claim as set forth in its Proposed Complaint is factually and legally deficient and should not be permitted to proceed.

### III.     MDA DOES NOT HAVE A COLORABLE CLAIM FOR EQUITABLE SUBORDINATION AGAINST THE ALBERTA LENDERS

58.     Bankruptcy Code Section 510 authorizes the equitable subordination of a creditor's claims if the moving party can show that (1) the accused creditor engaged in inequitable conduct, (2) the misconduct resulted in injury to the other creditors or conferred an unfair advantage on the accused creditor, and (3) equitable subordination of the accused creditor's claim must not be inconsistent with the provisions of the Bankruptcy Code.  *Schubert v. Lucent Tech., Inc. (In re Winstar Commc'n, Inc.*), 554 F.3d 382, 411 (3d Cir. 2009).  Equitable subordination has been described as a drastic remedy (*see Radnor*, 353 B.R. at 840), and an extraordinary departure from the property interests of secured creditors (*see Waslow v. MNC Commercial Corp. (In re Paolella & Sons, Inc.)*, 161 B.R. 107, 117 (E.D. Pa. 1993)), one that should be used only to undo injustice or unfairness to other creditors in terms of bankruptcy results (*see Winstar*, 554 F.3d at 411).

59.     Here, MDA has not alleged a single act of inequitable conduct on the part of the Alberta Lenders.  In addition, MDA has not alleged that the $50 million loaned by the Alberta Lenders to the Debtor, at approximately the same time as the $75 million loan made by MDA to the Debtor's subsidiary, KiOR Columbus, LLC, conferred an unfair advantage on the Alberta Lenders.  What then could possibly be the basis for reorganizing the priorities of the creditors' claims?  The equities favor the Alberta Lenders as much as they favor MDA – the Alberta

28

Lenders (among other things) invest employee pension funds, and MDA invests taxpayer funds. Both entities may not recover much on their claims against the estate, but neither is entitled to step over the other to advance their individual interests.

60.     MDA has alleged no facts that plausibly justify the remedy of equitable subordination.  MDA acknowledges that the Alberta Lenders made their secured Term Loans to the Debtor at a time when the Debtor had no other material secured debt, and that the loan proceeds were used to fund the Debtors' operations.  MDA fails to connect the Alberta Lenders' Term Loans to inequitable conduct or unfair advantage.  MDA's Proposed Complaint cannot meet basic pleading standards in the federal courts and the Motion should not be granted.

### A.     MDA's Proposed Complaint States No Facts Plausibly Evidencing Inequitable Conduct or Unfair Advantage on the Part of the Alberta Lenders

61.     Courts generally recognize three categories of conduct which may constitute inequitable conduct justifying equitable subordination: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego."  *U.S. v. State Street Bank and Trust Co.*, 520 B.R. 29, 82 (Bankr. D. Del. 2014).  MDA has not even attempted to allege that the Debtor was a "mere instrumentality" of the Alberta Lenders, or their alter ego.  Nor are there any facts plausibly connecting the Alberta Lenders to fraud, breach of fiduciary duty or any illegal act.  The question of undercapitalization has been addressed.  MDA admits that the Alberta Lenders made their Term Loan to the Debtor when the Debtor's assets were unencumbered by material liens, and the Debtor held $130 million in cash.  The cash at the time was sufficient to repay not only the Alberta Lenders' Term Loans, but also the MDA loan to the Debtor's subsidiary.  The Debtor was not undercapitalized at the time that the Alberta Lenders made their Term Loans to the Debtor.

## IV.    THERE IS NO ESTATE BENEFIT FROM THE PROPOSED COMPLAINT; THE COST OF LITIGATION WILL EXCEED THE VALUE OF THE ESTATE

62.    The cost of the pre-trial proceedings and lengthy trial that the MDA seeks will certainly be at least several million dollars.  Some of that will be cost to the estate, as the Debtor inevitably will, or will be forced to, participate in the proceedings.  Professional fees will wipe out any potential recovery for unsecured creditors.  Under the Debtor's proposed chapter 11 plan, the Alberta Lenders will recover nothing on the $50 million of Term Loans; but if the MDA is allowed to prosecute the Proposed Complaint, the Alberta Lenders will be forced to participate in the costly Litigation so that no default judgment is entered against them based upon the false allegations in MDA's Proposed Complaint.

63.    Before granting derivative standing, the Court's threshold inquiry is a determination of the probabilities of legal success and financial recovery in the event of success. *Unsecured Creditors' Comm. v. Noyes (In re STN Enter.*), 779 F.2d 901, 905 (2d Cir. 1985). The Court should assess "whether, in light of the probable costs of the litigation, the claim would likely benefit the estate if pursued." *Nat'l Forge*, 326 B.R. at 548.  At a minimum, a court should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will produce. *In re MIG, Inc.*, No. 09-12118 (KG), 2009 WL 8662897, at *2 (Bankr. D. Del. Dec. 18, 2009); *Centaur*, 2010 WL 4624910, at *6 (same).

64.    Here, the MDA asserts that the Debtor's assets are worth very little, perhaps just scrap value.  The MDA and the estate together will spend more than that scrap value on the proposed litigation.  The other creditors, like the Alberta Lenders, will be mere collateral damage in the litigation onslaught.

## V.      CONCLUSION

65.      For the reasons set forth herein, the Alberta Lenders respectfully request that the

Court deny MDA's Motion as to the Alberta Lenders and award such other and further relief as

the Court deems just and proper.


Dated:  April 14, 2015                                    **ASHBY & GEDDES, P.A.**
Wilmington, Delaware


                                                          */s/ Karen B. Skomorucha Owens*
                                                          Amanda Winfree Herrmann (I.D. #4615)
                                                          Karen B. Skomorucha Owens (I.D. #4759)
                                                          Stacy L. Newman (I.D. #5044)
                                                          500 Delaware Avenue, 8th Floor
                                                          Wilmington, DE 19801
                                                          Tel:  (302) 654-1888
                                                          Fax:  (302) 654-2067

                                                          -and-

                                                          **STRADLING YOCCA CARLSON & RAUTH, P.C.**
                                                          Fred Neufeld (admitted *pro hac* vice)
                                                          100 Wilshire Blvd., 4th Floor
                                                          Santa Monica, CA 90401
                                                          Tel: (424) 214-7000
                                                          Fax: (424) 214-7010

                                                          *Counsel to Alberta Investment Management Corp.,*
                                                          *1538731 Alberta Ltd., and 1538716 Alberta Ltd.*