IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KiOR, Inc. | ) | Case No. 14-12514 (CSS) |
| | ) | |
| Reorganized Debtor. | ) | **Related Docket No. 1002** |
| | ) | |

## <u>OPINION</u>[1]

**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight
Robert C. Maddox
920 North King Street
Wilmington, DE 19801

-and-

**KTBS LAW LLP, f/k/a KLEE, TUCHIN
BOGDANOFF & STERN LLP**
David M. Stern
Thomas E. Patterson
Robert J. Pfister
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, CA 90067

Counsel for Mard, Inc., f/k/a KiOR, Inc.


**REED SMITH LLP**
Mark W. Eckard
1201 Market Street, Suite 1500
Wilmington, DE 19801

-and-

**McCRANEY MONTAGNET
QUIN & NOBLE, PLLC**
William M. Quin II
602 Steed Road, Suite 200
Ridgeland, MS 39157




Counsel to the KiOR Liquidating
Trust

Dated: October 19, 2020

Sontchi, C.J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION[2]

Before the Court is the *Reorganized Debtor's Motion for an Order Enforcing the Plan,*[3] *Trust Agreement,*[4] *and Confirmation Order*[5] (the "Motion") filed by Mard, Inc., formerly known as KiOR, Inc. ("Mard," the "Reorganized Debtor," or prior to confirmation, the "Debtor").[6] The Reorganized Debtor seeks an order enforcing the Trust Agreement, Plan and Confirmation Order in order to protect the privileged information provided to the KiOR Liquidating Trust (the "Liquidating Trust") in order for the Liquidating Trust to pursue "Vested Causes of Action" as defined in the Plan and Trust Agreement. The Liquidating Trust responds that Mard is a defunct corporation and, therefore, can no longer assert privilege claims. The Liquidating Trust continues that *even if* the Reorganized Debtor may claim privilege, the Liquidating Trust can unilaterally waive

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

[3] Referring to *KiOR, Inc.'s Second Amended Chapter 11 Plan of Reorganization, as Revised dated June 1, 2015* (D.I. 611) (the "Plan").

[4] Referring to the *Liquidating Trust Agreement* (D.I. 637-1) (the "Trust Agreement"). The Trust Agreement establishes the "Liquidating Trust," defined in the Plan as "the liquidating trust established on the Effective Date, in accordance with the Plan and Liquidating Trust Agreement, for the benefit of the Liquidating Trust Beneficiaries, to which the Liquidating Trust Assets will be transferred and liquidated in accordance with the terms of this Plan and the Liquidating Trust Agreement . . .," Plan at Art. I(B)(65); and the "Liquidating Trustee," defined in the Plan "Mr. Kurt Gwynne, or such other Person or Entity appointed as trustee for the Liquidating Trust in accordance with the Liquidating Trust Agreement, which appointment is acceptable to the Debtor and approved by the Bankruptcy Court." Plan at Art. I(B)(70).

[5] Referring to the *Order Confirming KiOR's Inc's Second Amended Chapter 11 Plan of Reorganization, as Revised dated June 1, 2015* (D.I. 640) (the "Confirmation Order").

[6] D.I. 1002. Mard also filed the (a) *Declaration of Jan Nielson Little in Support of Reorganized Debtor's Motions (i) to Reopen the Bankruptcy Case for the Limited Purpose of Enforcing the Plan, Trust Agreement, and Confirmation Order; and (ii) for an Order Enforcing the Plan, Trust Agreement, and Confirmation Order* (D.I. 1001) (the "Little Declaration"); (b) *Declaration of Misty Osborn in Support of the Reorganized Debtor's Motion for an Order Enforcing the Plan, Trust Agreement, and Confirmation Order* (D.I. 1019) (the "Osborn Declaration"); (c) *Supplemental Declaration of Jan Nielson Little* (D.I. 1020) (the "Supplemental Little Declaration"); and (d) *Reorganized Debtor's Notice of Revival of Charter and Good Standing Under Delaware Law* (D.I. 1023).

that privilege.  As set forth below, the Court finds that Mard is the Reorganized Debtor and is not defunct, thus retaining claims of privilege.  The Court further finds that, at most, the Liquidating Trust has co-privilege and cannot waive such privilege without Mard's consent (or Court order).  The Court also will instruct the parties to formulate a process by which the privilege is maintained.  As set forth below, the Court will grant the Motion.

<u>**JURISDICTION**</u>

This Court has jurisdiction over this matter, pursuant to 28 U.S.C. sections 157 and 1334, Sections XII.7 and XII.12 of the Plan, Section 1.4 of the Trust Agreement, and paragraphs 33(f), (g), (h), and (l) of the Confirmation Order.  Venue is proper in this District, pursuant to 28 U.S.C. sections 1408 and 1409.  This is a core proceeding, pursuant to 28 U.S.C. section 157(b)(2).  The Court has the authority to enter a final order.

<u>**STATEMENT OF FACTS**</u>

**A.  Procedural History**

The above-captioned, now reorganized debtor, filed its petition under Chapter 11 on November 9, 2014.  The debtor's Plan was confirmed on June 9, 2015,[7] and became effective on June 30, 2015.[8]  Thereafter, on June 26, 2018, the Court entered a final decree

---

[7] D.I. 640.

[8] D.I. 702.

3

in this case and the bankruptcy case was closed.[9]  On June 2, 2020, the Reorganized Debtor filed its *Reorganized Debtor's Motion to Reopen the Bankruptcy Case for the Limited Purpose of Enforcing the Plan, Trust Agreement, and Confirmation Order*[10] ("Motion to Reopen") as well as the Motion.[11]  The Court granted the Motion to Reopen on June 8, 2020.[12]

The Motion is fully briefed[13] and the Court held an evidentiary hearing on the Motion on June 25, 2020.[14]  At the hearing, the Court took the Motion under advisement. This is the Court's ruling thereon.

## B. Factual History of the Bankruptcy Cases

### i.    The Parties

As of the petition date, the debtor was attempting to develop and commercialize proprietary technology designed to generate a renewable crude oil from non-food cellulosic biomass (e.g. trees, grasses, etc.), which can be refined into gasoline, diesel and aviation fuels.[15]  The Debtor was unable to commercialize its technology and scale its

---

[9]  D.I. 988 (*Order (I) Granting Final Decree Closing the Chapter 11 Case of KiOR, Inc. and (II) Terminating Claims and Noticing Services*).  The case was closed by the clerk's office on July 20, 2018.

[10]  D.I. 999.

[11]  D.I. 1002.

[12]  D.I. 1013 (*Order Reopening the Bankruptcy Case for the Limited Purpose of Enforcing the Plan, Trust Agreement, And Confirmation Order*).

[13]  *See Objection of the KiOR Liquidating Trust to the Motion of Mard, Inc. for an Order Enforcing the Plan, Trust Agreement, and Confirmation Order.* D.I. 1017 (the "Objection") and D.I. 1018 (reply).

[14]  *See* D.I. 1028 (Tr. of Hr'g June 25, 2020), subsequent references to the transcript will be noted as "Tr. of Hr'g June 25, 2020, page:line."

[15]  *See Second Amended Disclosure Statement for KiOR, Inc.'s Second Amended Chapter 11 Plan of Reorganization, as Revised Dated April 7, 2015* (D.I. 487) (the "Disclosure Statement") at 13.

production to the volumes necessary to meet its targets; as a result, litigation ensued, including with the Debtor's primary creditor, the Mississippi Development Authority ("MDA"), which was owed in excess of $75 million.[16]

The MDA participated in the Debtor's bankruptcy case, including objecting to the DIP credit facility ("The Bankruptcy Court overruled the MDA's objection and approved the DIP Financing following a two-day contested hearing.");[17] "object[ing] to various aspects of the initially-proposed bid procedures, including the time tables for the bidding and auction process and the approval of the Plan Support Agreement,"[18] taking at least a half-dozen depositions,[19] moving to convert the Bankruptcy Case to a chapter 7 liquidation;[20] and moving for derivative standing.[21]

Ultimately a Plan was proposed under which the Reorganized Debtor would "preserve [its] business as a going concern, … retain [its] employees and assets, and … reorganize [its] capital structure through a debt-to-equity conversion."[22] "The Plan also provide[d] for the creation of a Liquidating Trust [to] be funded with … cash [and] the

---

[16] Disclosure Statement at 15-16; 21-24; 28.

[17] *See id.* at 15.

[18] *Id.* at 22.

[19] *Id.* at 23.

[20] *Id.*

[21] *Id.* at 24.

[22] *Id.* at 1.

transfer of certain claims and Causes of Action that belong to the Estate."[23]   More specifically, "Vested Causes of Action" and all proceeds thereof became "Liquidating Trust Assets."[24]   Pursuant to the Trust Agreement, the Liquidating Trustee was (and is) vested with the power and duty to prosecute the Vested Causes of Action.[25]   In addition to avoidance actions, the Liquidating Trust Assets included causes of action against the Debtor's insiders.[26]

>       *ii.      The Attorney-Client Privilege Dispute*

As contemplated at confirmation of the Plan, the Reorganized Debtor intended to continue to operate as a going concern and would, as appropriate, continue to use the services of certain of the same attorneys and law firms that had advised the Debtor pre-bankruptcy, the Plan proposed that the Reorganized Debtor would maintain its attorney-client privilege – while at the same time recognizing the necessity of and providing for the Liquidating Trustee's access to such privileged materials for the purpose of investigating and pursuing the Liquidating Trust Assets:

> To effectively investigate, defend or pursue the Liquidating Trust Assets, including the Vested Causes of Action, the Debtor, the Liquidating Trust, Liquidating Trustee and all

---

[23] *Id.* at 2.

[24] Plan at Art. I(B)(65-67) "Vested Causes of Action" are all claims of the Debtor or the Debtor's bankruptcy estate that were or could have been pending or existing on the Effective Date, or that may have been brought thereafter, subject to certain exceptions.  Plan at Art. I(B)(104) ("Vested Causes of Action") and Art. I(B)(15) ("Causes of Action").

[25] Liquidating Trust Agreement at § 2.2.

[26] *See id.* at 7.

counsel thereto, must be able to exchange information with each other on a confidential basis and cooperate in common interest efforts without waiving any applicable privilege. Given the common interests of the parties and the Liquidating Trust's position as successor to the Liquidating Trust Assets, sharing such information in the manner described in the previous sentence to the extent necessary, shall not waive or limit any applicable privilege or exemption from disclosure or discovery related to such information.  To the extent necessary to the performance of the Liquidating Trustee's duties and responsibilities, the Debtor or Reorganized Debtor, as applicable, shall share with the Liquidating Trustee communications or documents that are subject to the attorney-client privilege, work product protection, or other applicable privilege; the sharing of such information shall not operate as a waiver of any applicable privileges. The parties shall agree on how to document the sharing of the attorney-client privilege such that the privilege is preserved, and in the absence of an agreement the Bankruptcy Court shall decide.[27]

The MDA objected to this provision of the Plan and Trust Agreement.  In a section of its confirmation objection entitled "Transfer of Liquidating Trust Assets Should Include Attorney-Client Privilege," the MDA argued that "all attorney-client privileges associated [with assets being transferred to the Liquidating Trust] should be transferred to and vest in the Liquidating Trust along with the Liquidating Trust Assets."[28]

---

[27] Liquidating Trust Agreement at § 1.4; *see also* Plan at Art. IV(C)(5).  *See also Notice of Filing of Second Plan Supplement* (D.I. 564) Exh. C (originally proposed version of Trust Agreement, with § 1.4 mirroring Plan Art. IV(C)(5)).

[28]  MDA Confirmation Obj. at 26. *See also id.* ("[T]he language should expressly waive the Debtor's right and the right of any legal, financial or other advisors to assert such rights and privileges …."); *id.* at 27 ("As [to] those claims and causes of action [that] will form the basis for any recoveries for Liquidating Trust beneficiaries, it is imperative that the attorney-client privileges be transferred to the Liquidating Trust so that the Liquidating Trustee can meaningfully pursue those claims and causes of action. Otherwise, the Liquidating Trustee 'would be deprived of a key tool that would otherwise be available to a company bringing suit against its officers and directors.'" (*quoting In re Flag Telecom Holdings, Ltd.*, No. 02 CIV. 3400 (WCC), 2009 WL 5245734, at *9 (S.D.N.Y. Jan. 14, 2009)).

In response to the MDA's objection, the Debtor explained that "there is no requirement that the Reorganized Debtor's attorney-client privilege pass to the Liquidation Trust," and pointed out that cases such as *Flag Telecom* "are all inapposite because they involved liquidations – not reorganizations."[29]

At confirmation, after hearing evidence and argument on this issue over multiple days,[30] the Court overruled the MDA's objection.  Rejecting the MDA's argument that the Debtor's privilege must be transferred entirely to the Liquidating Trust, the Court instead ruled that "the attorney-client privilege of the debtor needs to be available for Mr. Gwynne [the "Liquidating Trustee"],"[31] not that the attorney-client privilege was vitiated or re-vested in the Liquidating Trustee.

To implement the Court's ruling, the Debtor proposed a revised version of the Trust Agreement that added an important addendum to Section 1.4, at the end of the original version of that provision:

> To the extent necessary to the performance of the Liquidating Trustee's duties and responsibilities, the Debtor or Reorganized Debtor, as applicable, shall share with the Liquidating Trustee communications or documents that are subject to the attorney-client privilege, work product

---

[29] *Debtor's Reply to Objections to the Debtor's Second Amended Chapter 11 Plan of Reorganization*, as Revised Dated April 7, 2015 (D.I. 605) (the "Confirmation Reply") at 19–20 (some capitalization omitted). *E.g.*, *In re Flag Telecom Holdings, Ltd.*, No. 02 CIV. 3400 (WCC), 2009 WL 5245734 (S.D.N.Y. Jan. 14, 2009).

[30] *See, e.g.*, June 3, 2015 Tr. (D.I. 629) at 156:3–19 (testimony of Christopher Artzer, the Debtor's president, general counsel, and interim chief financial officer, regarding the sharing of privileged materials with the Liquidating Trustee); Tr. of Hr'g June 8, 2015  (D.I. 644) at 127:3–130:15 (testimony of Kurt F. Gwynne, who ultimately became the Liquidating Trustee, regarding the then-current version of Trust Agreement § 1.4).

[31] Tr. of Hr'g June 8, 2015 (D.I. 644) at 192:5–8.

protection, or other applicable privilege; the sharing of such information shall not operate as a waiver of any applicable privileges. The parties shall agree on how to document the sharing of the attorney-client privilege such that the privilege is preserved, and in the absence of an agreement the Bankruptcy Court shall decide.[32]

At the hearing later that same day (June 9, 2015), counsel for the MDA observed that the revised Trust Agreement "states that the attorney-client privilege is retained by the reorganized debtor,"[33] and proceeded to propose alternative language "provid[ing] that the privileges vest immediately in the liquidating trustee."[34] The Debtor objected to this proposed alternative – and the Court agreed with the Debtor:

> MR RIPLEY [Debtor's Counsel]: Again, the language for 1.4 provides for the attorney-client privilege. We don't believe it's appropriate to transfer the entire attorney-client privilege because there's matters where it may overlap. And so what we wanted to do is provide flexibility so that it's clear 'it shall be shared with a liquidating trust'. And again, because we don't know how that might implement itself, we have a requirement to work [together]. And if there's any disagreement, it comes before the Court. This is the language that Mr. Gwynne said was acceptable to him.
>
> THE COURT: Yeah, I'm satisfied with 1.4 as proposed by the debtors…. The point was to make sure that Mr. Gwynne would have access to documents and information that would otherwise be protected by the attorney-client privilege. That's been assured by 1.4. I don't really care about the mechanism. Mr. Gwynne's more than capable of standing up for himself. The point being, I didn't want any issue to arise that

---

[32] Trust Agreement § 1.4.  *See* Notice of Filing of Amended Exhibits to Second Plan Supplement (D.I. 637), Exhs. 1 & 2 (clean and blackline copies of as-amended Trust Agreement, filed June 9, 2015).

[33] Tr. of Hr'g June 9, 2015 (D.I. 643) at 16:18–20.

[34] *Id.* at 17:3–5.

9

> somehow, he couldn't get access to information because of the attorney-client privilege, to the extent the privilege belonged to the debtor, and that's been taken care of.
>
> MR. RIPLEY: And that's what we understood. And again, we weren't trying to limit what the liquidating trustee could or couldn't do. [35]

The Court thereafter signed the Confirmation Order confirming the Plan and approving the Trust Agreement.  The Confirmation Order provides that "[e]ach term and provision of the Plan is valid, binding and enforceable," and the Plan Documents (which include the Trust Agreement) are "approved and confirmed in their entirety."[36]    The Confirmation Order further provides that "the Plan and its provisions shall be binding upon … the Liquidating Trust [and] the Liquidating Trustee," and that the "Plan Documents . . . shall be enforceable notwithstanding any otherwise applicable non-bankruptcy law."[37]

        iii.    *The Mississippi Lawsuits and the Current Dispute*

        **a.  The Trustee Lawsuit**

The Liquidating Trustee is the plaintiff in an action styled *KiOR, Inc. Liquidating Trust v. Fred Cannon and Andre Ditsch*, Case No. 25CI1:16-cv-00656-TTG (the "Trustee Lawsuit" against the "Mississippi Defendants"), which seeks compensatory damages on account of alleged breaches of fiduciary duty by two individuals who were formerly

---

[35] *Id.* at 19:21–20:20.

[36] Confirmation Order ¶ 2.

[37] *Id.* ¶ 3. *See also id.* ¶ 10 (authorizing implementation of the Plan, including the creation of the Liquidating Trust in accordance with and subject to the Trust Agreement); *id.* ¶ 33 (retention of jurisdiction).

employed by the debtor, Fred Cannon and Andre Ditsch.[38]  In the Trustee Lawsuit, the Liquidating Trust asserts claims against the Mississippi Defendants for (i) failure to disclose material information to the board of directors (breach of fiduciary duty); (ii) failure to disclose material information to shareholders (breach of fiduciary duty); (iii) failure to rationally develop technological and financial projections (breach of fiduciary duty); and (iv) civil conspiracy to breach fiduciary duties.

The Liquidating Trust asserts that, as a result of Mississippi Defendants' failure to disclose the debtor's lack of commercial viability, the debtor constructed an entire plant in Columbus, Mississippi (the "Columbus Facility") with the proceeds of a $75 million loan from the State of Mississippi (the "Mississippi Loan").  But for the Mississippi Defendants' bad acts, KiOR, Inc. would not have taken the Mississippi Loan, the Columbus Facility would not have been constructed, and the State of Mississippi would not be a beneficiary of the Liquidating Trust.

### b. The SEC Action

The Mississippi Defendants' actions were the subject of an investigation by the Securities Exchange Commission (the "SEC"), which resulted in a lawsuit against Mard, Inc. and Fred Cannon in the United States District Court for the District of Texas and styled *Securities and Exchange Commission v. Mard, et al*, Case No. 16-cv-2880 (the "SEC

---

[38] A copy of the Complaint in the Trustee Action can be found at Little Declaration, Exh. 3.

Action" and together with the Trustee Lawsuit, the "Mississippi Lawsuits").[39] The SEC

described the actions of Fred Cannon as follows:

> KiOR is an alternative fuel company that raised $150 million by offering its securities to the public.  The company's disclosures suggested that its technology would be commercially viable. But KiOR, in documents approved and signed by Cannon, did not disclose key assumptions that the company relied on to generate a metric evidencing its commercial viability—the yield of fuel from each ton of raw materials. By engaging in the conduct described in this Complaint, Defendants have committed, and unless restrained and enjoined will continue to commit, violations of the antifraud provisions of the Securities Act of 1933.[40]

The SEC Action resulted in Mard, Inc. and Fred Cannon being permanently

enjoined from violating Section 17(a)(2) and (a)(3) of the Securities Act of 1933. In

addition, Fred Cannon was ordered to pay a civil penalty of $100,000.[41]

### c.  AG Lawsuit

The Attorney General for the State of Mississippi filed a lawsuit styled *Lynn Fitch,*

*Attorney General of the State of Mississippi ex rel. the State of Mississippi v. Fred Cannon, et al.,*

Case No. 25CI1:15-0017-TTG (the "AG Lawsuit"), which seeks compensatory and

punitive damages for alleged misrepresentations and omissions to the MDA in

connection with a $75 million loan extended to the Debtor. [42]  The AG Lawsuit names 17

---

[39] A copy of the complaint filed in the SEC Action can be found at Objection, Exh. A.

[40] *See* Objection, Exh. A at p. 1.

[41] Objection, Exh. B (Final Judgment as to Fred H. Cannon, Jr. entered in the SEC Action on September 29, 2016).

[42] A copy of the complaint in the AG Lawsuit can be found in the Little Declaration, Exh. 4.

defendants, at least some of whom are persons and entities to whom (according to the Trustee Lawsuit) the defendants in the Trustee Lawsuit made inadequate disclosure.

### d.  Current Dispute

Counsel for the Liquidating Trustee is plaintiff in the Mississippi Lawsuits and *also* counsel for the Attorney General of the State of Mississippi in the AG Lawsuit.  These are different lawsuits against different defendants arising out of the same facts.

Consistent with the Plan, the Trust Agreement, and this Court's resolution of the privilege issues at the confirmation hearing, the Reorganized Debtor asserts that it has no objection to the Liquidating Trustee's access to and use of materials protected by the Reorganized Debtor's attorney-client privilege for purposes of prosecuting the Trustee Lawsuit.

However, the Reorganized Debtor asserts that there is no basis in the Plan or the Trust Agreement for abrogating the Reorganized Debtor's privileges in connection with the AG Lawsuit, and the Reorganized Debtor does not waive its privilege.  The Reorganized Debtor asserts that William M. Quin II and his law firm, McCraney Montagnet Quin & Noble, PLLC – represents two different plaintiffs in the two lawsuits, and as a result, the Reorganized Debtor's attorney-client privilege with respect to the AG Lawsuit has been placed in jeopardy.

Furthermore, Mr. Quin was also counsel to the MDA during confirmation in 2015. He was a signatory to the *Objection of the Mississippi Development Authority to the Debtor's*

*Second Amended Chapter 11 Plan of Reorganization, as Revised Dated April 7, 2015* and was

present in Court for at least a portion of the multi-day confirmation hearing. [43]

The Reorganized Debtor asserts that MDA is now seeking to abrogate the

attorney-client privilege and in the Motion seeks to enforce Section 1.4 of the Trust

Agreement.

     *iv.*   *Reorganized Debtor, as a Corporate Entity*

In response, the Liquidating Trustee states that the Reorganized Debtor no longer

had a corporate presence and is a ghost that could no longer hold the attorney-client

privilege.

Prior to the commencement of the Trustee Lawsuit, the Reorganized Debtor

divested its business assets and operations by contributing them, effective as of

September 1, 2015, to a wholly-owned subsidiary, then named KiOR, LLC.    The

Reorganized Debtor described its restructuring in the first footnote of its Post-

Confirmation Quarterly Report for the Period Ending December 31, 2015, as follows:

> Effective September 1, 2015, KiOR was subject to an
> internal reorganization in which the business assets of
> KiOR, Inc. (including assets used in its renewable fuels
> business, properties, contractual rights, intellectual
> property, goodwill, and any rights or claims arising out
> of the business operations, but excluding certain contract
> rights, the ownership of KiOR Columbus, LLC and cash
> in the amount of $3,509,637) were contributed to a wholly-

---

[43] D.I. 580 (the "MDA Confirmation Objection"), *see id.* at 47 (signature block); June 3, 2015 Tr. (D.I. 629) at 5:2–4.

owned limited liability company, KiOR, LLC. . . . KiOR,
LLC entered into an intercompany services agreement,
under which it agreed, among other things, to effectuate
all future plan-related payments from the above-
referenced reserve accounts of KiOR, Inc. KiOR, LLC is
effectively the successor to KiOR, Inc. with respect to its
business operations. Future reports will reflect KiOR,
LLC's results of its business operations and plan-related
disbursements made from the KiOR, Inc. reserve
accounts.[44]

Having divested itself of its business assets, the Reorganized Debtor then changed

its name from KiOR, Inc. to "Mard, Inc." effective as of March 21, 2016.[45]  Furthermore,

effective as of March 21, 2016, KiOR, LLC changed its name to Inaeris Technologies, LLC

("Inaeris").[46]  Inaeris also divested its plant and equipment assets sometime prior to

December 11, 2018.[47]

On August 29, 2018, Mard, Inc.'s status as a Delaware corporation was "forfeited"

for failure to appoint a resident agent.[48]

In addition, on November 15, 2018, the State of Texas revoked Mard, Inc.'s

registration to do business for failure to maintain a registered agent or a registered office

---

[44] *See* Post-Confirmation Quarterly Summary Report for Period Ending December 31, 2015, fn. 1 (D.I. 826).

[45] *See* Post-Confirmation Quarterly Report for Period Ending March 31, 2016 (D.I. 860) ("Effective March 21, 2016 KiOR, Inc. changed its name to Mard, Inc. . . . ").

[46] *See* Post-Confirmation Quarterly Report for Period Ending March 31, 2016 (D.I. 860) ("Effective March 21, 2016 . . . KiOR, LLC changed its name to Inaeris Technologies, LLC.").

[47] *See* Objection at Exh. F (press release obtained online stating "Inaeris Technologies, LLC recently closed on the sale of its plant and equipment assets to Tiger Capital Group").

[48] Delaware Secretary of State regarding Mard, Inc.'s status (DE File No. 4393965), attached as Exh. C to the Objection.

in Texas.[49]    Accordingly, at the time of the Trustee Lawsuit, the Liquidating Trustee asserts that Mard, Inc. had no business assets and no corporate existence (or right to engage in business).    As a result, the Liquidating Trustee asserts that "Mard, Inc." is a corporate ghost with no valid legal existence, assets or operations.

On or about May 23, 2019, Inaeris held an auction to divest its remaining assets.[50] Inaeris (Mard, Inc.'s wholly-owned subsidiary) has now divested all of the assets it received via contribution from the Reorganized Debtor and has no valid website, equipment or office furniture, and the Liquidating Trustee asserts Inaeris also has no discernible business activity.

After the filing of the Objection, Mard and Inaeris learned of the corporate status lapses; Ms. Osborn took steps to have revive the certificates of incorporation.    Ms. Osborn testified:

> I recently learned that Mard's corporate status has been suspended.  I do not know how this happened, but I am sure it was inadvertent.    In years prior to 2018, I received email reminders from the Delaware Secretary of State to update corporate filings.    I have searched my emails and could not find a reminder in 2018 or 2019.    I believe that explains why

---

[49]  Certificate of Revocation from the Office of the Secretary of State of Texas, dated November 15, 2018, certifying that Mard, Inc.'s registration was revoked, attached as Exh. D to the Objection.

[50]  *See* Objection at Exh. G (advertisement for the May 23, 2019 auction of Inaeris Technologies' "remaining assets," including its equipment and office furniture); Exh. F (press release which states "[f]or more information about Inaeris Technologies, visit www.inaeristech.com." That website, however, redirects to hugedomains.com, which displays a large advertisement that the domain name "inaeristech.com is for sale."    *See    also*    www.inaeristech.com,    which    redirects    to https://www.hugedomains.com/domain_profile.cfm?d=inaeristech&e=com).

> Mard . . . failed to take timely steps to maintain [its] good
> standing in Delaware.[51]

However, throughout its history (including during the time that its corporate status had

lapsed), the Reorganized Debtor "maintained corporate bank accounts [and] timely filed

all federal and Texas state tax returns."[52]

As a result, Mard (and Inaeris[53]) filed a *State of Delaware Certificate of Revival of*

*Charter* and the Secretary of State for the State of Delaware issued a *Certificate of Good*

*Standing*.[54]

## LEGAL DISCUSSION

### A.    Revival of Reorganized Debtor

The Liquidating Trustee asserts that Mard cannot claim any attorney-client

privilege because (at the time of the Objection) Mard was a defunct or dissolved

corporation. The Reorganized Debtor responds that although Mard's corporate status

had inadvertently lapsed, it has since revived the corporation's good standing in the State

of Delaware.

---

[51] Osborn Declaration at ¶ 8.

[52] Osborn Declaration at ¶ 9. *See also* Osborn Declaration at Exhs. C–F (e-filing acknowledgments for relevant tax filings).

[53] Tr. of Hr'g June 25, 2020, 33:17-22.

[54] *Reorganized Debtor's Notice of Revival of Charter and Good Standing Under Delaware Law* (D.I. 1023), Exhs. G (*State of Delaware Certificate for Revival of Charter*, dated June 23, 2020) and H (*Certificate of Good Standing* issued by the Secretary of State for the State of Delaware, dated June 23, 2020).

Although the lapse of the corporate entity may have significant legal effect,[55] in accordance with Delaware law, the filing of a "revival of charter" allows the Reorganized Debtor to reinstate all of its corporate rights.  More specifically, section 312(e) of the title 8 of the Delaware Code states:

> Upon the filing of the [revival of] certificate [of incorporation] in accordance with § 103 of this title the corporation shall be revived with the same force and effect as if its certificate of incorporation had not been forfeited or void pursuant to this title. Such revival shall validate all contracts, acts, matters and things made, done and performed within the scope of its certificate of incorporation by the corporation, its directors or members of its governing body, officers, agents and stockholders or members during the time when its certificate of incorporation was forfeited or void pursuant to this title, with the same force and effect and to all intents and purposes as if the certificate of incorporation had at all times remained in full force and effect.  . . . [56]

---

[55]  *See*, *e.g.*, *In re Fundamental Long Term Care, Inc.*, No. 8:11-BK-22258-MGW, 2012 WL 4815321, at *9 (Bankr. M.D. Fla. Oct. 9, 2012) ("THMI appears to be administratively dissolved. Regardless of whether it is formally dissolved, all of the parties concede that the company has not done business since 2006. There does not appear to be anybody around to speak on THMI's behalf. So there is no one left to assert or waive the privilege on THMI's behalf.").

[56]  Del. Code Ann. tit. 8, § 312 (West). *See also Estate of Marvel*, Register of Wills Folio No. 152, 2018 WL 4762379, at *2 (Del. Ch. Oct. 1, 2018) (footnote omitted) (holding that "although its charter was revoked for failure to pay franchise taxes in March 2012, . . . [the company] was revived on August 8, 2014 negating its prior void status"); *Kostyszyn v. Martuscelli*, No. CV N14C-08-010 PRW, 2015 WL 721291, at *2, n. 15 (Del. Super. Ct. Feb. 18, 2015) (citations omitted) (holding that the "certificate retroactively validated all of . . . . [the company's] actions taken during the time period the corporation was void."); *V.E.C. Corp. of Delaware v. Hilliard*, No. 10 CV 2542 VB, 2011 WL 7101236, at *6 (S.D.N.Y. Dec. 13, 2011) (holding that "it is clear that upon the reinstatement of the corporation pursuant to Section 312(e), it regains the ability to prosecute actions on its behalf and any action taken while its charter was voided is ratified."); *Frederic G. Krapf & Son, Inc. v. Gorson*, 243 A.2d 713, 715 (Del. 1968) (citations omitted) ("[T]he performance of corporate acts following forfeiture is wrongful at the time, but the later reinstatement of the charter validates the corporate acts.  And in Delaware it has long been the law that a Delaware corporation is not dead for all purposes following forfeiture of its charter.").

As a result, and pursuant to section 312(e) of title 8 of the Delaware Code, once the Delaware Secretary of State reinstated the corporate certificates of both Mard (and Inaeris), all actions within the scope of the Reorganized Debtor's certificate of incorporation, including their rights and privileges, remain in full force and effect. As the Reorganized Debtor's certificate of incorporation has been revived, the Liquidating Trustee's assertions that the incorporation lapse also lapsed the attorney-client privilege must also fail. As a result, the Court turns to whether Mard's business has changed or stopped to such an extent that the Court must void the attorney-client privilege.

**B.    Regardless of "good standing," the Reorganized Debtors is sufficiently functioning to warrant retention of the attorney-client privilege**

The Liquidating Trustee asserts that, regardless of corporate standing, non-operating corporations do not have an attorney-client privilege to assert.

> Absent some compelling reason to the contrary, the attorney client privilege does not survive the death of the corporation. The different treatment for individuals and corporations makes sense, because once the business of a corporation is completely wound up, the company no longer has legal interests to protect or a reputation to maintain.
>
> To determine whether a corporation has "died," courts should look to practical business realities rather than technical legal status. One business may continue on even though its corporate structure has changed, while another business may terminate in reality even though it maintains its legal corporate status. A completely defunct company should not be allowed to assert privilege, regardless of whether it has technically maintained its legal status. Because a corporation's management controls its privilege, the

corporation must also retain current management capable of asserting the privilege.[57]

The rational for dissolution of the attorney-client privilege for a dissolved company is explained as follows:

> there is no "tradition" of the privilege surviving the demise of a corporation. Furthermore, "[t]he possibility that a corporation's management will hesitate to confide in legal counsel out of concern that such communication may become unprivileged after the corporation's demise is too remote and hypothetical to outweigh the countervailing policy considerations supporting discoverability." For example, after dissolution, "the corporation would no longer have any goodwill or reputation to maintain." Nor are there tangible assets left to protect.[58]

This rational is borne out in several cases. In *LTV*, the Court held that a business asserting the privilege (Hunter) did **not** lose its privilege simply by virtue of the temporary dissolution after it failed to pay franchise taxes; and was not defunct because

---

[57] *Official Comm. of Admin. Claimants ex rel. LTV Steel Co. v. Moran*, 802 F. Supp. 2d 947, 949 (N.D. Ill. 2011) (citations and internal quotation marks omitted). *United States v. Walters*, No. 2:19-CR-51-KS-MTP, 2020 WL 1934803, at *2 (S.D. Miss. Apr. 21, 2020) ("The weight of federal authority supports a holding that there is a presumption the attorney-client privilege is no longer viable after a business entity ceases to function. Absent some compelling reason to the contrary, the attorney-client privilege does not survive the death of the corporation. The party seeking to establish the privilege must demonstrate 'authority and good cause.'" (citations and internal quotation marks omitted)).

[58] *S.E.C. v. Carrillo Huettel LLP*, No. 13 CIV. 1735 GBD, 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) (*quoting Gilliland v. Geramita*, No. 2:05CV01059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006) (further citation omitted)). *Accord Trading Techs. Int'l, Inc. v. GL Consultants, Inc.*, No. CIV.A. 05 C 5164, 2012 WL 874322, at *4 (N.D. Ill. Mar. 14, 2012) ("When the corporation is gone, so too is its interest in protecting its communications; the need to promote full and frank exchanges between an attorney and agents of his corporate clients disappears when the corporation employing those clients has departed."); *City of Rialto v. U.S. Dep't of Def.*, 492 F. Supp. 2d 1193, 1200 (C.D. Cal. 2007) ("As there are usually no assets left and no directors, the protections of the attorney-client privilege are less meaningful to the dissolved corporation."); *Lewis v. United States*, No. 02-2958 B/AN, 2004 WL 3203121, at *4 (W.D. Tenn. Dec. 7, 2004), *aff'd*, No. 02-2958B, 2005 WL 1926655 (W.D. Tenn. June 20, 2005) ("The company is bankrupt and has no assets, liabilities, directors, shareholders, or employees.").

although it had ceased operations, the company continued to pursue claims.[59]  The *LTV Court*, holding that Hunter retained its claims of attorney-client privilege, stated: "When Hunter went out of business, the claim at issue became its primary asset, and Hunter is now 'in the business' of attempting to realize on that asset."[60]

In contrast in *United States v. Walters*, the Court found that the entities asserting the attorney-client privilege did not conduct any business (and that no evidence was presented to the contrary) and, as a result, there was no "authority or good cause to hold that the attorney-client privilege is viable even after these entities have ceased to function."[61]

As a result, the Court must determine if the Reorganized Debtor has ceased to operate, and if it has, whether it has "goodwill" or a "reputation to maintain."[62]

The Reorganized Debtors submitted the following testimony regarding the operations of Mard and Inaeris:

> For more than three years following its emergence from bankruptcy, Mard (through Inaeris) continued work to develop its proprietary technology designed to generate renewable crude oil from non-food cellulosic biomass with the same team and at the same facility in Pasadena, Texas as prior to and during the bankruptcy case.  Ultimately, in August 2018, operations at the Pasadena, Texas facility ended,

---

[59] *LTV Steel*, 802 F. Supp. 2d at 949-50.

[60] *LTV Steel*, 802 F. Supp. 2d at 950.

[61]  *United States v. Walters*, No. 2:19-CR-51-KS-MTP, 2020 WL 1934803, at *2 (S.D. Miss. Apr. 21, 2020) (footnote omitted).

[62] *Gilliland v. Geramita*, No. 2:05CV01059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006).

> and Inaeris is in the process of being wound-down. Mard itself, however, continues as a going concern, and holds all of the patents and other intellectual property that formed the basis of the renewable crude oil technology.
>
> Mard's current focus is on developing other investments in the renewable energy field, and currently has more than $70 million in actively managed investments, including a series of investments in private companies across a full range of green/alternative energy enterprises, with its most recent investment occurring in May 2020.[63]

In sum, all the intellectual property is being held and managed by Mard and Mard is now investing in other renewable energy field business; although, operations have ceased.[64] Thus, Mard incurs costs to keep its intellectual property active and its business now focuses on investing in other businesses in the renewable energy field.[65] Mard had hired consultants and pays those consultants.[66] Furthermore, throughout its history Mard has maintained corporate bank accounts, and has filed all its federal and Texas state tax returns.[67]

As a result, the Court finds that, although Mard is not the same business enterprise as before, it is an operating business enterprise. Mard's operations far surpass those

---

[63] Osborn Declaration at ¶¶ 6-7; *See also* Tr. of Hr'g June 25, 2020, 30:6-17.

[64] Tr of Hr'g June 25, 2020, 31:16-24.

[65] Tr. of Hr'g June 25, 2020, 22:17-23:6.

[66] Tr. of Hr'g June 25, 2020, 17:1-5 (testimony regarding Ms. Edgar, corporate secretary of Mard); 17:3 and 18:16-16 (testimony regarding of Ms. Osborn's consultant position with Mard); 18:9-14 (testimony regarding Margaret Karick, consultant/attorney specializing in intellectual property); 21:10-22 (testimony regarding Ms. Osborn's salary and payment structure); 23:20-24:11 (testimony regarding Vinod Khosla, Mard's sole director, who controls and directs Mard's business); 24:14-23 (testimony regarding Mard's corporate accountant, Kim Toda); 25:15-26:3 (testimony regarding Mard's bylaws).

[67] Osborn Declaration at ¶ 9.

described in *LTV* in which the company's sole "business" was pursuing claims.[68]  Here, Mard employs consultants, manages an intellectual property portfolio, and is in the business of investing in the renewable energy field.  As a result, Mard has retained its attorney-client privilege.

### C. This Court has Jurisdiction to Decide Disputes Regarding Waiver of the Attorney-Client Privilege

Second 1.4 of the Trust Agreement, as quoted more fulsomely above states:

> The parties shall agree on how to document the sharing of the attorney-client privilege such that the privilege is preserved, and in the absence of an agreement the Bankruptcy Court shall decide.[69]

The Liquidating Trustee asserts that the Trust Agreement does not address whether the Liquidating Trustee may unilaterally waive the attorney-client privilege.  The Liquidating Trustee claims that to the extent that this Court determines that section 1.4 of the Trust Agreement does not address the issue presented by the Reorganized Debtor, the Liquidating Trust asserts that the Court lacks post-confirmation jurisdiction to decide the issue presented in the Motion (and that the court for the Mississippi Litigation can make such determinations).

---

[68] *See Official Comm. of Admin. Claimants ex rel. LTV Steel Co. v. Moran*, 802 F. Supp. 2d 947, 950 (N.D. Ill. 2011).

[69] Trust Agreement § 1.4. See Notice of Filing of Amended Exhibits to Second Plan Supplement (D.I. 637), Exhs. 1 & 2 (clean and blackline copies of as-amended Trust Agreement, filed June 9, 2015).

The Liquidating Trust's argument reads out the Trust Agreement's language that the Reorganized Debtor and the Liquidating Trustee *share* communications or documents that are "subject to the attorney-client privilege, work product protection, or other applicable privilege."[70]  Furthermore, the Trust Agreement sets forth a process by which the document sharing of the attorney-client privilege "*such that the privilege is preserved.*"[71]  As offered by the Reorganized Debtor, that process may be a protective order or another such vehicle for protecting the shared privilege.[72]  It is the Liquidating Trustee's refusal to negotiate the shared privilege process that resulted in the Motion being filed.

As stated above, the Court finds that the Reorganized Debtors hold the privilege and as stated in the Trust Agreement, such privilege is *shared* with the Liquidating Trust. To be clear, nothing restricts the Liquidating Trustee's use of the attorney-client privileged information in pursuit of the Vested Causes of Action; however, such privileged information *may not* be used in the AG Lawsuit (except as discussed below). Furthermore, the Trust Agreement specifically contemplated this Court retaining jurisdiction to decide issues relating to the shared privilege.[73]  However, the Trust Agreement also contemplates a process to preserve the privilege.  Thus, the parties will be given 60 days from the date hereof to formulate a process for sharing that privilege.

---

[70]  Trust Agreement, § 1.4.

[71]  *Id.*

[72]  *See* Little Declaration at ¶ 10 and Exh. 15.

[73]  Trust Agreement, § 1.4.

At the end of the 60 days the parties must either submit a process to be approved by the Court or submit competing processes and the Court will make a determination as contemplated by section 1.4 of the Liquidation Trust.

**D. The Reorganized Debtor, by bringing the Motion, is Not Seeking an Advisory Opinion**

The Liquidating Trustee asserts that it "never said that it intends to share privileged information" with the State of Mississippi, but rather has simply refused the demand of the Mississippi Defendants that the Liquidating Trust agree that it will never share privileged documents with the State of Mississippi.  Thus, claiming that a ruling on the Motion would be an advisory opinion.

The Reorganized Debtor asserts that the passing of privileged information (covered by the shared privilege) has already been shared with the Liquidating Trust and, in turn, the Liquidating Trust has used those privileged documents in the AG Lawsuit.[74] The Trust did not present evidence to the contrary.

---

[74] The Reorganized Debtor cites the following as privileged documents provided to the Liquidating Trustee: Little Declaration, Exh. 17 (State Court Motion to Enforce) at 12 (describing the production the Trustee has already received from Locke Lord, which the Trustee admits contains "[p]rivileged documents and information"); *id.* at 12–13 ("A word search for 'WilmerHale' within the electronically stored information produced by Locke Lord renders 8,327 documents," listing 11 separate subject areas and insinuating there could be more as the Trustee's "document review is ongoing"); *id.* at 15 (similarly noting that "[a] word search for 'Baker Botts' within the electronically stored information produced by Locke Lord renders 4,052 documents"); *id.* at 1 (same, for "Adams and Reese"); *id.* at 18 (same, for "Mitchell McNutt"); *see also* Supplemental Little Declaration at Exhs. 18–19 (further filings from the Mississippi Lawsuits to the same effect).  Furthermore, the Reorganized Debtor asserts that the Liquidating Trustee is already using these privileged documents in the AG Lawsuit: Supplemental Little Declaration, Exh. 18 at 38–39 (specifically contending that Adams & Reese should be disqualified from both the Trustee Lawsuit and the AG Lawsuit); *id.* at Exh. 19 at 41–42 (specifically contending that WilmerHale should be disqualified from both the Trustee Lawsuit and the AG Lawsuit); *id.* at Exh. 20 at 25 (specifically arguing "it is appropriate

The Third Circuit has held "[t]o satisfy Article III's case or controversy requirement, an action must present (1) a legal controversy that is real and not hypothetical, (2) a legal controversy that affects an individual in a concrete manner so as to provide the factual predicate for reasoned adjudication, and (3) a legal controversy so as to sharpen the issues for judicial resolution."[75]  As the Reorganized Debtor has presented uncontroverted testimony that privileged information is being used in other lawsuits, without agreement between the Reorganized Debtor and the Liquidating Trustee and without Court order, the Court holds that this dispute is ripe for adjudication.

### E. The Liquidating Trust May Not Waive the Share Attorney-Client Privilege Without Consent or Court Order

The Liquidating Trustee asserts that as a practical consequence of the "shared" attorney-client privilege that the Liquidating Trustee may unilaterally waive or preserve the privilege at its leisure.  Pursuant to the Trust Agreement, the Reorganized Debtor and Liquidating Trustee *share* the information and documents covered by privilege – the Court is not ruling whether the Liquidating Trust is a "co-holder" of the privilege, which would be an even higher claim to the privileged information.

---

for [the Liquidating Trustee] to conduct coordinated discovery of the merits-based and jurisdictional issues" in both the Trustee Lawsuit and the AG Lawsuit).

[75] *Rhone-Poulenc Surfactants & Specialties, L.P. v. Comm'r*, 249 F.3d 175, 182 (3d Cir. 2001) (internal quotation marks and citations omitted).

In Delaware, even a co-holder of privilege cannot unilaterally waive privilege. "[T]he question is whether the co-client privilege is subject to a unilateral control rule (either co-client may waive the privilege unilaterally and thus force the other to turn over documents produced during the course of the joint representation to third parties) or a bilateral control rule (both clients must agree to waive the privilege in order for the waiver to take effect). The general answer is bilateral control."[76] In other words, if co-holders, both the Reorganized Debtor and the Liquidating Trustee must *both* waive the privilege.[77] Here, the Liquidating Trust's claim to the privilege might not rise to that of a co-holder, as a result, the Liquidating Trustee **cannot** unilaterally waive the privilege nor use *any* privileged information in the AG Litigation, without either the Reorganized Debtor's consent or Court order.

### F.  The Liquidating Trustee is not a Successor Chapter 11 or Chapter 7 Trustee

The Liquidating Trust next asserts that the Liquidating Trustee is akin to that of a successor chapter 11 or chapter 7 trustee; however, the Liquidating Trustee is not a "successor" to the Debtor under the Bankruptcy Code sections 323 or 1104, but rather is

---

[76] *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 379 (3d Cir. 2007), as amended (Oct. 12, 2007).

[77]  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 379 (3d Cir. 2007), as amended (Oct. 12, 2007) ("'One co-client does not have authority to waive the privilege with respect to another co-client's communications to their common lawyer.  If a document or other recording embodies communications from two or more co-clients, all those co-clients must join in a waiver, unless a nonwaiving co-client's communication can be redacted from the document.'" (*quoting* Restatement (Third) of the Law Governing Lawyers § 75 cmt. e.)). *See also Ashland Inc. v. G-I Holdings Inc.*, No. A-4356-17T3, 2019 WL 1552750, at *3 (N.J. Super. Ct. App. Div. Apr. 10, 2019) ("Pursuant to the bilateral control rule, co-clients may waive privilege as between themselves in adverse proceedings, but the decision to compel disclosure to third parties requires consent from all co-clients.").

a trustee of a trust created pursuant to Bankruptcy Code section 1123(b)(3). The Liquidating Trustee serves in a limited capacity as defined in the Confirmation Order and the Trust Agreement.[78] "The Bankruptcy Code authorizes a plan of reorganization to 'provide for ... the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any . . . claim or interest.'"[79] Thus, "[u]nder § 1123, a plan may transfer legal claims to a litigation trust, even when the debtor remains in possession of all of its other assets."[80] Thus, the Liquidating Trustee is not a successor Chapter 11 or Chapter 7 trustee and therefore serves in the limited capacity as defined in the Plan, Trust Agreement and Confirmation Order.

### G. The Liquidating Trustee's Rights to Privileged Information is Defined by the Trust Agreement

Lastly, the Liquidating Trustee asserts that it is a matter of common sense for the privilege to rest with the assets reserved for the Liquidating Trust (i.e. the Vested Assets). The Liquidating Trustee asserts that the Trust should be the only entity with control over the privileged information as it would be most practical.[81] However, that assertion is in

---

[78] Confirmation Order at ¶ 10; Plan at § V.C.7; and Trust Agreement at §§ 1.2 and 2.2.

[79] *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 414 (5th Cir. 2014), as revised (Sept. 2, 2014) (*quoting* 11 U.S.C. § 1123(b)(3)(B).

[80] *U.S. Bank Nat. Ass'n v. Verizon Commc'ns, Inc.*, 761 F.3d 409, 415 n. 1 (5th Cir. 2014), as revised (Sept. 2, 2014) (*citing Compton v. Anderson (In re MPF Holdings U.S. LLC)*, 701 F.3d 449, 453 (5th Cir. 2012)).

[81] The Liquidating Trustee cites to *Postorivo v. AG Paintball Holdings, Inc.*, No. CIV.A. 2991-VCP, 2008 WL 343856 (Del. Ch. Feb. 7, 2008). There, the Chancery Court was examining who retained the privilege after a sale. Therein under the terms of the APA, KEE Action explicitly recognized that Postorivo and NPS retained the attorney-client privilege regarding the excluded assets (such as the Procaps Litigation) and the excluded liabilities. *Id.* at *6. The Chancery court held: "Here, as a practical matter, it makes more sense for NPS and Postorivo to hold the attorney-client privilege for the discrete and segregable assets and

direct contravention of the Trust Agreement and the ruling of the Court at the confirmation hearing where the Court overruled the MDA's objection to confirmation on this very point.  As a result, the Liquidating Trustee's rights to the privileged information will be limited by the Plan, Trust Agreement and Confirmation Order.

## CONCLUSION

The Reorganized Debtor is still an active company that retains its privilege. Furthermore, the Trust Agreement allows for the sharing of privileged information and documents between the Reorganized Debtor and the Liquidating Trustee.  However, at most this privilege is a co-privilege and, thus, both parties must consent to the waiver of such privilege, which has not occurred.  Furthermore, the parties have 60 days to submit an agreed (or competing) process for the sharing of such privilege (such as a non-disclosure agreement).  As a result, the Court will grant the Motion.  An order will be issued.

---

liabilities explicitly reserved for them under the APA. Imagine the impracticality of a contrary result: NPS would have to prosecute the Procaps Litigation, for example, and defend an excluded liability without the ability to assert or waive the attorney-client privilege for communications related to those matters. Instead, KEE Action would be the only entity with that authority, and it foreseeably could have interests adverse to NPS. And third, the language of the APA reflects a clear recognition by KEE Action that NPS would retain the privilege as to the Procaps Litigation." *Id.* at *8.  However, the Chancery Court specifically held: "This Court generally eschews mandating actions contrary to the *intent explicitly reflected in freely negotiated contracts among sophisticated, well-represented parties*.  I therefore conclude that NPS and Postorivo hold the attorney-client privilege for communications regarding the Procaps Litigation and any other similar assets and liabilities excluded from the APA." *Id.* (emphasis added).  As a result, the Liquidating Trustee's reliance on *Postorivo* is misplaced as the Chancery Court made it ruling based on the negotiated documents between the parties; much like the Court is doing here – relying on the Trust Agreement, the colloquy with counsel at the confirmation hearing, as well, as this Court's rulings at the confirmation hearing.